1  Arjun Vasan

2  arjun.vasan@gmail.com

3  12615 193rd Street

4  Cerritos, CA 90703

5  562-900-6541

6  Plaintiff in Pro Per

7

```
┌─────────────────────────────────────┐
│               FILED                  │
│   CLERK, U.S. DISTRICT COURT         │
│   ┌───────────────────────┐          │
│   │     JAN 28, 2025       │          │
│   └───────────────────────┘          │
│   CENTRAL DISTRICT OF CALIFORNIA     │
│   BY        PD          DEPUTY       │
│   DOCUMENT SUBMITTED THROUGH THE     │
│  ELECTRONIC DOCUMENT SUBMISSION SYSTEM │
└─────────────────────────────────────┘
```

**PAID**

**NO CV-30**

8

9  **UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

10

11  **Arjun Vasan**,                    Case No.: **2:25-cv-00765-MEMF (JPRx)**

12             Plaintiff,

13      vs.

14                                     **COMPLAINT FOR WRONGFUL**
**TERMINATION, RETALIATION,**

15  **Checkmate.com, Inc.**,            **FRAUDULENT INDUCEMENT**
(dba "Checkmate"),

16                                     **BREACH OF CONTRACT,**
             Defendant.

17                                     **VIOLATION OF THE FAMILY**

18                                     **AND MEDICAL LEAVE ACT,**

19                                     **AND RELATED CLAIMS**

20

21                                     **JURY TRIAL DEMANDED**

22

23

24  **I. INTRODUCTION**

25      1.    **Nature of the Action**

26  Plaintiff brings this action for fraud, wrongful termination, violation of federal and

27  state medical leave laws, and breach of contract, arising out of a merger that was

28  induced by falsehood and coercion; and followed by retaliation in employment.

### 2.    Case Overview

Plaintiff, a pioneer in Voice AI Ordering technology, co-founded VoiceBite Corporation in July 2023. In April 2024, VoiceBite merged with Defendant Checkmate, who promised shared success with contractual guarantees. When Plaintiff advocated for his team's negotiated rights, Defendant viewed him as a threat and retaliated, wrongfully terminating him while fabricating excuses to evade its obligations—despite his pivotal role and tireless dedication.

### 3.    Defendant's Wrongful Conduct

Defendant's pattern of bad faith is evident in its conduct leading up to the merger, through employment, and after termination, as follows:

- First, inflating financial valuations and falsely promising job security to secure an exclusive Letter of Intent (LOI). (¶¶ 15, 16).
- Next, securing the Merger and Employment by coercing last-minute, harmful deal terms falsely presented as mutually beneficial (¶¶ 16–19).
- Then, retaliating against Plaintiff's lawful advocacy, undermining his role and eroding his team's solidarity (¶¶ 24, 26–30).
- Later, misclassifying Plaintiff's medical leave, revoking health benefits mid-treatment, and firing him under pretext while on leave (¶¶ 38–49).
- Breaching the Bonus Agreement ([Exhibit C]) by withholding payments despite publicly declaring qualified financing milestones (¶¶ 21, 28–32).
- Disparaging Plaintiff after firing him and threatening employees who remained in contact with him (¶¶ 50-51, 55, 58).
- Falsely asserting Plaintiff resigned to deny guaranteed severance ([Ex. B]), and speculating fraud to obstruct his pursuit of Justice (¶¶ 48–51).
- Interfering with attorney-client privilege to coerce harmful terms pre-merger, and to intimidate Plaintiff post-termination (¶¶ 16-17, 50).
- Refusing to provide legally obliged document access for Plaintiff to defend false claims and recover owed and unpaid compensation (¶ 56).

*All allegations in this complaint are supported by evidence presented herein or expected to be obtained through discovery under Plaintiff's reasonable belief.*

**4.      Harm to Plaintiff (¶¶ 59-117)**

Defendant's misconduct has caused Plaintiff to endure economic harm, damage to his reputation and a heavy personal and emotional toll.

**5.      Relief Sought (¶¶ 118-129)**

Plaintiff seeks compensatory damages for financial and reputational harm, punitive damages for Defendant's willful and malicious conduct, equitable relief, and attorney's fees as permitted by law. This case highlights the need to address predatory practices and inequities in small-team mergers, including the misuse of blanket attorney-client privilege transfers—to safeguard founders navigating similar transactions in California's innovation economy.

## II. JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., a federal statute.

7.      Supplemental jurisdiction over Plaintiff's state-law claims is proper under 28 U.S.C. § 1367, as these claims share a common nucleus of operative facts with the federal FMLA claim.

8.      Diversity of Citizenship (28 U.S.C. § 1332) is satisfied because:

- Plaintiff is a citizen of California.
- Defendant Checkmate is incorporated in Delaware with its principal place of business in New York.
- The amount in controversy exceeds $75,000.

9.      Plaintiff's Employment Offer Letter ([Exhibit B]) designates California law as governing, and Plaintiff primarily worked and was terminated in California. Hence, California law governs Plaintiff's state-law claims.

## III. VENUE

10.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims substantially occurred in this District, and Plaintiff was terminated in while undergoing medical treatment within the Southern Division.

## IV. PARTIES

11.     Plaintiff ARJUN VASAN is an individual domiciled and residing in Cerritos, California. He served as Vice President of AI Technology at Checkmate following the merger of his startup VoiceBite into Checkmate.

12.     Defendant CHECKMATE.COM, INC. (dba "Checkmate") is a Delaware corporation with its principal place of business in New York City, New York, and conducts business in California.

## V. STATEMENT OF FACTS

### A. Key Actors and Their Roles.

13.     Plaintiff references the individuals below throughout the complaint as representatives acting within the scope of their employment and on behalf of Defendant, playing key roles in the events giving rise to this complaint:

- **Michael "Bell"**: Chief of Strategy at Checkmate, who led negotiations for the VoiceBite merger and later served as Plaintiff's supervisor.
- **Vishal "Agarwal"**: Founder/CEO of Checkmate, who exercised authority over Plaintiff's employment, termination, and post-merger obligations.
- **Amy "Brown"**: Vice President of Human Resources at Checkmate, who managed Plaintiff's medical leave and termination process.

14.    Plaintiff also references his VoiceBite cofounders as "co-founders" or as "the founders" or by their names: **Chris "Lam"** (COO of VoiceBite, then VP AI Product at Checkmate) and **Robert "Nessler"** (CEO of VoiceBite, then VP AI Operations at Checkmate). VoiceBite's full team of six, including Lam and Nessler, were all subsequently employed by Defendant. Lam and Nessler are prospective witnesses and shared similar terms of employment with Plaintiff.[1]

**B. Fraud in the Merger's Inducement (Claims I and IX).**

15.    Around February 15, 2024, Defendant Checkmate secured an exclusive Letter of Intent ("LOI") with VoiceBite, making material representations about share valuations and guaranteed job security, which played a critical role in the founders' decision to proceed:

- **Jan 31, 2024**: In an email, Michael Bell claimed, "Checkmate stock is worth $4.67 per share," valuing the shares offered to VoiceBite at $1.5 million. A supporting spreadsheet corroborated this, showing Checkmate's "baseline 2023 valuation" at $140 million and projecting future growth. Bell assured the founders of an opportunity to create "generational wealth." ([Ex. P, Q])
  - However, after the LOI was executed, a 409A valuation from April 2023 revealed Checkmate's stock had a fair market value of just $0.41 per share, a stark discrepancy from Bell's claims. ([Ex. R])
- **Early Feb, 2024**: In another email, Bell promised 18 months of guaranteed employment[2] for the founders, with full compensation owed if they were terminated during this period—assuring financial and professional stability.

---

[1] Plaintiff, Lam, Nessler, Bell and Agarwal shared a private Slack channel named **#voicemate,** where many of the events herein occurred.

[2] **[Bell email to Robert Nessler (early Feb 2024)]** ".. I will work to have the employment agreements contain a term that prevents the company from terminating you in the first eighteen months, other than for cause (to be defined). If the company does terminate your employment in this period of time for any reason, you would be owed your full compensation that would otherwise have been available to you. This term will be extended to all three co-founders"

- Post-LOI execution Bell dismissed Plaintiff as "weird" and "delusional" for insisting the written promises be honored. Ultimately, Plaintiff and his team were pressured into accepting just three months of severance.

16.    A "no shop" clause in the LOI forced VoiceBite to forego other lucrative opportunities (¶ 107). Once the LOI was signed, Defendant pressured the founders to accept final terms that undermined their interests:

- **April 3, 2024**: In a Zoom meeting to finalize terms with the founders:
  - Bell reacted with notable anger to disclosures advocated for by Plaintiff to protect the founders against indemnification claims.
  - Agarwal expressly assured the founders that indemnification would be handled "as partners"—omitting any direct claim risk—and that liability would be capped at $150k, split pro rata between the VoiceBite team.
  - These commitments were memorialized in a "Closing Framework".
- **Apr 6, 2024**: In a text message, Bell urged the founders to fire their attorney, Alan Foster, for his diligence in reviewing proposed terms. ([Ex. U])
- **Apr 10, 2024**: In an email, Bell conditions promised back pay on agreeing to finalize terms as they stand, which Plaintiff and team accept and confirm.
- **Apr 17-22, 2024**: Via emails, Defendant Counsel Murtha shares sweeping new documents, falsely framing them as benign. Bell presents the new "IP Letter" as solely a "joint defense" against third-party claims ([Ex. S]).

17.    **April 22-26, 2024**: Foster objected to the changes in a memo to the founders, warning of the undue leverage these gave Checkmate to target them personally and as employees. Bell then induced the founders to share parts of Foster's memo to "understand his concerns"[3]. Foster resigned in protest, citing Defendant's unethical behavior and jeopardizing of privilege—forcing the founders to scramble for new counsel at the eleventh hour.

---

[3] **Michael Bell** is a sophisticated business executive, having served as CEO or in the C-suite of several companies, including some listed on the public markets; and negotiated several M&A transactions.

18.    **April 26, 2024**: Replacement counsel was secured just days before an imposed "deadline" of April 30th, leaving scant time for review, especially given the team's reliance on post-merger salaries and back pay.

19.    **April 30, 2024**: Plaintiff proceeds with the merger under pressure but also under explicit promises of good faith and compensation guarantees. Defendant would later capitalize on the last-minute changes to disadvantage Plaintiff[4].

**C. Guarantees and Terms of Employment (**Claims VI and VIII**).**

20.    After the merger, Plaintiff's employment with Checkmate continued under an Offer Letter ([Ex. B]), which provided:

- VP Title, annual salary of $280,000, performance bonus of $200,000.
- Severance of 3 months of salary plus one quarter of the performance bonus if terminated for any reason or if Plaintiff resigned with good reason.

21.    A separate Bonus Agreement ([Ex. C]) promised a retention bonus vesting at 3 months of employment (August 1, 2024), structured as:

- $450,000 "Initial Payment" -  triggered upon Defendant's completion of a preferred stock financing of $7,500,000 or more.
- $50,000 "Final Payment" - paid on the one year anniversary of the merger, and serving as a cap and offset to indemnification claims.

22.    Defendant further shared a spreadsheet detailing reimbursements and a schedule of payment for two months of back pay[5] for VoiceBite employees' work during negotiations, to be paid as Checkmate employees after close. ([Ex. N]).

23.    Plaintiff objected, in writing, to reporting to Strategy Chief Michael Bell, who had preemptively threatened to terminate him during negotiations, but CEO Vishal Agarwal nonetheless assigned him to report to Bell.

---

[4] **[Exhibit J, Notice of Claim]** The import of these changes became clear after Plaintiff's termination, as indemnification claims made by Defendant counsel expressly relied on changes presented as benign and 3rd party focused to deny Plaintiff owed compensation. See **§** 50.

[5] **[Exhibit N, Back Pay Schedule]:** To be paid in installments on June 1, June 15, and July 12, 2024

**D. Seeds of Discord in the Workplace (Claim V).**

24.     From the start of employment, Plaintiff encountered hostility in response to legal or contractual concerns he raised. For instance, on Plaintiff's second day (May 2, 2024) he questioned Checkmate's "Bring Your Own Device" (BYOD) policy for violating Cal. Labor Code § 2802 (failure to provision or to reimburse employees for necessary work expenses). In response:

- CEO Agarwal forwarded Plaintiff's private request to #voicemate[6], terming him a "problem", stating "*I'm happy to fire you*" and dismissing concerns with "*we won't hire people who are stickler for the law.*" ([Ex. M])

25.     Agarwal and Bell repeatedly made excuses to delay promised back pay (¶ 22), blaming board members and "cash flow issues" before closing funding, and after funding: "managing P&L statements" in light of the new investment. Meanwhile, Bell and Agarwal were pressuring Plaintiff and his co-founders to hire additional engineers, undermining the credibility of their financial excuses.

26.     Frustrated by Defendant's shifting reasons, and skeptical of it's intentions, Plaintiff posted a list of demands in the #voicemate channel for overdue back wages, retention bonus payment and clarity on performance targets.

27.     Agarwal responded "You don't speak for the team," and instructed each team member to schedule back pay with HR and "consider the company's interests", isolating Plaintiff and chilling lawful advocacy. Defendant escalated during a team meeting convened to address Plaintiff's demands (¶ 30).

**E. Events Triggering the Retention Bonus (Claims II and VIII).**

28.     In late July 2024, Agarwal internally announced via a public Slack channel that Checkmate had closed a $10,000,000 series B round[7].

---

[6] **#voicemate** - Team Slack channel shared by Bell, Agarwal, Lam, Nessler and Plaintiff.

[7] **Series B** in the tech industry generally refers to a bona fide preferred stock financing.

29.     Agarwal denied that Plaintiff's retention bonus had been triggered, asserting that the fundraise was structured in two tranches. Plaintiff contends this explanation contradicts the plain language definition[8] from his Bonus Agreement.

30.     Agarwal asserted that Tiger Global, Defendant's primary investor, suggested a tranche structure to delay bonus payments owed to the VoiceBite team. Plaintiff objected in #voicemate and Defendant called a team meeting where:

- Bell and Agarwal accused Plaintiff of disloyalty and prioritizing personal interests over the company's. Bell asserted that, as a VP, Plaintiff was expected to sacrifice his own rights for the company's benefit.

- Agarwal explicitly threatened to terminate Plaintiff, warning that "one more demand", even if rightful, could result in dismissal.

Agarwal acknowledged prior assurances to treat the team fairly if financing fell short. He proposed "accelerating" 50% of the bonus—but conditioned on individual request, with the "company in mind"—reinforcing a chilling effect that discouraged employees from asserting their contractual rights.

31.     On or about October 20, 2024, under pressure, Plaintiff signed the provided "partial bonus acceleration" document stipulating payment of half of the Initial Payment within 10 business days of execution[9] (due by Nov 3, 2024).

32.     On or about October 23, 2024, Defendant publicly announced the successful completion of a $10,000,000 Series B round ([Ex. D]) with no mention of any contingency or delayed structure of investment.

**F. Provision of and Progress towards Performance Targets (Claim VIII).**

---

[8] **[Exhibit C, Financing Trigger]**: "completion by Checkmate of a preferred stock financing in which Checkmate sells preferred stock for an aggregate purchase price of not less than $7,500,000."

[9] This payment was never made, see **§ 46**. Defendant has refused to provide the executed document.

33.     Plaintiff's Offer Letter ([Ex. B]) included a $200,000 performance bonus as a material inducement to employment, contingent on metrics to be provided within two weeks after the merger.[10]

34.     When the targets were finally provided on or about September 25, 2024—nearly five months after the merger—they imposed a deadline of October 1, 2024, leaving Plaintiff only six days to meet the defined goals.

35.     Nonetheless, Plaintiff successfully achieved several targets, as evidenced by quarterly leadership slides, performance metrics and announcements, and was making steady and documented progress toward the remainder. Further:

- Plaintiff's leadership was demonstrated by his initiative of weekly Voice demos, which engaged the company and motivated his team. Agarwal credited Plaintiff at an all hands meeting, urging other teams to follow suite.
- Plaintiff work ethic and collaborative attitude was evident by his abundant cross-functional work with teams outside his own.
- At FSTec[11], Plaintiff and Lam demoed their wares to hundreds of potential customers and partners, earning widespread praise. On their own initiative, they took a live customer to breakfast, who raved about his experience, praised their vision, and showed interest in rolling out chain-wide.

**G. Escalating Pressure to Force Plaintiff's Exit (Claims V and X).**

36.     On Sep 25, 2024, Plaintiff's key technical partner, Chris Lam, began a planned month-long leave, coincidentally as Agarwal informed the team of a "make or break" customer demo scheduled for Oct 22, 2024.

37.     Plaintiff's workload doubled as he took on Lam's responsibilities, while also enduring persistent undermining by Agarwal and Bell, including:

---

[10] In a meeting with Plaintiff and Chris Lam at his Manhattan Beach home, Michael Bell promised to provide achievable targets within two weeks of the merger close, at a proposed merger celebration in New York. The get together never happened, and the metrics were not provided.

[11] **FSTec** is a leading restaurant technology trade show.

- Canceling, unilaterally, Plaintiff's initiative of weekly Voice demos, claiming they were a distraction, despite their popularity and success.
- Accusing Plaintiff's team of disorganization and meeting his direct reports without notice, undermining the team hierarchy and his role as a team leader.
- Retaliating after Plaintiff re-raised concerns about Defendant's BYOD policy (see ¶ 24) on Oct 14, 2024, with Agarwal issuing a "final warning." and Bell officially threatening dismissal for "anything construed as a rant".
- Mischaracterizing an Oct 15, 2024, investor demo as a "disaster" and convening a team-wide "post-mortem". A review of the recording of this demo revealed it was in fact a success, and the investor committed.

38.     Despite the challenging environment and lack of support, Plaintiff successfully led his team to deliver the Oct 22, 2024, demo and meet aggressive performance targets. However the hostility and unsustainable workload—often in excess of 80 hours per week—took a toll on his mental health.

## H. Employer interference with Medical Leave (Claims III, IV and V).

39.     On October 22, 2024, after Plaintiff suffered a panic attack during a team meeting, Defendant's representatives issued an ultimatum: Plaintiff must accept a demotion or be terminated within 24 hours. Overworked and in a mental health crisis, Plaintiff requested medical leave.

40.     Plaintiff promptly entered inpatient treatment with symptoms of severe sleep deprivation, panic attacks, and burnout. Plaintiff (through his medical provider) soon provided medical certification to Checkmate on the provided form.

41.     Checkmate had an unlimited paid leave policy as per its Employee Handbook ([Ex. E]) and Plaintiff's Offer Letter ([Ex. B]) and had routinely approved paid leaves to employees at Plaintiff's level, including Lam (¶¶ 36-37).

42.     On October 23, 2024, VP of HR Brown emailed Plaintiff referring to his leave as "unpaid personal leave" and failing to provide the FMLA notice of rights under 29 C.F.R. § 825.300. ([Ex. F]).

43.     On October 25, 2024, on information and belief, Strategy Chief Bell reorganized Plaintiff's team and re-assigned Plaintiff's direct reports to himself.

44.     On November 3, 2024, Brown reiterated to Plaintiff via email ([Exhibit G]) that his pay would cease on November 6, further citing "security protocols" for revoking his Slack and email access. Brown never informed Plaintiff of short-term disability options that could have supplemented his pay.

45.     Plaintiff protested the unpaid status of his leave in response, pointing to Checkmate's policies and referencing the precedent of Chris Lam (¶ 36). Brown nonetheless insisted that the paid leave policy did not apply to medical leave, contradicting the Employee Handbook ([Ex. E]).

46.     Plaintiff repeatedly requested an update on his overdue "partial bonus" (¶ 31). Bell finally replied "We are going to talk to you about the partial bonus payment when you are back on Wednesday, not before." Plaintiff protested he needed get medical clearance to return. Bell did not reply. ([Ex. G])

47.     On November 12, 2024, Brown emailed Plaintiff ([Ex. H]), notifying him that his now "unprotected personal leave" status would result in the termination of his health coverage at the end of the month. Plaintiff protested, and offered to seek medical clearance to return part-time to retain coverage.

**I. Defendant Fires Plaintiff Alleging Solicitation (**Claim VI**).**

48.     On November 14, 2024, Agarwal scheduled a Zoom meeting at 8:00 AM, offering to discuss Plaintiff's reduced work schedule. However, during this meeting, he explicitly terminated Plaintiff: ([Ex. K])

- Agarwal cited private emails sent by Plaintiff to a competitor from his personal email account and alleged solicitation[12] (see ¶ 54).
- Agarwal told Plaintiff that they would discuss a "final settlement", implicitly acknowledging that he owed post-termination compensation.

49.    At 9:56 AM, approximately two hours after the meeting, and without access to his employment contracts in the medical facility, Plaintiff sent an email in distress, attempting to "resign for good reason." Plaintiff subsequently sent emails offering to settle along the lines of his contracts and requesting severance.

## J. Defendant's December 6th, 2024 "Notice of Claim" (Claims I, V and IX).

50.    On Dec 6, 2024, Defendant served a "Notice of Claim," discarding the earlier "solicitation" rationale for termination and instead rejecting Plaintiff's "good reason" email, thereby denying him severance—despite the legal impossibility of resigning after being terminated. Further, the Notice:

- Misstates the date of the "good reason" email as Nov 13—the day before Plaintiff's termination—indicating a deliberate effort to distort the timeline.
- Speculatively alleges fraud[13] to justify withholding other owed payments, including bonuses, without specifying actual damages.
- Implied these payments were otherwise due by withholding on new grounds.
- Was initially sent to former VoiceBite counsel. When Plaintiff replied pro se, Defendant threatened to compel disclosure of his privileged material[14].

51.    On Jan 22, 2024, Defendant partly reversed course in a second Notice—dropping the "resignation" claim entirely and explicitly referring to Plaintiff's termination—and threatened action to prevent competition. Plaintiff contends that

---

[12] **[Exhibit K, Agarwal terminates Plaintiff]** *"We just wanted to make something absolutely clear that you're being completely terminated with with no regard to anything that else that has happened in the past. And it is only because you reached out to a competitor and you have offered to bring and poach two of the engineers … a clear violation of a non solicitation."*

[13] Plaintiff rejects these allegations as untrue, and anyway not justification to withhold earned wages.

[14] Defendant's coercive actions recall their earlier interference with VoiceBite corporate counsel Foster.

1  these shifting justifications—the ultimatum before medical leave, to solicitation

2  allegations, to false resignation claims, to fraud accusations—demonstrate a

3  retaliatory pattern of bad faith intended to evade contractual obligations.

4

5  **K. Discovery of Zoom Recording and Privacy Implications (Claim VI).**

6    52.    On December 7th, 2024, unaware that his termination meeting had

7  been recorded, Plaintiff discovered that Checkmate's AI note-taking service had

8  inadvertently sent him a link to the meeting video and AI-generated summary

9  ([Exhibit K]). The recording, hosted by Fathom.video using an unpaid and

10  unsecured account, continued even after Plaintiff had left the meeting.

11    53.    In the recording, CEO Agarwal acknowledges Plaintiff's medical

12  leave status and implies other motives for the termination[15].

13    54.    The emails referenced by Agarwal were sent from Plaintiff's personal

14  account and device. Agarwal implies the emails were obtained using questionable

15  means, raising further privacy concerns.

16    55.    The recording further captures Agarwal, Brown, and Bell disparaging

17  Plaintiff and discussing efforts to isolate him from his former team. It highlights[16]:

18  •  All three executives knew Plaintiff had been explicitly terminated, yet

19      conspired to later reframe his departure as a resignation.

20  •  The retaliatory nature of Plaintiff's termination.

21  •  Awareness of potential liabilities regarding FMLA/CFRA leave.

22  •  Defendant's carelessness regarding Plaintiff's privacy rights.

23

24  **L. Ongoing Harm (Claims V, VII and IX).**

25

26  ───────────────

27  [15] **[Exhibit K, Recording Transcript]** " *…if there was a 0.001% chance [Plaintiff] didn't send those emails, we'd be totally screwed. He was on medical leave, in this condition, and we fired him for something that isn't true. So last night I pulled some favors, and today morning we have the emails.*"

28  [16] See **Exhibit K**, Recording Transcript

56.     Plaintiff, citing California law, has repeatedly requested executed copies of the agreements governing his employment and the merger, along with his personnel file. Defendant refuses to produce these documents, hindering Plaintiff's ability in evaluate and pursue legal remedies.

57.     Plaintiff denies any misuse of IP or breach of the merger agreement. He alleges Defendant never intended to honor its obligations, using intimidation, fabrication and shifting pretexts to evade payment.

58.     Plaintiff has suffered, and continues to suffer significant harm as a direct result of Defendant's actions, including but not limited to:

- **Disparagement and Isolation**: Defendant has disparaged Plaintiff to his former teammates and issued threats of termination should they contact him, depriving Plaintiff of crucial emotional and professional support.
- **Damage to Reputation**: Defendant's unfounded accusations and hostile conduct have created a cloud of suspicion that Plaintiff must now address with prospective employers and business partners.
- **Financial and Emotional Burden**: Plaintiff has expended significant time and resources pursuing his owed compensation, diverting energy from securing new employment or developing his next venture.

## VI. CLAIMS FOR RELIEF

## CLAIM I. Declaratory Relief Invalidating Coerced Agreements and Related Notice of Claim

**59.     Nature of the Claim**

Plaintiff seeks a declaration that agreements introduced after the parties agreed to finalize merger and employment terms—including but not limited to the "IP Letter" and "Assignment Agreement"—are void and unenforceable due to lack of

consideration[17], duress[18], and bad faith. Plaintiff further seeks a declaration that Defendant's Notice of Claim dated December 6, 2024, is without legal effect.

**60.    Basis for Declaratory Relief**

A clear legal dispute exists between Plaintiff and Defendant regarding:

- The validity of agreements introduced after terms were finalized April 10, 2024, including the "IP Letter" and "Assignment Agreement".
- The legal and factual basis of the Notice of Claim dated December 6, 2024, which relies on these agreements to deny Plaintiff owed compensation.

The dispute is actual, immediate[19] and substantive as required by the Declaratory Judgment Act (28 U.S.C. § 2201).

**61.    Pre-merger Pressure and Finalized Terms of April 10, 2024**

During the four months of pre-merger negotiations, Defendant pressured the founders by refusing their request for a consulting agreement, despite:

- The LOI's "No shop" clause, which prevented Plaintiff and team from pursuing investment or business income to compensate themselves.
- Plaintiff and his team performing substantial integration work and building IP that would accrue exclusively to Defendant upon merger close.
- The team being completely dependent on the deal closing to receive any form of compensation for this work, which would be worthless otherwise.

On April 10, 2024, Plaintiff and Defendant expressly agreed to finalize terms of the merger and employment agreements. This agreement was supported by explicit consideration: back pay for work performed during negotiations[20], conditioned upon Plaintiff and team's acceptance of these terms as final, which they confirmed.

---

[17] **Cal. Civ. Code §§ 1550, 1605 (9)** - Agreements are voidable for lack of mutual consideration.

[18] **Cal. Civ. Code § 1689 (2)** - Agreements are voidable if signed under duress.

[19] On information and belief, Defendant has used these allegations to withhold payments to the other VoiceBite founders, totaling $1,400,000, inclusive of Plaintiff.

[20] The offer was 2 months of pay for 4-5 months of exclusive work. Post-merger, Defendant repeatedly made excuses to delay payment of even this partial amount (see ¶¶ 25-27).

**62.    Introductions Under Duress and Without Consideration**

Defendant unilaterally introduced additional documents on or about April 22, 2024, including the "IP Letter" and "Assignment Agreement." These documents:

A. Were falsely presented as benign and mutually beneficial[21] (¶¶ 16-17), yet:

- **"IP Letter"** (or Trade Secret Acknowledgement): transformed the nature and scope of Plaintiff's representations from time bound and specific to applicable to every agreement made with former employers.

- **"Assignment Agreement"**: subjected Plaintiff to personal indemnification claims, contrary to the shared liability inherent in the April 10th terms.

B. Provided no reciprocal benefits, violating Cal. Civil Code §§ 1550 and 1605.

C. Were executed under false pretenses[22], duress and coercion (see ¶¶ 16-18). The absence of mutual consideration and the coercive circumstances surrounding the execution render these agreements invalid under California law.

**63.    Voidable Agreements and Fabrications in the Notice of Claim**

Defendant's December 6, 2024, Notice of Claim[23] relies heavily on these voidable agreements and additional fabrications (see ¶ 50) to deny Plaintiff compensation owed under the April 10, 2024 finalized terms.

**64.    Relief Requested**

Plaintiff respectfully requests that this Court declare:

A. The "IP Letter," "Assignment Agreement," and any material changes to the merger and employment agreements introduced after April 10, 2024, are void and unenforceable due to lack of consideration, duress, and bad faith.

---

[21] **[Exhibit S, Bell shares summary of 'IP Letter']** "The Holders and the Company have a joint interest in insulating themselves against the prospect of liability in any potential lawsuit arising from the potential misappropriation … It provides a means by which the Holders and the Company will be able to jointly argue, in the event any such suit is brought, that the plaintiffs cannot make a showing of improper acquisition – thus requiring dismissal."

[22] *Lazar v. Superior Court, 12 Cal.4th 631* - Voiding obligations arising from fraud.

[23] **[Exhibit J, Notice of Claim]** References the IP (Trade Secret) Letter and Assignment Agreement.

B. Defendant's Notice of Claim dated December 6, 2024, is legally meritless for relying on void agreements, falsehoods and unsupported allegations.

C. Plaintiff's rights and obligations under the merger and employment agreements are governed solely by the finalized terms of April 10, 2024.

D. Plaintiff is entitled to discovery of materials pertaining to the negotiation, preparation, and execution of the disputed agreements[24].

E. Any other relief the Court deems just and proper to protect Plaintiff's rights.

## CLAIM II. Declaratory Judgment Confirming Retention Bonus is Owed

**65.    Nature of the Claim**

Plaintiff seeks a declaratory judgment that the Retention Bonus, as outlined in the Bonus Agreement ([Exhibit C]), is earned and owed as the conditions for payment have been satisfied and that Defendant cannot lawfully withhold payment based on unproven allegations or speculative claims of fraud.

**66.    Basis for Declaratory Relief**

There is an actual, immediate and substantive legal dispute between Plaintiff and Defendant regarding whether:

- Plaintiff's Retention Bonus has been triggered and is owed.
- Defendant can withhold payment due to unproven allegations.

**67.    Conditions to Earn Retention Bonus (¶¶ 28-32)**

Plaintiff's Bonus Agreement contains two stipulations:

- Plaintiff remained employed by Defendant for 90 days (met Aug. 1st, 2024).
- Defendant completed a preferred stock sale of at least $7,500,000.

The following communications by Defendant indicate qualifying events:

- Late July 2024 Slack post announcing a $10,000,000 series B round[25].

---

[24] ***Hickman v. Taylor,*** 329 U.S. 495, 507 (1947) - The Supreme Court emphasized the broad scope of discovery in civil cases, stating that litigants are entitled to obtain information that is relevant to the subject matter of the lawsuit, including materials related to the formulation of claims and defenses.

[25] **Series B** is an industry description most commonly of a bona fide "preferred stock" sale.

- Oct. 23rd 2024 public press releases titled "*Checkmate Secures $10 Million in Series B Funding*" and containing no mention of contingencies ([Ex. D]).

Defendant has contended the financing was raised in tranches, the latter tranche contingent upon unspecified milestones. Plaintiff asserts[26] that Defendant must prove this alleged structure precludes qualification under the language of the Bonus Agreement, and otherwise asserts the bonus is earned compensation under California Labor Code §§ 200 and 204.

**68.    No Right to Withhold on Allegations.**

Defendant's Dec. 6th "Notice of Claim" claims the unilateral right to deny owed compensation pursuant to speculative allegations, which Plaintiff contends:

- Violates California Labor Code § 221, which prohibits deductions from earned wages absent legal or adjudicated grounds.
- Contravenes California's public policy as affirmed in *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509 (2006), and *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313 (2006), which reject the withholding of earned compensation based on speculative claims or contingencies.

Fraud or indemnification claims, even if alleged, cannot justify preemptive withholding of earned compensation without adjudication by a court or other neutral forum. Defendant has not obtained such and must remit payment.

**69.    Relief Sought**

Plaintiff respectfully requests that the Court declare:

- The Retention Bonus was triggered and is owed as earned compensation under the terms of the Bonus Agreement.
- Defendant's withholding of these earned compensation based on speculative claims is unlawful absent neutral adjudication of such claims.

---

[26] Plaintiff further contents that deliberately structuring the Series B funding in tranches to avoid triggering the Retention Bonus breaches the implied covenant of good faith and fair dealing (see **Dunlap v. State Farm**, 878 A.2d 434, 441 (Del. 2005)). Misrepresentation or concealment of such intent may also constitute fraud (**Abry Partners v. F&W Acquisition**, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

- Plaintiff is entitled to immediate payment of all amounts due under the terms of the Bonus Agreement.
- Any further relief the Court deems just and proper.

## CLAIM III.
## Violation of the Family and Medical Leave Act (29 U.S.C. § 2601 et seq.)

70.    Plaintiff re-alleges and incorporates all paragraphs herein.

**71.    FMLA Eligibility**

Plaintiff was FMLA-eligible as he had (1) worked for VoiceBite (and then Checkmate as successor-in-interest) for at least 12 months, and (2) performed the requisite 1,250 hours of service in the preceding 12 months. Defendant is eligible for the FMLA as an employer, as:

- It advertises as much explicitly in its Employee Handbook. ([Exhibit E])
- It has at least 50 employees who all virtually report into the same corporate headquarters in New York.

**72.    Retaliation and Interference (¶¶ 39-47)**

Defendant violated 29 U.S.C. § 2615 by interfering with Plaintiff's FMLA rights and retaliating against him, including by[27]:

A. Misclassifying Plaintiff's protected leave as "unpaid personal leave" and later "unprotected personal leave."

B. On information and belief, utilizing Plaintiff's absence to restructure his team, re-assign his direct reports and hire additional engineers, fundamentally altering the nature of his team to prevent his return on equitable grounds.

C. Refusing to apply the same unlimited paid leave policy they granted to others.

D. Cutting off Plaintiff's access to Checkmate Slack and GMail accounts under the pretext of "security reasons".

---

[27] *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001) - Establishes that Defendant's actions, such as misclassifying leave, terminating health coverage, withholding earned bonuses, and terminating Plaintiff during protected leave, constitute interference and retaliation

E.  Financially pressuring Plaintiff by conditioning discussion of his overdue retention bonus on premature return from leave.

F.  Terminating Plaintiff's health coverage while he was under inpatient care.

G.  Terminating Plaintiff while he was on (and certified for) protected FMLA leave.

73.    These actions caused Plaintiff substantial financial and emotional harm in violation of his FMLA rights.

## **CLAIM IV.**

### **Violation of the California Family Rights Act (Cal. Gov. Code § 12945.2)**

74.    Plaintiff re-alleges and incorporates all paragraphs herein.

**75.    CFRA Eligibility**

Plaintiff satisfied the CFRA eligibility requirements (12 months of service and at least 1,250 hours worked) and provided valid medical certification. Defendant employees at least 5 individuals in California, and claims CFRA eligibility.

**76.    Retaliation and Interference (¶¶ 39-47)**

Defendant interfered with and retaliated against Plaintiff's CFRA rights by:

A.  Failing to recognize his leave as CFRA-protected, labeling it "unpaid" or "unprotected."

B.  Terminating his health coverage mid-treatment.

C.  Terminating him while on protected leave based on pretextual allegations.

**77.    Damages**

Defendant's violations of CFRA caused Plaintiff financial harm, emotional distress, and wrongful termination.

### **CLAIM V. Retaliation (Cal. Labor Code § 1102.5)**

78.    Plaintiff re-alleges and incorporates all paragraphs herein.

**79.    Plaintiff's Protected Activities (¶¶ 24-25, 39-40)**

Plaintiff engaged in protected activity by, among other things:

A. Reporting violations of Labor Code § 2802 related to BYOD policy.

B. Exercising rights under FMLA/CFRA.

C. Advocating for payment of his team's overdue back pay and bonuses, as protected by Cal. Labor Code §§ 232(a)-(b) and 29 U.S.C. § 215(a)(3).

D. Post-termination, requesting contractual severance and bonus payments.

**80.** **Retaliation by Defendant (¶¶ 24-25, 41-47, 50-51):**

A. Threatening termination when he raised legal and contractual concerns.

B. Misclassifying his medical leave, conditioning owed pay on return to work, and terminating his health coverage while he was under in-patient care.

C. Ultimately terminating him falsely alleging solicitation as pretext.

D. Withholding severance and bonus payments owed by Checkmate pursuant to Plaintiff's Employment Offer Letter and Bonus Agreement.

E. Disparaging Plaintiff to his teammates, and threatening them with termination should they continue to communicate with him.

F. Responding to his lawful post-termination requests by issuing a "Notice of Claim" to deny payments it implicitly admitted were owed (¶¶ 50-51).

**81.** **Evidence for Retaliation**

Defendant retaliated against Plaintiff shortly after or in response to these protected activities, as evidenced by:

- **Temporal Proximity:** Defendant's retaliatory actions occurred on the same day or within days of raising concerns about Labor Code § 2802 violations (¶¶ 24-27) and after requesting contractual bonuses (¶ 30). Additionally, Defendant's actions to misclassify his medical leave and withhold pay began almost immediately after Plaintiff requested FMLA/CFRA leave (¶¶ 41-47).

- **Direct Evidence:** Statements from Defendant during the termination meeting and other conversations, see ¶¶ 24, 53 and 55.

- **Notice of Claim**: By falsely claiming he resigned to deny severance and attempting to "disentitle" him from other payments, the Notice serves as direct evidence such payments were otherwise owed (¶¶ 50-51).

82.    **Violations of Federal and State Laws**

Defendant's actions violated:

A. California Labor Code § 1102.5 for retaliating against Plaintiff's citing of California Labor Code § 2802 regarding the company's BYOD policy.

B. Fair Labor Standards Act (29 U.S.C. § 215(a)(3)) and California Labor Code §§ 232(a)-(b) for retaliating against Plaintiff for asserting rights to earned back pay, bonuses and severance, for himself and for his team.

C. FMLA (29 U.S.C. § 2615(a)) and CFRA (Cal. Gov't Code § 12945.2) for interfering and retaliating against Plaintiff's protected leave.

83.    **Harm to Plaintiff.**

Defendant's actions caused Plaintiff substantial financial loss, emotional distress, and professional harm.

84.    **Relief Requested**

Plaintiff respectfully requests that the Court:

1. Declare that Defendant's actions violated California Labor Code §§ 1102.5 and 232, FMLA/CFRA, and 29 U.S.C. § 215(a)(3).

2. Order Defendant to pay:

- Compensatory damages for severance, bonuses, and lost wages.
- Emotional distress damages.
- Liquidated damages under 29 U.S.C. § 216(b) for FLSA retaliation.
- Statutory penalties under California law.

3. Award punitive damages to deter future violations.

4. Grant injunctive relief to prohibit further retaliation against Plaintiff or his teammates.

5. Award attorneys' fees, costs, and any other relief deemed just and proper.

# CLAIM VI.

## Wrongful Termination in Violation of Public Policy

85.    Plaintiff re-alleges and incorporates all paragraphs herein.

**86.    Legal Basis**

California public policy, including but not limited to Business and Professions Code § 16600 (generally prohibiting non-competition/solicitation restraints), the California Labor Code (e.g., §§ 2802, 1102.5), and FMLA/CFRA protections, prohibit termination based on invalid or retaliatory reasons. These statutes and policies are designed to ensure fair treatment in the workplace and to foster an environment where innovation can thrive without fear of exploitation or retaliation.

**87.    Solicitation as a Pretext for Termination**

Defendant explicitly terminated Plaintiff for contacting a competitor and violating a non-solicitation clause (¶ 48), purportedly on November 7th, 2024. However, this justification was pre-textual and unlawful because:

- The Non-Solicitation clause is void or overly broad under California law (¶ 88) and the Employee Handbook doesn't prohibit the alleged actions.
- Defendant relied on improperly obtained private emails, which in plain language do not constitute solicitation or breach of any valid agreement.
- Defendant failed to conduct a thorough investigation, and Plaintiff's emails reflected efforts to seek alternate employment out of fear of termination.
- Plaintiff also maintains that any investigation would find no evidence of solicitation and any mention of Defendant's employees was speculative.

**88.    Invalidity of Non-Competition and Non-Solicitation Clauses**

Defendant may argue the "sale of business" exception (California Bus. & Prof. Code § 16601). This defense is meritless because:

- **No bona fide sale of goodwill:** VoiceBite had no customers or revenue prior to the merger, thus lacking "goodwill" tied to a legitimate business interest.

- **Illusory consideration:** Defendant inflated Checkmate's valuation to misrepresent the value of Plaintiff's equity grant.
- **Lack of separate counsel:** Plaintiff relied on VoiceBite's counsel, whose relationship was absorbed by Defendant post-merger.
- **Overly broad scope:** The Non-Competition Agreement prohibits competition or solicitation across nearly the entire world[28], contrary to the narrow construction of any valid sale-of-business exception in California.

### 89.    Violation of the Mutual Non-Disparagement Clause

The Non-Competition Agreement also contains a mutual Non-Disparagement clause, stating that executives would not disparage Plaintiff[29]. Plaintiff alleges that Defendant violated this clause when Bell and Agarwal spread accusations, and threatened to terminate his teammates if they maintained contact with him.

### 90.    Connection to Broader Public Policy

Plaintiff raised legitimate concerns about wage-and-hour compliance and exercised rights under FMLA/CFRA, which implicates public policy protections against retaliation (¶¶ 24-27, 39-47, 79-81). Specifically, Plaintiff frames this claim within the broader context of protecting founders from predatory acquirers who exploit them post-acquisition. This case highlights the need to reinforce protections against retaliation and bad-faith, ensuring the vitality of California's startup ecosystem.

### 91.    Harm to Plaintiff

As a direct result of Defendant's reliance on a void or unenforceable clause and their retaliatory motives, Plaintiff suffered economic harm, damage to his reputation, and emotional distress, contravening California public policy.

---

[28] **[Exhibit I, Non-Competition Agreement] "Restrictive Territory"** means the United States, the European Union and Canada and each other jurisdiction in which the Company has any customers, employees or operations during the Restrictive Period (thereby including India and Eastern Europe).

[29] **[Exhibit I, Non-Competition Agreement, Non-Disparagement]:** Stockholder agrees that Stockholder will not directly or indirectly or induce others to disparage Company or the Company in any manner that is harmful to the business, business reputation or reputation of Company or the Company. *The executive team of Company will not make any statement of a disparaging nature about Stockholder.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**92.    Relief Sought**

Plaintiff respectfully requests that the Court declare Plaintiff's termination as
without cause, and obligate Defendant to follow applicable merger and
employment stipulations for this designation.

## CLAIM VII.
### Wage Theft (Cal. Labor Code §§ 200, 201, 204, 221, 226, 2802)

93.    Plaintiff re-alleges and incorporates all paragraphs herein.

**94.    Unpaid or Delayed Wages**

Defendant violated California wage laws by failing to pay (or timely pay):

A. Retention Bonus triggered by qualified financing ([Ex. C, D]).
  • Also "Partial Bonus Acceleration" (¶¶ 31 and 46).
B. Severance guaranteed under the Offer Letter ([Ex. B]).
C. Final wages upon termination.
D. Two months of back pay, which was promised in a schedule of three
   payments and delayed by 30-60+ days for each installment (¶¶ 25-27).

By delaying or withholding these amounts, Defendant unlawfully withheld earned
compensation in violation of Labor Code §§ 200, 201, 204, and 221[30]—and are
subject to Waiting Time penalties pursuant to § 203.

**95.    Work Expenses**

Defendant further violated § 2802 by refusing to provision or reimburse the
purchase of required work equipment.

**96.    Willful Violations**

Defendant repeatedly and willfully violated Plaintiff's lawful requests, including
rejecting his request for a work laptop (¶¶ 24) by stating *"we can't afford to give
out equipment so we won't hire people who are stickler for the law."* ([Ex. M]).

---

[30] see ***Koehl v. Verio, Inc.,*** *142 Cal. App. 4th 1313 (2006)*: (Earned compensation cannot be forfeited or delayed based on speculative claims or contingencies) and ***Neisendorf v. Levi Strauss & Co.,*** *143 Cal. App. 4th 509 (2006)* (Employers may not impose retroactive conditions on earned compensation).

26

**97.    Waiting Time Penalties (Labor Code § 203)**

Under Labor Code § 203[31], Defendant's willful failure to pay wages on time subjects them to waiting time penalties for each infraction, calculated at Plaintiff's daily wage rate and accruing up to 30 days for each of 6 infractions.

**98.    Plaintiff seeks the following relief:**

- Payment of unpaid wages, including his retention bonus and severance[32].
- Waiting time penalties under Labor Code § 203, totaling $505,384.62[33].
- Reimbursement of work expenses under Labor Code § 2802.
- Attorneys' fees, costs, and interest as permitted by law.
- Any additional relief the Court deems just and proper.

## CLAIM VIII. Breach of Contract.

**99.**    Plaintiff re-alleges and incorporates all paragraphs herein.

**100.    Contractual Basis (¶¶ 20-23)**

---

[31] see ***McCoy v. Superior Court***, 157 Cal.App.4th 225, 229 (2007) (6) (Waiting time penalties apply to willful failures to pay wages). and ***Ling v. P.F. Chang's China Bistro, Inc.***, 245 Cal.App.4th 1242, 1254 (2016) (7) (Bonuses are considered wages under the Labor Code)

[32] By withholding the Retention Bonus and Partial Bonus Acceleration without **proven fraud or damages adjudicated in a court of law or other neutral forum**, Defendant contravened California law and deprived Plaintiff of wages earned during his employment.

[33] **Waiting Time Penalty Calculations (preliminary calculations)**
Plaintiff's daily wage is: $280,000 (base sal.) + $450,000 (ret. bonus) ÷ 260 workdays = **$2,807.69**
30 day accrued penalty is: 30 (days) * $2,807.69 (daily wage) = **$84,230.77**
Defendant's infractions included: (total 6, each accruing for 30 days)
- Back pay for pre-merger work, as promised on a schedule.
  - Installment 1 (June 1, 2024): $84,230.77.
  - Installment 2 (June 15, 2024): $84,230.77.
  - Installment 3 (July 12, 2024): $84,230.77.
- Partial Bonus Acceleration (November 3, 2024): $84,230.77.
  - Obligated within 10 days of Plaintiff signing a "partial bonus acceleration" document on or about October 20th, 2024.
- Retention Bonus (November 6, 2024): $84,230.77
  - Obligated upon qualified financing of $7,500,00 or greater, which Defendant publicly announced on October 23rd, 2024.
- Final Wages (November 14, 2024): $84,230.77
**Total Waiting Time Penalties: $84,230.77 * 6 = $505,384.62.**

Plaintiff and Defendant entered into valid agreements, including the Offer Letter
and Bonus Agreement ([Ex. B, C]), which outlined clear and enforceable
obligations for severance, retention and performance bonuses:

A. **Severance**: The Offer Letter specifies severance as owed upon termination,
   regardless of cause, or for resignation with good reason[34].

   - See terms in ¶ 20 and reason for denial in ¶ 50.

B. **Retention Bonus**: The Bonus Agreement specifies a $450,000 Initial
   Payment[35], which is overdue, as discussed in ¶¶ 28-32 and 65-69.

   - Termination or resignation do not affect this payment after vesting after
     90 days of employment (August 1st, 2024)[36].

C. **Performance Bonus**: The Offer Letter specifies a performance bonus as a
   material inducement to employment and performance. See ¶¶ 33-35.

**101.  Closing Framework**

The Closing Framework table shared by Defendant on April 3, confirms the
parties' negotiated intent is as described. ([Exhibit Q], "Closing Framework")

**102.  Substantial Performance**

---

[34] **[Exhibit B, Offer Letter, "Post-Termination Compensation]**: ".. if the Company terminates your
employment or your terminate your employment for Good Reason, in any such case before August 1,
2025 (the "Applicable Date"), you will receive as post-termination compensation:

1. A lump sum payment equal to three (3) months base salary; paid on the Company's first regular
   payroll paydate following the termination, … (the "Payment Date");
2. A lump sum payment equal to twenty-five percent (25%) of the performance bonus for the then
   current year, paid on the Payment Date;
3. Any Accrued Compensation (as defined below). .."

[35] **[Exhibit C, Bonus Agreement, "Initial Payment Date"]** shall mean the earlier of (a) the date that is
ten (10) business days after completion by Checkmate of a preferred stock financing in which
Checkmate sells preferred stock for an aggregate purchase price of not less than $7,500,000 not
including conversion of any outstanding notes or SAFEs (a "Qualified Financing") or (b) the date that is
ten (10) business days after the one year anniversary of the date of this Bonus Agreement.

[36] **[Exhibit C, Bonus Agreement, "Termination of Employment"]** .. if you terminate your employment
for Good Reason or if the Company terminates your employment for any reason, before the Bonus Date,
you will be entitled to receive payment equal to the Initial Payment Amount and Final Payment Amount

Plaintiff substantially performed his obligations under the agreements despite persistent undermining of his role by Defendant, including unreasonable delays in back pay, bonus target-setting, false accusations, and retaliatory conduct.

### 103.  Breaches by Defendant

Defendant breached these agreements by:

- Refusing to remit the $450,000 Initial Payment of the Bonus Agreement, despite publicly announcing the Qualified Financing trigger.
- Breaching the implied covenant of good faith and fair dealing by:
  - Failing to share performance bonus targets in a timely manner.
  - Imposing unreasonable deadlines to avoid paying the bonus.
- Terminating Plaintiff using pretext to avoid obligations.
- Failing to pay severance owed under the Offer Letter.
- Making false accusations to "disentitle" Plaintiff, despite lack of evidence or justification under the Merger and Employment Agreements.
- Violating the Non-Disparagement clause of the Non-Competition agreement ([Exhibit I]) by disparaging Plaintiff and threatening teammates with termination if they remained in contact with him.

### 104.  Damages

As a direct and proximate result of Defendant's breaches, Plaintiff has suffered significant financial damages, including but not limited to:

- $122,000 Unpaid severance.
- $450,000 Unpaid initial retention bonus payment.
- $200,000 Unpaid performance bonus.
- Compensatory damages for reputational harm, emotional distress, and lost professional opportunities caused by Defendant's bad-faith actions.

## CLAIM IX. Fraudulent Inducement

105.  Plaintiff re-alleges and incorporates all paragraphs herein.

**106.   Misrepresentations to Induce Execution of LOI**

On or about February 15, 2024, Plaintiff and his team entered into an exclusive
Letter of Intent ("LOI") with Defendant. To induce execution of the LOI, Strategy
Chief Michael Bell made material false statements (see ¶ 15).

**107.   Plaintiff's Reasonable Reliance (LOI)**

Plaintiff and team reasonably relied on these representations in signing the LOI
around February 15th, 2024 foregoing other lucrative opportunities, including:

- Late stage discussions to raise $3,000,000 at a $16,000,000 valuation from a
  well known and reputable Venture Capital firm.
- An invitation to apply to the prestigious Y Combinator program signaling
  likely acceptance as a top applicant.
- An opportunity to join a colleague's startup as a cofounder, which would
  later be accepted to Y Combinator and raise a $2.3m seed round.
- Opportunities to acquire customers and grow VoiceBite organically.

**108.   Misrepresentations to Finalize Merger.**

Post LOI, Bell, Agarwal and Defendant Counsel Murtha repeatedly misrepresented
the intent and nature of indemnification clauses as benign, mutually beneficial and
3rd party focused—omitting any direct claim risk. (see ¶¶ 16 and 62)

**109.   Coercive Tactics by Bell and Agarwal**

Bell and Agarwal also employed coercive tactics to finalize the agreement under
unfavorable terms for Plaintiff and team (see ¶¶ 16, 17, 18, 50 and 60-63)

**110.   Post Merger Bad Faith Conduct**

After the merger closed, Defendant evaded owed obligations they had just
promised to Plaintiff and the VoiceBite team—including back pay, retention
bonuses, performances bonuses—eventually denying severance and weaponizing
the coerced agreements to "disentitle" Plaintiff entirely[37].

---

[37] Defendant claimed Plaintiff's "failure to disclose" a prior venture as 'fraud'—Defendant was fully aware
of the venture yet failed to request relevant disclosures; the venture was inactive; the IP authored by him
and posed no risk. Plaintiff contends this was pretext to evade its obligations.

### 111.   Concealed Intent and Structural Fraud

Defendant's actions are not merely a late shift in intent; the fraud was embedded into the merger's structure. By framing indemnification related provisions as defenses against third-party claims, Defendant secured broad power to assert direct claims against Plaintiff after the fact. Had Plaintiff known these provisions could be—and would be—turned inward to deny him compensation—rather than safeguard him from third-party risks—he would never have agreed to the changes.

### 112.   Plaintiff's Continued Reliance (Merger & Employment)

Plaintiff indeed yet reasonably relied on Defendant's misrepresentations by foregoing other potential opportunities (¶ 107) and:

- Executing the merger & employment documents—sacrificing VoiceBite's independence—under assurances of good faith and contractual protection.
- Continuing to perform post-merger obligations in the reasonable belief that the promised compensation and would be honored.

### 113.   Harm to Plaintiff

As a direct and proximate result of Defendant's actions, Plaintiff suffered financial, reputational and emotional losses; including distress from realizing Defendant did not intend, and never intended, to fulfill its obligations, while he and his team had sacrificed their cherished independence.

### 114.   Willful, Malicious and Oppressive Conduct

Defendant's fraudulent conduct was willful, malicious, and oppressive, justifying the imposition of punitive damages to deter similar misconduct. The ever present fraud was unveiled in the Dec 6, 2024, Notice (¶¶ 50-51), which invoked previously termed "joint defenses" (¶ 16) to "disentitle" Plaintiff. No third-party lawsuit materialized; instead, Defendant weaponized the merger to assert direct claims against Plaintiff for unspecified damages, revealing their calculated deceit.

### 115.   Relief Sought

Plaintiff requests that this Court:

- Compel Defendant to repurchase Plaintiff's merger shares at the falsely represented $4.67 per share or otherwise make Plaintiff whole.
- Award Punitive Damages to punish and deter such fraudulent conduct.
- Grant Such Further Relief as the Court deems just and equitable.

## CLAIM X. Constructive Discharge in Violation of Public Policy
## (in the Alternative)

116.    Plaintiff re-alleges and incorporates all paragraphs herein.

117.    While Plaintiff maintains he was explicitly terminated on November 14, 2024 (see [Exhibit K]), this claim is pled in the alternative to Claim VI (Wrongful Termination in Violation of Public Policy). Given the confusion caused by Defendant's shifting explanations for Plaintiff's separation, if the Court finds Plaintiff resigned, the conditions created by Defendant's retaliatory and hostile conduct were so intolerable that Plaintiff's separation constitutes a constructive discharge. See ¶¶ 24-27 and 39-47, and Claims V and VI.

## VII. REQUEST FOR RELIEF

Plaintiff prays for judgment against Defendant and requests as follows:

118.    Declaratory Judgment clarifying that Plaintiff was terminated by Defendant, without cause, and is owed severance pursuant to his Offer Letter;

119.    Declaratory Judgment that Plaintiff's Retention Bonus has been triggered and is payable under the terms of the Bonus Agreement (¶¶ 65-69);

120.    Declaratory Judgment invalidating Defendant's coerced agreements and "Notice of Claim" against Plaintiff (¶¶ 59-64);

121.    Declaratory Judgment preserving Plaintiff's attorney-client privilege with respect to communications with VoiceBite corporate counsel;

122.    Compensatory Damages in an amount to be proven at trial, including:

- Back pay for lost wages and benefits, including final wages and unpaid salary during medical leave;
- Compensation owed under the employment agreement ([Exhibit B, C]):
  - $500,000 retention bonus triggered by the Series B fundraising;
    - $450,000 currently overdue (¶¶ 65-69).
    - $50,000 due on May 1st, 2025.
  - $200,000 performance bonus, as Defendant's wrongful conduct and termination prevented Plaintiff from achieving the remaining metrics;
  - $122,000 in severance pay, including three months' salary and one-quarter of the performance bonus;
- Reimbursement for uncompensated work-related expenses.
- Front pay to compensate for future lost earnings and benefits resulting from wrongful termination and damage to Plaintiff's professional reputation.
- Waiting time penalties under Labor Code § 203, totaling $505,384.62 (¶ 97)

123.   Liquidated Damages or statutory damages as permitted under the FMLA and Labor Code provisions;

124.   Civil Penalties under applicable California Labor Code sections;

125.   Punitive Damages where allowed by law, including for Intentional Infliction of Emotional Distress and Fraudulent Inducement;

126.   Injunctive or Equitable Relief, including reinstatement or removal of any invalid contractual provisions and an Order requiring Defendant to repurchase Plaintiff's merger consideration shares at the misrepresented value of $4.67/share;

127.   Prejudgment and Post-judgment Interest;

128.   Attorneys' Fees and Costs (if Plaintiff later obtains counsel), including fees recoverable under the Labor Code or FMLA; and

129.   Such other and further relief as the Court deems just and proper. The total amount in controversy exceeds $2,100,000.

## VIII. EXHIBIT REFERENCES

All factual allegations in this complaint are supported by evidence either presented in the exhibits below or reasonably believed to be discoverable.

### Contracts, Agreements and Related Materials

- [Exhibit B]: Employee Offer Letter (final draft).
- [Exhibit C]: Bonus Agreement (final draft).
- [Exhibit I]: Non-Competition Agreement (final draft).
- [Exhibit D]: **10/23/2024** Checkmate Fundraising Announcement.
- [Exhibit E]: Checkmate Employee Handbook (relevant excerpts).

### Pre-Termination Communications and Materials

- [Exhibit M]: **05/02/2024** Slack argument re provision of work laptops.
- [Exhibit N]: Schedule of reimbursement and back pay.
- [Exhibit F]: **10/23/2024** Email thread with Brown (re: "personal leave").
- [Exhibit G]: **11/03/2024** Email w/Brown and Bell (pressuring to return).
- [Exhibit H]: **11/12/2024** Email thread (to termination, re: health coverage).

### Post-Termination Communications and Materials

- [Exhibit J]: **12/06/2024** Notice of Claim by Defendant Counsel.
- [Exhibit K]: Fathom.video screenshots/transcript of 11/14/2024 meeting.

### Misrepresentations Around Merger Negotiations.

- [Exhibit P]: Email from Bell representing a per share value of $4.67.
- [Exhibit Q]: Spreadsheet provided in January 2024 showing Checkmate's valuation at $140,000,000 as the 2023 "baseline valuation".
- [Exhibit R]: Contemporaneous (April 2023) 409A valuation showing the fair market valuation of the company to be $0.41c/share, shared post-LOI.
- [Exhibit S]: April 22nd Bell IP Letter Summary as "joint defenses".

### Communications Demonstrating Coercion and Interference

- [Exhibit U]: Bell Text Message urging founders to fire their Counsel.

*Plaintiff reserves the right to expand this list as the case proceeds. The executed copies of agreements listed above have not been provided by Defendant, so Plaintiff has provided the latest draft versions provided by counsel prior to signing.*

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

## X. RESERVATION OF RIGHT TO RETAIN COUNSEL

Plaintiff expressly reserves the right to retain counsel at any point during these proceedings to protect his legal rights and to advance the claims asserted herein.

**DATED**: January 28th, 2025

Respectfully submitted,

_____

**ARJUN VASAN**

Plaintiff in Pro Per

12615 193rd St, Cerritos, CA 90703

562-900-6541

arjun.vasan@gmail.com

35

Complaint



Checkmate.com Inc.

April __, 2024

Dear Arjun Vasan,

<u>Offer and Position</u>

We are pleased to extend an offer of employment to you for the position of **VP AI Technology** at Checkmate.com Inc., a Delaware corporation (the "***Company***"). This offer of employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter.

<u>Duties</u>

In your capacity as VP AI Technology, you will perform duties and responsibilities that are commensurate with your position and such other duties as may be assigned to you from time to time. You will report to Mike Bell. You agree to devote your full business time, attention, and best efforts to the performance of your duties and to the furtherance of the Company's interests.

<u>Location</u>

You will work remotely for the Company, subject to business travel as needed to properly fulfill your employment duties and responsibilities.

<u>Start Date</u>

Subject to satisfaction of all of the conditions described in this letter, this offer is based on a mutually acceptable start date of May 1, 2024.

<u>Compensation</u>

Your starting base salary will be $280,000 per year, payable in two (2) week increments, and you will be eligible to receive a target bonus of up to $200,000 based on performance for 2024 and a target bonus of up to 50% of your annual salary based on performance for 2025 going forward, payable in accordance with the Company's standard practices, provided that you will not be eligible for a bonus payments unless you are continuously employed with the Company through the time of payment. Your compensation is subject to review from time to time, and all payments will be made in accordance with the standard payroll practices of the Company and subject to standard withholdings and deductions.

<u>Stock Options</u>

Subject to approval by the Company's Board of Directors (the "***Board***"), the Company anticipates granting you an option to purchase 100,000 shares of the Company's common stock at the fair market value as

determined by the Board as of the date of grant (the "**Option**").  The anticipated Option will be governed by the terms and conditions of the Company's 2018 Stock Plan (the "**Plan**") and your grant agreement, and will include the following vesting schedule: 1/8th of the total shares will vest on the date that is 6 months after the vesting commencement date, and 1/48th of the total shares will vest at the end of each month thereafter on the same day of the month as the vesting commencement date (or if there is no corresponding day, on the last day of the month), until either the Option is fully vested or your continuous service (as defined in the Plan) terminates, whichever occurs first.

Benefits and Perquisites

You will be eligible to participate in the employee benefit plans and programs available  to the Company's employees, subject to the terms and conditions of such plans and  programs. You will be entitled to paid vacation in accordance with the Company's policies in effect from time to time. You will also be entitled to the fringe benefits and  perquisites that are made available to other similarly situated employees of the Company, each in accordance with and subject to the eligibility and other provisions of  such plans and programs. The Company reserves the right to amend, modify or  terminate any of its benefit plans or programs at any time and for any reason.

Withholding

All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.

Stock Ownership Requirements

Except as may be expressly provided otherwise in this offer letter, as an employee of the Company, you will be required to comply with the Company's  Stock Ownership Requirements applicable to employees and to be adopted in the  future.

At-will Employment

Your employment with the Company will be for no specific period. Rather, your  employment will be at will, meaning that you or the Company may terminate the  employment relationship at any time, with or without cause, and with or without  notice and for any reason or no particular reason. Although your compensation and  benefits may change from time to time, the at-will nature of your employment may only be changed by an express written agreement signed by an authorized officer of the Company.

Contingent Post-Termination Compensation

Notwithstanding any other provision of this offer letter, if the Company terminates your employment or your terminate your employment for Good Reason, in any such case before August 1, 2025  (the "**Applicable Date**"), you will receive as post-termination compensation:

1. A lump sum payment equal to three (3) months base salary, paid on the Company's first regular payroll paydate following the termination, provided that if such paydate is within five (5) days of the termination date, then such amount will be paid on the Company's second regular payroll paydate following the termination (the "**Payment Date**");

2.  A lump sum payment equal to twenty-five percent (25%) of the performance bonus for the then current year, paid on the Payment Date;

3.  any Accrued Compensation (as defined below).

If your employment is terminated by you other than for Good Reason, you will be paid only (i) any earned but unpaid base salary, (ii) other unpaid vested amounts or benefits under the compensation, incentive and benefit plans of the Company in which you participate, and (iii) reimbursement for all reasonable and necessary expenses incurred by you in connection with the performance of your duties on behalf of the Company in accordance with applicable Company policies and guidelines, in each case as of the effective date of such separation from service (the "***Accrued Compensation***").

"***Good Reason***" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

Dispute Resolution

Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS.  At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "Mediator Opinion").  The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding.  The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

Section 409A

This offer letter is intended to comply with Section 409A of the Internal Revenue Code  ("***Section 409A***") or an exemption thereunder and shall be construed and administered  in accordance with Section 409A. Notwithstanding any other provision of this offer  letter, payments provided under this offer letter may only be made upon an event and in  a manner that complies with Section 409A or an applicable exemption. Any payments  under this offer letter that may be excluded from Section 409A either as separation pay  due to

an involuntary separation from service or as a short-term deferral shall be  excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this offer letter shall be treated as a separate payment. Any payments to be made under this offer letter upon the termination  of employment shall only be made upon a "separation from service" under Section  409A. Notwithstanding the foregoing, the Company makes no representations that the  payments and benefits provided under this offer letter comply with Section 409A, and  in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by you on account of non-compliance  with Section 409A.

Notwithstanding any other provision of this offer letter, if any payment or benefit  provided to you in connection with the termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A  and you are determined to be a "specified employee" as defined in Section  409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of your termination date (the  "***Specified Employee Payment Date***") or, if earlier, on the date of your death. The  aggregate of any payments that would otherwise have been paid before the Specified  Employee Payment Date and interest on such amounts calculated based on the  applicable federal rate published by the Internal Revenue Service for the month in which  your separation from service occurs shall be paid to you in a lump sum on the Specified  Employee Payment Date and thereafter, any remaining payments shall be paid without  delay in accordance with their original schedule.

Governing Law

This offer letter shall be governed by the laws of the State of California, without regard to conflict of law principles.

Contingent Offer

This offer is contingent upon:

(a) Verification of your right to work in the United States, as demonstrated by your completion of an I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of your Start Date.

(b) Satisfactory completion of reference checks.

(c) Your execution of the Company's Confidentiality and Intellectual Rights Assignment Agreement.

This offer will be withdrawn if any of the above conditions are not satisfied.

Representations and Obligations

By accepting this offer, you represent that you are able to accept this job and carry out the work that it would involve without breaching any legal restrictions on your activities, such as non-competition, non-solicitation or other work-related restrictions imposed by a current or former employer. You also represent that you will inform the Company about any such restrictions and provide the Company with as much information about them as possible, including any agreements between you and your current or former

employer describing such restrictions on your activities. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company. If you have any questions about the ownership of particular documents or other information, you should discuss such questions with your former employer before removing or copying the documents or information.

As a Company employee, you will be expected to abide by Company rules and policies. Normal business hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday. As a full-time exempt salaried employee, you will be expected to work the Company's normal business hours as well as additional hours as required by the nature of your work assignments, and you will not be eligible for overtime compensation.

We are excited at the prospect of you joining our team. If you have any questions about the above details, please call me immediately. If you wish to accept this position, please sign below, and return this letter to me.

I look forward to hearing from you.

Yours sincerely,

Amy Brown – Head of Human Resources | US

On behalf of Checkmate.com Inc.

<u>Acceptance of Offer</u>

I have read, understood, and accept all the terms of the offer of employment as set forth in the foregoing letter. I have not relied on any agreements or representations, express  or implied, that are not set forth expressly in the foregoing letter, and this letter  supersedes all prior and contemporaneous understandings, agreements, representations,   and warranties, both written and oral, with respect to the subject matter of this letter.

Signed _____

Date _____

Checkmate.com Inc.
April _____, 2024

**BY E-MAIL**

Arjun Vasan

Dear Arjun:

This letter (the "<u>Bonus Agreement</u>") is being delivered to you in connection with the commencement of your employment with Checkmate.com Inc. ("<u>Checkmate</u>") and in conjunction with your execution of an offer letter and Confidential Information and Inventions Agreement with Checkmate.

In consideration of you remaining employed with Checkmate, and to further motivate you to devote the exceptional service and performance necessary to maximize Checkmate's performance and value, Checkmate wishes to provide you with the below bonus opportunity.

1.  <u>Bonus</u>.  On July __, 2024 (the "<u>Bonus Date</u>"), you will become entitled to receive a cash bonus (less applicable withholdings and deductions) payable as set out below (the "<u>Retention Bonus</u>").

    a.   An amount equal to the Initial Payment Amount (as defined below), subject to reduction or adjustment as set out in this Agreement, shall be paid as set out in Section 3 of this Agreement.

    b.   A maximum of Fifty Thousand Dollars ($50,000) of the Retention Bonus (the "<u>Final Payment Amount</u>"), reduced as provided below, shall be paid as set forth below (the "<u>Final Payment</u>").  The Final Payment Amount may be reduced as set forth below:

        i.   Checkmate may seek recovery of up to your Pro Rata Share of any Purchaser Loss that is recoverable by any Purchaser Indemnified Party pursuant to Article 8 of the Merger Agreement by recovering and offsetting against (and reducing the amount of) the Final Payment Amount (it being understood that such reimbursement shall not reduce such Checkmate Indemnified Party's right to seek recovery as set out in the Merger Agreement of any Purchaser Losses that are not recovered pursuant to this Section 1(b)).  Any recovery of any Purchaser Loss against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

        ii.  Checkmate may seek recovery of any Reduction Amount that was not deducted from the Initial Payment Amount by recovering and offsetting against (and reducing the amount of) the Final Payment Amount.  Any recovery of any Reduction Amount against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

        iii. No later than five (5) business days following the Final Payment Date, Checkmate shall pay an amount in cash to you in the amount of Final Payment Amount reduced as set out in Section 1(b)(i) or (ii) *minus* an amount equal to your Pro Rata Share of any Purchaser Loss for which any Purchaser Indemnified Party may be entitled to indemnification under Section 8 of the Merger Agreement and clause (i) above as result of any pending, but unresolved, claims

for indemnification for which Checkmate has provided notice to the Holder Representative prior to the Final Payment Date in accordance with the Merger Agreement (a "<u>Dispute</u>") (the amount contemplated by clause (C), the "<u>Disputed Cash Amount</u>").

    iv.    On the later of the Final Payment Date or five (5) business days following the final resolution of any Dispute, Checkmate shall pay to you an amount in cash equal to (i) any remaining Disputed Cash Amount *minus* (ii) your Pro Rata Share of any Purchaser Indemnified Losses for which any Purchaser Indemnified Party may be entitled to indemnification under Article 8 of the Merger Agreement as result of any unresolved Dispute.

    v.    For the avoidance of doubt, in no event shall you be entitled to an amount greater than Fifty Thousand Dollars ($50,000) pursuant to this Section 1(b).

2.    <u>Definitions</u>.

    a.    "<u>Expense Reconciliation Agreement</u>" shall mean that certain Expense Reconciliation Agreement dated as of April __, 2024 by and among Checkmate, VoiceBite Corporation, a Delaware corporation (the "<u>Company</u>"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia.

    b.    "<u>Final Payment Date</u>" shall mean the date that is the later of (a) twelve (12) months after the Closing or (b) the Initial Payment Date.

    c.    "<u>Initial Payment Amount</u>" shall mean Four Hundred Fifty Thousand Dollars ($450,000) minus (a) your Pro Rata Share of the amount of Company Transaction Expenses and Indebtedness that are unpaid as of the Closing and minus (b) your pro rata share of Non-Reimbursed Expenses as defined in the Expense Reconciliation Agreement (the amounts in (a) and (b) collectively the "<u>Reduction Amount</u>").

    d.    The "<u>Initial Payment Date</u>" shall mean the earlier of (a) the date that is ten (10) business days after completion by Checkmate of a preferred stock financing in which Checkmate sells preferred stock for an aggregate purchase price of not less than $7,500,000 not including conversion of any outstanding notes or SAFEs (a "<u>Qualified Financing</u>") or (b) the date that is ten (10) business days after the one year anniversary of the date of this Bonus Agreement.

    e.    "<u>Merger Agreement</u>" shall mean that certain Agreement and Plan of Merger (the "<u>Merger Agreement</u>"), dated April ___, 2024, by and among Checkmate, VoiceBite Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Checkmate, the Company, Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki, Paul Justin Garcia, and Robert Nessler as the Holder Representative.

3.    <u>Form of Payment</u>.  If Checkmate closes a Qualified Financing (the date of such closing, the "<u>Closing Date</u>") within one year after the date of this Bonus Agreement (the "<u>Anniversary Date</u>"), then any earned Retention Bonus will be payable in cash no later than ten (10) business days after the later of the Bonus Date or the Closing Date. If Checkmate does not close a Qualified Financing by the Anniversary Date, then any earned Retention Bonus will be payable, at your discretion, (a) by conversion of any earned Retention Bonus, without interest, into Checkmate Common Stock at a price per share of $4.67, or (b) in cash, without interest, in fifteen

monthly installments beginning no later than ten (10) business days after your election of payment method is received by Checkmate. If you have not notified Checkmate in writing within 30 days after the Anniversary Date of your choice to have the Retention Bonus convert into Checkmate Common Stock or pay out in fifteen monthly installments, then Checkmate may select the payment method and notify you. As a condition to any earned Retention Bonus converting into Checkmate Common Stock, you and Checkmate will enter into a standard stock purchase agreement. Any payment of Retention Bonus in cash to employees of Checkmate or any of its subsidiaries will be made through Checkmate's or such subsidiary's payroll system on the next regular payroll date after the Payment Date unless such payroll date is within ten (10) business days of the Payment Date, in which case the payment may be made on the second regular payroll date after the Payment Date.

4.    <u>Termination of Employment</u>.  Notwithstanding any other provision of this Bonus Agreement, if you terminate your employment for Good Reason or if the Company terminates your employment for any reason, before the Bonus Date, you will be entitled to receive payment equal to the Initial Payment Amount and Final Payment Amount, each as adjusted or reduced as set out in this Agreement, each paid on the appropriate date set out in Section 1.

If you terminate your employment before the Bonus Date other than for Good Reason, you will not be eligible to receive any Initial Payment Amount or Final Payment.

"<u>Good Reason</u>" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

5.    <u>Dispute Resolution</u>.  Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "<u>Mediator Opinion</u>"). The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding. The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise

admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

6.     <u>Employment Terms</u>.  You and Checkmate acknowledge that neither this Bonus Agreement nor any other oral or written agreement between Checkmate (or any affiliate thereof) and you have established any contract of employment preventing either party from terminating the relationship for any reason.  Nothing in this Bonus Agreement may be construed to create any agreement for any indefinite or specific term of employment and you will at all times be an "at will" employee of Checkmate or an affiliate thereof.

7.     <u>Miscellaneous</u>.  This Bonus Agreement may be modified only by a contract in writing executed by the party to this Bonus Agreement against whom enforcement of the modification is sought. This Bonus Agreement: (i) contains the entire and final agreement of the parties to this Bonus Agreement with respect to the subject matter of this Bonus Agreement, and (ii) supersedes all negotiations, stipulations, understandings, letters, offers, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Bonus Agreement.  If any provision of this Bonus Agreement (including its attachments) is held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, such provision shall be deemed modified to the fullest extent permitted by such court in order to be legal, enforceable, or valid, unless such modification shall be deemed to be inconsistent with the intent of the parties hereto in which case such provision shall be deemed severed from this Bonus Agreement and the remaining provisions and this Bonus Agreement (without the affected provision) shall remain in full force and effect, if and to the extent practicable and equitable.  The failure or delay of either party to enforce at any time any provision of this Bonus Agreement shall not constitute a waiver of such party's right thereafter to enforce each provision of this Bonus Agreement.  You may not voluntarily or by operation of law assign, pledge, delegate or otherwise transfer or encumber all or any part of your rights, duties or other interests in this Bonus Agreement.  Subject to the foregoing, this Bonus Agreement is binding on and inures to the benefit of the successors-in-interest and assigns of each party to this Bonus Agreement (whether by merger, consolidation, or bulk transfer of Checkmate's assets, or otherwise).  Nothing in this Bonus Agreement may be construed to create, or contemplate the creation of, any trust arrangement or security interest.  This Bonus Agreement may be executed simultaneously in two (2) or more counterparts (and by facsimile copy), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bonus Agreement shall be governed in accordance with the laws of Delaware.

8.     <u>Section 409A</u>.  The provisions of this Bonus Agreement have been prepared with the intention to comply in all respects with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), and Treasury Regulations and other official guidance promulgated thereunder, and such provisions shall be construed and interpreted consistent with that intention.  A termination of employment shall not be deemed to have occurred for purposes of any provision of this Bonus Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A of the Code upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Bonus Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." For purposes of Section 409A of the Code, your right to receive any installment payments pursuant to this Bonus Agreement shall be treated as a right to receive a series of separate and distinct payments.  Whenever a payment under this Bonus Agreement specifies a payment period with reference to a number of days (e.g., "payment shall

be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of Checkmate.

9. <u>Termination</u>.  This This Agreement shall automatically terminate, and be of no further force and effect, upon the termination of the Merger Agreement in accordance with its terms.

***********

      Thank you for your cooperation in this transition.  The offer set forth in this Bonus Agreement may be revoked by Checkmate at any time prior to acceptance by you upon written notice to you and, if so revoked, cannot be accepted after such revocation.  Please contact the undersigned with any questions you may have.


Very truly yours,

Checkmate.com Inc.




_____

By: Vishal Agarwal

Its: Chief Executive Officer



ACCEPTED:




_____

Arjun Vasan

Date: _____

CHECKMATE.COM INC.

NON-COMPETITION AGREEMENT

This NON-COMPETITION AGREEMENT (this "*Agreement*"), dated April ___, 2024 is made by and between Arjun Vasan (the "*Stockholder*") and Checkmate.com Inc., a Delaware corporation ("*Acquirer*"). For purposes of this Agreement, "Company" shall be deemed to include Company and its direct and indirect subsidiaries.

BACKGROUND

A.        Acquirer and VoiceBite Corporation, a Delaware corporation (the "*Company*") are parties to an Agreement and Plan of Merger dated as of the date hereof (the "*Merger Agreement*"), pursuant to which Acquirer will acquire the Company (the "*Merger*"). Capitalized terms used, but not defined herein, shall have the meanings assigned to such terms in the Merger Agreement. Capitalized terms used, but not defined herein, shall have the meanings assigned to such terms in the Merger Agreement.

B.        Stockholder beneficially holds a substantial amount of the Company's capital stock, and will receive substantial consideration as a result of Stockholder's stock ownership in the Company upon the closing of the Merger (the "*Closing*").

C.        Stockholder understands and agrees that as a Company Employee and a key member of the Company's management and technical workforce, Stockholder will obtain, extensive and valuable knowledge, technical expertise, confidential information and other trade secrets concerning the Business.

D.        Stockholder will be hired as an at-will employee of Company, and Stockholder will derive significant value from Company's agreement to provide Stockholder with confidential and proprietary information relating to the business and operation of the Company in the course of Stockholder's duties to Company.

E.        This Agreement is necessary to protect Company's legitimate interests, including its legitimate interests in its confidential information and trade secrets. Stockholder understands and acknowledges that the execution and delivery of this Agreement by Stockholder is a material inducement to the willingness of Company to offer Stockholder employment by Company and is a condition of such employment, for the purpose of protecting Company's legitimate interests in its confidential information and trade secrets.

NOW, THEREFORE, in consideration of the foregoing premises and for good and valuable consideration, receipt of which is hereby acknowledged, Stockholder, intending to be legally bound, agrees as follows:

1.        **Certain Defined Terms**. As used herein:

"*Business*" means the Company's current business of providing artificial intelligence powered voice systems for phone answering or for restaurant drive through order processing.

"*Good Reason*" means: (i) a material reduction in Stockholder's job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because Stockholder will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from

any such acquisition; (ii) without Stockholder's prior written consent, the Company requires Stockholder to relocate to a facility or location more than thirty (30) miles away from the location at which Stockholder was working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in Stockholder's then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that no change in job title after the first anniversary of the Closing shall constitute Good Reason, and provided further that none of the foregoing events or conditions will constitute Good Reason unless Stockholder provides the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and Stockholder resigns his employment within 30 days following the expiration of that cure period.

"*Restrictive Period*" means the period commencing on the date hereof and ending on the date that is two years from the date hereof, provided that the Restrictive Period shall terminate if Stockholder terminates his employment for Good Reason or the Company terminates Stockholder's employment other than for Cause; provided that in the event that it is judicially determined that Stockholder has breached any provision of this Agreement, the Restrictive Period shall be automatically extended by a number of days equal to the total number of days in the period from the date on which such breach shall have first occurred through the date as of which such breach shall have been fully cured.

"*Cause*" means (i) Stockholder's failure or refusal to perform his duties to the Company in any material way after specific instruction from the Company which failure or refusal, if curable (in the reasonable determination of the Company), is not cured to the reasonable satisfaction of the Company within thirty (30) days after delivery of written notice thereof; (ii) Stockholder's failure to cooperate in any internal or external investigation involving the Company; (iii) Stockholder's indictment for, conviction of, or plea of guilty or nolo contendere to, any felony (whether or not any right to appeal has been or may be exercised) or any crime of moral turpitude; (iv) Stockholder's commission of fraud, embezzlement, dishonesty, misappropriation or reckless or willful destruction of the Company's property; (v) any act or omission constituting willful malfeasance, gross negligence or willful or gross misconduct relating to the business of the Company, in either case resulting in harm to the Company; (vi) Stockholder's breach of any statutory or common law duty of loyalty to the Company; or (vii) Stockholder's breach of this Agreement, the Merger Agreement, the Transaction Documents, Offer Letter, Confidential Information and Inventions Agreement, or other signed agreement with or for the benefit of the Company.

"*Restrictive Territory*" means the United States, the European Union and Canada and each other jurisdiction in which the Company has any customers, employees or operations during the Restrictive Period.

2.      **Agreement Not to Compete**. During the Restrictive Period and except as otherwise provided herein or unless approved by Company in writing, Stockholder agrees that Stockholder will not, as an employee, agent, consultant, advisor, independent contractor, general partner, officer, director, Stockholder, investor, lender or guarantor of any corporation, partnership or other entity, or in any other capacity, directly or indirectly, for himself or on behalf of any other Person (other than Company or any of its affiliates):

(a)      engage or participate in, or acquire any financial or beneficial interest in, any business that competes with the Business in the Restrictive Territory; or

(b)      induce or assist any other Person to engage in any of the activities described in subparagraph (a).

Notwithstanding the foregoing, Stockholder may own, directly or indirectly, solely as an investment, up

to 1% of any class of "publicly traded securities" of any business that is competitive or substantially similar to the Business. The term "publicly traded securities" shall mean securities that are traded on a national securities exchange or on the over-the-counter market.

3.    **Agreement Not to Solicit**. Stockholder further agrees that during the Restrictive Period, Stockholder will not, as an employee, agent, consultant, advisor, independent contractor, general partner, officer, director, Stockholder, investor, lender or guarantor of any corporation, partnership or other entity, or in any other capacity, directly or indirectly, for himself or on behalf of any other Person (other than Company or any of its affiliates):

(a)    solicit or attempt to solicit any of employees of Acquirer or the Company or induce any of employees of Acquirer or the Company to resign from their employment by Acquirer or the Company, as applicable; or

(b)    induce or assist any other Person to engage in any of the activities described in subparagraph (a).

4.    **Agreement Not to Disparage**. During the term of this Agreement and during the Restrictive Period, Stockholder agrees that Stockholder will not directly or indirectly or induce others to disparage Company or the Company in any manner that is harmful to the business, business reputation or reputation of Company or the Company. The executive  team of Company will not make any statement of a disparaging nature about Stockholder. Nothing in this paragraph shall prohibit a party from providing truthful information in response to a subpoena or other legal process, or otherwise required by law.

5.    **Acknowledgment**. Stockholder hereby acknowledges and agrees that:

(a)    this Agreement is necessary for the protection of the legitimate business interests of Company in acquiring the Company, including but not limited to trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers, patients, or clients, and/or customer or client goodwill associated with an ongoing business;

(b)    the covenants set forth herein are separately bargained-for consideration, and the execution and delivery and continuation in force of this Agreement is a material inducement to Company to enter into employment with Stockholder, without which Company would not offer or enter into such employment;

(c)    the scope of this Agreement is reasonable in duration, geographic scope and in the types of restricted activities;

(d)    Stockholder's expertise and capabilities are such that his obligations under this Agreement (and the enforcement thereof by injunction or otherwise) will not prevent him from earning a livelihood;

(e)    Stockholder represents and warrants that neither the execution and delivery nor the performance of this Agreement will result directly or indirectly in a violation or breach of any agreement or obligation by which Stockholder is or may be bound, the violation of which would impair Stockholder's ability to perform Stockholder's obligations under this Agreement; and

(f)    Stockholder has read and understands California Business and Professions Code Section 16601 regarding the enforceability of covenants not to compete. Stockholder acknowledges and

agrees that the covenants contained in this Agreement are a valid restraint on trade pursuant to Section 16601 and are binding and enforceable against Stockholder in accordance with their terms.

6. **Remedy**. Stockholder acknowledges and agrees that (a) the rights of Company under this Agreement are of a specialized and unique character and that immediate and irreparable damage will result to Company if Stockholder fails to or refuses to perform his obligations under this Agreement and (b) Company shall be entitled, in addition to any other remedies and damages available, to obtain an injunction in a court of competent jurisdiction to restrain any such failure or refusal without posting bond or other security, and without the necessity of proving actual damages. No single exercise of the foregoing remedies shall be deemed to exhaust Company's right to such remedies, but the right to such remedies shall continue undiminished and may be exercised from time to time as often as Company may elect.

7. **Severability**. If any provisions of this Agreement as applied to any part or to any circumstances shall be adjudged by a court to be invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. Company and Stockholder intend this Agreement to be enforced as written. If any provision, or part thereof, however, is held to be unenforceable because of the duration thereof or the area covered thereby, all parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases and in its reduced form such provision shall then be enforceable.

8. **Amendment**. This Agreement may not be amended except by an instrument in writing signed by Company's duly authorized representative, or his designee, and Stockholder.

9. **Waiver**. No waiver of any nature, in any one or more instances, shall be deemed to be or construed as a further or continued waiver of any breach of any other term or agreement contained in this Agreement.

10. **Headings**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11. **Governing Law**.

(a) This Agreement shall be construed and interpreted and its performance shall be governed by the laws of the state of Delaware without regard to conflicts of law principles of any jurisdiction.

(b) The parties hereto agree that any proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal court located in New York County in the State of New York or any New York state court located in New York County, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding in any such court or that any such proceeding brought in any such court has been brought in an inconvenient forum. Process in any such proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

12. **Dispute Resolution**. Any controversy, dispute or claim regarding whether a termination is for Cause shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Cause" as defined in this

4

Agreement (the "<u>Mediator Opinion</u>").  The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding.  The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

13.    **<u>Entire Agreement</u>**. This Agreement constitutes the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and undertakings, both written and oral, between the parties, with respect to the subject matter of this Agreement (but does not in any way merge or supersede the Stockholder's Offer Letter and or Confidential Information and Inventions Agreement with Company).

*[SIGNATURE PAGES FOLLOW.]*

**IN WITNESS WHEREOF**, Company and Stockholder have executed this Non-Competition Agreement on the day and year first above written.

**STOCKHOLDER:**

_____

**Arjun Vasan**

**IN WITNESS WHEREOF**, Company and Stockholder have executed this Agreement on the day and year first above written.

**CHECKMATE.COM INC**.
a Delaware corporation


By: _____
Name: Vishal Agarwal
Title:  Chief Executive Officer





SUBSCRIBE

# Checkmate Secures $10 Million in Series B Funding

**OCT** **23** 2024

---

News                                               Share:   

---

Checkmate, a leading provider of unified ordering solutions for enterprise restaurants, announced that it secured $10 million in Series B funding, led by Tiger Global. The round will enable Checkmate to accelerate the adoption of its voice AI and kiosk technologies across the industry and deliver the custom experience brands need. Checkmate has already developed world-class expertise in integrating digital orders into restaurant point-of-sale (POS) systems. This foundation serves as a critical advantage in entering these new business segments.

Checkmate offers best-in-class phone ordering and drive-thru AI solutions to some of the country's largest brands, all seamlessly integrated with their POS. The core business is profitable, and this additional round was raised primarily to bring these breakthrough technologies to mid-market and enterprise brands.

"With this investment, we're doubling down on our development of the technologies that are helping restaurants scale their operations, grow digital revenue, and improve efficiency," said Vishal Agarwal, Founder and CEO of Checkmate. "We are at the forefront of bringing voice AI to the restaurant space, given our existing network of customers and POS integrations. With Tiger Global's support, we will continue leading the charge in transforming the restaurant experience."

Securing Checkmate's Series B round underscores the company's ability to provide technology to restaurant brands at scale efficiently. With restaurant brands under pressure to meet the demands of digital-savvy customers, Checkmate empowers enterprises to launch unique



prepared for whatever the future holds.

---

News, Technology

---

 **QSR Uncut**                                      **Episodes**



## The Meteoric Rise of Taylor Chip, with CEO Doug Taylor

LISTEN TO THE EPISODE 🎧





Subscribe to A.M. Jolt

## Get daily updates on quick-serve industry news, tips, and events.

Your email address

SUBSCRIBE

 **More News News**

News

**Chipotle Creates 'Extra Sunday' Holiday, with Free Guac and Queso for Rewards Members**

News

**Domino's Pizza Customers Donates Over $18M to St. Jude Children's Research Hospital**

News

**Pizza Guys Rides Growth Into 2025 with New Deals and Openings**



Subscribe to A.M. Jolt

## Get daily updates on quick-serve industry news, tips, and events.



  

Search articles, media, resources, sup|

SUBSCRIBE



QSR delivers timely and in-depth reporting on the $350 billion quick-service restaurant industry. For 25 years, QSR has defined this market, including traditional fast food, fast casual, coffee, snacks, concessions, and related segments of the foodservice industry.

**ADVERTISE** | **CONTACT**

© 2025 WTWH Media, LLC. All rights reserved.

Privacy Policy | Terms & Conditions





CStoreDecisions

# Checkmate.com, Inc. Employee Handbook



10/04/2023



ARI CAI COI FLI ILI KSI MEI MDI MII MNI MOI NVI NJI NYI NCI ORI PAI TNI TXI VAI WI

Christmas Day

When holidays fall or are celebrated on a regular work day, hourly employees will receive one (1) day's pay at their regular straight-time rate, and an additional payment of straight-time for the actual time they work that day. Salaried employees who are called in or scheduled to work on a holiday will receive a floating holiday to be used at a later date.

If a holiday falls within an eligible employee's approved FTO period, the eligible employee will be paid for the holiday instead of the approved FTO day.

If a holiday falls within a jury duty or bereavement leave, the eligible employee will be paid for the holiday instead of jury duty or bereavement leave.

FTO or Unpaid Time Off may be granted to employees who desire to observe a religious holiday that is not recognized by the Company, provided undue hardship is not introduced to the company.

## 3-3. Flex Time Off

Checkmate.com, Inc. appreciates how hard employees work and recognizes the importance of providing time for rest and relaxation.

US employees enjoy an unlimited Flexible Time Off or FTO policy. This means employees do not accrue nor are they allotted an amount of FTO time based upon hours worked or tenure with the organization. Employees who have been employed for at least three (3) consecutive months may be eligible for FTO.

We recognize that our employees deserve and need their time off for renewal and rejuvenation. That said below are the conditions for utilizing IACM's Unlimited FTO policy.

- To be eligible for this benefit you must be employed by IACM for a minimum of 30 days.
- All FTO must be scheduled and approved by your manager in advance of taking the time off, whenever possible.
- Employees should understand that due to staffing needs, sometimes, not all leave requests can be honored. Advance requests are still subject to the appropriate approval.
- Employees are required to meet all established performance goals despite the absences.
- Except for those on protected leave (such as state or federal family and medical leave), if an eligible employee is unable to meet the expectations outlined above, IACM reserves the right to temporarily revoke unlimited leave.
- Continued abuse of this leave could result in disciplinary action, which may include separation of employment.

## 3-4. Lactation Accommodations

Checkmate.com, Inc. will provide a reasonable amount of break time to accommodate employees desiring to express breast milk for their child, in accordance with and to the extent required by applicable law. The break time, if possible and permitted by applicable law, must run concurrently with rest and meal periods already provided. If the break time cannot run concurrently with rest and meal periods already provided, the break time will be unpaid, subject to applicable law.

The Company may not be able to provide additional break time if doing so would seriously disrupt the

Company's operations, subject to applicable law.

The Company will make reasonable efforts to provide employees with the use of a room or location in close proximity to the employee's work area, other than a bathroom, to express milk in private. This location may be the employee's private office, if applicable. Please consult the CEO with questions regarding this policy.

Employees should advise management if they need break time and an area for this purpose. Employees will not be discriminated against or retaliated against for exercising their rights under this policy.

## 3-5. Workers' Compensation

On-the-job injuries are covered by Checkmate.com, Inc.'s Workers' Compensation Insurance Policy, which is provided at no cost. If employees are injured on the job, no matter how slightly, they should report the incident immediately to their supervisor. Failure to follow Company procedures may affect the ability of employees to receive Workers Compensation benefits.

This is solely a monetary benefit and not a leave of absence entitlement. Employees who need to miss work due to a workplace injury must also request a formal leave of absence. See the Leave of Absence sections of this handbook for more information.

## 3-6. Jury Duty

Checkmate.com, Inc. realizes that it is the obligation of all U.S. citizens to serve on a jury when summoned to do so. All employees will be allowed time off to perform such civic service as required by law. Employees are expected, however, to provide proper notice of a request to perform jury duty and verification of their service.

Employees also are expected to keep management informed of the expected length of jury duty service and to report to work for the major portion of the day if excused by the court. If the required absence presents a serious conflict for management, employees may be asked to try to postpone jury duty.

Employees on jury duty leave will be paid for their jury duty service in accordance with state law; employees will be paid their full salary unless they are on leave for an entire workweek during which no work is performed. If so, they may use FTO paid time off for leave taken under this policy.

## 3-7. Bereavement Leave

The death of a family member is a time when employees wish to be with their families. If the employee is full-time and loses a close relative, the employee will be allowed paid time off of up to four (4) workdays to assist in attending to obligations and commitments. For the purposes of this policy, a close relative includes a spouse, domestic/civil union partner, child, parent, sibling, aunt, uncle, cousin, in-laws or any other relation required by applicable law. Paid leave days only may be taken on regularly scheduled, consecutive workdays following the day of death. Employees must inform their supervisor prior to commencing bereavement leave. In administering this policy, Checkmate.com, Inc. may require verification of death.

Employees should follow individual applicable state laws.

## 3-8. Voting Leave

In the event employees do not have sufficient time outside of working hours to vote in a statewide election, if required by state law, the employee may take off enough working time to vote. Such time will be paid if required by state law. This time should be taken at the beginning or end of the regular work schedule. Where possible, supervisors should be notified at least two (2) days prior to the voting day.

## 3-9. Insurance Programs

Full-time employees may participate in Checkmate.com, Inc.'s insurance programs. Under these plans, eligible employees will receive comprehensive health and other insurance coverage for themselves and their families, as well as other benefits.

Upon becoming eligible to participate in these plans, employees will receive summary plan descriptions (SPDs) describing the benefits in greater detail. Please refer to the SPDs for detailed plan information. Of course, feel free to contact the CEO with any further questions.

## 3-10. Long-Term Disability Benefits

Full-time employees are eligible to participate in the Long-Term Disability plan, subject to all terms and conditions of the agreement between Checkmate.com, Inc. and the insurance carrier.

This is solely a monetary benefit and not a leave of absence. Employees who will be out of work must also request a formal leave of absence. See the Leave of Absence sections of this handbook for more information.

## 3-11. Salary Continuation

Checkmate.com, Inc. provides enhanced monetary short-term disability benefits to full-time employees. These enhanced monetary benefits are inclusive of any monetary workers' compensation or statutory short-term disability benefits.

This is not a leave of absence provision. Employees who will be out of work must request a leave of absence. See the Leave of Absence sections of this handbook for more information. Employees will be required to submit medical certification as requested by Checkmate.com, Inc. Required medical certification under this policy may differ from the medical certification required for any leave of absence requested.

## 3-12. Employee Assistance Program

Checkmate.com, Inc. provides the Employee Assistance Program, which offers qualified counselors to help employees cope with personal problems they may be facing. Further details can be obtained through Human Resources.

 Gmail

**Arjun Vasan <arjun.vasan@gmail.com>**

---

## Fwd: Medical Leave request - Certification for serious Health Condition for your Doctor to complete

1 message

---

**Amy Brown** <amy.brown@itsacheckmate.com>                    Wed, Oct 23, 2024 at 7:27 AM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Jennifer Young <jennifer@itsacheckmate.com>

Hi Arj,

I realized I forgot to include your personal email in my previous message regarding the medical certification form that needs to be completed by your doctor. Please ensure the form is returned by November 7, 2024.

Additionally, please let us know the duration of unpaid personal leave you are requesting for your medical condition so we can better understand your expected return-to-work date.

Let me know if you have any questions.

Regards,



Amy Brown
Vice President of Human Resources | U.S.
+1 855.953.4340

---------- Forwarded message ---------
From: **Amy Brown** <amy.brown@itsacheckmate.com>
Date: Wed, Oct 23, 2024 at 8:39AM
Subject: Medical Leave request - Certification for serious Health Condition for your Doctor to complete
To: Arjun Vasan <arjun@itsacheckmate.com>
Cc: Jennifer Young <jennifer@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Hi Arj,

Per your Slack message this morning regarding your request for medical leave, which you sent to Mike, Vishal, and me, I have attached the required "Certification for Employee's Serious Health Condition" form. Please have this form completed by your doctor and return it by November 7, 2024.

Let me know if you have any questions or need further assistance.

Regards,



Amy Brown
Vice President of Human Resources | U.S.
+1 855.953.4340

---

*This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential*

*and may contain information that is privileged or exempt from disclosure under applicable law.  If you have received it in error, please notify the sender by return email and delete this message*.

**Arjun Vasan - Certification for Employees Serious Health Condition.pdf**
263K

 Gmail

Arjun Vasan <arjun.vasan@gmail.com>

## Access Disabled due to security protocol

14 messages

---

**Amy Brown** <amy.brown@itsacheckmate.com>                        Sun, Nov 3, 2024 at 9:59 PM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Hello Arj,

This email is to inform you that Security has disabled your access to Slack and your Checkmate email in keeping with our security guidelines.

Also, I need confirmation if you will be returning to work on Wednesday, November 6th since the two weeks of leave will end at this time.

If you need to stay out on leave, let me know how long your doctor is wanting you off work as soon as possible.   Please note, if you do continue needing a personal leave, the rest of the time will be unpaid.

If you have any other questions, let me know.

Regards,

 Amy Brown
Vice President of Human Resources | U.S.
+1 855.953.4340

***This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential and may contain information that is privileged or exempt from disclosure under applicable law.  If you have received it in error, please notify the sender by return email and delete this message.***

---

**Arjun Vasan** <arjun.vasan@gmail.com>                        Mon, Nov 4, 2024 at 7:32 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Amy, Mike, Vishal,

I was originally planning to return on the 7th (as that was the date given earlier). The staff is filling out the form in case after evaluation on Wednesday they think I should stay here longer. However, my current plan is that the 7th will be my return date. I have been, in the limited time I have with my computer (30 mins a day at the moment) and phone (1 hour a day), been working with Robert, Chris and Jeff to explain how certain things work and what is needed to stabilize the system, get sarpino's off the ground, get zalat numbers up and so on.

I am sure that the aforementioned would confirm I am the opposite of a security risk, and would like my accounts restored as I am still contributing to the project actively.

```

Hi Arj,

Per your Slack message this morning regarding your request for medical leave, which you sent to Mike, Vishal, and me, I have attached the required "Certification for Employee's Serious Health Condition" form. **Please have this form completed by your doctor and return it by November 7, 2024.**

Let me know if you have any questions or need further assistance.

Regards,
```

- Arj

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Mon, Nov 4, 2024 at 7:38 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

I would also like to check in on the partial signing bonus payment, the release indicated it would be paid within 10 days. It has now been 15 since I signed it.

I do not see it in either of my bank accounts. Furthermore, some of my ADP logins are only stored on the checkmate email, so I cannot check there at the moment if it was sent.

- Arj

[Quoted text hidden]

---

**Amy Brown** <amy.brown@itsacheckmate.com>                                Mon, Nov 4, 2024 at 7:57 AM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Hi Arj,

As we discussed, you initially requested two weeks of paid leave starting from your emergency leave on October 23, 2024. This means your paid leave period will conclude on Tuesday, November 5, 2024, with your scheduled return date set for Wednesday, November 6, 2024. The deadline for your medical certification form remains separate from your return-to-work date.

Since you are planning to return on Thursday, November 7, 2024, pending your doctor's approval, Wednesday, November 6, 2024, will be considered an unpaid day, as it extends beyond your allocated two weeks of paid leave.

Please note that, in compliance with our SOC 2 security protocols, your access will remain restricted until your official return. We will restore your access on your confirmed return date.

If you have any questions or need further clarification, please feel free to reach out.

Regards,



Amy Brown
Vice President of Human Resources | U.S.
+1 855.953.4340

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Mon, Nov 4, 2024 at 8:29 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

I'll return on Wednesday then. I was under the impression that at checkmate, there was unlimited paid leave, as long as the work was done, as Chris was able to take a month off. But fine, though I think its unfair, considering the number of weekends I worked that this small courtesy is not extended to me.

You did not answer my question about the bonus payment.

- Arj



Sent from Gmail Mobile

[Quoted text hidden]

---

**Mike Bell** <michaelb@itsacheckmate.com>                                            Mon, Nov 4, 2024 at 9:35 AM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Arj,
We are going to talk to you about the partial bonus payment when you are back on Wednesday, not before.
Thanks,

Mike

[Quoted text hidden]
--



Michael Bell
Chief of Strategy

+1 855.953.4340    itsacheckmate.com

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                            Mon, Nov 4, 2024 at 12:44 PM
To: Mike Bell <michaelb@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

What is there to talk about? It was an agreement that very clearly stipulates payment within 10 days. To be honest, I don't know for sure if my doctor will clear me. I had symptoms of severe sleep deprivation, panic attacks and exhaustion and was kept under medication until a few days ago. I feel fine personally now and that is what I will tell the doctor.

What if I can't return on Wednesday? Please send the executed document, which is in my checkmate email, so I can confer with my attorney.

- Arj

[Quoted text hidden]

---

**Amy Brown** <amy.brown@itsacheckmate.com>                                            Mon, Nov 4, 2024 at 1:03 PM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Arj,

I have noted that you will return from your personal leave on Wednesday, November 6, 2024.

Your leave is for a medical reason, according to the company's Flex Time Off policy. You can refer to our Employee Handbook in ADP, under our Flex Time Off Policies, which states: When an employee needs to be out for more than two (2) weeks for medical leave, they will need to apply for FMLA to be qualified for a Personal Leave of absence without pay.

You can review our policies in ADP under the Quick links. I have also attached the Flex Time Off policy and I have highlighted the bullet point that pertains to your leave.

## Quick Links

Compliance Updates
Invoices

My Information
TotalSource Forms LibraryCompany Policies
Direct Deposit
Pay Statements
myLearning@ADP
Optum Spending Accounts

Checkmate Employee Handbook 8.5.2024.pdf

WSE Benefit Presentation - 2024-2025 Benefit Year.pdf

FAQs

Please note, if your Doctor wants to keep you on leave, your unpaid time will start on Wednesday, November, 6 per our Time Off Policy since you're out for a Medical Personal Leave.

Regards,



**Amy Brown**
Vice President of Human Resources | U.S.
+1 855.953.4340

[Quoted text hidden]

---



**Checkmate Handbook- Flex Time Off Policy.pdf**
31K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                Mon, Nov 4, 2024 at 1:15 PM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Thank you Amy for the quick response. We are getting the paperwork filled out in case the medical staff recommends additional time off.

I still need the executed partial bonus document, please send at the earliest convenience.

- Arj

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                Tue, Nov 5, 2024 at 9:57 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Hi Amy, Vishal, Mike,

The staff has filled out and are sending the paperwork, it states 12/6 as return date, though i will be re evaluated weekly and am likely to return much earlier. Will keep you posted.

- Arj

Sent from Gmail Mobile

[Quoted text hidden]

---

**Amy Brown** <amy.brown@itsacheckmate.com>                                      Tue, Nov 5, 2024 at 12:49 PM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Hi Arj,

I received the medical certification form indicating that you will be out until December 6, 2024. If your doctor clears you to return before that date, please provide a release form confirming you're approved to resume work.

Please note that your unpaid leave starts tomorrow, November 6, 2024. As a result, your November 15 paycheck will include only two days of pay (November 4 and November 5).

Upon your return, we look forward to discussing the proposed updates to your job title and responsibilities.

Regards,



Amy Brown
Vice President of Human Resources | U.S.
+1 855.953.4340

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                          Thu, Nov 7, 2024 at 7:46 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Thank you Amy, I understand that policy and staff is handling short term disability to cover the gap.

Mike, Vishal, for the third time, I am requesting the executed partial bonus agreement, or payment made to my account. There is no stipulation that about medical leave in the document as far as I know (and if there was, what kind of company would put such a thing in?) If you are not paying, either explain "it's coming in a few days" or why it's not.

As requested, on September 1st I shared the codebase with luke/matthias and opened everything up. Then I truly overworked and burned myself out completely so checkmate could give a good demo and keep Popeye's on track, also as requested.

Everyone will confirm that it was me that made that happen. I did my job, and Chris' job since he was gone.

I made you a specific promise Vishal. I didn't drop the catch. Please reciprocate.

- Arj

Sent from Gmail Mobile

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                          Thu, Nov 7, 2024 at 8:13 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal <vishal@itsacheckmate.com>

Further, during the  weeks prior to medical leave,  and in fact stated that multiple times that i was exhausted, "going crazy", hadn't slept .. in email and over slack. I also menAnd that i was still not going to stop, for the company/and my team. I was not going to drop the catch.

And it wasn't just work. I led/motivated the team, worked closely with voiceops, with eriq bloomquist and many others, professionally, despite exhaustion.

The primary mental symptoms of severe sleep deprivation is impaired judgement, anxiety, irritability,

As per FMLA, and I am not a lawyer, and do not wish to get pietari involved more than necessary, however it would be legally questionable to demand a demotion for a few slack rants/ and a single in person outburst that are directly attributable to the cause of the medical leave. Or for taking FMLA leave.

So let's figure out a path forward that addresses both the company's concerns .. that I am not a manager and have never claimed to be. Which is why i asked to be VP of Technology and not VP Engineering. And over the most critical time for the company, i did both those jobs and VP of Product (for ai) as well.

I am the leader, and visionary, that took on the *biggest responsibility* of all. I was going to make Popeyes work, even when it seemed impossible.

So I ask again that you respect that, and retain my title. All the other things are fine.

Sent from Gmail Mobile
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                     Thu, Nov 7, 2024 at 8:43 AM
To: robert nessler <robert.nessler@gmail.com>, chrislam.contact@gmail.com

Please read and strategize how to back me up and retain my title and leadership role. I dont care about people management, that was supposed to be Christian's role but they screwed that up (worked out well regardless for him, happily)

But I am the tech leader of the team and everyone knows it. Changing that, i would definitely leave.

Sent from Gmail Mobile
[Quoted text hidden]

 Gmail

**Arjun Vasan <arjun.vasan@gmail.com>**

---

## Important Information Regarding Your Benefits and Leave of Absence
12 messages

---

**Amy Brown** <amy.brown@itsacheckmate.com>                     Tue, Nov 12, 2024 at 12:36 PM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Jennifer Young <jennifer@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal
<vishal@itsacheckmate.com>

Hello Arj,

As your return-to-work date is currently set for December 6, 2024, ADP TotalSource has informed me that your benefits
coverage will end on November 30, 2024, due to your status on an unprotected Personal Leave of Absence.

The ADP TotalSource Benefits Department will send you information on COBRA coverage within 30 days of your benefits
expiration, which is November 30, 2024. If you choose to elect COBRA, your coverage will be retroactively effective
starting December 1, 2024.


Please feel free to reach out with any questions or if you need further assistance.



Regards,

 Amy Brown
Vice President of Human Resources | U.S.
+1 855.953.4340


***This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential
and may contain information that is privileged or exempt from disclosure under applicable law.  If you have
received it in error, please notify the sender by return email and delete this message***.

---

**Arjun Vasan** <arjun.vasan@gmail.com>                        Wed, Nov 13, 2024 at 7:37 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Jennifer Young <jennifer@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal
<vishal@itsacheckmate.com>

I dont understand, am I not on FMLA protections?

Sent from Gmail Mobile
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                        Wed, Nov 13, 2024 at 7:53 AM
To: Amy Brown <amy.brown@itsacheckmate.com>
Cc: Jennifer Young <jennifer@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>, Vishal Agarwal
<vishal@itsacheckmate.com>

Amy, you sent the form for FMLA, i filled it out and you accepted it. How is this an "unprotected personal leave of
absense?" Please inform at the earliest, as i understand it, a reduced schedule FMLA grants the same protections for 12
weeks.

I am eager to get back to work and help my team, while i am still under in patient medical care, we have come to arrangement where I can work for 5 hours a day, updated as i get better.

I am taking classes in anger management and controlling my emotions. Most importantly i'm sleeping well, and have a schedule.

I will dramatically accelerate this project, and this will be confirmed universally by chris, robert, jeffrey, pranav, paul and sam.

- Arj

Sent from Gmail Mobile

[Quoted text hidden]

---

**Vishal Agarwal** <vishal@itsacheckmate.com>                                           Wed, Nov 13, 2024 at 9:03 AM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Jennifer Young <jennifer@itsacheckmate.com>, Mike Bell
<michaelb@itsacheckmate.com>

Hi Arj,

Thank you. We'd like to have a discussion with you right away about this. Can you jump on the call, we have created this link for our meeting: https://itsacheckmate.zoom.us/j/85854457061?pwd=8AbRT8FKPjPE1voT1bGHvqbAbK0K4M.1

Or let us know when you are available please.

Please confirm via email once you are able to join.

Regards,



+1 855.953.4340  |  itsacheckmate.com

[Quoted text hidden]
[Quoted text hidden]

---

**Vishal Agarwal** <vishal@itsacheckmate.com>                                           Wed, Nov 13, 2024 at 9:26 AM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Hi Arj,

We don't want to rush this but it will be difficult for all of us to get on a call today. Please let us know if a call tomorrow at 11 am ET works for you, and I can send an invite.

Regards,



+1 855.953.4340  |  itsacheckmate.com

[Quoted text hidden]
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                                 Wed, Nov 13, 2024 at 10:12 AM
To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Ok that works.

Sent from Gmail Mobile

[Quoted text hidden]

---

**Vishal Agarwal** <vishal@itsacheckmate.com>                    Wed, Nov 13, 2024 at 11:04 AM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Thank you, I've sent an invite.

Regards,



**Vishal Agarwal**
FOUNDER AND CEO
+1 855.953.4340 | itsacheckmate.com

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                    Wed, Nov 13, 2024 at 8:49 PM
To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Ok, I've informed the staff here, but cannot guarantee I will get my phone in time, as it's held by the staff and the morning nurse gets here at 8 and has the keys. So I may be a few minutes late, but will make every attempt to be on time. In case I am delayed by more than 5 minutes, I will reply here as soon as I get the phone.

- Arj

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                    Wed, Nov 13, 2024 at 8:49 PM
To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

(i get my computer 5-9pm and phone in the morning 8-9am usually, which is the 5 hour approved schedule they approved)

[Quoted text hidden]

---

**Vishal Agarwal** <vishal@itsacheckmate.com>                    Wed, Nov 13, 2024 at 8:58 PM
To: Arjun Vasan <arjun.vasan@gmail.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Noted, thank you for the update Arj.

Regards,



**Vishal Agarwal**
FOUNDER AND CEO
+1 855.953.4340 | itsacheckmate.com

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                    Thu, Nov 14, 2024 at 8:00 AM
To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Ok got my phone and computer, joining now.

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                        Thu, Nov 14, 2024 at 8:43 AM
To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Just to be clear, i never actually solicited anyone to leave checkmate. I never mentioned lunchbox to anyone. I reached out to them after:

1. My partial bonus wasn't paid as agreed
2. My access to checkmate slack/email was disconnected. I believed that was an indication of being terminated.

Wrt settlement, I'd like to see the proposed terms asap. If they do not align with the merger agreement, i will need to engage pietari to represent me.

- Arj


Sent from Gmail Mobile

[Quoted text hidden]



December 6, 2024

Ryan Q. Keech
Partner
Ryan.Keech@klgates.com

T +1 310 552 5070
F +1 310 552 5001

**VIA ELECTRONIC MAIL ONLY**

Pietari Grohn, Esq.
GC+ Law Group
101 The Embarcadero, Suite 211
San Francisco, California 94110
pietari@gcpluslaw.com

Re:    **VoiceBite/Arjun Vasan – Notice of Direct Claim**

Dear Mr. Grohn:

We understand that you represent Arjun Vasan. Pursuant to Section 8.3(c) of the Agreement and Plan of Merger ("Merger Agreement") entered into by and between our client Checkmate.com Inc. ("Checkmate") in connection with Checkmate's April 2024 acquisition of VoiceBite Corporation ("VoiceBite"), we write to (a) inform you that we have been retained to investigate claims and defenses against your client arising out of his conduct in connection with such transaction and his recently-ended service as a Checkmate employee; and (b) provide you with notice of our client's Direct Claim for indemnification for certain Company losses against your client, Arjun Vasan.[1] We ask that you please direct all correspondence regarding this matter to our attention.

By way of background: as you know, Mr. Vasan became an employee of Checkmate as a result of a series of transactions that closed on or about April 30, 2024, whereby Checkmate acquired a controlling interest in VoiceBite. As you also know, VoiceBite was co-founded by Mr. Vasan and held itself out to Checkmate, the market and the public as holding the rights in certain software enabling the provision of highly valuable AI-based phone ordering solutions. Much of the reason for Checkmate's agreement to acquire a controlling interest in VoiceBite AI was premised on VoiceBite's presumed ownership of its own intellectual property and your client's related express representations and warranties concerning same, which representations and warranties were backed up by several express indemnification provisions.

As part of the Checkmate/VoiceBite transaction, your client – as a "Pre-Closing Holder" – guaranteed the accuracy of the following:

---

[1] Such notice will also be provided to additional parties, as may be appropriate and required.

- That your client was the "owner, inventor and/or author" of certain assigned intellectual property related to VoiceBite software (namely, a "comprehensive set of components of an AI voice ordering system" (*see* Company Disclosure Schedule, Section 5.9)), and that such intellectual property was not subject to "any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party" or "any claim of any prior employer or third party client" of your client (Arjun Assignment Agreement, Section 3);

- That VoiceBite "owns, free and clear of any Encumbrances (other than Permitted Encumbrances), or has a valid and enforceable right to use, all Intellectual Property used or proposed to be used in connection with the operation and conduct" of its business (Checkmate/VoiceBite Merger Agreement, Section 5.9(c));

- That neither VoiceBite "nor any of its current or proposed products or services have infringed upon, misappropriated or are currently infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person" (*Id*., Section 5.9(f));

- That "no source code for any Company Proprietary Software has been delivered, licensed, or made available" to any person "who is not an employee of the Company" (*Id*., Section 5.9(h));

- That your client would "not bring onto [VoiceBite]'s premises" any "property belonging to a former employer or any other person to whom I have an obligation of confidentiality unless that former employer or person has consented in writing" (Vasan Trade Secret Acknowledgement);

- That "[n]either this Agreement nor any agreement, attachment, schedule, exhibit, certificate or other statement delivered pursuant to this Agreement or in connection with the transactions contemplated hereby omits to state a material fact necessary in order to make the statements and information contained herein or therein, not misleading." (Checkmate/VoiceBite Merger Agreement, Section 5.19); and

- That your client was "not aware of any information necessary to enable a prospective purchaser of the Company Shares or the business of the Company and its Subsidiaries to make an informed decision with respect to the purchase of such Company Shares or business that has not been expressly disclosed herein." (*Id*).

The importance of ensuring complete and unassailable rights to purported VoiceBite intellectual property – again, a primary reason for the transaction – was repeatedly and explicitly made crystal-clear to your client. He agreed, among other things, that in the event any of these representations and warranties turned out to be inaccurate, he would take on several responsibility for "any and all claims, liabilities, obligations, damages, losses, penalties, judgments, costs and expenses (including amounts paid in settlement, costs of investigation and reasonable attorney's fees and expenses), whenever arising or incurred" arising therefrom or relating thereto. (Checkmate/VoiceBite Merger Agreement, Section 8.1(a)).



December 6, 2024





3

December 6, 2024

And still more troubling evidence has come to light indicating that portions of VoiceBite code appear to have been authored and by and subject to ownership claims by yet another *third party*: Vasan Varadarajan.



The import of all of this is clear. When your client assured Checkmate and VoiceBite in so many words that they were the *exclusive* and *rightful* owners of all of the *original* code at the heart of VoiceBite's technology, Mr. Vasan was either knowingly lying or was recklessly untruthful in a way that suggests not only breaches of the relevant agreements, but serious civil or even criminal misconduct. None of this is consistent with your client's obligations under his agreements and all, taken together, entitle Checkmate to compensation and disentitle your client to claim that he is owed the compensation that he claims to be owed for what he appears to consider to be some kind of "Good Reason" resignation.

We would be remiss if we did not directly address just how misguided your client is on that last point: as you know, on November 13, 2024, your client claimed that he was "resign[ing] from [Checkmate], with good reason, due to the demand made in late October that I accept a demotion, despite exceptional performance." Email from Vasan to Agrarwal dated November 24, 2024. He subsequently claimed entitlement to a "Retention Bonus" of "~475K," $72,000 in severance, $140,000 in a "Performance Bonus," certain "estimated" "Reimbursements" and "Legal Fees," for a total settlement amount of "[a]pproximately $690,000-$700,000." Your client well knows that he did not exemplify "exceptional performance" during his time with Checkmate. To the contrary, his time with Checkmate was marred by a consistent failure to demonstrate the professionalism and conduct expected of company executives and to comply with the company's culture of courtesy and professionalism. The end of your client's employment came as a result of his own inability to conduct himself with appropriate professionalism; it is *your client* that owes Checkmate significant funds arising out of his obligation to indemnify Checkmate for losses arising out of his conduct, and it is your client who must and will pay for those losses and do so immediately. For these and other reasons, Checkmate (a) rejects your client's "Good Reason" resignation; and (b) further rejects the purported "settlement" demand as outrageous and unsupported under the circumstances.

In light of the results of Checkmate's ongoing investigation into the foregoing significant concerns regarding your client's conduct, together with the misrepresentations regarding the ownership of and rights to VoiceBite's intellectual property, Checkmate has no intention to make any more payments to your client at this time. *See* Checkmate/VoiceBite Merger Agreement, Section 3.3 ("Each of Purchaser, Merger Sub and the Surviving Corporation will be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it reasonably determines in good faith it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable Law."). Rather, Checkmate expects *your client* to provide *Checkmate* with immediate reimbursement for all of Checkmate's related out-of-pocket expenses associated with the Merger Agreement and otherwise including, but not limited to, attorney's fees, reimbursement expenses, and other related costs incurred.

4

Please let us know if you have any questions regarding the foregoing.  Otherwise, nothing herein is intended to be, nor should it be construed as, a waiver or limitation of any of Checkmate's or VoiceBite's rights, claims or defenses in this matter, all of which are and will remain expressly reserved.

Very truly yours,

Ryan Q. Keech

5

December 6, 2024

Exhibit-K-Termination-Meeting - Transcript & Screenshots

## Transcript of Termination Meeting on 11/14/24 at 8:00AM

**Arj - Arjun Vasan (Plaintiff)**

**Amy Brown**
Good morning. How are you? Well, you know, I'm good, ready to complete paperwork. I will see what today has in store.

Yeah, very exciting stuff.

**Mike Bell**
So I'm like, my zoom is frozen. My camera is not coming up. So I might. We didn't try again.

**Amy Brown**
We see. Okay.

**Mike Bell**
Yeah. Okay. I'm going to click back in.

**Amy Brown**
Okay. Hi, Michelle.

**Vishal Agarwal**
Hello.

**Amy Brown**
Mike's having problems with this video. So he was going to back out and come back in so I'm not sure.

I see you still there. This meeting is being recorded.

**Vishal Agarwal**
Hello, aren't just waiting for Mike, he's rejoining.

**Amy Brown**
There he is.

**Mike Bell**
Hello guys, there we go.

**arj**
Sorry, technical problems.

Vishal Agarwal
Good morning.

**arj**
How are you feeling? I don't want to hear you.

**Vishal Agarwal**
Sorry, voice is on.

**Mike Bell**
we're able to hear you.

**arj**
No, no. Let me turn to Mike.

**Vishal Agarwal**
Yeah.

**arj**
I'm really not.

**Vishal Agarwal**
Not very clearly now.

**arj**
I'm going to do that in a minute.

**arj**
Hi, can you hear me?

**Vishal Agarwal**
Yeah, I'm going to. Sounds good. How are you feeling?

**Arj**
Definitely like a lot better. know, finally slept for a couple of weeks. Properly rich. Yeah, hadn't been doing. So I.

And now my father. And they've said that, you know, they don't want me to, they want me to build like work-life balance for something I never really had.

So, like, I know it's only five hours day for now, but we can upgrade that, you know, weekly as a doctor says.

████████████████████████████████████

It usually happens when I go and sleep. And I have a tendency to get like very obsessed about things, so I would get very obsessed with but, you know, it goes the next year's.

actions I did, I'm not trying to make an excuse for a reason. I'm just saying that I'm doing better now.

And I think that, you know, I'm being sort of keeping up with, you know, with Robert Chris and Jeffrey and what's happening.

And I mean, I really think that there's some knowledge transfer that needs to happen. Even if, like, even if it's not a corporate bit, like, I kind of agree, maybe it is a corporate bit with Burmese and Shekman.

**Vishal Agarwal**

Arj al, just stopped you right there. **This call is to let you know that you're being terminated with immediate effect**.

Right now, right this second. It has nothing to do with the history and **nothing to do with anything that we have discussed in the past** or the choice for the motion and the outburst.

It has nothing to do with that. **It has purely to do with the fact you reached out to our competitor asking to join them and bring two of the engineers along with you I have the e-mails with me right now it is so disappointing Arj,** I fought for you

**Arj**
yeah but you didn't pay me my thing so I thought you guys were trying to screw you over sure

**Vishal Agarwal**
so this call is to tell you that because of that action irrespective of anything that has happened in the past **you're being terminated with immediate effect** and we can take one of two courses from here we can either work out a final settlement solution or you can get a lawyer involved either way is final but I just want you to let you know that the email that you sent out to our competitor is in my position possession both the e-mails that you sent to them and that

is not acceptable at all. We were looking to work out a solution. Until Friday afternoon, I was fighting for you, Ajay.

I really thought we could still make this work. Not anymore. Because that is one thing that we cannot be okay with.

**iPhone**
But I thought that you were going to terminate me anyways. This is why I reached out. you get to have a look.

I apologize for that. It was a act of not accepting, not accepting.

**Vishal Agarwal**
All of your access will be terminated. All of the team members will be informed about this. So you can choose to release.

in this up to you now on whether you want to, you know, work out a solution between us or you want to get lawyers involved.

**Are**
Okay, what is your proposal? What is your proposal then?

**Vishal Agarwal**
We will review and get back to you on that.

**Mike Bell**
It's not what it's called. Yeah.

**Vishal Agarwal**
Yeah, that is not, you know, what we are here to talk about. We can review and get back to you.

But at this moment, we just wanted to make something absolutely clear that you're being completely terminated with with no regard to anything that else that has happened in the past.

And it is only because you reached out to a competitor and you have offered to bring and coach two of the engineers from this company, which is a clear violation of a non solicitation.

So that's the end of this call. And we will be in touch.

**Are**
Well, I wasn't technically, I was on leave, right? I wasn't actually in the company.

**Vishal Agarwal**
It's not a discussion.

**iPhone**
I didn't reach out to him prior to being disconnected from trickling, but I thought was the anticipation of being fired.

**Vishal Agarwal**
Like I'm saying, you can either get a lawyer to have these discussions, **but the decision that we're communicating to you is not a discussion**.

Mike, is there anything you both want to add, please?

**Mike Bell**
No, just if you want to negotiate a settlement with us and reach out directly, if you'd rather turn that over to a lawyer representing you, that's fine as well.

**Are**
We have one already. So just let us know. Ball's in your corner. Well, I mean, I'm open to discussing it now.

**Mike Bell**
That's not the point of this call. So is that your formal, are you elected? to try to negotiate it directly without a lawyer?

That's it.

**Vishal Agarwal**
That's it.

**Mike Bell**
That's the case and we'll let Amy and Vishal and I discuss and we'll reach out to you for a meeting in a proposal.

We'll see how far that goes. If that doesn't go anywhere, we'll just turn over professionals. That's fine. So you want to try to do this ourselves?

**Are**
For now?

**Mike Bell**

Yes. Okay. All right. Good. Then we'll get back to you with kind of what our thoughts are and communicate with you, Amy.

**(Arjun Vasan leaves the call)**

**Vishal Agarwal**
Sounds great. Thank you, George. Amy, Mike, can you just see back for a second?

**Mike Bell**
For sure.

**Vishal Agarwal**
I have the ears.

**Mike Bell**
Wow. We'll hear. Well, he didn't deny it. He's not going to like to stand on. Yeah.

**Vishal Agarwal**
I was thinking about this last night. I'm like, there's a 0.001% chance that he did not send those emails.

we would be completely screwed. He's on medical leave, in his condition (nods head acknowledgement Plaintiffs vulnerability), we fired him for something that is not true.

So, pulled some favors last night. today morning have the email. I'll forward it to both of you. It's not pretty.

**Mike Bell**
Yeah.

**Amy Brown**
Well, he tried the leave part. You're still employed with the company on leave. So, he's wrong in that thought process.

**Mike Bell**
Yeah. He's just this Ross.

**Amy Brown**
Yeah.

**Vishal Agarwal**
we have 20 minutes. Do you want to call the voice EIP movers? And Amy can be a part of that call too.

**Mike Bell**
Yeah. Yeah. With me.

**Vishal Agarwal**
That's too early, too short of a notice.

**Mike Bell**

Well, that's the question I don't have. Jeff and Robert kind of know they're kind of on standby.
Chris and my sur are already up.

So let me reach out and find out if they're available and up for a call right now.

**Mike Bell**
Can you do 12 Eastern, Amy?

**Amy Brown**
Yes, I can.

**Mike Bell**
I can definitely wake everybody up by that. Okay, so I'll just schedule that meeting with us,
hearing all the voice people, and I'll just hit them on text and slack right now, saying there's a
meeting at nine.

**Amy Brown**
Y**ou may talk to Robert and Jeffrey, and I forgot the third person he mentioned, as well,
because they obviously were communicating with them when they should not have been**.

**Mike Bell**
Yeah, I'm. I'm pretty the only the only person I haven't connected with is is Pernav But
everybody so so yeah, yeah, so I'm in good place with pretty much everybody Pernav is only
one but pretty much everyone else.

I've talked to you is pretty much ready But they're like they're like Pernav is so about and he's
committed company Everyone's looking at Arj for who he is.

So I think we're in good place, but we'll handle it at at noon Easter and I'll go ahead set the
meeting up now Any you'll handle lot of the of putting process I will I'm actually well I'll have to
send Mike the offboarding since he's the main dr.

**Vishal Agarwal**
So okay You'll see in the email he reached out twice over two days It was not a momentary
laugh momentary loss in judgment.

**Mike Bell**
Yeah Yeah, geez, okay All right, okay cool. I think I see thanks good to thank you













 Gmail

Arjun Vasan <arj@voicebite.ai>

## $1.5M Stock

3 messages

**Michael Bell** <michaelb@itsacheckmate.com>     Wed, Jan 31, 2024 at 5:02 PM
To: chris@voicebite.ai, arj@voicebite.ai, Robert Nessler <robert@voicebite.ai>

Hey Guys,
Going through the math and I am realizing we have not been thinking correctly about the stock granted / merged / exchanged on closing.

Because its stock being "pushed" over to you (via a type B reorg), there is no concept of a strike price. It is not a warrant structure, therefore the delta of *current value minus purchase price* does not apply.

Checkmate stock is worth $4.67 per share. We need to enable you to capture $1.5M in value for VB using Checkmate stock as currency. In doing so using Checkmate's stock as currency, it equates to 321,199 shares - the same number in the term sheet and the same number we've used in our modeling.

If it were $0.01 per share, we'd need to issue 150 million shares. Strike price only applies in instances wherein the parties need to establish a right to purchase agreement, in anticipation of future growth in value.

I hope this makes sense. LMK if not and we can chat tomorrow.

Thanks for the very productive day today.

Mike

FOR DISCUSSION PURPOSES ONLY

## Acquisition Offer

| Condition | Currency | Amount | Note | Value* |
|---|---|---|---|---|
| Closing | Cash | $1,500,000 | Promissory note payable at close of next qualified round. | $1,500,000 |
| Closing | Warrants | 3,000,000 | | $1,500,000 |
| Revenue Milestone | Warrants | 106,383 | $1.0M in lifetime ARR from DT, VoiceAI products | $500,000 |
| Revenue Milestone | Warrants | 106,383 | $2.5M in lifetime ARR from DT, VoiceAI products | $500,000 |
| Revenue Milestone | Warrants | 106,383 | $10M in lifetime ARR from DT, VoiceAI products | $500,000 |

| Total Consideration | $4,500,000 |
|---|---|

*\* Warrant value is based upon $4.70 share price*

## The Potential Future Value of Checkmate Shares

| Installs | | 100 | 250 | 1,000 | 2,500 | 5,000 | 10,000 |
|---|---|---|---|---|---|---|---|
| Associated ARR | $15,000 | $1,500,000 | $3,750,000 | $15,000,000 | $37,500,000 | $75,000,000 | $150,000,000 |
| *% of 2024 Installed Base* | *28,000* | *0.36%* | *0.89%* | *3.57%* | *8.93%* | *17.86%* | *35.71%* |
| *% of TAM* | *150,000* | *0.07%* | *0.17%* | *0.67%* | *1.67%* | *3.33%* | *6.67%* |
| | *2023 Baseline* | | | | | | |
| ARR | $17,500,000 | $19,000,000 | $22,750,000 | $37,750,000 | $75,250,000 | $150,250,000 | $300,250,000 |
| Rev Multiple | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| Valuation | $140,000,000 | $152,000,000 | $182,000,000 | $302,000,000 | $602,000,000 | $1,202,000,000 | $2,402,000,000 |
| Shares outstanding | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 |
| Projected share price | $4.67 | $5.07 | $6.07 | $10.07 | $20.07 | $40.07 | $80.07 |
| Potential value of VB warrants | 3,319,149 | $16,817,021 | $20,136,170 | $33,412,766 | $66,604,255 | $132,987,234 | $265,753,191 |

*This proforma model reflects no revenue growth from Checkmate's other products*

**11.06%**

Common stock valuation for

# Checkmate.com, Inc. NEW dba Itsacheckmate.com

**Valuation date** April 1, 2023

Prepared by Carta Valuations LLC on May 23, 2023



# TABLE OF CONTENTS

## Introduction

Letter of engagement ................................................................................................................3
Valuation summary .....................................................................................................................5

## Company overview

Company overview .......................................................................................................................6
Financials overview .....................................................................................................................7
Capitalization ...............................................................................................................................8
Discussion of methodology .........................................................................................................9

## Valuation results

Guideline public companies method .......................................................................................... 11
Comparable public companies statistics ................................................................................... 12
Equity allocation discussion ...................................................................................................... 16
Discount for lack of marketability .............................................................................................. 22

## Report certification

Carta Valuations LLC Qualifications .......................................................................................... 23
Representation of Carta Valuations LLC ................................................................................... 24
Statement of assumptions and limiting conditions .................................................................... 25

## Appendix

Economic overview ..................................................................................................................... 31
Economic outlook ....................................................................................................................... 38
Major products ........................................................................................................................... 41
Operating conditions .................................................................................................................. 43
Industry structure ....................................................................................................................... 45
Valuation methodologies ............................................................................................................ 49
Allocation ................................................................................................................................... 53
Discount for lack of marketability .............................................................................................. 58

carta

**Vishal Agarwal**                                                                                              **May 23, 2023**

Chief Executive Officer

**CHECKMATE.COM, INC. NEW DBA ITSACHECKMATE.COM**

3001 BISHOP DR STE 300 SAN RAMON, CA 94583-5005

This report details the valuation analysis used to derive the fair market value of the common equity of Check-mate.com, Inc. NEW dba Itsacheckmate.com (hereinafter referred to as "Itsacheckmate.com" or the "Company") on a per share basis ("Subject Interest") as of April 1, 2023 ("Valuation Date"). It is understood that the valuation of the Subject Interest, as developed in this report, will be used for tax planning and financial reporting purposes in recognition of Internal Revenue Code Section 409A ("409A") and FASB Accounting Standards Codification Topic 718 – Stock Compensation ("ASC 718"). As such, this report should not be used for any other purpose.

The analysis was prepared following the guidance of the American Institute of Certified Public Accountants ("AICPA") Accounting and Valuation Guide: Valuation of Privately-Held-Company Equity Securities Issued as Compensation (the "AICPA Guide").

The definition of fair market value is predicated on IRS Revenue Ruling 59-60.

## STANDARD OF VALUE

For income tax purposes, the appropriate standard of value is fair market value ("FMV"), which is defined as:

*The price, expressed in terms of cash equivalents, at which such property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or to sell, and when both have reasonable knowledge of relevant facts.*

For financial reporting purposes, the appropriate standard of value is fair value ("FV"), which is defined as:

*The amount at which an asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale.*

According to the May 7, 2003 FASB Board meeting, the above definition of fair value is consistent with the definition of fair market value in Internal Revenue Ruling 59-60. We are not aware of any facts that would cause a difference in our conclusions on a fair market value basis compared with fair value. As such, it is not unreasonable that our conclusion of fair value for financial reporting purposes be consistent with our conclusion of fair market value for tax reporting purposes.

## SCOPE OF ENGAGEMENT

This report was created in compliance with guidance regarding valuation methodologies published by the AICPA.



We considered differences between the Company's preferred and common shares, as applicable, with respect to liquidation preferences, conversion rights, voting rights, and other features. We also considered appropriate adjustments to recognize lack of marketability related to the Subject Interest.

## SCOPE OF ANALYSIS

Carta Valuations, LLC has based this report on information provided and represented by the management of Itsacheckmate.com ("Management"). Our review and analysis included, but was not necessarily limited to, the following steps:

- Communication with Management concerning the assets, financial and operating history and forecasted future operations of the Company;
- Analysis of audited and unaudited historical and forecast financial statements, as applicable, and other financial and operational data concerning the Company;
- Review of corporate documents including, but not limited to, the capitalization summary of preferred stock ("Preferred Stock" or "Preferred Shares"), Common Stock, options and warrants;
- Analysis of the Company, its financial and operating history, the nature of its product(s)/service(s), technologies and its competitive position;
- Analysis of the industry in which the Company competes, the stage of the development of the Company's target markets and the pace of adoption of its chosen technology platforms;
- Research and analysis concerning comparable public companies and transactions involving comparable public and private companies;
- Analysis concerning the current economic conditions and outlook for the US economy, as well as applicable global economic conditions; and
- Analysis and estimation of the FMV and FV of the common equity on a non-marketable, minority interest basis as of the Valuation Date.

## CONCLUSIONS

Based on the information provided and the analysis conducted, and subject to the attached Statement of Assumptions and Limiting Conditions, it is our opinion that the fair value and fair market value of one share of the Company's common stock on a non-marketable, minority basis as of the Valuation Date is as follows:

Common Stock of Itsacheckmate.com: **$0.41**

Carta Valuations LLC's fee for this service is not contingent upon the results of the Valuation expressed herein. This Valuation is subject to the terms and conditions of the master subscription agreement between eShares, Inc. (an affiliate of Carta Valuations LLC) and Itsacheckmate.com executed on Dec. 12, 2022.

4

carta

## VALUATION SUMMARY

*Company value*

| Approach | Value | Weighting |
|---|---|---|
| Market approach (guideline public company method) | $21,789,000 | 100.00% |
| **Concluded value** | **$21,789,000** | **100.00%** |

*Common share value*

| Inputs | Conclusion |
|---|---|
| Allocation methodology | Option pricing model |
| Fully marketable value | $0.68 |
| Discount for lack of marketability | 40.00% |
| **Concluded fair market value** | **$0.41** |

carta

## COMPANY OVERVIEW

Checkmate.com, Inc. (doing business as ItsaCheckmate.com) is a software company that develops technology solutions for the restaurant industry. The Company's software product provides integration of orders from various online ordering platforms such as GrubHub, UberEats, DoorDash, Postmates among others directly to the Point of Sale systems of restaurants. The Company has a SaaS revenue model and charges $85 per month per location for up to 2 platforms and $100 per month per location for unlimited platforms without any per transaction pricing. The Company was founded in Dec. 2015 and is based in New York, New York.

### Company Update

Since the prior 409A, the Company completed its acquisition of Open Tender, providing an expansion into white label, first party order management. The Company also achieved profitability, added major customers such as Wendy's and Sonic and entered into a partnership referral agreement with DoorDash. The Company now services more than 23,000 restaurant locations. Given the market condition, the Company is looking to focus more on profitability instead of growth in the coming year.

### Competitors

Given the disruptive, competitive environment that the Company operates in, Checkmate.com, Inc. NEW dba Itsacheckmate.com has many competitors that operate in the private market. While this 409A Valuation incorporates public comparable market data into the analysis private competitors were noted and considered such as Order-Mark, Inc., Chowly, Inc., otter.

 **Mike Bell**
IP Acknowledgement Letter

April 22, 2024, 5:27 AM

To:  arj@voicebite.ai,    Robert Nessler,    chris@voicebite.ai,    Alan Foster,    Todd Murtha,    Vishal Agarwal

Good Morning,

Later in this process, as it was becoming clear that the transaction would contain less indemnification protection than we had envisioned or expected, we engaged an IP litigation firm to help us understand the risks and communicate them to the Checkmate board accurately.  The firm, KL Gates, advised us that a stand alone letter could provide additional protection in the event we find ourselves in litigation with a prior employer.  They explained the letter like this:

"The Holders and the Company have a joint interest in insulating themselves against the prospect of liability in any potential lawsuit arising from the potential misappropriation of trade secrets or other intellectual property.  Common in deals involving specialized IP, the letter supplements the existing representations and warranties.  Its effect is to provide evidence that everybody understands and takes seriously their obligations regarding the protection of proprietary information and trade secrets.  It provides a means by which the Holders and the Company will be able to jointly argue, in the event any such suit is brought, that the plaintiffs cannot make a showing of improper acquisition -- thus requiring dismissal."

We would like to get on call with all parties to have a constructive, cooperative conversation about how to make the draft of the letter acceptable to you all.  We are aligned in that this letter should not increase your exposure in any way and should come with whatever protections you need.  So instead of categorically rejecting the letter, we would ask that you approach this request from the same side of the table, as one team, looking to solve a problem.

Alan, I would ask that you communicate your proposed edits to Todd in writing, so that we have open communication and facts to work with.

Robert, can you please send me some times that work on your end?

Thanks in advance for your help solving this item.

Mike

