1  Arjun Vasan

2  arjun.vasan@gmail.com

3  12615 193rd Street

4  Cerritos, CA 90703

5  562-900-6541

6  Plaintiff in Pro Per



FILED
CLERK, U.S. DISTRICT COURT
2/21/25
CENTRAL DISTRICT OF CALIFORNIA
BY      MRV      DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**Arjun Vasan**,

        Plaintiff,

    vs.

**Checkmate.com, Inc.**,

(dba "Checkmate"),

        Defendant.

Case No.:  2:25−cv−00765−MEMF−JPR

**COMPLAINT FOR WRONGFUL TERMINATION, RETALIATION, FRAUDULENT INDUCEMENT BREACH OF CONTRACT, VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT, AND RELATED CLAIMS**

**JURY TRIAL DEMANDED**

## I. INTRODUCTION

1.  **Nature of the Action**

Plaintiff brings this action for fraud, wrongful termination, violation of federal and state medical leave laws, and breach of contract, arising out of a merger that was induced by falsehood and coercion; and followed by retaliation in employment.

**2.    Case Overview**

Plaintiff, a pioneer in Voice AI Ordering technology, co-founded VoiceBite Corporation in July 2023. In April 2024, VoiceBite merged with Defendant Checkmate, who promised shared success with contractual guarantees. When Plaintiff advocated for his team's negotiated rights, Defendant viewed him as a threat and retaliated, wrongfully terminating him while fabricating excuses to evade its obligations—despite his pivotal role and tireless dedication.

**3.    Defendant's Wrongful Conduct**

Defendant's **coordinated scheme of fraud, coercion, and retaliation** is evident in its conduct pre-merger, during employment, and post-termination, as follows:

- First, inflating financial valuations and falsely promising job security to secure an exclusive Letter of Intent ("LOI"). (¶¶ 15, 16).
- Next, securing the Merger and Employment by coercing last-minute, harmful deal terms falsely presented as mutually beneficial (¶¶ 16–19).
- Then, retaliating against Plaintiff's lawful advocacy, undermining his role and eroding his team's solidarity (¶¶ 24, 26–30).
- Later, misclassifying Plaintiff's medical leave, revoking health benefits mid-treatment, and firing him under pretext while on leave (¶¶ 38–49).
- Breaching the Bonus Agreement ([Ex. C]) by withholding payment despite publicly declaring qualified financing milestones (¶¶ 21, 28–32).
- Disparaging Plaintiff after firing him and threatening employees who remained in contact with him (¶¶ 50-51, 56, 59).
- Falsely asserting Plaintiff resigned to deny guaranteed severance ([Ex. B]), and falsely alleging misconduct to obstruct his pursuit of Justice (¶¶ 48–51).
- Interfering with attorney-client privilege to coerce harmful terms pre-merger, and to intimidate Plaintiff post-termination (¶¶ 16-17, 50).
- Refusing to provide legally obliged document access for Plaintiff to contest false allegations and recover owed and unpaid compensation (¶ 57).

**4.      Harm to Plaintiff**

Defendant's misconduct has caused Plaintiff significant economic, reputational, and emotional harm, with the total amount in controversy exceeding $7,000,000.

**5.      Relief Sought**

Plaintiff seeks compensatory damages for financial and reputational harm, punitive damages for Defendant's willful and malicious conduct, equitable relief, and attorney's fees as permitted by law. This case highlights the need to address predatory practices and inequities in small-team mergers and safeguard founders navigating similar transactions in California's innovation economy.

## II. JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., a federal statute.

7.      Supplemental jurisdiction over Plaintiff's state-law claims is proper under 28 U.S.C. § 1367, as these claims share a common nucleus of operative facts with the federal FMLA claim.

8.      Diversity of Citizenship (28 U.S.C. § 1332) is satisfied because:

- Plaintiff is a citizen of California.
- Defendant is a Delaware corporation based in New York.
- The amount in controversy exceeds $75,000.

9.      Plaintiff's Offer Letter, employment, termination and residence in California establish California law as governing Plaintiff's state-law claims.

## III. VENUE

10.      Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims substantially occurred in this District, and Plaintiff was terminated while undergoing medical treatment within the District.

1

**IV. PARTIES**

2      11.      Plaintiff ARJUN VASAN is an individual domiciled and residing in

3  Cerritos, California. He served as Vice President of AI Technology at Checkmate

4  following the merger of his startup VoiceBite into Checkmate.

5      12.      Defendant CHECKMATE.COM, INC. (dba "Checkmate") is a

6  Delaware corporation with its principal place of business in New York City, New

7  York, and conducts business in California.

8

9      **V. STATEMENT OF FACTS**

10  *All allegations in this complaint are supported by evidence presented herein or*

11  *expected to be obtained through discovery under Plaintiff's reasonable belief.*

12

13  **A. Key Actors and Their Roles.**

14      13.      Plaintiff references the following as Defendant's representatives,

15  acting within their employment scope and central to this complaint:

16   •  **Michael "Bell"**: Chief of Strategy at Checkmate, who led negotiations for

17        the VoiceBite merger and later served as Plaintiff's supervisor.

18   •  **Vishal "Agarwal"**: Founder & CEO of Checkmate, who exercised authority

19        over Plaintiff's employment, termination, and post-merger obligations.

20   •  **Amy "Brown"**: Vice President of Human Resources at Checkmate, who

21        managed Plaintiff's medical leave and termination process.

22      14.      Post-merger, Defendant employed VoiceBite's team of six. Plaintiff

23  refers to his cofounders **Chris "Lam"** and **Robert "Nessler"** individually by

24  name, or collectively with Plaintiff as "the founders"[1].

25

26  _____

27  [1] **Lam** and **Nessler** are prospective witnesses and shared similar terms of employment with Plaintiff. The
    founders shared a text message thread amongst themselves which captures their real time, candid

28  reactions to and impressions of the events described herein in great detail. The founders also shared a
    private Slack channel #**voicemate** with Bell and Agarwal, where many of these events occurred.

**B. Fraud in the Merger's Inducement (**Claims IX and X**).**

15.    Around **February 17, 2024**, Defendant secured an exclusive LOI with VoiceBite, making representations about share valuations and guaranteed job security, which played a critical role in the founders' decision to proceed:

- **Jan 31, 2024**: In an email, Michael Bell claimed, "Checkmate stock is worth $4.67 per share", valuing the equity offered to VoiceBite at $1.5 million. A supporting spreadsheet corroborated this, showing Checkmate's "baseline 2023 valuation" at $140 million and projecting future growth. Bell assured the founders of an opportunity to create "generational wealth."
  - However, after the LOI was executed, a 409A valuation from April 2023 revealed a fair market value of just $0.41 per share.
- **Early Feb, 2024**: In another email, Bell promised 18 months of guaranteed employment[2] for the founders—ensuring financial and professional stability.
  - Post-LOI execution Bell dismissed Plaintiff as "weird" and "delusional" for insisting the written promises be honored. Ultimately, Plaintiff and his team were pressured into accepting just three months of severance.
- **Feb 17, 2024**: Once the LOI was signed, a "no shop" clause forced the founders to forego other lucrative opportunities (¶ 107).

16.    While the founders dedicated their full efforts to integration with Checkmate's platform—without pay—Defendant utilized the one-sided exclusivity to pressure them to accept terms that undermined their interests (¶ 112):

- **April 2, 2024**: The founders agree on a plan to disclose personal legacy code —some of it co-authored by Plaintiff's father ("VV"), who had given his full consent to its use for VoiceBite. The founders suspect Bell is behind covert interviews of their prior associates—including VV—which Bell denies.

---

[2] **[Bell email to Robert Nessler (early Feb 2024)]** ".. I will work to have the employment agreements contain a term that prevents the company from terminating you in the first eighteen months, other than for cause (to be defined). If the company does terminate your employment in this period of time for any reason, you would be owed your full compensation that would otherwise have been available to you. This term will be extended to all three co-founders"

- **April 3, 2024**: During a meeting to discuss final terms, Bell played the aggressor in a classic "good cop, bad cop" routine with Agarwal:
  - Bell reacted with notable anger to changes proposed by Plaintiff to ensure transparency and protect the founders against liability.
  - Plaintiff questioned this reaction: "*You wouldn't want us to lie, would you?*"—Bell replied that they would have to risk it and sign as-is.
  - Agarwal reassured the founders that indemnification would be handled *as partners*—omitting any direct claim risk—and that liability would be capped at $150,000, split pro rata between the VoiceBite team.
  - Post-meeting, the founders debate disclosing the legacy code, citing Bell's hostility to changes and Agarwal's reassurances of partnership.
- **Apr 6, 2024**: In a text message, Bell urged the founders to fire their attorney, Alan Foster, for his diligence in reviewing the proposed terms.
- **Apr 10, 2024**: In an email, Bell conditions promised back pay on agreeing to finalize terms as they stand, which the founders accept and confirm.
- **Apr 17-22, 2024**: Via emails, Defendant Counsel shares sweeping new documents, framing them as benign. Bell presents the new "IP Letter" as solely a joint defense against third-party claims.

17.     **April 22-26, 2024**: Foster objected to the changes in a memo to the founders, warning of the undue leverage these gave Checkmate to target them personally and as employees. Bell then pressured the founders to share parts of Foster's memo to understand his concerns. Foster resigned in protest, citing Defendant's unethical behavior and jeopardizing of privilege—forcing the founders to scramble for new counsel at the eleventh hour.

18.     **April 26, 2024**: Replacement counsel was secured just days before an imposed deadline of April 30th, leaving meager time for legal review, especially given the team's reliance on post-merger salaries and back pay.

19.    **April 30, 2024**: Plaintiff proceeds with the merger under pressure but also under explicit promises of good faith and compensation guarantees. Defendant would later capitalize on the last-minute changes to "disentitle" Plaintiff (¶ 50).

**C. Guarantees and Terms of Employment (**Claims IV, VI and VII**).**

20.    After the merger, Plaintiff's employment with Checkmate continued under an Offer Letter ([Ex. B]), which provided:

- VP Title, annual salary of $280,000, performance bonus of $200,000.
- Severance of 3 months of salary plus one quarter of the performance bonus if terminated for any reason or if Plaintiff resigned with good reason.

21.    A Bonus Agreement ([Ex. C]) promised further consideration for employment vesting at 3 months thereof[3] (August 1, 2024), structured as:

- $450,000 "Initial Payment" - triggered upon Defendant's completion of a preferred stock financing of $7,500,000 or more.
- $50,000 "Final Payment" - paid on the one year anniversary of the merger, and serving as a cap and offset to indemnification claims.

22.    Defendant further shared a spreadsheet detailing reimbursements and a schedule of payment for two months of back pay[4] for VoiceBite employees' work during negotiations, to be paid as Checkmate employees after close.

23.    Despite Plaintiff's written objections to reporting to Strategy Chief Michael Bell—citing prior threats of termination during negotiations—CEO Vishal Agarwal assigned him to report directly to Bell.

**D. Seeds of Discord in the Workplace (**Claims III and IV**).**

---

[3] [**Exhibit C, Bonus Agreement**] .. in connection with .. your **employment** .. and in conjunction with .. an **offer letter** .. In **consideration of you remaining employed** with Checkmate.

[4] **[Back Pay Schedule]:** To be paid in installments on June 1, June 15, and July 12, 2024

7

24.     From the start of employment, Plaintiff encountered hostility in response to legal or contractual concerns he raised. For instance, on Plaintiff's second day (May 2, 2024) he questioned Checkmate's "Bring Your Own Device" (BYOD) policy for potentially violating California law. In response:

- CEO Agarwal forwarded Plaintiff's private request to #voicemate[5], terming him a "problem", stating "*I'm happy to fire you*" and dismissing concerns with "*we won't hire people who are stickler for the law.*"

25.     Agarwal and Bell repeatedly made excuses to delay promised back pay (¶ 22), blaming board members and cash flow issues before closing funding, and after funding: managing P&L statements in light of the new investment. Meanwhile, Bell and Agarwal were urging Plaintiff and his co-founders to hire additional engineers, undermining the credibility of their financial excuses.

26.     Frustrated by Defendant's shifting reasons, and skeptical of it's intentions, Plaintiff posted a list of demands in #voicemate for overdue back wages, retention bonus payment and clarity on performance targets.

27.     Agarwal responded that Plaintiff did not speak for the team and instructed each member to schedule back pay with HR and prioritize the company's interests, isolating Plaintiff and chilling lawful advocacy.

**E. Events Triggering the Retention Bonus (Claim VII).**

28.     In late July 2024, Agarwal internally announced via a public Slack channel that Checkmate had closed a $10,000,000 series B round[6].

29.     Agarwal denied that Plaintiff's retention bonus had been triggered, asserting that the fundraise was structured in two tranches. Plaintiff contended this explanation contradicted the plain language of the Bonus Agreement (see ¶ 94).

30.     To address Plaintiff's objections, Defendant called a meeting where:

---

[5] **#voicemate** - Team Slack channel shared by Bell, Agarwal, Lam, Nessler and Plaintiff**.**
[6] **Series B** in the tech industry generally refers to a bona fide preferred stock financing.

- Agarwal asserted that Tiger Global, Defendant's investor, suggested the tranche structure to delay bonus payments owed to the VoiceBite team
- Bell stated that, as a VP, Plaintiff should set aside his own personal interests for the benefit of the company. Agarwal threatened to terminate Plaintiff, warning that one more demand, even if rightful, could cause dismissal.
- Agarwal acknowledged prior assurances to treat the team fairly if financing fell short and proposed accelerating 50% of the bonus on individual request[7], requesting once again the team prioritize the company's interests.

31.    On or about October 20, 2024, under pressure, Plaintiff signed the provided "partial bonus acceleration" document stipulating payment of half of the Initial Payment within 10 business days of execution[8] (due by Nov 3, 2024).

32.    On or about October 23, 2024, Defendant publicly announced the successful completion of a $10,000,000 Series B round ([Ex. D]) with no mention of any contingency or delayed structure of investment.

**F. Provision of and Progress towards Performance Targets (**Claim VII**).**

33.    Plaintiff's Offer Letter included a $200,000 performance bonus as a material inducement to employment, contingent on metrics promised to be provided within two weeks after the merger.

34.    When the targets were finally provided on or about September 7, 2024 —nearly four months after the merger—they imposed a deadline of October 1, 2024, leaving Plaintiff only three weeks to meet the defined goals.

35.    Nonetheless, Plaintiff successfully achieved several targets, as evidenced by quarterly leadership slides, performance metrics and announcements, and was making steady and documented progress toward the remainder. Further:

---

[7] Via email, Agarwal directed HR to hold the partial bonus amounts "in escrow". Plaintiff will seek confirmation of the tranche structure and purported escrow in discovery.

[8] This payment was never made, see § 46. Defendant has refused to provide the executed document.

- Plaintiff's leadership was demonstrated by his initiative of weekly Voice demos, which engaged the company and motivated his team. Agarwal credited Plaintiff at an all hands meeting, urging other teams to follow suit.
- Plaintiff's work ethic and collaborative attitude was evident by his abundant cross-functional work with teams outside his own.
- At FSTec[9], Plaintiff and Lam demoed their wares to hundreds of potential customers and partners, earning widespread praise. On their own initiative, they took a live customer to breakfast, who raved about his experience, praised their vision, and showed interest in rolling out chain-wide.

**G. Escalating Pressure to Force Plaintiff's Exit (**Claim III**).**

36.    On Sept 24, 2024, Plaintiff's key technical partner, Chris Lam, began a planned month-long leave, coincidentally as Agarwal informed the team of a "make or break" customer demo scheduled for Oct 23, 2024.

37.    Plaintiff's workload doubled as he took on Lam's responsibilities, while also enduring persistent undermining by Agarwal and Bell, including:

- Unilaterally cancelling Plaintiff's weekly Voice demos, claiming they were a distraction, despite—or perhaps because of—their popularity and success.
- Accusing Plaintiff's team of disorganization and meeting his direct reports without notice, undermining the team hierarchy and his role as a team leader.
- Retaliating after Plaintiff re-raised concerns about Defendant's BYOD policy (see ¶ 24) on Oct 14, 2024, with Agarwal issuing a final warning and Bell officially threatening dismissal for anything "construed as a rant".
- Mischaracterizing an Oct 15, 2024, investor demo as a disaster and convening a team-wide post-mortem. A review of the recording of this demo revealed it was in fact a success, and the investor committed.

---

[9] **FSTec** is a leading restaurant technology trade show.

38.     Despite the challenging environment and lack of support, Plaintiff successfully led his team to deliver the Oct 23, 2024 demo and meet aggressive performance targets. However the hostility and unsustainable workload—often in excess of 80 hours per week—took a toll on his mental health.

**H. Employer interference with Medical Leave (**Claims I, II and III**).**

39.     On **October 22, 2024**, after Plaintiff suffered a panic attack during a team meeting, Defendant's representatives issued an ultimatum: Plaintiff must accept a demotion or be terminated within 24 hours. Overworked and in a mental health crisis, Plaintiff requested medical leave.

40.     Plaintiff promptly entered inpatient treatment with symptoms of severe sleep deprivation, panic attacks, and burnout. Plaintiff (through his medical provider) soon provided medical certification to Checkmate on the provided form.

41.     Checkmate had an unlimited paid leave policy as per its Employee Handbook and Plaintiff's Offer Letter ([Ex. B]) and had routinely approved paid leaves to employees at Plaintiff's level, including Lam (¶¶ 36-37).

42.     On **October 23, 2024**, VP of HR Brown emailed Plaintiff referring to his leave as "unpaid personal leave" and failing to provide the FMLA notice of rights under 29 C.F.R. § 825.300.

43.     On **October 25, 2024**, on information and belief, Strategy Chief Bell reorganized Plaintiff's team and re-assigned Plaintiff's direct reports to himself.

44.     On **November 3, 2024**, Brown reiterated to Plaintiff via email that his pay would cease on November 6, further citing security protocols for revoking his Slack and email access. Brown never informed Plaintiff of short-term disability options that could have supplemented his pay.

45.     Plaintiff protested the unpaid status of his leave in response, pointing to Checkmate's policies and referencing the precedent of Chris Lam (¶ 36). Brown

nonetheless insisted that the paid leave policy did not apply to medical leave, contradicting the Employee Handbook.

46.    Plaintiff repeatedly requested an update on his overdue "partial bonus" (¶ 31). Bell finally replied "We are going to talk to you about the partial bonus payment when you are back on Wednesday, not before." Plaintiff protested that he needed to obtain medical clearance to return. Bell did not reply.

47.    On **November 12, 2024**, Brown emailed Plaintiff ([Ex. H]), notifying him that his now "unprotected personal leave" status would cause the termination of his health coverage at the end of the month. Plaintiff protested, and offered to seek medical clearance to return part-time to retain coverage.

## **I. Defendant Fires Plaintiff Alleging Solicitation (**Claim IV**).**

48.    On **November 14, 2024**, Agarwal scheduled a Zoom meeting at **8:00 AM**, offering to discuss Plaintiff's reduced work schedule. However, during this meeting, he explicitly terminated Plaintiff: ([Ex. H, K])

- Agarwal cited private emails sent by Plaintiff to a competitor from his personal email account and alleged solicitation (see ¶ 55).
- Agarwal told Plaintiff that they would discuss a "final settlement", implicitly acknowledging that he owed post-termination compensation.

49.    At **9:56 AM**, approximately two hours *after* the meeting, and without access to his employment contracts in the medical facility, Plaintiff sent an email in distress, attempting to "resign for good reason." Plaintiff subsequently sent emails offering to settle along the lines of his contracts and requesting his severance.

## **J. Clawback of Earned Compensation (**Claims III, IX and X**).**

50.    On **Dec 6, 2024**, Defendant served a "Notice of Claim,"[10] discarding the earlier solicitation accusation and instead rejecting Plaintiff's good reason

---

[10] **Notice of Claim**: Provided mechanism to initiate merger agreement's indemnification procedures.

email, thereby denying him $122,000 in severance—despite the legal impossibility of resigning after being terminated. Further, the Notice:

- Misstates the date of the good reason email as Nov 13—the day before Plaintiff's termination—suggesting an effort to distort the timeline.
- Alleges Fraud and IP Misuse to justify withholding other owed payments, including $450,000 in earned bonuses, without specifying actual damages.
- Implied these payments were otherwise due by withholding on new grounds.
- Initially was sent to former VoiceBite counsel. When Plaintiff replied pro se, Defendant threatened to compel disclosure of his privileged material[11].

51.    On **Jan 22, 2024**, a second Notice dropped the resignation claim entirely, explicitly referring to Plaintiff's termination and threatening to enforce an unlawful non-compete and blacklist him from the industry.

52.    On **Jan 28, 2025**, a third Notice shifted to alleging fraud against the VoiceBite shareholders as a group—claiming $5m of damages without evidence— and asserting forfeiture of all merger equity and all $1.5 million in unpaid bonuses.

**K. Discovery of Zoom Recording and Privacy Implications (Claim IV).**

53.    On December 7th, 2024, unaware that his termination meeting had been recorded, Plaintiff discovered that Checkmate's AI note-taking service had inadvertently sent him a link to the meeting video and AI-generated summary ([Ex. K]). The recording, hosted by Fathom.video using an unpaid and unsecured account, continued even after Plaintiff had left the meeting.

54.    In the recording, CEO Agarwal acknowledges Plaintiff's medical leave status and implies other motives for the termination.

55.    The emails cited by Agarwal to justify the termination were sent from Plaintiff's personal account and device. Agarwal implies the emails were obtained using questionable means, raising further privacy concerns.

---

[11] Defendant's coercive actions recall their earlier interference with VoiceBite corporate counsel Foster.

56.    The recording further captures Agarwal, Brown, and Bell disparaging Plaintiff and discussing efforts to isolate him from his former team. It highlights:

- All three executives knew Plaintiff had been explicitly terminated.
- The potentially retaliatory nature of Plaintiff's termination.
- Awareness of potential liabilities regarding FMLA/CFRA leave.
- Defendant's apparent disregard for Plaintiff's privacy rights.

**L. Ongoing Harm (**Claims III, VI and X**).**

57.    Plaintiff has repeatedly requested executed copies of the agreements governing his employment and the merger. Defendant refuses to produce these documents, hindering Plaintiff's ability to evaluate and pursue legal remedies.

58.    Defendant has used threats of defamation and career interference to intimidate Plaintiff and hinder his pursuit of owed compensation (¶¶ 48–51).

59.    Plaintiff has suffered, and continues to suffer significant harm as a direct result of Defendant's actions, including but not limited to:

- Defendant has disparaged Plaintiff to his teammates and threatened to terminate those who stay in contact, leaving him isolated.
- Defendant's accusations and threats have created a cloud of suspicion that he must address with prospective employers and business partners.
- Plaintiff has expended time and resources pursuing his owed compensation, rather than securing new employment or developing his next venture.

## CLAIM I.

### Violation of the Family and Medical Leave Act (29 U.S.C. § 2601 et seq.)

60.    Plaintiff re-alleges and incorporates all paragraphs herein.

**61.    FMLA Eligibility**

Plaintiff was FMLA-eligible as he had (1) worked for VoiceBite (and then Checkmate as successor-in-interest) for at least 12 months, and (2) performed the

requisite 1,250 hours of service in the preceding 12 months. Defendant is subject to the FMLA as an employer, as:

- It advertises as much explicitly in its Employee Handbook.
- It has at least 50 employees who all virtually report into the same corporate headquarters in New York.

**62.    Retaliation and Interference (¶¶ 39-47)**

Defendant violated 29 U.S.C. § 2615 by interfering with Plaintiff's FMLA rights and retaliating against him, including by[12]:

A. Misclassifying Plaintiff's protected leave as "unpaid personal leave" and later "unprotected personal leave."

B. On information and belief, utilizing Plaintiff's absence to restructure his team, re-assign his direct reports and hire additional engineers, fundamentally altering the nature of his team to prevent his return on equitable grounds.

C. Refusing to apply the same unlimited paid leave policy they granted to others.

D. Cutting Plaintiff from work accounts under the pretext of security reasons.

E. Financially pressuring Plaintiff by conditioning discussion of his overdue retention bonus on premature return from leave.

F. Terminating Plaintiff's health coverage while he was under inpatient care.

G. Terminating Plaintiff while he was on (and certified for) protected leave.

63.    These actions caused Plaintiff substantial financial and emotional harm in violation of his FMLA rights.


**CLAIM II.**

**Violation of the California Family Rights Act (Cal. Gov. Code § 12945.2)**

64.    Plaintiff re-alleges and incorporates all paragraphs herein.

**65.    CFRA Eligibility**

---

[12] ***Bachelder v. America West Airlines, Inc.***, *259 F.3d 1112, 1130 (9th Cir. 2001)* - Establishes that Defendant's actions, such as misclassifying leave, terminating health coverage, withholding earned bonuses, and terminating Plaintiff during protected leave, constitute interference and retaliation

Plaintiff satisfied the CFRA eligibility requirements (12 months of service and at least 1,250 hours worked) and provided valid medical certification. Defendant employees at least 5 individuals in California, and claims CFRA eligibility.

**66.    Retaliation and Interference (**see ¶¶ 39-47 and 72**)**

Defendant interfered with and retaliated against Plaintiff's CFRA rights.

67.    Defendant's violations of CFRA caused Plaintiff financial harm, emotional distress, and wrongful termination.

## CLAIM III. Retaliation (Cal. Labor Code § 1102.5)

68.    Plaintiff re-alleges and incorporates all paragraphs herein.

**69.    Plaintiff's Protected Activities (**¶¶ 24-25, 39-40**)**

Plaintiff engaged in protected activity by, among other things:

A. Reporting violations of Labor Code § 2802 related to BYOD policy.

B. Exercising rights under FMLA/CFRA.

C. Advocating for payment of his team's overdue back pay and bonuses, as protected by Cal. Labor Code §§ 232(a)-(b) and 29 U.S.C. § 215(a)(3).

D. Post-termination, requesting contractual severance and bonus payments.

**70.    Retaliation by Defendant (**¶¶ 24-25, 41-47, 50-51**):**

A. Threatening termination when he raised legal and contractual concerns.

B. Misclassifying his medical leave, conditioning owed pay on return to work, and terminating his health coverage while he was under in-patient care.

C. Ultimately terminating him falsely alleging solicitation as a pretext.

D. Withholding payments owed under his Offer Letter and Bonus Agreement.

E. Disparaging him and threatening teammates for maintaining contact.

F. Responding to his lawful post-termination requests by issuing a "Notice of Claim" to deny payments it implicitly admitted were owed (¶¶ 50-51).

G. Threatening to blacklist Plaintiff and enforce an unlawful non-compete.

**71.    Evidence for Retaliation**

Defendant retaliated against Plaintiff shortly after or in response to these protected activities, as evidenced by:

- **Temporal Proximity:** Defendant's retaliatory actions occurred on the same day or within days of raising concerns about Labor Code § 2802 violations (¶¶ 24-27) and after requesting contractual bonuses (¶ 30). Additionally, Defendant's actions to misclassify his medical leave and withhold pay began almost immediately after Plaintiff requested FMLA/CFRA leave (¶¶ 41-47).
- **Direct Evidence:** Statements from Defendant during the termination meeting and other conversations, see ¶¶ 24, 54 and 56.
- **Notice of Claim**: By falsely claiming he resigned to deny severance and attempting to "disentitle" him from other payments, the Notice serves as direct evidence such payments were otherwise owed (¶¶ 50-51).

    **72.    Violations of Federal and State Laws**

Defendant's actions violated:

A. California Labor Code § 1102.5 for retaliating against Plaintiff's citing of California Labor Code § 2802 regarding the company's BYOD policy.

B. Fair Labor Standards Act (29 U.S.C. § 215(a)(3)) and California Labor Code §§ 232(a)-(b) for retaliating against Plaintiff for asserting rights to earned back pay, bonuses and severance, for himself and for his team.

C. FMLA (29 U.S.C. § 2615(a)) and CFRA (Cal. Gov't Code § 12945.2) for interfering and retaliating against Plaintiff's protected leave.

    **73.    Harm to Plaintiff.**

Defendant's actions caused Plaintiff substantial financial loss, emotional distress, and professional harm.

    **74.    Plaintiff requests that the Court:**

1. Declare that Defendant's actions violated California Labor Code §§ 1102.5 and 232, FMLA/CFRA, and 29 U.S.C. § 215(a)(3).

2. Order Defendant to pay:

- Compensatory damages for severance, bonuses, and lost wages.

- Emotional distress damages.

- Liquidated damages under 29 U.S.C. § 216(b) for FLSA retaliation.

- Statutory penalties under California law.

3. Award punitive damages to deter future violations.

4. Enjoin Defendant from further retaliation against Plaintiff or his teammates.

5. Award attorneys' fees, costs, and any other relief deemed just and proper.

## CLAIM IV.

### Wrongful Termination in Violation of Public Policy

75.     Plaintiff re-alleges and incorporates all paragraphs herein.

**76.    Legal Basis**

California public policy, including but not limited to Business and Professions Code § 16600 (generally prohibiting non-competition/solicitation restraints), the California Labor Code (e.g., §§ 2802, 1102.5), and FMLA/CFRA protections, prohibit termination based on invalid or retaliatory reasons. These statutes and policies are designed to ensure fair treatment in the workplace and to foster an environment where innovation can thrive without fear of exploitation or retaliation.

**77.    Solicitation as a Pretext for Termination**

Defendant explicitly terminated Plaintiff for contacting a competitor and violating a non-solicitation clause (¶ 48), purportedly on November 7th, 2024. However, this justification was pre-textual and unlawful because:

- The Non-Solicitation clause is void or overly broad under California law[13] and the Employee Handbook doesn't prohibit the alleged actions.

- Defendant relied on improperly obtained private emails, which in plain language do not constitute solicitation or breach of any valid agreement.

---

[13] **[Non-Competition Agreement] "Restrictive Territory"** "means the United States, the European Union and Canada and each other jurisdiction in which the Company has any customers, employees or operations during the Restrictive Period" (*thereby including India and Eastern Europe*).

18

- Defendant failed to conduct a thorough investigation, and Plaintiff's emails reflected efforts to seek alternate employment out of fear of termination.

- Plaintiff also maintains that any investigation would find no evidence of solicitation and any mention of Defendant's employees was speculative.

Further, Defendant dropped this allegation three weeks later when asserting that Plaintiff had resigned—strongly supporting an inference that the termination was motivated by retaliatory animus and a pretext to evade obligations[14].

**78.    Violation of the Mutual Non-Disparagement Clause**

The Non-Competition Agreement also contains a mutual Non-Disparagement clause, stating that executives would not disparage Plaintiff[15]. Plaintiff alleges that Defendant violated this clause when Bell and Agarwal spread accusations, and threatened to terminate his teammates if they maintained contact with him.

**79.    Connection to Broader Public Policy**

Plaintiff raised legitimate concerns about wage-and-hour compliance and exercised rights under FMLA/CFRA, which implicates public policy protections against retaliation (¶¶ 24-27, 39-47, 69-71). Specifically, Plaintiff frames this claim within the broader context of protecting founders from exploitation by predatory acquirers and highlights the need to reinforce protections against retaliation and bad-faith, ensuring the vitality of California's startup ecosystem.

**80.    Harm to Plaintiff**

As a direct result of Defendant's reliance on a void or unenforceable clause and their retaliatory motives, Plaintiff suffered economic harm, damage to his reputation, and emotional distress, contravening California public policy.

**81.    Relief Sought**

---

[14] ***EEOC v. Sears Roebuck & Co.,*** *243 F.3d 846 (4th Cir. 2001)* inconsistent or shifting justifications for an adverse employment action can serve as evidence of retaliatory motive.

[15] **[Non-Competition Agreement, Non-Disparagement]:** *The executive team of Company will not make any statement of a disparaging nature about Stockholder.*

Plaintiff requests that the Court declare Plaintiff's termination as wrongful and without cause, and award back pay, front pay and lost benefits accordingly.

### CLAIM V. Constructive Discharge in Violation of Public Policy (in the Alternative)

82.   Plaintiff re-alleges and incorporates all paragraphs herein.

83.   While Plaintiff maintains he was explicitly terminated on November 14, 2024 (see [Ex. K]), this claim is pled in the alternative to Claim IV. Given the confusion caused by the shifting reasons for Plaintiff's separation, if the Court finds Plaintiff resigned, the conditions created by Defendant's retaliatory and hostile conduct were so intolerable that Plaintiff's separation constitutes a constructive discharge. See ¶¶ 24-27 and 39-47, and Claims III and IV.

### CLAIM VI.
### Wage Theft (Cal. Labor Code §§ 200, 201, 204, 221, 226, 2802)

84.   Plaintiff re-alleges and incorporates all paragraphs herein.

**85.   Unpaid or Delayed Wages**

Defendant violated California wage laws by failing to pay (or timely pay):

A. Retention Bonus triggered by qualified financing ([Ex. C, D]).

  • Also "Partial Bonus Acceleration" (¶¶ 31 and 46).

B. Severance guaranteed under the Offer Letter ([Ex. B]).

C. Final wages upon termination.

D. Two months of back pay, which was promised in a schedule of three payments and delayed by 30-60+ days for each installment (¶¶ 25-27).

By delaying or withholding these amounts, Defendant unlawfully withheld earned compensation in violation of Labor Code §§ 200, 201, 204, and 221—and are subject to Waiting Time penalties pursuant to § 203.

**86.   Work Expenses**

Defendant further violated § 2802 by refusing to provision or reimburse the purchase of required work equipment.

### 87.    Willful Violations

Defendant repeatedly and willfully violated Plaintiff's lawful requests, including rejecting his request for a work laptop (¶¶ 24) by stating "*we can't afford to give out equipment so we won't hire people who are stickler for the law.*".

### 88.    No Right to Withhold on Allegations.

Defendant's Dec. 6th "Notice of Claim" claims the unilateral right to deny earned compensation pursuant to speculative allegations, which Plaintiff contends:

- Violates California Labor Code § 221, which prohibits deductions from earned wages absent legal or adjudicated grounds.
- Contravenes California's public policy as affirmed in *Koehl v. Verio, Inc., 142 Cal. App. 4th 1313 (2006)*, and *Schachter v. Citigroup, Inc., 47 Cal. 4th 610 (2009)*, which reject the withholding of earned compensation based on speculative claims or retroactive contingencies.[16]

Employers cannot justify preemptive withholding of earned compensation using speculative allegations without adjudication by a court or other neutral forum. Defendant has not obtained such and must remit payment.

### 89.    Waiting Time Penalties (Labor Code § 203)

Under Labor Code § 203[17], Defendant's willful failure to pay wages on time subjects them to waiting time penalties for each infraction, calculated at Plaintiff's daily wage rate and accruing up to 30 days for each of 6 infractions.

### 90.    Plaintiff respectfully asks the Court:

---

[16] Both cases emphasize once an employee satisfies the conditions for a bonus or other compensation, an employer cannot impose new conditions or withhold payment without legal justification.

[17] see **McCoy v. Superior Court**, *157 Cal.App.4th 225, 229 (2007) (6) (*Waiting time penalties apply to willful failures to pay wages). and **Ling v. P.F. Chang's China Bistro, Inc.**, *245 Cal.App.4th 1242, 1254 (2016) (7)* (Bonuses are considered wages under the Labor Code)

- Declare the Retention Bonus is triggered and is in any case earned and unpaid wages due immediately upon Plaintiff's termination..

- Declare that Defendant's withholding of earned compensation[18] based on speculative claims is unlawful absent neutral adjudication of such claims.

- Waiting time penalties under Labor Code § 203, totaling $**589,680**[19].

- Reimbursement of work expenses under Labor Code § 2802.

- Attorneys' fees, costs, and interest as permitted by law.

### CLAIM VII. Breach of Contract.

91.    Plaintiff re-alleges and incorporates all paragraphs herein.

**92.    Contractual Basis (¶¶ 20-23)**

Plaintiff and Defendant entered into valid contracts, including the Offer Letter and Bonus Agreement, with clear and enforceable obligations:

A. **Retention Bonus**: The Bonus Agreement specifies a $450,000 Initial Payment[20], which is overdue, as discussed in ¶¶ 28-32 and 94.

---

[18] [**Ex. C, Bonus Agreement**] Provided "*in consideration of you remaining employed with Checkmate*"

[19] **Waiting Time Penalty Calculations (**preliminary**)**
Daily wage: $280,000 (base) + $450,000 (bonus) + $122,000 (severance) ÷ 260 workdays = $**3,276**
30 day accrued penalty is: 30 (days) * $2,807.69 (daily wage) = $**98,280**
Defendant's infractions included: (total 6, each accruing for 30 days)
- Back pay for pre-merger work, as promised on a schedule.
  - Installment 1 (June 1, 2024): $**98,280**.
  - Installment 2 (June 15, 2024): $**98,280**.
  - Installment 3 (July 12, 2024): $**98,280**.
- Partial Bonus Acceleration (November 3, 2024): $**98,280**.
  - Obligated within 10 days of Plaintiff signing a "partial bonus acceleration" document on or about October 20th, 2024.
- Retention Bonus (November 6, 2024): $**98,280**
  - Obligated upon qualified financing of $7,500,00 or greater, which Defendant publicly announced on October 23rd, 2024.
- Final Wages (November 14, 2024): $84,230.77
**Total Waiting Time Penalties: $98,280 * 6 = $589,680**.

[20] [**Exhibit C, Bonus Ag., "Initial Payment.."**] shall mean the earlier of (a) the date that is ten (10) business days after completion by Checkmate of a preferred stock financing .. for an aggregate purchase price of not less than $7,500,000 .. (a "Qualified Financing") or (b) the date that is ten (10) business days after the one year anniversary of the date of this Bonus Agreement.

B. **Severance**: The Offer Letter specifies severance as owed upon termination, regardless of cause, or for resignation with good reason[21] (¶ 20, ¶ 50).

C. **Performance Bonus**: The Offer Letter specifies a performance bonus as a material inducement to employment and performance. See ¶¶ 33-35.

### 93.    Substantial Performance

Plaintiff substantially performed his obligations under the agreements despite persistent undermining of his role by Defendant, including unreasonable delays in back pay, bonus target-setting, false accusations, and retaliatory conduct.

### 94.    Conditions to Earn Retention Bonus (¶¶ 28-32)

Plaintiff's Bonus Agreement contains two stipulations:

- Plaintiff remained employed by Defendant for 90 days (met Aug. 1st, 2024).
- Defendant completed a preferred stock sale of at least $7,500,000.

The following communications by Defendant indicate qualifying events:

- Late July 2024 Slack post announcing a $10,000,000 series B round[22]. Agarwal claimed a tranche structure precluded qualification.
- Oct. 23rd 2024 public press releases titled "*Checkmate Secures $10 Million in Series B Funding*" and containing no mention of contingencies ([Ex. D]).

Plaintiff asserts[23] that Defendant must prove the funding structure, if as alleged, precludes qualification under the Bonus Agreement, and otherwise asserts the bonus is earned compensation under California Labor Code §§ 200 and 204.

### 95.    Breaches by Defendant

Defendant breached these agreements by:

---

[21] **[Exhibit B, Offer Letter, "Post-Termination Compensation]**: ".. if the Company terminates your employment or your terminate your employment for Good Reason, in any such case before August 1, 2025 (the "Applicable Date"), you will receive as post-termination compensation:
    1. A lump sum payment equal to three (3) months base salary;..
    2. A lump sum payment equal to twenty-five percent (25%) of the performance bonus .."

[22] **Series B** is an industry description most commonly of a bona fide "preferred stock" sale.

[23] Plaintiff further contents that deliberately structuring the Series B funding in tranches to avoid triggering the Retention Bonus breaches the implied covenant of good faith and fair dealing (see ***Dunlap v. State Farm***, *878 A.2d 434, 441 (Del. 2005)*). Misrepresentation or concealment of such intent may also constitute fraud (***Abry Partners v. F&W Acquisition***, *891 A.2d 1032, 1050 (Del. Ch. 2006)*).

- Refusing to remit the $450,000 Initial Payment of the Bonus Agreement—earned upon completion of the 90-day vesting period and payable immediately upon termination under California Law.
- Breaching the implied covenant of good faith and fair dealing by:
  - Failing to share performance bonus targets in a timely manner.
  - Imposing unreasonable deadlines to avoid paying the bonus.
- Failing to pay $122,000 in severance owed under the Offer Letter.
- Violating the Non-Disparagement clause by making negative statements about Plaintiff and threatening teammates for maintaining contact.

**96.    Relief Sought**

Plaintiff requests that this Court award Compensatory Damages for:

- $500,000 contractually guaranteed retention bonus (¶¶ 21);
- $200,000 performance bonus he was prevented from earning;
- $122,000 contractually guaranteed severance pay;

## **CLAIM VIII. Unjust Enrichment (in the Alternative)**

97.    Plaintiff re-alleges and incorporates all paragraphs herein.

98.    To the extent that any beneficial agreements between Plaintiff and Defendant are deemed unenforceable, void, or otherwise invalid, Plaintiff asserts this claim for unjust enrichment as an alternative to Claim VII.

99.    Defendant received substantial benefits from Plaintiff's efforts, and those of the team he had assembled, including but not limited to:

- Pre-merger integration work that facilitated a smooth acquisition process.
- Proprietary technology developed by Plaintiff and team, which accelerated time to market for the Voice AI product.
- Recruiting and assembling the experienced VoiceBite team.
- Plaintiff's efforts enabled Defendant to raise its Series B funding and commercialize the voice product.

- Customer references, industry relationships and technical partnerships.

100.    Plaintiff performed these services and provided these benefits with the reasonable expectation of compensation, as promised in the merger negotiations and formalized through various agreements.

101.    Defendant failed to compensate Plaintiff for the benefits conferred, retaining the value of his work without fair payment.

102.    Regardless of contract enforceability, it is unjust for Defendant to benefit from Plaintiff's labor, IP, and relationships without fair compensation.

103.    Plaintiff respectfully requests restitution in the form of:

- Compensation for the benefits unjustly retained by Defendant.

## CLAIM IX. Promissory Fraud and Estoppel

**104.**    Plaintiff re-alleges and incorporates all paragraphs herein.

**105.    False Promises & Misrepresentations (¶ 15)**

Bell and Agarwal made clear and definite promises and representations that induced the founders to sign the exclusive LOI with Defendant. These included:

- Eighteen months of job security with full compensation if terminated.
- $1.5 million in merger equity (321,199 shares worth $4.67/share).
- $1.5 million in guaranteed cash payouts upon qualified financing.
- Checkmate's qualifying $10 million series B round was imminent.

**106.    Knowledge of Falsity and Intent to Induce Reliance**

Defendant's fraudulent intent is supported by extensive documentary evidence evincing a pervasive attempt to defraud the founders.

- Bell immediately retracted the written promise to guarantee 18 months of employment, after successfully securing execution of the LOI.
- Bell's assurances of "generational wealth", emails and the spreadsheet with rosy future projections starkly contrasted with reality (¶ 15).

25

- Though explicitly in the LOI, the founders found themselves having to re-negotiate the $1.5 million cash payout guarantee, reducing their leverage.

**107.  Reasonable Reliance**

Relying on these clear promises, Plaintiff and his co-founders:

- Forewent extensive, unsolicited discussions with reputable investors for a $3 million investment at a $16 million valuation.
- Traded independence and upside for the promised job stability and career opportunity—knowing that not all opportunities were actively pursued.

**108.  Detrimental Reliance and Damages**

As a direct result of Defendant's broken promises and misrepresentations:

- The founders ended fundraising efforts and VoiceBite's independence.
- Plaintiff was terminated after only 6 months, short of the promised 18.
- The founders went into merger negotiations with greatly reduced leverage.

**109.  Injustice Without Enforcement**

Enforcing Defendant's explicit promises is necessary to prevent injustice. Under California law, even if the LOI is deemed "non-binding" in certain respects, the specific promises regarding job security, share valuation and retention bonuses are enforceable. Absent enforcement, Plaintiff remains uncompensated for the substantial economic, reputational, and emotional harm suffered.

**110.  Plaintiff requests that this Court:**

1. Declare that Defendant's promises regarding (i) 18 months of job security, (ii) fully guaranteed retention bonuses, and (iii) equity consideration were clear, definite, and enforceable, and that, in the alternative, if Defendant's intent to defraud cannot be established, the Court find that Plaintiff is entitled to relief under the doctrine of promissory estoppel;

2. Award compensatory damages sufficient to remedy:
   - The 12-month shortfall in promised employment;
   - The discrepancy between the represented and actual share value.

- The lost opportunity to secure funding and keep VoiceBite independent[24];
3. Grant injunctive or equitable relief to prevent further evasion of obligations.

## CLAIM X. CIVIL CONSPIRACY:
### Fraudulent Inducement, Concealment and Extortion

111.    Plaintiff re-alleges and incorporates all paragraphs herein.

**112.    Fraudulent Inducement of the LOI (**see ¶ 15 and ¶¶ 105-109**).** Locked in by the LOI's exclusivity, the founders found themselves having to repeatedly renegotiate agreed terms (both explicit and promised), reducing their leverage and placing them under significant duress while finalizing the merger.

**113.    Duress[25] During the "No Shop" Period.** During the four months of pre-merger negotiations, Defendant pressured[26] the founders by refusing their request for a consulting agreement, despite:

- The LOI's "No Shop" clause, which prevented Plaintiff and team from pursuing investment or business income to compensate themselves.
- Plaintiff and his team performing substantial integration work and building IP that would accrue exclusively to Defendant upon merger close.
- The team being completely dependent on the deal closing to receive any form of compensation for this work, which would be otherwise worthless.
- The founders personally covering legal expenses during negotiations— which were repeatedly extended by Defendant's "bait-and-switch" tactics.

**114.    Coercion and Entrapment by Bell and Agarwal** Bell and Agarwal employed coercive tactics to entrap the founders (see ¶¶ 16, 17, 18 and 50). On April 3, 2024, Bell's hostile reaction to updates led the founders to

---

[24] **VoiceBite** was in late stage talks with a major Venture Capital firm to raise $3 million at a $16 million valuation—cut short by the LOI deadline. Plaintiff's pro-rata share would be $**5,330,000**.

[25] **Cal. Civ. Code § 1689 (2)** - Agreements are voidable if signed under duress.

[26] See ¶ 16-17 for facts establishing coercion and duress.

1  limit planned disclosures—and exclude personal legacy code, which would later be
2  cited as "evidence" of fraud to disentitle the founders.

3    115.    On April 10, 2024, the parties agreed to finalize terms as they stood.
4  This agreement was supported by explicit consideration: back pay for work
5  performed during negotiations[27]—to be paid on closing and conditioned upon
6  Plaintiff and team's acceptance of these terms as final, which they confirmed.

7    116.    Defendant unilaterally introduced sweeping changes on or about April
8  22, 2024, including a new "IP Letter"[28]. These changes:

9  A. Were falsely presented as benign and mutually beneficial[29] (¶¶ 16-17).

10  B. Provided no reciprocal benefits[30], violating Cal. Civil Code §§ 1550 and 1605.

11  C. Were executed under false pretenses[31], duress and coercion (see ¶¶ 16-18).

12  The absence of mutual consideration and the coercive circumstances surrounding
13  the execution render these agreements invalid under California law[32].

14    **117.    Conspiracy to Conceal True Intent of Indemnification**

15  Bell, Agarwal, and Defendant Counsel coordinated to misrepresent the intent
16  behind indemnification provisions via emails, text messages, shared documents
17  and zoom meetings (¶¶ 16-19)—while purportedly to share in liability for 3rd party
18  claims, and otherwise benign—these clauses were later weaponized as a hidden
19  clawback mechanism by way of Direct Claims (see ¶¶ 50-51). This allegation is

---

[27] The offer was 2 months of pay for 4-5 months of exclusive work. Post-merger, Defendant repeatedly made excuses to delay payment of even this partial amount (see ¶¶ 25-27).

[28] Defendant has relied on these 11th hour changes to withhold $1,500,000 from the VoiceBite founders.

[29] **[Bell's summary of 'IP Letter']** "The Holders and the Company have a joint interest in insulating themselves against the prospect of liability in any potential lawsuit arising from the potential misappropriation … It provides a means by which the Holders and the Company will be able to jointly argue, in the event any such suit is brought, that the plaintiffs cannot make a showing of improper acquisition – thus requiring dismissal."

[30] **Cal. Civ. Code §§ 1550, 1605 (9)** - Agreements are voidable for lack of mutual consideration.

[31] ***Lazar v. Superior Court, 12 Cal.4th 631*** - Voiding obligations arising from fraud.

[32] Defendant's Dec 06 **Notice of Claim** references the IP Letter and Assignment Agreement.

further substantiated by Alan Foster's documented independent analysis and—under Plaintiff's reasonable belief—with material obtainable in discovery.

### 118.   Plaintiff's Justifiable Reliance

The founders' reliance on Defendant's false assurances was reasonable because:

- On April 3, 2024, Bell shared a "meeting of the minds" Closing Framework that, from the founders' perspective, guaranteed their bonuses and severance—key deal points—and there was no indication that potential liabilities exceeded a collective indemnification cap of $150,000.

- While Alan Foster had serious reservations about Defendant's intentions, he resigned days before close—protesting Defendant's ethics. His replacement counsel—lacking Foster's understanding of the deal's history—reviewed the agreement and confirmed the founders' understanding of the key terms.

- The founders (and their counsel) were repeatedly and explicitly assured that indemnification was solely to defend against claims from former employers.

Therefore, the founders executed the merger & employment documents—trading the upside of independence for the stability of employment—under assurances of good faith and contractual protection for key employment terms.

### 119.   Red Flags of Bad Faith during Employment

After the merger closed, Defendant evaded obligations they had just promised to Plaintiff and the VoiceBite team—including back pay, retention bonuses and performances bonuses—retaliated against Plaintiff for demanding these obligations be honored (¶ 69-73) and finally terminated him while on medical leave (¶ 62). This swift reversal highlights a stark dissonance between Defendant's promises and its actions, and a deliberate strategy to induce reliance—making assurances only to revoke them once the merger closed and their objectives were met.

### 120.   Conspiracy to Falsify Plaintiff's Resignation

After terminating him on Nov 14, 2024, Bell, Agarwal and Brown knowingly and opportunistically directed the fabrication of Plaintiff's resignation (¶¶ 49-50). Two

hours after being terminated, Plaintiff—distressed—sent an email "resigning for good reason." Yet, one cannot resign from a position they no longer hold. Fully aware that severance would otherwise be owed—Defendant seized on the moment to recast the narrative, using Plaintiff's own words against him.

121.    Defendant's Dec 6th Notice (¶ 50) falsely asserted that Plaintiff attempted to resign on Nov 13th, 2024—the day *before* his termination. But why change the date? If their claim was legitimate, why not rely on the actual timeline? After all Plaintiff sent the email, possessed it, and knew precisely when it was sent. The only plausible reason was to rewrite the record—erasing any trace of the termination meeting and shield Defendant's actions from scrutiny.

122. It is reasonable to infer that Bell, Agarwal and or Brown either:

- Altered the date before passing the claim to legal counsel, OR
- Conspired with legal counsel to propagate the altered date.

123.    Discovery will reveal who falsified the record and for what purpose, but in any case, Defendant would benefit at Plaintiff's expense by:

- Fraudulently evading its contractual obligation to pay severance (¶ 20).
- Minimizing exposure by erasing all trace of an unjustifiable termination.

Defendant—through legal counsel—then demanded Plaintiff submit to a recorded interview as a condition to reconsider payment, an attempt to extract a forced admission. These actions collectively implicate both civil and criminal violations: **Fraud** (Cal. Civ. Code §§ 1572, 1709-1710), **Wage Theft** (Labor Code § 221), **Evidence Tampering** (Penal Code § 134), and **Extortion** (Penal Code § 518).

**124.    Concealed Clawback and Structural Fraud**

Moreover, the entire merger was fraudulent—engineered to extract the founders' technology, goodwill, and expertise without delivering the agreed compensation.

- Indemnification provisions were framed as reasonable protections from 3rd party claims, but were actually a hidden mechanism for clawbacks.

- Full disclosures were intentionally obstructed, ensuring the founders unknowingly walked into a legal trap (see ¶¶ 50-51).
- When read independently of the Merger Agreement, the employment related Offer Letter and Bonus Agreement appear to provide no basis for withholding payments beyond the specified indemnification cap.

Had Plaintiff known that these provisions could be used as a pretext to claw back hard earned compensation, he never would have signed the merger agreement.

### 125.  Harm to Plaintiff

As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff suffered financial, reputational and emotional losses; including distress from realizing Defendant did not intend, and never intended, to fulfill its obligations, while he and his team had sacrificed their cherished independence.

### 126.  Willful, Malicious and Oppressive Conduct

Defendant deliberately induced the exclusive LOI with false promises, entrapped the founders through coercion, and structured the merger to enable withholding of compensation under false pretenses. This calculated scheme to defraud warrants punitive damages to deter similar misconduct.

### 127.  Plaintiff requests that this Court:

- Compel Defendant to repurchase Plaintiff's merger shares at the falsely represented $4.67 per share or otherwise make Plaintiff whole.
- Declare that any Claims based on Defendant's fraudulent misrepresentations, concealment, or extortionate demands are void and unenforceable;
- Declare that Defendant's use of legal threats against shareholders constitutes a continuation of its fraudulent scheme and an unlawful act of retaliation.
- Declare that Defendant's falsification of Plaintiff's resignation, coercive tactics to gain leverage, and willful withholding of earned wages constitute:

- Civil Extortion under Cal. Civ. Code §§ 1572, 1709-1710 (Fraud) and Cal. Penal Code § 518 (Extortion), as Defendant's coercive threats led to futile attempts by Plaintiff to defend himself from baseless allegations.
- Criminal wage theft under Cal. Labor Code §§ 201-203 and Cal. Penal Code § 487 (Grand Theft) and/or § 532 (Theft by False Pretenses).
- Evidence tampering under Cal. Penal Code § 134 for knowingly altering employment records to evade legal obligations.

• Enjoin Defendant from initiating, pursuing, or enforcing any claims, demands, or legal actions arising from its fraudulent scheme, including but not limited to any indemnification claims.

• Award punitive damages under Cal. Civ. Code § 3294 to punish Defendant's willful, malicious, and oppressive conduct—aggravated by its exploitation of Plaintiff's vulnerability—and to deter such future predatory schemes.

## VII. REQUEST FOR RELIEF

Plaintiff prays for judgment against Defendant and requests as follows:

128.    Declaratory Relief as specified in ¶¶ 74, 81, 90, 110 and 126;

129.    Compensatory Damages as in ¶¶ 74, 81, 90, 96, 110 and 126;

130.    Liquidated or statutory damages under the FMLA and Labor Code;

131.    Civil and Waiting Time Penalties under the Cal. Labor Code (¶ 90);

132.    Punitive Damages for Fraud, Extortion and Retaliation (¶¶ 74, 126);

133.    Injunctive or Equitable Relief as in ¶¶ 74, 110 and 126;

134.    Emotional Distress Damages as in ¶¶ 63, 67, 74, and 125;

135.    Prejudgment and Post-judgment Interest;

136.    Attorneys' Fees and Costs (if Plaintiff later obtains counsel); and

137.    Such other and further relief as the Court deems just and proper.

The total amount in controversy to be proven at trial exceeds **$7,000,000**.

## VIII. EXHIBIT REFERENCES

*Plaintiff reserves the right to expand this list as the case proceeds.*

### Contracts, Agreements and Related Materials

- [Exhibit B]: Employee Offer Letter (final draft).
- [Exhibit C]: Bonus Agreement (final draft).
- [Exhibit D]: **10/23/2024** Checkmate Fundraising Press Release.

### Termination Related Communications and Materials

- [Exhibit H]: **11/12/2024** Email thread (to termination, re: health coverage).
- [Exhibit K]: **11/14/2024** Fathom.video Meeting Summary.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

## X. RESERVATION OF RIGHT TO RETAIN COUNSEL

Plaintiff expressly reserves the right to retain counsel at any point during these proceedings to protect his legal rights and to advance the claims asserted herein.

**DATED**: February 20, 2025

Respectfully submitted,

_____

**ARJUN VASAN**

Plaintiff in Pro Per

12615 193rd St, Cerritos, CA 90703

562-900-6541

arjun.vasan@gmail.com