Arjun Vasan

12615 193rd Street
Cerritos, CA 90703
arjun.vasan@gmail.com
562-900-6541

February 20, 2025

Clerk of the Court
United States District Court
Central District of California
Western District

Re: Submission of Updated Complaint (Pre-Service Filing)
Case Name: Vasan v. Checkmate.com, Inc.
Case No.: 2:25–cv–00765–MEMF–JPR

Dear Clerk of the Court,

I am submitting an updated version of the Complaint in the above-referenced matter. This filing supersedes the previously filed complaint before service and is being submitted as a pre-service update, not a formal amendment requiring leave of court.

This updated complaint includes substantive revisions, including updated claims based on newly identified information. As the original complaint has not yet been served, this filing replaces it in full before service on the defendant.

Additionally, please note that no new summons is required. The summons issued on February 1, 2025 (Doc #8) remains valid for service with this updated complaint.

Please process this filing accordingly. Should you have any questions or require further clarification, please feel free to contact me at arjun.vasan@gmail.com or 562-900-6541.

Thank you for your time and assistance.

Sincerely,

*[signature]*

_____

Arjun Vasan
Plaintiff, Pro Se

FILED
CLERK, U.S. DISTRICT COURT
2/21/25
CENTRAL DISTRICT OF CALIFORNIA
BY ___MRV___ DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM



**Exhibit B - Offer Letter**

Checkmate.com Inc.

April __, 2024

Dear Arjun Vasan,

Offer and Position

We are pleased to extend an offer of employment to you for the position of **VP AI Technology** at Checkmate.com Inc., a Delaware corporation (the "***Company***"). This offer of employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter.

Duties

In your capacity as VP AI Technology, you will perform duties and responsibilities that are commensurate with your position and such other duties as may be assigned to you from time to time. You will report to Mike Bell. You agree to devote your full business time, attention, and best efforts to the performance of your duties and to the furtherance of the Company's interests.

Location

You will work remotely for the Company, subject to business travel as needed to properly fulfill your employment duties and responsibilities.

Start Date

Subject to satisfaction of all of the conditions described in this letter, this offer is based on a mutually acceptable start date of May 1, 2024.

Compensation

Your starting base salary will be $280,000 per year, payable in two (2) week increments, and you will be eligible to receive a target bonus of up to $200,000 based on performance for 2024 and a target bonus of up to 50% of your annual salary based on performance for 2025 going forward, payable in accordance with the Company's standard practices, provided that you will not be eligible for a bonus payments unless you are continuously employed with the Company through the time of payment. Your compensation is subject to review from time to time, and all payments will be made in accordance with the standard payroll practices of the Company and subject to standard withholdings and deductions.

Stock Options

Subject to approval by the Company's Board of Directors (the "***Board***"), the Company anticipates granting you an option to purchase 100,000 shares of the Company's common stock at the fair market value as

determined by the Board as of the date of grant (the "*Option*"). The anticipated Option will be governed by the terms and conditions of the Company's 2018 Stock Plan (the "*Plan*") and your grant agreement, and will include the following vesting schedule: 1/8th of the total shares will vest on the date that is 6 months after the vesting commencement date, and 1/48th of the total shares will vest at the end of each month thereafter on the same day of the month as the vesting commencement date (or if there is no corresponding day, on the last day of the month), until either the Option is fully vested or your continuous service (as defined in the Plan) terminates, whichever occurs first.

Benefits and Perquisites

You will be eligible to participate in the employee benefit plans and programs available to the Company's employees, subject to the terms and conditions of such plans and programs. You will be entitled to paid vacation in accordance with the Company's policies in effect from time to time. You will also be entitled to the fringe benefits and perquisites that are made available to other similarly situated employees of the Company, each in accordance with and subject to the eligibility and other provisions of such plans and programs. The Company reserves the right to amend, modify or terminate any of its benefit plans or programs at any time and for any reason.

Withholding

All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.

Stock Ownership Requirements

Except as may be expressly provided otherwise in this offer letter, as an employee of the Company, you will be required to comply with the Company's Stock Ownership Requirements applicable to employees and to be adopted in the future.

At-will Employment

Your employment with the Company will be for no specific period. Rather, your employment will be at will, meaning that you or the Company may terminate the employment relationship at any time, with or without cause, and with or without notice and for any reason or no particular reason. Although your compensation and benefits may change from time to time, the at-will nature of your employment may only be changed by an express written agreement signed by an authorized officer of the Company.

Contingent Post-Termination Compensation

Notwithstanding any other provision of this offer letter, if the Company terminates your employment or your terminate your employment for Good Reason, in any such case before August 1, 2025 (the "*Applicable Date*"), you will receive as post-termination compensation:

1. A lump sum payment equal to three (3) months base salary, paid on the Company's first regular payroll paydate following the termination, provided that if such paydate is within five (5) days of the termination date, then such amount will be paid on the Company's second regular payroll paydate following the termination (the "*Payment Date*");

2. A lump sum payment equal to twenty-five percent (25%) of the performance bonus for the then current year, paid on the Payment Date;

3. any Accrued Compensation (as defined below).

If your employment is terminated by you other than for Good Reason, you will be paid only (i) any earned but unpaid base salary, (ii) other unpaid vested amounts or benefits under the compensation, incentive and benefit plans of the Company in which you participate, and (iii) reimbursement for all reasonable and necessary expenses incurred by you in connection with the performance of your duties on behalf of the Company in accordance with applicable Company policies and guidelines, in each case as of the effective date of such separation from service (the "*Accrued Compensation*").

"*Good Reason*" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

Dispute Resolution

Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "Mediator Opinion"). The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding. The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

Section 409A

This offer letter is intended to comply with Section 409A of the Internal Revenue Code ("*Section 409A*") or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this offer letter, payments provided under this offer letter may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this offer letter that may be excluded from Section 409A either as separation pay due to

an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this offer letter shall be treated as a separate payment. Any payments to be made under this offer letter upon the termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this offer letter comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by you on account of non-compliance with Section 409A.

Notwithstanding any other provision of this offer letter, if any payment or benefit provided to you in connection with the termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and you are determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of your termination date (the "**Specified Employee Payment Date**") or, if earlier, on the date of your death. The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which your separation from service occurs shall be paid to you in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

Governing Law

This offer letter shall be governed by the laws of the State of California, without regard to conflict of law principles.

Contingent Offer

This offer is contingent upon:

(a) Verification of your right to work in the United States, as demonstrated by your completion of an I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of your Start Date.

(b) Satisfactory completion of reference checks.

(c) Your execution of the Company's Confidentiality and Intellectual Rights Assignment Agreement.

This offer will be withdrawn if any of the above conditions are not satisfied.

Representations and Obligations

By accepting this offer, you represent that you are able to accept this job and carry out the work that it would involve without breaching any legal restrictions on your activities, such as non-competition, non-solicitation or other work-related restrictions imposed by a current or former employer. You also represent that you will inform the Company about any such restrictions and provide the Company with as much information about them as possible, including any agreements between you and your current or former

employer describing such restrictions on your activities. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company. If you have any questions about the ownership of particular documents or other information, you should discuss such questions with your former employer before removing or copying the documents or information.

As a Company employee, you will be expected to abide by Company rules and policies. Normal business hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday. As a full-time exempt salaried employee, you will be expected to work the Company's normal business hours as well as additional hours as required by the nature of your work assignments, and you will not be eligible for overtime compensation.

We are excited at the prospect of you joining our team. If you have any questions about the above details, please call me immediately. If you wish to accept this position, please sign below, and return this letter to me.

I look forward to hearing from you.

Yours sincerely,

Amy Brown – Head of Human Resources | US

On behalf of Checkmate.com Inc.

Acceptance of Offer

I have read, understood, and accept all the terms of the offer of employment as set forth in the foregoing letter. I have not relied on any agreements or representations, express or implied, that are not set forth expressly in the foregoing letter, and this letter supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to the subject matter of this letter.

Signed _____

Date _____

Checkmate.com Inc.
April \_\_\_\_, 2024

**BY E-MAIL**               Exhibit C - Bonus Agreement

Arjun Vasan

Dear Arjun:

This letter (the "Bonus Agreement") is being delivered to you in connection with the commencement of your employment with Checkmate.com Inc. ("Checkmate") and in conjunction with your execution of an offer letter and Confidential Information and Inventions Agreement with Checkmate.

In consideration of you remaining employed with Checkmate, and to further motivate you to devote the exceptional service and performance necessary to maximize Checkmate's performance and value, Checkmate wishes to provide you with the below bonus opportunity.

1. Bonus. On July \_\_, 2024 (the "Bonus Date"), you will become entitled to receive a cash bonus (less applicable withholdings and deductions) payable as set out below (the "Retention Bonus").

    a. An amount equal to the Initial Payment Amount (as defined below), subject to reduction or adjustment as set out in this Agreement, shall be paid as set out in Section 3 of this Agreement.

    b. A maximum of Fifty Thousand Dollars ($50,000) of the Retention Bonus (the "Final Payment Amount"), reduced as provided below, shall be paid as set forth below (the "Final Payment"). The Final Payment Amount may be reduced as set forth below:

        i. Checkmate may seek recovery of up to your Pro Rata Share of any Purchaser Loss that is recoverable by any Purchaser Indemnified Party pursuant to Article 8 of the Merger Agreement by recovering and offsetting against (and reducing the amount of) the Final Payment Amount (it being understood that such reimbursement shall not reduce such Checkmate Indemnified Party's right to seek recovery as set out in the Merger Agreement of any Purchaser Losses that are not recovered pursuant to this Section 1(b)). Any recovery of any Purchaser Loss against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

        ii. Checkmate may seek recovery of any Reduction Amount that was not deducted from the Initial Payment Amount by recovering and offsetting against (and reducing the amount of) the Final Payment Amount. Any recovery of any Reduction Amount against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

        iii. No later than five (5) business days following the Final Payment Date, Checkmate shall pay an amount in cash to you in the amount of Final Payment Amount reduced as set out in Section 1(b)(i) or (ii) *minus* an amount equal to your Pro Rata Share of any Purchaser Loss for which any Purchaser Indemnified Party may be entitled to indemnification under Section 8 of the Merger Agreement and clause (i) above as result of any pending, but unresolved, claims

39
Complaint

### Exhibit C - Bonus Agreement

for indemnification for which Checkmate has provided notice to the Holder Representative prior to the Final Payment Date in accordance with the Merger Agreement (a "Dispute") (the amount contemplated by clause (C), the "Disputed Cash Amount").

    iv.    On the later of the Final Payment Date or five (5) business days following the final resolution of any Dispute, Checkmate shall pay to you an amount in cash equal to (i) any remaining Disputed Cash Amount *minus* (ii) your Pro Rata Share of any Purchaser Indemnified Losses for which any Purchaser Indemnified Party may be entitled to indemnification under Article 8 of the Merger Agreement as result of any unresolved Dispute.

    v.    For the avoidance of doubt, in no event shall you be entitled to an amount greater than Fifty Thousand Dollars ($50,000) pursuant to this Section 1(b).

2. Definitions.

   a. "Expense Reconciliation Agreement" shall mean that certain Expense Reconciliation Agreement dated as of April __, 2024 by and among Checkmate, VoiceBite Corporation, a Delaware corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia.

   b. "Final Payment Date" shall mean the date that is the later of (a) twelve (12) months after the Closing or (b) the Initial Payment Date.

   c. "Initial Payment Amount" shall mean Four Hundred Fifty Thousand Dollars ($450,000) minus (a) your Pro Rata Share of the amount of Company Transaction Expenses and Indebtedness that are unpaid as of the Closing and minus (b) your pro rata share of Non-Reimbursed Expenses as defined in the Expense Reconciliation Agreement (the amounts in (a) and (b) collectively the "Reduction Amount").

   d. The "Initial Payment Date" shall mean the earlier of (a) the date that is ten (10) business days after completion by Checkmate of a preferred stock financing in which Checkmate sells preferred stock for an aggregate purchase price of not less than $7,500,000 not including conversion of any outstanding notes or SAFEs (a "Qualified Financing") or (b) the date that is ten (10) business days after the one year anniversary of the date of this Bonus Agreement.

   e. "Merger Agreement" shall mean that certain Agreement and Plan of Merger (the "Merger Agreement"), dated April ___, 2024, by and among Checkmate, VoiceBite Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Checkmate, the Company, Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia, and Robert Nessler as the Holder Representative.

3. Form of Payment. If Checkmate closes a Qualified Financing (the date of such closing, the "Closing Date") within one year after the date of this Bonus Agreement (the "Anniversary Date"), then any earned Retention Bonus will be payable in cash no later than ten (10) business days after the later of the Bonus Date or the Closing Date. If Checkmate does not close a Qualified Financing by the Anniversary Date, then any earned Retention Bonus will be payable, at your discretion, (a) by conversion of any earned Retention Bonus, without interest, into Checkmate Common Stock at a price per share of $4.67, or (b) in cash, without interest, in fifteen

## Exhibit C - Bonus Agreement

monthly installments beginning no later than ten (10) business days after your election of payment method is received by Checkmate. If you have not notified Checkmate in writing within 30 days after the Anniversary Date of your choice to have the Retention Bonus convert into Checkmate Common Stock or pay out in fifteen monthly installments, then Checkmate may select the payment method and notify you. As a condition to any earned Retention Bonus converting into Checkmate Common Stock, you and Checkmate will enter into a standard stock purchase agreement. Any payment of Retention Bonus in cash to employees of Checkmate or any of its subsidiaries will be made through Checkmate's or such subsidiary's payroll system on the next regular payroll date after the Payment Date unless such payroll date is within ten (10) business days of the Payment Date, in which case the payment may be made on the second regular payroll date after the Payment Date.

4. <u>Termination of Employment</u>. Notwithstanding any other provision of this Bonus Agreement, if you terminate your employment for Good Reason or if the Company terminates your employment for any reason, before the Bonus Date, you will be entitled to receive payment equal to the Initial Payment Amount and Final Payment Amount, each as adjusted or reduced as set out in this Agreement, each paid on the appropriate date set out in Section 1.

   If you terminate your employment before the Bonus Date other than for Good Reason, you will not be eligible to receive any Initial Payment Amount or Final Payment.

   "<u>Good Reason</u>" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

5. <u>Dispute Resolution</u>. Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "<u>Mediator Opinion</u>"). The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding. The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise



   

**SUBSCRIBE**

Exhibit D - Fundraising Announcement

# Checkmate Secures $10 Million in Series B Funding

**OCT 23 2024**

News    Share:

Checkmate, a leading provider of unified ordering solutions for enterprise restaurants, announced that it secured $10 million in Series B funding, led by Tiger Global. The round will enable Checkmate to accelerate the adoption of its voice AI and kiosk technologies across the industry and deliver the custom experience brands need. Checkmate has already developed world-class expertise in integrating digital orders into restaurant point-of-sale (POS) systems. This foundation serves as a critical advantage in entering these new business segments.

Checkmate offers best-in-class phone ordering and drive-thru AI solutions to some of the country's largest brands, all seamlessly integrated with their POS. The core business is profitable, and this additional round was raised primarily to bring these breakthrough technologies to mid-market and enterprise brands.

"With this investment, we're doubling down on our development of the technologies that are helping restaurants scale their operations, grow digital revenue, and improve efficiency," said Vishal Agarwal, Founder and CEO of Checkmate. "We are at the forefront of bringing voice AI to the restaurant space, given our existing network of customers and POS integrations. With Tiger Global's support, we will continue leading the charge in transforming the restaurant experience."

Securing Checkmate's Series B round underscores the company's ability to provide technology to restaurant brands at scale efficiently. With restaurant brands under pressure to meet the demands of digital-savvy customers, Checkmate empowers enterprises to launch unique



Exhibit H - Email Thread (re: termination)

Arjun Vasan <arjun.vasan@gmail.com>

---

## Good reason resignation
3 messages

---

**Arjun Vasan** <arjun.vasan@gmail.com>     Thu, Nov 14, 2024 at 9:56 AM
To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

I hereby resign from checkmate, with good reason, due to the demand made in late October that i accept a demotion, despite exceptional performance.

As this demand was not lifted within 30 days, I resign as per our agreement.

- Arj

Sent from Gmail Mobile

> On Thu, Nov 14, 2024 at 8:43 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
> Just to be clear, i never actually solicited anyone to leave checkmate. I never mentioned lunchbox to anyone. I reached out to them after:
>
> 1. My partial bonus wasn't paid as agreed
> 2. My access to checkmate slack/email was disconnected. I believed that was an indication of being terminated.
>
> Wrt settlement, I'd like to see the proposed terms asap. If they do not align with the merger agreement, i will need to engage pietari to represent me.
>
> - Arj
>
> Sent from Gmail Mobile
>
>> On Thu, Nov 14, 2024 at 8:00 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
>> Ok got my phone and computer, joining now.
>>
>>> On Wed, Nov 13, 2024 at 8:59 PM Vishal Agarwal <vishal@itsacheckmate.com> wrote:
>>> Noted, thank you for the update Arj.
>>>
>>> Regards,
>>>
>>> 
>>>
>>> **Vishal Agarwal**
>>> FOUNDER AND CEO
>>>
>>> +1 855.953.4340  |  itsacheckmate.com
>>>
>>>> On Wed, Nov 13, 2024 at 11:50 PM Arjun Vasan <arjun.vasan@gmail.com> wrote:
>>>> (i get my computer 5-9pm and phone in the morning 8-9am usually, which is the 5 hour approved schedule they approved)
>>>>
>>>>> On Wed, Nov 13, 2024 at 8:49 PM Arjun Vasan <arjun.vasan@gmail.com> wrote:
>>>>> Ok, I've informed the staff here, but cannot guarantee I will get my phone in time, as it's held by the staff and the morning nurse gets here at 8 and has the keys. So I may be a few minutes late, but will make every attempt to be on time. In case I am delayed by more than 5 minutes, I will reply here as soon as I get the phone.

43
Complaint

- Arj

On Wed, Nov 13, 2024 at 11:04 AM Vishal Agarwal <vishal@itsacheckmate.com> wrote:
> Thank you, I've sent an invite.
>
> Regards,
>
> 
> **Vishal Agarwal**
> FOUNDER AND CEO
> +1 855.953.4340 | itsacheckmate.com

On Wed, Nov 13, 2024 at 1:12 PM Arjun Vasan <arjun.vasan@gmail.com> wrote:
> Ok that works.
>
> Sent from Gmail Mobile

On Wed, Nov 13, 2024 at 9:27 AM Vishal Agarwal <vishal@itsacheckmate.com> wrote:
> Hi Arj,
>
> We don't want to rush this but it will be difficult for all of us to get on a call today. Please let us know if a call tomorrow at 11 am ET works for you, and I can send an invite.
>
> Regards,
>
> 
> **Vishal Agarwal**
> FOUNDER AND CEO
> +1 855.953.4340 | itsacheckmate.com

On Wed, Nov 13, 2024 at 12:03 PM Vishal Agarwal <vishal@itsacheckmate.com> wrote:
> Hi Arj,
>
> Thank you. We'd like to have a discussion with you right away about this. Can you jump on the call, we have created this link for our meeting: https://itsacheckmate.zoom.us/j/85854457061?pwd=8AbRT8FKPjPE1voT1bGHvqbAbK0K4M.1
>
> Or let us know when you are available please.
>
> Please confirm via email once you are able to join.
>
> Regards,
>
> 
> **Vishal Agarwal**
> FOUNDER AND CEO
> +1 855.953.4340 | itsacheckmate.com

On Wed, Nov 13, 2024 at 10:54 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
> Amy, you sent the form for FMLA, i filled it out and you accepted it. How is this an "unprotected personal leave of absense?" Please inform at the earliest, as i understand it, a reduced schedule FMLA grants the same protections for 12 weeks.
>
> I am eager to get back to work and help my team, while i am still under in patient medical care, we have come to arrangement where I can work for 5 hours a day, updated as i get better.
>
> I am taking classes in anger management and controlling my emotions. Most importantly i'm sleeping well, and have a schedule.

> I will dramatically accelerate this project, and this will be confirmed universally by chris, robert, jeffrey, pranav, paul and sam.
>
> - Arj
>
> Sent from Gmail Mobile
>
> On Wed, Nov 13, 2024 at 7:37 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
>> I dont understand, am I not on FMLA protections?
>>
>> Sent from Gmail Mobile
>>
>> On Tue, Nov 12, 2024 at 12:36 PM Amy Brown <amy.brown@itsacheckmate.com> wrote:
>>> Hello Arj,
>>>
>>> As your return-to-work date is currently set for December 6, 2024, ADP TotalSource has informed me that your benefits coverage will end on November 30, 2024, due to your status on an unprotected Personal Leave of Absence.
>>>
>>> The ADP TotalSource Benefits Department will send you information on COBRA coverage within 30 days of your benefits expiration, which is November 30, 2024. If you choose to elect COBRA, your coverage will be retroactively effective starting December 1, 2024.
>>>
>>> Please feel free to reach out with any questions or if you need further assistance.
>>>
>>> Regards,
>>>
>>>   Amy Brown
>>> Vice President of Human Resources | U.S.
>>> +1 855.953.4340
>>>
>>> *This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential and may contain information that is privileged or exempt from disclosure under applicable law.  If you have received it in error, please notify the sender by return email and delete this message.*
>>
>> *This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential and may contain information that is privileged or exempt from disclosure under applicable law.  If you have received it in error, please notify the sender by return email and delete this message.*
>
> *This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential and may contain information that is privileged or exempt from disclosure under applicable law.  If you have received it in error, please notify the sender by return email and delete this message.*

*This email (covered by the Electronic Communications Privacy Act 18 U.S.C. Section 2510-2521) is confidential and may contain information that is privileged or exempt from disclosure under applicable law.  If you have received it in error, please notify the sender by return email and delete this message.*

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                                                                    Mon, Dec 2, 2024 at 3:06 PM
Draft To: Vishal Agarwal <vishal@itsacheckmate.com>
Cc: Amy Brown <amy.brown@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

 Exhibit K - Fathom.video recap                                    Arjun Vasan <arjun.vasan@gmail.com>

---

**Recap of your meeting with ItsaCheckmate**
1 message

**Fathom** <no-reply@fathom.video>                                              Thu, Nov 14, 2024 at 8:13 AM
To: "arjun.vasan@gmail.com" <arjun.vasan@gmail.com>

            **Get your own FREE AI notetaker**             5.0/5.0
                    Click to unlock Amy's referral bonus                    #1 Rated • 1,500+ Reviews

---

Meeting with ItsaCheckmate

# Discussion with Arjun Vasan

November 14, 2024  •  13 mins  •  View Recording & Summary

✨ The following summary and action items were generated by AI

## Summary

**Meeting Purpose**

To inform Arjun Vasan of his immediate termination due to a breach of company trust and non-solicitation agreement.

**Key Takeaways**

- Arjun Vasan terminated effective immediately for reaching out to a competitor and offering to bring two engineers
- Company possesses emails proving Arjun's actions; decision is final and non-negotiable
- Next steps involve either working out a settlement or involving lawyers
- Follow-up meeting scheduled with voice team members at 12 PM Eastern to discuss situation

**Topics**

**Termination Announcement and Reasoning**

- Vishal informed Arjun of immediate termination, unrelated to past issues or health concerns
- Termination solely due to Arjun contacting a competitor, offering to join and bring two engineers
- Company has emails as evidence; Vishal expressed deep disappointment

- Arjun's status as "on leave" doesn't exempt him from non-solicitation agreement

<span style="color:red">Exhibit K - Fathom.video recap</span>

**Arjun's Response and Attempted Justification**

- Arjun claimed he thought he was going to be terminated anyway, prompting his actions
- Attempted to argue he wasn't technically with the company as he was on leave
- Expressed willingness to negotiate, mentioning he has a lawyer available

**Next Steps and Settlement Options**

- Company offered two paths: work out final settlement or involve lawyers
- Arjun tentatively agreed to try negotiating directly without lawyers
- Mike, Vishal, and Amy to discuss and present a proposal to Arjun

**Post-Call Discussion**

- Confirmed Arjun sent emails on two separate days, not a momentary lapse
- Team expressed confidence in loyalty of other team members, particularly Pernav
- Amy to handle offboarding process, sending documents to Mike

**Planned Follow-up Meeting**

- Scheduled for 12 PM Eastern with voice team members
- Mike to notify Robert, Jeffrey, and others via text and Slack
- Amy included to participate in the discussion

**Next Steps**

- Mike to set up meeting with voice team for 12 PM Eastern
- Amy to send offboarding documents to Mike
- Team to formulate settlement proposal for Arjun
- Monitor and secure company assets/access points following Arjun's termination
- Prepare communication strategy for informing relevant team members about the situation

# Action Items

☐ **Forward Arjun's emails to competitor to Amy and Mike**
Vishal Agarwal

☐ **Initiate standard termination procedures for Arjun (access revocation, team notification, etc.)**
Amy Brown

☐ **Draft settlement proposal for Arjun. Schedule follow-up meeting to discuss**
Mike Bell

Exhibit K - Fathom.video recap

☐ **Schedule 12PM EST meeting w/ voice team. Notify Robert, Jeffrey, Chris, Mayur via text/Slack**
Mike Bell

☐ **Prepare/send offboarding docs to Mike for Arjun's termination**
Amy Brown

**View Recording & Summary**

Fathom is the award-winning AI notetaker that takes brilliant meeting notes. Sign up for FREE at fathom.video

