1  Arjun Vasan

2  arjun.vasan@gmail.com

3  12615 193rd Street

4  Cerritos, CA 90703

5  562-900-6541

6  Plaintiff in Pro Per

7

8

9

**FILED**

CLERK, U.S. DISTRICT COURT

**4/9/25**

CENTRAL DISTRICT OF CALIFORNIA

BY _____ CS _____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

10  **Arjun Vasan**,
            Plaintiff,

11

        vs.

12  **Checkmate.com, Inc.**,
    (dba "Checkmate"),

13              Defendant.

14

15

16

17

18

Case No.:  2:25−cv−00765−MEMF−JPR

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE**

[Filed concurrently with Declaration of Arjun Vasan, Declaration of Latha Vasan, Request for Judicial Notice, [Proposed] Order]

19

20

## TABLE OF CONTENTS

21  I. INTRODUCTION................................................................................................1

22

23  II. PRELIMINARY MATTERS .............................................................................3

24      A. DEFENDANT FAILED TO PROPERLY MEET AND CONFER............................. 3

25      B. DEFENDANT'S ARGUMENTS ARE UNDERMINED BY THE ACTUAL RECORD ......... 3

26      C. DEFENDANT'S MOTION ENGAGES IN IMPROPER CHARACTER ATTACKS .............. 3

27  III. FACTUAL BACKGROUND ..............................................................................4

28

A. California Connections Are Substantial and Predominant ............................................ 4

B. Key Claims Arose in California .................................................................................. 5

C. Plaintiff Filed and Properly Served First in this Action ............................................ 5

D. Employment Claims are Explicitly Carved Out of the Merger Agreement ............... 5

IV. LEGAL STANDARD .................................................................................................... 6

A. Plaintiff was First to File and Serve His Action ........................................................ 6

B. Venue is Proper in the Central District of California ................................................. 6

C. Plaintiff Can — and Does — Challenge the Forum Selection Clause(s) .................. 7

D. Traditional § 1404(a) Analysis Favors Retention in California ................................ 8

V. LEGAL ARGUMENT ..................................................................................................... 8

A. This Court Has Priority Under the First-to-File Doctrine .................. **Error! Bookmark not defined.**

B. Venue is Proper under Rule 12(b)(3) and 28 U.S.C. §1391(b) ................................. 8

C. The Forum Selection Clause Does Not Apply to Plaintiff's Claims .......................... 10

   *1. Plaintiff's Claims Do Not — and Cannot -- Arise from the Merger Agreement* ........ *10*

      (a) The Merger Agreement Explicitly Carves Out Employment Claims ..................... 10

      (b) The Agreement's Structure Confirms the Exclusion of Employment Claims ......... 11

      (c) Contract Interpretation Principles Support This Reading ..................................... 11

   *2. The Merger Agreement is not "Primary or More Comprehensive"* ........................... *12*

   *3. California Labor Code § 925 Invalidates Forum Selection Clauses* ......................... *13*

      (a) Nature of the Transaction as an "Acquihire" ....................................................... 13

      (b) Strong Precedent Supports § 925 Applicability to this Case ................................ 14

      (c) The § 925(e) Exception Does Not Apply to this Case .......................................... 14

      (d) Choice of Law Provisions Are Similarly Voidable Under § 925 ........................... 15

      (e) "Primarily Resides and Works" Depends on Actual Work, Not Address on File ...... 15

      (f) Defendant Neglects to Account for Time at VoiceBite ......................................... 16

      (g) Defendant Misstates California Public Policy and Misinterprets Precedent ........... 16

   *4. Fraud and Overreach Void the Forum Selection Clauses* ......................................... *16*

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

*5. Plaintiff's Missteps Refute the "Sophisticated Party" Defense* ............................................................... *17*

D. Comprehensive § 1404(a) Analysis Compels Retaining Jurisdiction Here ................................................ 18

*1. California Has a Strong Interest in This Litigation* ............................................................................... *18*

*2. Defendant's Convenience Arguments Are Inconsistent and Pretextual* ................................................ *19*

*3. Traditional § 1404(a) Factors Overwhelmingly Favor this Venue* ...................................................... *19*

**VI. THE FACTUAL RECORD UNDERMINES DEFENDANT'S MOTION** .......................................................... **20**

A. Termination Meeting Recording Contradicts Resignation Narrative ................................................ 20

*1. Defendant's Sworn Declarations Underpin This False Narrative* ......................................................... *20*

*2. Defendant's Own Recording Proves These Statements Are False* ........................................................ *21*

*3. Plaintiff's Post-Termination Email Cannot Constitute a Resignation* ................................................. *21*

*4. Defendant Makes These Claims Fully Aware of their Falsity* .............................................................. *21*

B. Critical Omission of Key California Witness from Defendant's Motion ............................................ 21

C. VoiceBite Merger was not a "Multimillion Dollar" Transaction ...................................................... 22

D. Plaintiff was Not Individually Represented Despite Defendant's Claims .......................................... 23

E. Unsupported Assertions Regarding Plaintiff's Residence and Motives ............................................. 23

*1. Plaintiff "deliberately moved to Texas to avoid paying" California taxes* ......................................... *23*

*2. Plaintiff was Primarily a Texas Resident during Employment* ............................................................ *23*

*3. Plaintiff is Currently a Texas Resident* ............................................................................................... *24*

**VII. CONCLUSION** .............................................................................................................................. **24**

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ajemian v. Yahoo!, Inc.*,

    83 Mass. App. Ct. 565, 577 (2013) ........................................................................ 17

*Armendariz v. Foundation Health Psychcare Servs., Inc.*,

    24 Cal.4th 83, 115 (2000) ...................................................................................... 18

Atlantic Marine Constr. Co. v. U.S. Dist. Ct.,

    134 S. Ct. 568, 577, 579 (2013) .............................................................................. 7

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,

    874 F.3d 1064, 1068 (9th Cir. 2017) ....................................................................... 9

*Ballard v. Savage*,

    65 F.3d 1495, 1498 (9th Cir. 1995) ......................................................................... 9

*Boschetto v. Hansing*,

    539 F.3d 1011, 1015–16 (9th Cir. 2008). .............................................................. 10

*Bradford v. Prof'l Tech. Sec. Servs. Inc.*,

    2020 WL 2747767, at *5 (N.D. Cal. May 27, 2020) ........................................ 14, 16

*Bromlow v. D & M Carriers, LLC* ........................................................................... 15

*Carnival Cruise Lines, Inc. v. Shute*,

    499 U.S. 585, 595 (1991); ..................................................................................... 17

*Chavarria v. Ralphs Grocery Co.*,

    733 F.3d 916, 923 (9th Cir. 2013) ......................................................................... 18

*Cotter v. Lyft, Inc.*,

    60 F. Supp. 3d 1067 (N.D. Cal. 2015). .................................................................. 13

*Depuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, ...................................... 8

*Depuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*,

    28 F.4th 956, 962 (9th Cir. 2022) ......................................................................... 14

*Doe 1 v. AOL LLC*,

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

552 F.3d 1077, 1083 (9th Cir. 2009) ........................................................ 18

*Energy Investments, Inc. v. Greenstein*,

235 Cal. App. 4th 906 (2015), .............................................................. 12

*Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*,

905 F.3d 597, 603-04 (9th Cir. 2018) ..................................................... 9

*Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,

972 F.3d 1101, 1107 (9th Cir. 2020). ..................................................... 9

*Grafton Partners v. Superior Court*,

36 Cal.4th 944, 952 (2005) ................................................................. 18

*Graham v. Scissor-Tail, Inc.*,

28 Cal.3d 807, 820 (1981) ................................................................... 17

*Grey v. American Management Services*,

204 Cal. App. 4th 803 (2012), ............................................................. 12

*Impossible Foods Inc. v. Impossible X LLC*,

80 F.4th 1079, 1088 (9th Cir. 2023) ....................................................... 9

*Iskanian v. CLS Transportation Los Angeles, LLC*,

59 Cal.4th 348, 382-383 (2014) ............................................................ 2

*JLM Couture, Inc. v. Gutman*,

2021 WL 827749 (S.D.N.Y. Mar. 4, 2021), ........................................... 12

*Karl v. Zimmer Biomet Holdings, Inc.*,

2021 WL 810590, at *6 (N.D. Cal. Mar. 3, 2021) .................................... 14

*Karl v. Zimmer Biomet Holdings, Inc.*,

2021 WL 810590, at *7 (N.D. Cal. Mar. 3, 2021). ................................... 15

*Kem v. Strike Advisory, LLC* ............................................................... 16

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*,

787 F.3d 1237, 1240 (9th Cir. 2015). ..................................................... 6

*Midwest Motor Supply Co. v. Superior Court*,

56 Cal.App.5th 702, 708-10 (2020). ..................................................... 14

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

*Nagrampa v. MailCoups, Inc.*,

    469 F.3d 1257, 1283 (9th Cir. 2006) ........................................................ 17

*New Hampshire v. Maine*,

    532 U.S. 742, 749-51 (2001) ................................................................... 19

*Pacesetter Sys., Inc. v. Medtronic, Inc.*,

    678 F.2d 93, 95 (9th Cir. 1982); ............................................................... 6

*Perez v. Wells Fargo & Co.*,

    75 F. Supp. 3d 1184, 1190 (N.D. Cal. 2014) ........................................... 16

*Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.*,

    102 Cal.App.4th 765, 779 (2002) .............................................................. 2

*Ryze Claim Solutions LLC v. Superior Court*,

    33 Cal.App.5th 1066, 1070-72 (2019). ..................................................... 14

*Salgado v. Carrows Restaurants, Inc.*,

    33 Cal.App.5th 356, 362 (2019) ............................................................... 14

*Scherk v. Alberto-Culver Co.*,

    417 U.S. 506, 519 n.14 (1974) ................................................................. 17

See *Decker Coal Co. v. Commonwealth Edison Co.*,

    805 F.2d 834, 843 (9th Cir. 1986) ............................................................. 3

*Tompkins v. 23andMe, Inc.*,

    2014 WL 2903752, at *7 (N.D. Cal. June 25, 2014) ................................ 17

*Waller v. Truck Ins. Exchange, Inc.*,

    11 Cal. 4th 1 (1995), ................................................................................. 12

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.*,

    2019 WL 5789273, at *5 (N.D. Cal. Nov. 6, 2019) ........................... 14, 16

**STATUTES**

28 U.S.C. § 1391(b)(2) ............................................................................... 6, 8

28 U.S.C. § 1404 ................................................................................. 8, 18, 19

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

California Labor Code § 221 ..................................................................................... 2, 15

California Labor Code § 925 ..................................................................................... passim

**RULES**

Rule 12(b)(3) ................................................................................................................ 8

Rule 7-3 ......................................................................................................................... 3

**SUMMARY OF SUPPORTING MATERIALS**

| EXHIBITS | (A) Evidentiary Table[1]; (B) Witnesses; and (C) Key Events. |
| --- | --- |
| REQUEST FOR JUDICIAL NOTICE | (1) Bell Residency; (2) Shareholder Notice of Claim; (3) Google Results for "Arjun Vasan"; (4) Fathom.video Zoom Summary; and (5) K&L Gates General Counsel Letter re: Ethics. |
| DECLARATIONS | Arjun Vasan (Plaintiff, "Vasan Decl."); and Latha Vasan (Plaintiff's Mother, "Latha Decl."). |
| RESERVATIONS | *Plaintiff respectfully reserves the right to submit additional declarations and or exhibits in support of this Opposition, should the need arise.* |

---

[1] The Full List of Referenced Exhibits is Provided in Exhibit A.

**I. INTRODUCTION**

On November 14th, 2024, while under inpatient medical treatment in Costa Mesa, California, Plaintiff Arjun Vasan was terminated from his position as VP of AI Technology with Defendant Checkmate in a Zoom meeting. Defendant had recorded the meeting with an AI Summarizer tool, Fathom.video, and accidentally copied Plaintiff on the list of participants who received the recording—which continued after he had left the call (Compl. ¶53):

> "*He's on medical leave, in this condition, we fired him for something that's not true.*" — Vishal Agarwal, CEO of Checkmate, November 14, 2024

This candid admission from bookmarked a journey for Plaintiff that was thoroughly anchored in *California* from start to finish. This is the tale of a long-established California resident (25+ years) who co-founded a startup called VoiceBite in California, recruited its primarily California based team, built its product and technology in California, negotiated its acquisition entirely from California (Compl. at §V.B), commenced his employment in California—where he performed the majority of his duties under a California based supervisor.

Plaintiff and his cofounders negotiated what they believed were strong protections, including guaranteed retention bonuses and severance for the VoiceBite team—clearly tied to employment, not the merger (Compl. at §V.C). Plaintiff was also keenly aware of statutory protections under California law—under which he insisted his employment be governed.

Plaintiff apparently overlooked fine print that allowed Defendant to reap the benefits of California s innovation and talent—then later assert forfeiture of every promised cent and share when payment came due. Far from the  multimillion-dollar deal" claimed in Defendant s motion, its own legal notices show that Plaintiff and his team received nothing beyond salary: no stock, no severance, no bonus. Defendant structured the deal to *take Plaintiff s cake—and eat it too*.

VoiceBite began in a Cupertino garage in August 2023, just blocks from the birthplace of another California garage startup of some note. Its founding team worked from their Cupertino homes throughout negotiations with Defendant, which commenced in January 2024, were

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

conducted exclusively from California and led by Plaintiff's eventual supervisor Checkmate Chief of Strategy Michael Bell—a Manhattan Beach resident (Ex. E; Vasan Decl. ¶¶5-8)

Bell visited the founders in Cupertino in February 2024, and the founders visited Bell in Manhattan Beach in March 2024. Plaintiff executed the agreements from Cerritos—where he resides now in this district—on April 30, 2024, after which he commenced his employment.

For the next six months, Plaintiff resided and worked primarily in California—142 out of 198 days of employment (over 70%). When accounting for his time at VoiceBite—to which Defendant is successor-in-interest—Plaintiff had worked 417 of 470 days (nearly 90%) in California. When Plaintiff required medical leave for inpatient treatment in October 2024, he sought care at a California facility, where he was terminated on November 14, 2024.

Once Plaintiff realized Defendant did not intend to pay what was owed, he reluctantly filed the case before this Court. A little over two weeks later, Defendant sought judicial sanction for what California calls wage theft[2]—filing suit in New York State Supreme Court and seeking Declaratory Relief to  disentitle" him from earned and unpaid compensation (ECF No. 18-1).

Now, Defendant seeks to compel Plaintiff to litigate his claims—which arise primarily under California labor and medical leave laws—in New York or West Texas, despite the overwhelming California connections to this dispute and strong legal backing for this jurisdiction including under California Labor Code § 925 and the "First to File" doctrine. (Ex. A, B and C)

Defendant's claim that this forum is inconvenient is curious given the four Los Angeles attorneys prominently featured in the caption of its Motion. By contrast, Plaintiff, currently proceeding *pro se*, would face substantial difficulties and expense litigating in New York—where has not set foot in years—or in West Texas, where he *does not live*. (Ex. A; §III.5)

---

[2] California Labor Code § 221 explicitly prohibits employers from withholding earned wages, *even when* disputes exist about an employee's conduct. Unlike many jurisdictions, California requires employers to pay all earned wages when due and litigate any disputes afterward. This "pay first, litigate later" principle represents a fundamental public policy of California, with willful violations potentially constituting criminal wage theft under Labor Code § 216. Checkmate's New York declaratory action seeking to "disentitle" Plaintiff to earned wages directly conflicts with this California statutory protection. See *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal.4th 348, 382-383 (2014) (recognizing the "public importance" of California's wage laws and their unwaivable nature); *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.*, 102 Cal.App.4th 765, 779 (2002) ("California has a strong public policy that is specifically directed at the prompt payment of wages.").

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

Venue should not be used to shift inconvenience from Defendant to Plaintiff[3]. Given the deep ties to California and the state s strong interest in protecting its workers and innovation economy, Plaintiff respectfully requests this Court deny Defendant s motion in its entirety.

## II. PRELIMINARY MATTERS

**A. Defendant Failed to Properly Meet and Confer**

In her Declaration, attorney Stacy Chiu asserts that a proper and timely meet and confer would have been futile. This is incorrect. Had Defendant complied with the Rule 7-3 timeline—instead of contacting him on the day before filing—Plaintiff could have provided material evidence—such as documentation of his California residence during the majority of his employment—and clarified factual disputes before burdening the Court with motion practice.

**B. Defendant's Arguments are Undermined by the Actual Record**

Defendant s Motion rests on factual assertions that are contradicted by indisputable documentary evidence—presented in Ex. A—demonstrating (1) Plaintiff was terminated while on medical leave in this District; (2) the key witness in this case is Michael Bell, who has long lived and worked in this District. (3) the merger was a zero-dollar acquihire, not a multimillion dollar transaction; (4) Plaintiff was not—in fact—individually represented by counsel; and (5) Plaintiff *primarily* lived, worked and was taxed as a California resident.

Once the record is corrected—as Plaintiff does in §VI—the picture becomes clear: this case belongs in the Central District of California.

**C. Defendant's Motion Engages in Improper Character Attacks**

In addition to presenting factually dubious assertions, the Motion devotes considerable space to portraying Plaintiff as, *inter alia*, "disruptive", "insubordinate" and unprofessional. Plaintiff will not address each insinuation in detail here, as they are more appropriately addressed when the merits are litigated. At present, Plaintiff requests the Court consider these attacks—and the decision to include them in a procedural motion—with appropriate skepticism.

---

[3] See *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

### III. FACTUAL BACKGROUND

Plaintiff incorporates by reference all factual allegations contained in his Complaint (ECF No. 10) as if fully set forth herein. The following additional facts are particularly relevant to the jurisdictional and venue issues before the Court.

**A. California Connections Are Substantial and Predominant**

(a) Plaintiff resided and worked in California for approximately 142 out of his 198 days of employment with Checkmate (Exhibit C, "Key Events")

    (i) **May 1** to **Aug 3, 2024**: First three months in California (95 days)

    (ii) **Aug 3** to **Sep 30, 2024**: Temporary residence in Texas (58 days)

    (iii) **Sep 30** to **Nov 14, 2024**: Return to California up to termination (45 days)

(b) VoiceBite was founded in California on or around August 1, 2023, where Plaintiff worked and resided from founding through acquisition on April 30, 2024 (272 days). This totals 414 of 470 days in California including both VoiceBite and Checkmate.

(c) Checkmate's Chief of Strategy Michael Bell led merger negotiations, and was later Plaintiff's direct supervisor, is a long-term resident of this District (RJN; Ex. A, B).

(d) The merger and employment were negotiated and executed in California:

    (i) Bell visited the founders in Cupertino during negotiations (Vasan Decl. ¶4).

    (ii) The founders likewise visited Bell in Manhattan Beach (Id. ¶5).

    (iii) The merger and employment documents were executed from California (Vasan Decl. ¶8, Compl. ¶18-20, ECF 18-4 at 47)

    (iv) No in person meetings were conducted in New York or Texas. (Vasan Decl. ¶5).

(e) Checkmate operates as a fully remote company with employees distributed nationwide and beyond. The only relevant witness in New York is CEO Agarwal. (Ex. C, Witnesses)

(f) Plaintiff's termination occurred while he was receiving medical treatment in a Costa Mesa medical facility (Vasan Decl. ¶25).

(g) Plaintiff resides in Cerritos, California—which is in this district (Vasan Decl. ¶2).

(h) His W2 shows California taxes withheld on 60%+ of income (ECF No. 18-2 at 10).

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

(i)  Plaintiff is a long time California resident who (1) completed high school and university in California (2) founded multiple startups in California (3) has longstanding family and personal ties across the state (4) has lived in and worked from Cerritos, Cupertino, Los Altos, Mountain View, Menlo Park, La Jolla and other California cities for over 25 years.

**B. Key Claims Arose in California**

(a)  Plaintiff's retention bonus was earned during the first 90 days of employment (ECF No. 18-4 at 62), spent entirely in California (ECF No. 18-2 at 2 ¶¶5-10).

(b)  Plaintiff's severance claim arose from termination in California. (Vasan Decl. ¶¶25-33)

(c)  Plaintiff's FMLA/CFRA claims relate to medical leave taken in California (Vasan Decl. ¶¶24-25; Latha Decl. ¶¶10-11; Ex. P, "Medical Leave Form").

(d)  Plaintiff's wrongful termination occurred while he was in California (Vasan Decl. ¶25).

(e)  The merger and employment agreements were fraudulently induced and executed while Plaintiff resided exclusively in California. (ECF No. 18-4 at 47)

**C. Plaintiff Filed and Properly Served First in this Action**

(a)  Plaintiff filed the action before this Court on January 28th, 2025 (ECF No. 1).

(b)  Defendant filed its New York action on February 14th, 2025 (ECF No. 18-1).

(c)  Plaintiff's proper personal service was completed on March 5th, 2025. (ECF No. 17)

(d)  Defendant "nail and mail" service would be "deemed complete" on March 17th, 2025, ten days after proof of service was filed as per New York law. (NY CPLR § 308)

(e)  Defendant's never corrected and judicially noticed New York filing identifies the wrong "Arjun Vasan"—an unrelated student at the University of Texas (ECF No. 18-1 at 6). *Plaintiff intends to challenge this action for improper service.*

(f)  Defendant cannot simultaneously—and incorrectly—assert that Plaintiff resides in Texas despite eventually attempting service at his correct address in California.

**D. Employment Claims are Explicitly Carved Out of the Merger Agreement**

(a)  The Merger Agreement's principal subject matter is Checkmate's acquisition of VoiceBite stock and distribution of equity as merger consideration. (ECF No. 18-4 at 7)

5

(b) The agreement contains a broad release of claims in **§7.4(a),** which notably carves out employment related claims, such as those at issue here (see *Id*. at 35).

   (i) In **§7.4(a)** (titled "Release"), the agreement imposes a broad release of "any and all claims…arising on or before the Closing."

   (ii) Critically, **§7.4(a)(ii)** (the "carve-out") expressly excludes from that release any right of any employee to receive "... wages, salary, compensation, bonuses, accrued vacation, and any other accrued but unpaid compensation and/or benefits."

(c) The agreement also contains a dispute resolution procedure, noting that post-closing disputes must be routed through a Holder Representative, designated by the shareholders to coordinate their claims, contemplating a collective indemnification process (*Id.* at 40).

(d) In **§8.8** ("exclusive remedy") the agreement limits remedies for claims "arising from" or "relating to" the agreement or "transactions contemplated hereby" to this process.

> the indemnities provided in this Section 8 will **constitute the sole and exclusive remedy** … for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement or arising out of the transactions contemplated hereby; (*Id.* at 39)

(e) The agreement also expressly waives the right to a trial by Jury in **§9.8**.

## IV. LEGAL STANDARD

### A. Plaintiff was First to File and Serve His Action

Plaintiff filed this action before Defendant initiated its New York case, thereby invoking the first-to-file doctrine that favors retaining the first-filed action to promote judicial efficiency and discourage forum shopping[4]. Under *Alltrade v. Uniweld Prods*[5], Ninth Circuit specified that courts should evaluate (1) the chronology of the actions, (2) the similarity of the parties, and (3) the similarity of the issues. Here (1) this action was filed 17 days before the New York action (2) the parties are identical and (3) the actions share the same nucleus of facts and payment dispute.

### B. Venue is Proper in the Central District of California

---

[4] See *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982); *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015).
[5] See *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625 (9th Cir. 1991)

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

Plaintiff concedes general jurisdiction, but as detailed in §III and V.B, Defendant is subject to specific jurisdiction in this District. Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred in California, including merger negotiations, Plaintiff's employment, protected activity, medical leave and wrongful termination. Defendant's anticipated request for limited discovery or an evidentiary hearing should be denied, as the facts are clear, documented, and not meaningfully in dispute.

Importantly, Defendant's motion to dismiss or transfer, to the extent it relies solely on a forum-selection clause, is procedurally flawed. As the Supreme Court made clear in *Atlantic Marine Constr. Co. v. U.S. Dist. Ct.*, 134 S. Ct. 568, 577, 579 (2013), the presence of a forum-selection clause does not render venue "improper" under 28 U.S.C. § 1406 or Rule 12(b)(3) if venue is otherwise proper under § 1391. Defendant's reliance on Rule 12(b)(3) is thus misplaced, and the motion should be denied on this ground alone.

A motion to dismiss or transfer sought solely on the basis of a forum-selection clause or agreement binding on the parties is not one sought on the basis of "improper venue" and is not properly brought under § 1406 or Rule 12(b)(3). *Atl. Marine Constr. Co.*, 134 S. Ct. at 577, 579 (if venue is otherwise proper under § 1391, presence of forum selection clause is not basis for § 1406(a) or Rule 12(b)(3) motion).

Defendant's anticipated request for limited discovery or an evidentiary hearing should be denied, as the facts are clear, documented, and not meaningfully in dispute.

**C. Plaintiff Can — and Does — Challenge the Forum Selection Clause(s)**

Motion confidently asserts the primacy of the Merger Agreement and its forum selection clause—not just over Plaintiff but over California law itself—yet it tellingly fails to address the carve-out provision expressly exempting employment claims from the agreement's scope. Under *Atlantic Marine*, forum selection clauses are enforceable *unless* they are invalid, inapplicable, conflict with public policy or procured by fraud or duress. Accordingly, Plaintiff will show: (1) his claims do not arise from the Merger Agreement as per its own terms (§III.D and V.C); (2) even if they did, Labor Code § 925 renders any forum selection or choice of law voidable at his

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

election (§V.D-E) [6]; and (3) in the alternative, the clause is rendered unenforceable due to procurement by fraud, coercion, and duress—qualifying as "exceptional circumstances" that warrant denial of enforcement (§V.G).

**D. Traditional § 1404(a) Analysis Favors Retention in California**

If a forum selection clause does not control, courts evaluate transfer under 28 U.S.C. § 1404(a) by considering multiple factors: (1) plaintiff's choice of forum, (2) where agreements were negotiated and executed, (3) state most familiar with governing law, (4) parties' contacts with the forum, (5) the forum's relation to the claims, (6) differences in litigation costs, (7) availability of compulsory process for witnesses, (8) ease of access to proof, and (9) public policy considerations. As summarized in §V.D, eight of these nine factors strongly favor retaining this action in the Central District of California, where key events occurred, primary witnesses—including Mr. Bell and Plaintiff—reside (see Exhibit B, "Witnesses"), and where California's strong interest in enforcing its statutory protections is best served.

**V. LEGAL ARGUMENT**

**A. Venue is Proper under Rule 12(b)(3) and 28 U.S.C. §1391(b)**

Venue is independently proper because this Court has specific personal jurisdiction over Checkmate. While Plaintiff acknowledges that Checkmate is a Delaware corporation headquartered in New York, Checkmate purposefully availed itself of this forum by acquiring a California company, employing California residents, and executing contracts governed by California law. Jurisdiction is appropriate under the Ninth Circuit's three-part test.

To establish purposeful availment "(1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and

---

[6] See *Depuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.,* 28 F.4th 956, 962 (9th Cir. 2022) (Finding that Labor Code Section 925 in part barred application of a forum selection clause when weighing the public and private interest factors under § 1404.)

substantial justice, i.e. it must be reasonable." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (alterations and quotations omitted).

When a defendant's conduct primarily occurs outside the forum state, the court generally applies the purposeful direction test and looks to whether the defendant "expressly aimed acts at the forum state knowing that they would harm the plaintiff there." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023); citing *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.,* 905 F.3d 597, 603-04 (9th Cir. 2018). Purposeful availment, meanwhile, is satisfied when "the defendant has taken deliberate action within the forum state or... has created continuing obligations to forum residents." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "Purposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort." *Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020). Applying these standards:

(a) Checkmate **purposefully availed itself of this jurisdiction** by:

    (i) Acquiring VoiceBite—a California-based entity with employees who worked in California and in this District (Ex. XX, "Merger Press Release").

    (ii) Further acknowledging this reality when drafting Employment Offer Letters— including Plaintiff's—governed by California law (ECF No. 18-4 at 73).

    (iii)   The Merger and Employment Agreement were negotiated and executed while Plaintiff and other VoiceBite employees were California residents (*Id*. at 47).

(b) Plaintiff s claims **arise directly out of those California-directed activities**:

    (i) including fraudulent inducement into employment, breach of contract, retaliation and wrongful termination under California law (see Compl. ¶X-Y).

    (ii) Plaintiff worked from California for over 70% of his employment and was terminated while on medical leave in California. (see §III.A, Vasan Decl. ¶X)

(c) The **exercise of jurisdiction is fair and reasonable**:

    (i) Checkmate knew or should have known it was acquiring a California startup, employing California residents and subjecting itself to California s protections.

(ii) Checkmate's status as a distributed company, with no fixed physical office, makes California as central for its employees as any other location.

(iii)   The key actor in this dispute is Michael Bell, the chief negotiator for the VoiceBite merger and Plaintiff's direct supervisor—and is notably absent from Defendant's motion. Mr. Bell in Manhattan Beach, California.

Accordingly, this Court's exercise of jurisdiction comports with due process and satisfies California's long-arm statute, which is coextensive with federal standards. See *Boschetto v. Hansing*, 539 F.3d 1011, 1015–16 (9th Cir. 2008). Jurisdiction exists where a defendant has "minimum contacts" with the forum state such that jurisdiction does not offend "traditional notions of fair play and substantial justice." *Id*.

Here, Checkmate is subject to personal jurisdiction and therefore venue is proper because Checkmate purposefully availed itself to the forum by directing activities through negotiations and hiring employees, including Plaintiff and his co-founder, within the forum state, and Plaintiff's claims arise out of Checkmate's forum-related activities. The exercise of personal jurisdiction comports with fair play and substantial justice because a majority of the witnesses and evidence is present in this district.

**B. The Forum Selection Clause Does Not Apply to Plaintiff's Claims**

1. Plaintiff's Claims Do Not — and Cannot -- Arise from the Merger Agreement

The forum selection clause in **§9.7(b)** is limited to actions "relating to this Agreement" or "enforcement of any provision of this Agreement" (ECF No. 18-4 at 42). Plaintiff's claims do not arise from, relate to or require enforcing of the Merger Agreement, but rather arise from statutory protections, his Offer Letter—governed by California law (*Id*. at 73)—and his Bonus Agreement delivered "in consideration of" employment and "in conjunction with" the Offer Letter (*Id* at 62).

*(a) The Merger Agreement Explicitly Carves Out Employment Claims*

In **§ 7.4(a)**, the agreement explicitly preserves employment claims like those asserted by Plaintiff. This provision would be rendered meaningless if employment claims were subjected to the collective indemnification framework encompassing the forum selection clause. (*Id*. at 35)

*(b) The Agreement's Structure Confirms the Exclusion of Employment Claims*

Section **§8** establishes a comprehensive framework for resolving claims "relating to this Agreement," including: (1) a "Holder Representative" to act on behalf of all Stockholders in **§9.1** (*Id*. at 40) (2) Specific processes for third-party claims and direct claims in **§8.3** (*Id*. at 37) and (3) collective remedies through indemnification in **§8.1** and **§8.2** (*Id*. at 36).

Section **§8.8** (*Id*. at 39, "exclusive remedy") requires any claim "relating to this Agreement" be resolved through the collective framework. If employment claims were deemed to "relate to" the Merger Agreement for purposes of the forum selection clause, they would also be subject to this exclusive remedy provision—contradicting the explicit carve-out in **§7.4**.

*(c) Contract Interpretation Principles Support This Reading*

Well-established principles of contract interpretation further support the conclusion that the forum selection clause does not apply to Plaintiff's claims:

a. **Contract provisions must be read together and harmonized**[7]. Reading the forum selection clause to encompass employment claims would create an irreconcilable conflict with the **§7.4** carve-out and would subject employment claims to the **§8.8** "exclusive remedy" provision—effectively eliminating the individual right to pursue such claims.

b. **Specific provisions control over general ones**[8]. The carve-out for employment claims in **§7.4** controls over the general forum selection clause in **§9.7**. The carve-out specifically addresses employment claims, while the forum selection clause speaks generally about actions "relating to this Agreement."

c. **Contracts should not be interpreted to create absurd results**[9]. Interpreting the forum selection clause to cover employment claims would lead to an absurd result—it would

---

[7] See *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("a document should be read to give effect to all its provisions and to render them consistent with each other"); *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (interpretation should "give meaning to every provision" and "not render any portion meaningless").

[8] See *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) (noting that "where there is an apparent conflict between a general provision and a specific provision... the specific provision controls"); *Sheldon v. Shelter Resources Corp.*, 838 F.2d 375, 379 (9th Cir. 1988) ("specific provisions control over more general ones").

[9] See *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (courts should select the "most reasonable interpretation" that avoids "commercial unreasonableness"); *ASMI LLC v. Zurich American Insurance Co.*, 780 F.3d 349, 359 (7th Cir. 2015) (rejecting interpretations that would lead to "absurd results"); *Local Motion, Inc. v. Niescher*, 105 F.3d 1278, 1280 (9th Cir. 1997) (holding courts should avoid contract interpretations that produce "absurd results").

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

simultaneously preserve employment claims (**§7.4**) while subjecting them to a collective process that would effectively prevent their individual assertion (**§8.8**).

Due to these clear contractual limitations, the forum selection clause does not apply to Plaintiff's employment-related claims, and Defendant's Motion must be denied.

2. The Merger Agreement is not "Primary or More Comprehensive"

Defendant asserts—with substantial confidence but minimal analysis—that the merger agreement is the "primary or more comprehensive agreement". Several factors suggest this was not the parties' mutual intent, or at the very least, not Plaintiff's:

a. Employment was a condition precedent to the merger, as explicitly stated in the merger agreement. Courts have found that when one agreement is a precondition to another, the earlier agreement often reflects the foundational relationship. Here, that foundational agreement was Plaintiff's Offer Letter[10].

b. The Offer Letter is the only contract that is referenced by all other contracts, including the merger agreement—while it references none other in return, indicating the parties' intent for it to be the controlling document[11].

c. The parties' day to day relationship was defined by Plaintiff's employment not shareholder status[12]. VoiceBite had no customers or revenue before the merger; and post-acquisition, the team had no budget, branding authority, or customer relations.

d. The intent of Plaintiff and his teammates was to secure stable livelihoods and fair compensation for delivering voice AI technology to Checkmate's customers, which they traded for the upside of remaining independent. The intention of the parties at contract formation is a critical to which agreement governs their relationship[13].

e. The merger agreement governed the corporate transaction between Checkmate and VoiceBite shareholders, whereas the employment agreements created relationships

---

[10]  See *Energy Investments, Inc. v. Greenstein*, 235 Cal. App. 4th 906 (2015)
[11]  See *Grey v. American Management Services*, 204 Cal. App. 4th 803 (2012), holding if one agreement serves as the reference point for all others but doesn't return the favor, the parties intended it to be the controlling.
[12]  See *JLM Couture, Inc. v. Gutman*, 2021 WL 827749 (S.D.N.Y. Mar. 4, 2021), holding that functional realities, not formal labels, determine which agreement governs.
[13]  See *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1 (1995)

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

between individual employees and Checkmate. Courts do not presume that contracts signed in one capacity apply to disputes arising in another[14].

Even if this Court finds the dispute "related" to the merger agreement—which it is not—§ 925 enables Plaintiff to void any forum selection or choice of law clause.

### 3. California Labor Code § 925 Invalidates Forum Selection Clauses

Defendant has cited forum selection clauses favoring a New York venue. However, California Labor Code § 925 expressly bars such clauses in an employment context:

> An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would require the employee to adjudicate outside of California a claim arising in California … Any provision of a contract that violates this subdivision is voidable by the employee and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute… (**California Labor Code § 925**)

*(a) Nature of the Transaction as an "Acquihire"*

While purportedly a "merger", the true substance of the transaction was that of an acquihire, where Checkmate's primary goal was to hire the VoiceBite team as employees. Accordingly, all related agreements—including the merger agreement and non-compete cited by Checkmate—were entered into as conditions of employment and are subject to California Labor Code § 925, rendering any out-of-state forum selection clauses voidable at Plaintiff's election:

a. The Merger Agreement states: "… *as a condition and inducement … certain employees of the Company have entered into employment arrangements with Purchaser.*"

b. Similarly, the Non-Competition Agreement provides: "*The execution and delivery of this Agreement by Stockholder is a material inducement to the willingness of Company to offer Stockholder employment by Company and is a condition of such employment.*"

c. The Offer Letter explicitly cites California Law as governing the terms of Plaintiff's employment, and all other documents explicitly reference it.

---

[14] See *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067 (N.D. Cal. 2015).

*(b) Strong Precedent Supports § 925 Applicability to this Case*

a.  Courts have consistently held that § 925 reflects California's strong public policy of protecting employees[15].

b.  California courts interpret § 925 broadly[16] to protect California employees[17].

c.  Multiple courts have held that provisions in employment-related contracts requiring out-of-state litigation are voidable at the employee's request[18].

d.  Courts recognize that agreements tied to employment must be viewed through the lens of § 925, regardless of how they are labeled[19].

e.  § 925 was designed to apply to disputes like this one, where employers attempt to force California employees to litigate in distant forums or under unfamiliar laws[20].

*(c) The § 925(e) Exception Does Not Apply to this Case (see §VI.D).*

Defendant asserts that Plaintiff was "represented by counsel", and therefore not entitled to protection from § 925. However, Courts have made clear that § 925(e) is narrowly constructed and does not extend to shared corporate counsel[21]. It reads, "*This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel*". Defendant cannot rely on its own declarations or contractual disclaimers—the representation must be "**in fact**" and "**individual**", which is not the case here (see Vasan Decl.; Ex. N, G, Q).

---

[15] See *Depuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 962 (9th Cir. 2022) (strong public policy interest disfavoring provisions that would deprive employees of the protection of California law).

[16] See *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 2019 WL 5789273, at *5 (N.D. Cal. Nov. 6, 2019) (finding agreements signed contemporaneously with employment were "conditions of employment" under § 925).

[17] . See *Karl v. Zimmer Biomet Holdings, Inc.*, 2021 WL 810590, at *6 (N.D. Cal. Mar. 3, 2021) (rejecting a narrow reading of § 925 and finding it applied to protect an employee who primarily worked and resided in California).

[18] See *Midwest Motor Supply Co. v. Superior Court*, 56 Cal.App.5th 702, 708-10 (2020).

[19] See *Ryze Claim Solutions LLC v. Superior Court*, 33 Cal.App.5th 1066, 1070-72 (2019).

[20] See *Salgado v. Carrows Restaurants, Inc.*, 33 Cal.App.5th 356, 362 (2019) (emphasizing that § 925 reflects "California's strong interest in protecting its employees").

[21] See *Bradford v. Prof'l Tech. Sec. Servs. Inc.*, 2020 WL 2747767, at *5 (N.D. Cal. May 27, 2020) (company counsel does not constitute individual representation under § 925(e)).

14

*(d) Choice of Law Provisions Are Similarly Voidable Under § 925*

§ 925 not only invalidates forum selection clauses but also renders choice of law provisions voidable at the employee's election[22]. The Bonus Agreement's Delaware choice of law provision is therefore voidable, and California law should govern all aspects of this dispute.

*(e)  Primarily Resides and Works" Means Actual Work, Not Address on File*

California Labor Code § 925 turns on where the employee *actually* lives and performs work. For example, in *Bromlow v. D & M Carriers, LLC*, a truck driver who was a California resident failed to qualify for § 925 protection because only about 20% of his driving occurred in California. The court emphasized that § 925 did not apply since he did not  primarily" work in California, even though he lived there. *Bromlow* is cited by Defendant to support their assertions, but in fact undermines them, as it establishes **physical presence as the critical factor** in § 925 s applicability, not what address Defendant had on file. Here, Plaintiff provides documentation of his return California on September 28, 2024, and continued presence ever since.

Even assuming, *arguendo*, that Defendant s payroll records controlled the analysis (they do not), its argument that Plaintiff did not  primarily reside and work in California" is unpersuasive. At a minimum, even under Defendant s accounting, Plaintiff s employment term was evenly split — but the balance of evidence overwhelmingly favors California: (1) Plaintiff performed the first 93 days of work and further received two months of back pay subject to California tax withholding — totaling over 62% of all his income taxed in California; (2) VoiceBite operated exclusively from California from August 2023 until acquisition, with 4 of 5 team members being longtime California residents; (3) all employment and merger documents were negotiated and executed in California; (4) Plaintiff was terminated while physically present in California; (5) Plaintiff returned to California on September 30, 2024, and has not returned to Texas since; and (6) Plaintiff's offer letter explicitly states that California law governs the employment relationship. These factors conclusively establish that Plaintiff primarily resided and worked in California within the meaning of Labor Code § 925.

---

[22]  See *Karl v. Zimmer Biomet Holdings, Inc.*, 2021 WL 810590, at *7 (N.D. Cal. Mar. 3, 2021).

*(f) Defendant Neglects to Account for Time at VoiceBite*

Defendant s analysis artificially limits Plaintiff s employment period to the post-merger relationship, ignoring that Plaintiff and his team were retained without interruption following the merger. Courts have held that where an employee s duties, role, and reporting structure remain materially unchanged after a corporate transaction, continuity of employment is presumed[23].

Here, Plaintiff co-founded VoiceBite, worked exclusively in California from its inception in August 2023 through the April 2024 merger, and continued in a substantially similar role and on the same product — without any break in service — under Checkmate. Including this continuous period of employment, Plaintiff worked approximately 88% of the relevant period from California, far exceeding any threshold for protection under Labor Code § 925.

*(g) Defendant Misstates California Public Policy and Misinterprets Precedent*

Defendant cites pre-2017 cases to argue that enforcement of a forum selection clause does not violate California s public policy. This is misleading. In 2017, California enacted Labor Code § 925, which reflects an explicit and strong public policy prohibiting employers from imposing out-of-state forum and choice-of-law provisions on California employees.

Courts recognize § 925 as embodying a strong California public interest[24]. Enforcement of the forum selection clause would directly violate that policy. Defendant further cites *Kem v. Strike Advisory, LLC* to assert that courts have declined to enforce § 925 when the employee was an executive with significant bargaining power. The facts of that case are notably distinct:

a. Kem was an executive re-negotiating terms of his *existing* employment from a position of authority. Plaintiff was negotiating terms of new employment along with his cofounders.

b. Evidence showed that Kem had retained *individual* counsel for contract review. Plaintiff did not, nor has Defendant presented any evidence beyond self-serving Declarations that Plaintiff had individual counsel who advised him during the negotiations.

4. Fraud and Overreach Void the Forum Selection Clauses

---

[23]  See *Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184, 1190 (N.D. Cal. 2014) (finding uninterrupted employment across predecessor and successor entities where job duties remained substantially the same).
[24]  See *Yeomans*, 2019 WL 5789273, at *5; *Bradford*, 2020 WL 2747767, at *4.

Even apart from Labor Code § 925, the forum selection clause is unenforceable because it was introduced through fraud, concealment, and coercive tactics. Courts decline to enforce such clauses where they are   the product of fraud or overreaching."[25]

At the Rule 12 stage, the Court must accept Plaintiff s allegations as true. See *Iqbal*, 556 U.S. at 678. Plaintiff has pled specific and particularized facts in his Complaint (see ¶15-¶19). Most pertinent here is that Defendant interfered with his right to counsel, urging the founders to fire their attorney Alan Foster, and to divulge portions of Foster's memo expressing alarm about the flurry of last-minute changes and introductions to the transaction agreements.

The Forum Selection clause was never discussed. When Foster ultimately resigned, citing Defendant's misconduct—days before the imposed closing deadline—Plaintiff and his cofounders lacked meaningful legal guidance, rendering consent to the clause neither knowing nor voluntary. Enforcing it now would reward Defendant for engineering a situation in which Plaintiff was legally disarmed. See *Murphy*, 362 F.3d at 1140–42.

### 5. Plaintiff's Missteps Refute the "Sophisticated Party" Defense

Defendant argues that Plaintiff was sophisticated, but the record says otherwise. Plaintiff is technically capable—but was not legally equipped during the transaction[26]. He had no personal counsel, did not understand that disclosing legal summaries could waive privilege, and mistakenly believed corporate counsel represented him individually[27]. These missteps led directly to his post-termination discovery that the attorneys now had conflicts—a realization that underscores his lack of legal sophistication at the time of contracting.

Plaintiff was focused on engineering, not contract risk[28]. The clause was never discussed or explained—let alone negotiated—and VoiceBite's legal representation dissolved under

---

[25] *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595 (1991); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519 n.14 (1974).

[26] See *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1283 (9th Cir. 2006) (finding business experience "does not necessarily equate with legal sophistication" when evaluating contractual provisions).

[27] See *Graham v. Scissor-Tail, Inc.,* 28 Cal.3d 807, 820 (1981) (holding that a party's lack of opportunity for meaningful negotiation undermines claimed sophistication).

[28] See *Tompkins v. 23andMe, Inc.,* 2014 WL 2903752, at *7 (N.D. Cal. June 25, 2014) (distinguishing between technical expertise and actual legal sophistication); *Ajemian v. Yahoo!, Inc.,* 83 Mass. App. Ct. 565, 577 (2013) (recognizing that "technical savvy" does not equate to understanding legal implications of contractual terms).

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

pressure applied by Checkmate[29]. While Plaintiff has since educated himself through necessity, that post hoc effort cannot substitute for meaningful consent at signing[30].

Sophistication must be measured in context, not in hindsight[31]. Defendant cannot create a power imbalance, then invoke it as a defense.

**C. Comprehensive § 1404(a) Analysis Compels Retaining Jurisdiction Here**

1. California Has a Strong Interest in This Litigation

California s strong public policy supports adjudicating this dispute in its Central District. Under the public-interest prong of 28 U.S.C. § 1404(a) analysis, courts evaluate each forum s connection to the underlying controversy and its interest in applying local law. Here:

a. Plaintiff invokes California s labor statutes—directly implicating the rights of its workers. California courts have a strong interest in interpreting and enforcing these state-law claims.

b. By enacting Labor Code § 925, the California Legislature signaled its robust policy against forcing California employees to litigate in distant forums.

c. This Court routinely handles employment disputes arising under state and federal law, which enhances judicial efficiency and the accuracy of rulings. Moving the case would undercut that efficiency and risk inconsistent application of California s statutes.

Transferring venue would undermine California's interest in resolving claims implicating its labor protections, contrary to the public-interest factors under § 1404(a).

2. The Merger Agreement's jury trial waiver also violates California law.

In addition to the forum and choice of law clauses, the Merger Agreement includes a waiver of the right to a trial by jury. Under California law, such waivers are unenforceable in employment agreements as a matter of public policy. See *Grafton Partners v. Superior Court*, 36 Cal.4th 944, 952 (2005) (holding that predispute jury trial waivers in civil employment contracts are unenforceable under Cal. Code Civ. Proc. § 631). Because Plaintiff's claims arise from his

---

[29] See *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009) (noting that forum selection clauses should be "reasonably communicated" to be enforceable).

[30] See *Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 115 (2000) ("absence of meaningful choice" is critical in evaluating contract terms regardless of claimed sophistication).

[31] *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 923 (9th Cir. 2013) (finding bargaining power relevant in evaluating contract terms).

employment—and not the corporate merger—the inclusion of this waiver further supports the inapplicability of the Merger Agreement to this dispute and reinforces California's strong public policy protecting employees.

### 3. Defendant's Convenience Arguments Are Inconsistent and Pretextual

Defendant's Motion presents the remarkable position that both New York and Texas—jurisdictions separated by over 1,500 miles—are equally convenient forums. This inconsistency reveals that Defendant's motion is not grounded in genuine convenience concerns but rather in forum shopping. Courts have long disfavored such 'heads I win, tails you lose' positioning[32].

Checkmate is headquartered in Mr. Agarwal's New York apartment, while Ms. Brown lives in Kansas and Mr. Bell in this District—like Plaintiff. Defendant hired K&L Gates' Los Angeles office to handle both this and the New York case. The attorneys who signed its Motion specialize in California employment law—indicating that Checkmate itself view this as a California employment dispute, not a New York merger dispute.

Stating that Plaintiff "resides in Texas" doesn't make it true, which Defendant implicitly admits by serving him in California. No parties or key witnesses are in Texas, Defendant has not identified any connection to the state and transfer there would inconvenience both parties.

### 4. Traditional § 1404(a) Factors Overwhelmingly Favor this Venue

If no valid or applicable forum selection clause exists, Ninth Circuit courts analyze nine additional factors (see §IV.E). Here, Plaintiff (1) chose to bring his case in this Venue (2) negotiated his agreements across California and executed them from Cerritos—in this District; (3) this Court is more far familiar with California law than the courts of New York or West Texas; (4) Plaintiff has lived in California for over 25 years, and his supervisor at Checkmate—Michael Bell—has been an executive in California for over 25 years; (5) the key events at issue substantially occurred in California—mostly in this District; (6) Defendant has waived its right to argue litigation costs favor New York by retaining K&L Gates' local office in this matter. Plaintiff is proceeding *pro se* and would face significant financial and logistical burdens if forced

---

[32] See *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001) (Supreme Court finding judicial estoppel where parties assert inconsistent positions).

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

to litigate elsewhere; (7) Mr. Bell is Plaintiff's most critical adverse witness, without whom he cannot prosecute his claims. Plaintiff is Defendant's most critical adverse witness, without whom Defendant cannot defend them. Bell is subject to compulsion here not necessarily in New York or West Texas; (8) Checkmate is a distributed company with relevant records stored digitally and remotely, and (9) public policy strongly favors this forum, where California's interests in its workers and its innovation economy are best safeguarded.

## VI. THE FACTUAL RECORD UNDERMINES DEFENDANT'S MOTION

### A. Termination Meeting Recording Contradicts Resignation Narrative

Defendant organizes an entire section of its Motion titled "*D. Disputes Following the Merger and Plaintiff's Resignation*" (Mot. at 7). Throughout the Motion, Defendant refers to Plaintiff's "resignation" (see Mot. at 25), and further that "The key decisions giving rise to Plaintiff's claims—concerning his … resignation—were largely made by Checkmate personnel located outside California...". Defendant has falsely asserted this "resignation" throughout its filings and notices to material effect. As described in the Complaint—a central issue—Defendant seized on his vulnerability while under medical treatment to deny over $120,000 in guaranteed severance[33]. This distinction is critical here—termination while on medical leave is central to Plaintiff s claims and directly informs the strength of California s interest in adjudicating them.

### 1. Defendant's Sworn Declarations Underpin This False Narrative

Defendant's Motion incorporates and relies on Declarations—from Vishal Agarwal and Amy Brown—that are carefully crafted to omit Plaintiff's termination and utilize a distressed email to characterize his separation as a resignation. Ms. Brown's declaration states: "On November 14, 2024, Mr. Agarwal, Mr. Bell, and I met with Mr. Vasan via Zoom … On the same day, after the meeting, Mr. Vasan sent an email … stating that he was resigning." (ECF No. 18-2 ¶16.). Similarly, Mr. Agarwal's declaration states: "… after the meeting, Mr. Vasan sent me an

---

[33] In a Notice of Claim issued three weeks after Plaintiff s termination, Defendant cited the same email in Exhibit C of this Motion but asserted—incorrectly—that it was sent on November 13th, *the day prior to termination*. It is difficult to imagine such a misreading of an email thread involving a material fact, by qualified counsel. By advancing this timeline, Defendant attempted to erase the fact of Plaintiff s termination—an effort they continue to pursue in this Motion.

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

email stating that he was resigning." (ECF No. 18-4 ¶26.) Both Declarations are cited repeatedly in the motion, creating a false impression that Plaintiff voluntarily resigned.

### 2. Defendant's Own Recording Proves These Statements Are False[34]

The transcript of the Nov. 14th meeting (Ex. I) shows Mr. Agarwal clearly terminating Plaintiff: "*Arj, I'll just stop you right there. This call is to let you know that you're being terminated with immediate effect. Right now, right this second.*". Later, Mr. Agarwal reiterates: "*But at this moment, we just wanted to make something absolutely clear that you're being completely terminated with no regard to anything that else that has happened in the past.*" After Plaintiff left the call, the recording continued with Agarwal noting "*He's on medical leave. In this condition, we fired him for something that is not true*". As Defendant's own AI-generated summary confirms, the meeting's purpose was "To inform Arjun Vasan of his immediate termination due to a breach of company trust and non-solicitation agreement."

### 3. Plaintiff's Post-Termination Email Cannot Constitute a Resignation[35]

After termination by the employer, an employment relationship no longer exists, rendering resignation impossible. Plaintiff's email—sent two hours after being "completely terminated" "right now, right this second"—had no legal effect on his employment status.

### 4. Defendant Makes These Claims Fully Aware of their Falsity

Defendant cannot claim ignorance of a meeting attended by two of the Declarants to its Motion. Moreover, Plaintiff's Complaint discusses the meeting and recording at length and its contents regarding termination. (Cmpl. ¶¶ 48, 53-56.) Despite this knowledge, Defendant chose to make sworn statements that directly contradict known and indisputable facts.

**B. Critical Omission of Key California Witness from Defendant's Motion**

Defendant's motion identifies a "Mr. Bell" in a single line, without further explanation or context. **Michael Bell** is not just a witness, he is Checkmate's Chief of Strategy and was the

---

[34] These statements are provided as Exhibit K (1. Transcript, 2. Screenshots and 3. Fathom.video Summary)

[35] Even if, *arguendo*, Plaintiff s email was actionable—which it is not—one cannot treat  I resign" as binding while rejecting  for good reason." Under his terms, a resignation for good reason is equivalent to a termination without cause—voiding restrictive covenants. Severance is owed upon ***any*** termination, underscoring Defendant s intent in contriving the only one of four separation scenarios in which Plaintiff received no benefits whatsoever.

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

company's primary negotiator for the VoiceBite merger, Plaintiff's supervisor—and a *long-term California resident living just miles from this courthouse* (RJN, Ex. B, E).

Bell was central to every aspect of this dispute. He led negotiations for the merger (Comp. ¶¶ 13-16), served as Plaintiff's direct supervisor (¶¶ 23, 37, 43, 46), participated in his termination while Plaintiff was under medical care (¶ 56) and—on information and belief—is directing Defendant's litigation strategy in this matter.

In Exhibit B (Witnesses), Plaintiff tallies the number of references to each witness in his Complaint, objectively confirming the centrality of Bell to this dispute and that venue in this District is not only proper, but necessary for fair adjudication[36].

## C. VoiceBite Merger was not a "Multimillion Dollar" Commercial Transaction

In ¶6 of his declaration, Mr. Agarwal asserts—under penalty of Perjury—that the transaction "involved the multimillion-dollar acquisition of VoiceBite." This characterization is objectively false and deliberately misleading. The Merger Agreement specifies consideration of 321,199 Checkmate shares worth $0.41 each, amounting to a collective total for the entire VoiceBite team of just $131,691 of illiquid equity (ECF No. 18-4).

By portraying this transaction as a sophisticated commercial deal between equals, Defendant seeks to distance itself from what was fundamentally an employment relationship. The true nature of the arrangement is further revealed in its subsequent actions: one day after Plaintiff filed this complaint—on January 29, 2025—Defendant served a Notice of Direct Claim (RJN, Ex. C) on the VoiceBite shareholders, declaring forfeiture of not only all equity but also $1.5 million in unpaid retention bonuses earned by the team through employment.

This Notice exposes the stark fiction in Defendant's narrative—the only "millions" ever at stake were compensation tied to employment, which Defendant now refuses to pay. No cash was ever paid to any VoiceBite shareholder other than salary as employees, confirming the merger's true nature as an acquihire, not a commercial transaction. This misrepresentation serves Defendant's broader strategy to acquire California talent and innovation while avoiding the

---

[36] If Bell were a "non-party witness" as the Motion implies, only this Court can compel his testimony.

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

state's worker protections. The Motion and its *judicially noticed* New York action (ECF No. 18-1) represent the culmination of this strategy, which the Court should reject.

**D. Plaintiff was Not Individually Represented Despite Defendant's Claims**

In ¶7 of his sworn declaration, Mr. Agarwal falsely states that Plaintiff was represented by legal counsel, including employment counsel." This is incorrect. Plaintiff did not retain *individual* legal counsel at any point during the negotiation of the merger or employment. VoiceBite, as a corporate entity, had shared counsel, but that attorney did not represent Plaintiff individually, and in fact explicitly disclaimed any employment law expertise when Plaintiff contacted him after his termination. A copy of that email is attached as Exhibit V.

Moreover, this attorney, Alan Foster, resigned days prior to closing, citing Defendant's misconduct and interference with attorney client privilege. Plaintiff also reached out to his replacement, Pietari Grohn, and mentioned this to Agarwal and Bell when asking for his unpaid severance and bonuses (Exhibit W). When later Plaintiff responded to the December 6th Notice of Claim and stated he would represent himself, Ryan Keech of K&L Gates threatened to compel disclosure of any communications Plaintiff had with Grohn, expressing his knowledge that Grohn had represented *VoiceBite*—now owned by Checkmate (Exhibit Y).

Defendant s reliance on the § 925(e) exception is thus misplaced. Plaintiff was not—in fact—individually represented, and the forum selection and choice-of-law provisions are voidable and moreover waived by Defendant's evident disregard for Plaintiff's right to counsel.

**E. Unsupported Assertions Regarding Plaintiff's Residence and Motives**

1. Plaintiff "deliberately moved to Texas to avoid paying" California taxes

This irrelevant and defamatory claim (Mot. at p.2) is unsupported by the evidence presented but appears calculated to prejudice the Court against Plaintiff. The Slack chat between Plaintiff and HR (Mot. Ex. A) merely shows he (1) informed HR of his move to Texas (2) asked administrative questions about updating his address and tax withholdings (3) that it was *Ms. Brown* (and or HR) who took the initiative to backdate his withholdings and (4) Plaintiff was surprised by refunds he never expected or requested.

2. Plaintiff was Primarily a Texas Resident During Employment

23

Defendant's own payroll documentation (ECF No. 18-2 at 10) shows California income taxes withheld on 60% of his income and a California address on file from May 1st until September 7th. Plaintiff further provides evidence of his return to and presence in California from September 30th onwards, including sworn Declarations, air tickets, pharmacy receipts and medical documentation of his stay at a Costa Mesa facility from October 23rd to well after his termination on November 14th. Plaintiff has not returned to Texas since (Vasan Decl. ¶¶19, 23).

### 3. Plaintiff is *Currently* a Texas Resident

Without any evidence, Defendant asserts that Plaintiff is—*currently*—a "Texas Resident" (Mot. at 19) who "resides in Texas" (Mot. at 24). Most notably, its judicially noticed New York Complaint (ECF No. 18-1) includes an uncorrected Summons listing an address of "15 Greenlaw St" in Sugar Land, Texas. A simple web search reveals the address belongs to a student at the University of Texas who shares Plaintiff's name but has no relation to this case, suggesting either deliberate misrepresentation or reckless disregard in an attempt to manipulate Jurisdiction.

## VII. CONCLUSION

On May 1-2, 2024—on Plaintiff's very first two days as a Checkmate employee—CEO Agarwal rejected his request for a separate work computer and threatened to fire him if he did not agree to install intrusive monitoring software on his *personal* computer. When Plaintiff cited contravening California law to object, Agarwal dismissed his concerns:

"*We won't hire people who are stickler for the law.*" [Cmpl. ¶ 24, Ex. M]

That comment—made at the outset of the employment relationship—reflects not only Defendant s attitude toward California s worker protections but its retaliatory disregard for legal and contractual duties. What Defendant truly finds inconvenient is not this venue. It is California law itself. Now, facing meritorious claims, Defendant seeks to shift venue by misrepresentations and character assassination rather than engage with the substance of its misconduct.

While Defendant frames its motion as a procedural challenge, it is functionally asking this Court to accept its heavily disputed factual narrative—advancing unproven allegations, imputing improper motivations, and asserting false jurisdictional facts. Defendant does not simply argue that this Court is the wrong forum; it seeks to persuade this Court that Plaintiff is not entitled to have his choice of forum *respected* due to alleged misconduct, thereby injecting factual merit-based arguments into what should be a threshold inquiry.

Plaintiff gently reminds the Court that not only are his personal interests at stake, but also those of four of his teammates--three of whom are lifelong California residents. This Motion continues a strategy designed to exploit California's talent and innovation while evading its worker protections—a scheme this Court should reject by maintaining venue where California's interests are properly safeguarded (see §VI.C).

Critically, Defendant's approach to contract interpretation appears remarkably self-serving: it swears by provisions to its benefit but disregards those that might protect Plaintiff. It (1) fabricates a resignation to evade severance guaranteed by the Offer Letter; (2) treats the Bonus Agreement's clear payment triggers as optional; (3) ignores the Merger Agreement's carve-out for employment claims; and (4) bypasses its dispute resolution process by suing Plaintiff individually in New York. Yet it sees no double standard in demanding strict adherence to a forum selection clause that on its face does not apply to this dispute.

Venue cannot be used as a shield against the consequences of unlawful conduct. Nor can self-serving assertions alter the factual record. The evidence is clear: this case was properly filed and served first, in a forum with deep and indisputable ties to the underlying facts, legal claims, and parties involved. Plaintiff respectfully requests that the Court deny Defendant s Motion and retain jurisdiction in the Central District of California, where he seeks justice under the fair laws of the land, and in the courts entrusted to uphold them.

MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER VENUE

*Plaintiff Arjun Vasan, having personal and contemporaneous knowledge of the events described herein, declares under penalty of perjury under the laws of the United States of America that the factual statements in the foregoing Opposition are true and correct.*

Respectfully Submitted,

**Dated**: Monday, April 7, 2025

*By:* _____

**Arjun Vasan**
Plaintiff In Pro Per

## Exhibit A - Evidentiary Table

**Plaintiff Makes Reference to the Following Exhibits to his Opposition.**

| Exhibit # | Attached To | Summary |
|---|---|---|
| Exhibit A | Opposition Memorandum | Tables of Exhibits and Evidence |
| Exhibit B | Opposition Memorandum | Table of Witness Locations |
| Exhibit C | Opposition Memorandum | Key Events Timeline |
| Exhibit D | Request for Judicial Notice | Google Search results for "Arjun Vasan" and related queries. |
| Exhibit E | Request for Judicial Notice | SEC Filings Referencing Michael Bell and California Ties |
| Exhibit F | Request for Judicial Notice | Jan 29 Notice of Claim to VoiceBite Shareholders |
| Exhibit G | Request for Judicial Notice | February 22nd Letter to Arjun Vasan from K&L Gates General Counsel re: Ethics Issues |
| Exhibit H | Request for Judicial Notice | Nov 14 Fathom.video AI Summary Email |
| Exhibit I | Declaration of Arjun Vasan | Nov 14 Termination Zoom Call Transcript |
| Exhibit J | Declaration of Arjun Vasan | Nov 14 Termination Screenshots |
| Exhibit K | Declaration of Arjun Vasan | Dec 6 (First) Notice of Claim |
| Exhibit L | Declaration of Arjun Vasan | Emails requesting severance and objecting to the assertion his separation was a resignation. |
| Exhibit M | Declaration of Arjun Vasan | Retaliation for questioning BYOD Policy on Day 2 of Employment |
| Exhibit N | Declaration of Arjun Vasan | Dec 10, 2024: Alan Foster email disclaiming employment law experience and expressing conflict of interest as the corporate counsel for VoiceBite; |
| Exhibit O | Declaration of Arjun Vasan | 1. Flight tickets back to California on Sept 30th 2. Pharmacy receipts at local Walgreens on Artesia Blvd. (Near Cerritos, CA) from then onward. |
| Exhibit P | Declaration of Arjun Vasan | Medical Certification from California Physician for Inpatient Treatment of a Serious Condition |
| Exhibit Q | Declaration of Arjun Vasan | Ryan Keech of KL Gates email threatening to compel disclosure of post termination conversations with Pietari Grohn, on account of his former representation of VoiceBite, not of Plaintiff Individually. |
| | | |
| | | |

**Exhibit A - Evidentiary Table**

PLAINTIFF REFERENCES THE FOLLOWING SECTIONS OF DEFENDANT'S MOTION.

| Document Name | Summary of Content | ECF Reference |
|---|---|---|
| **Motion** | Memorandum | 18 |
|  | Statement of Facts - Resignation not Termination |  |
|  | Statement of Facts - Representation by Counsel |  |
|  | Statement of Facts - Transaction Value is "millions of dollars" |  |
|  |  |  |
| **RJN** | Request for Judicial Notice | 18-1 |
| Exhibit A | New York Complaint | 18-1 at 3 |
|  | Summons | 18-1 at 6 |
|  | Complaint | 18-1 at 8 |
| **Brown Declaration** | Brown Declaration | 18-2 |
|  | "Resigning" | 18-2 ¶16 |
| Exhibit A | Slack Conversation re: Texas | 18-2 at 6 |
| Exhibit B | W2 | 18-2 at 10 |
| Exhibit C | Paystubs | 18-2 at 12 |
| Exhibit D | Email re: two weeks paid leave | 18-2 at 21 |
| **Chiu Declaration** | Chiu Declaration | 18-3 |
| **Agarwal Declaration** | Agarwal Declaration | 18-4 |
|  | "Multimillion-dollar acquisition" | At 2 ¶6 |
|  | "Represented by counsel, including employment counsel" | At 3 ¶7 |
|  | "Oversaw .. Mr. Vasan" | At 4 ¶17 |
|  | "Refused to provide" code access | At 4 ¶19 |
|  | Oct 22 Meeting - demotion or termination ultimatum | At 4 ¶22 |
|  | "Alleged Bonuses" | At 5 ¶23 |

|  |  |  |
|---|---|---|
|  | "Suspend Access" | At 5 ¶24 |
|  | "Resigning" | At 5 ¶26 |
| Exhibit A | Merger Agreement | 18-4 at 7 |
|  | "Merger Consideration" defined as "321,199 Purchaser Common Shares" | 18-4 at 12 |
|  | "Purchaser Share Price" shall mean $0.41, subject to adjustment for stock splits and similar events. | 18-4 at 13 |
|  | § 7.4 ("Release") | At 35 |
|  | § 8.1 ("Indemnification") | At 36 |
|  | § 8.8 ("Exclusive Remedy") | At 39 |
|  | § 9.1 ("Holder Representative") | At 40 |
|  | § 9.7 ("Governing Law") | At 42 |
|  | Signature Page | At 47 |
| Exhibit B | Non Competition Agreement | 18-4 at 54 |
|  | ¶11 ("Governing Law") | At 57 |
|  | ¶13 ("Entire Agreement") | At 58 |
| Exhibit C | Bonus Agreement | 18-4 at 62 |
|  | "Employment" Language | At 62 |
| Exhibit D | Offer Letter | 18-4 at 70 |
|  | "Governing Law" | At 73 |
| Exhibit E | Lunchbox Email | 18-4 at 76 |
| Exhibit F | Good Reason Email | 18-4 at 79 |
| **Corporate Disclosure** | Disclosure Statement (Missing Tiger Global) | 18-5 |
| **Proposed Order** | Proposed Order | 18-6 |

<span style="color:red">**Exhibit A - Evidentiary Table**</span>

**PLAINTIFF NOTES THE FOLLOWING DISPUTED NARRATIVES WITH CONTRADICTORY EVIDENCE**

### 1.  <u>False Resignation Narrative - Plaintiff was Terminated</u>

| | |
|---|---|
| **False Statement** | Plaintiff voluntarily resigned from Checkmate. |
| **Corrected Record** | Plaintiff was plainly and explicitly terminated by Agarwal, Bell and Brown while on medical leave. |
| **Used to Support** | Denial of Severance; undermining retaliation and wage claims; minimizing California's interest in adjudicating a termination while on medical leave in California. |
| **Contradicted by Evidence** | (Ex. H) Termination Transcript; <br> (Ex. J) Fathom.AI Summary Email; <br> (Ex. L) Emails objecting to "resignation" and demanding severance and his unpaid earned compensation (Nov 14-Dec 31, 2024) |
| **Never Retracted** | (Ex. K) 1st Notice of Claim; (December 6, 2024) <br> *[Add Motion References to Resignation]* <br> (ECF No. 18-2 at 4 ¶16, "Brown Declaration", March 26, 2025) <br> (ECF No. 18-4 at 5 ¶16, "Agarwal Declaration", March 26, 2025) |

### 2.  <u>Omission of Michael Bell - The Key Actor in Plaintiff's Complaint</u>

| | |
|---|---|
| **Misleading Omission** | (Michael Bell - missing almost entirely from motion, at most mentioned as a peripheral figure. Other than Plaintiff (see Exhibit B), Bell is the most commonly referenced witness in the Complaint (ECF No. 10)) |
| **Corrected Record** | Michael Bell—a Manhattan beach resident—is the Central Figure in the Claims at Issue. |
| **Used to Support** | Forum non conveniens argument; claim that the relevant witnesses are outside California; claim that key decisions regarding Plaintiff's claims were made outside California |
| **Contradicted by Evidence** | (Ex. E) SEC Filings Bell is a long time, established California based executive who lives in Manhattan Beach; LinkedIn Profile <br> (Nessler, Lam, Vasan Declarations) - confirm Bell was their supervisor <br> (Complaint 16, 23, 37, 43, 46, 56) Bell is directly implicated, indeed the key decision maker, in most of Plaintiff's claims, ***referenced in 62 paragraphs***. |
| **Never Retracted** | Defendant's Motion almost erases Bell's role in the events at issue |

### 3. <u>"Multimillion Dollar" Merger is Really an Acquihire, with the Promised Cash Never Paid</u>

| | |
|---|---|
| **Misleading Statement** | Checkmate purchased VoiceBite for "millions of dollars". The merger was a "multimillion dollar acquisition". |
| **Corrected Record** | It was a $0 transaction — no one was paid anything other than salary. Checkmate already asserting forfeiture of not just the $131k in Merger Consideration, but $1.5m in earned and unpaid *employment* compensation — a key issue in the dispute. |
| **Used to Support** | Recasts dispute as commercial - used to argue for new york. Undermines wage/ employee protections; sophisticated party defense |

<span style="color:red">**Exhibit A - Evidentiary Table**</span>

| | |
|---|---|
| **Contradicted by Evidence** | 1. Merger Agreement lists 321,199 shares worth $0.41c each as merger consideration. (ECF No. 18-4 at 12-13)<br>2. Bonus Agreement - Bonuses were in consideration of employment, in conjunction with the Offer Letter. (ECF No. 18-4 at 62)<br>3. W-2: around $180k income ($280k/year if not terminated). Paid nothing else other than salary plus back pay; (ECF No. 18-2 at 10)<br>4. Exhibit F - Shareholder Notice of Claim (Jan 29th): (a) admits merger was worth $131k total for all 5 members (b) asserts forfeiture of this equity AND *employment consideration* (retention bonuses) from the entire team. (Exhibit F) |
| **Never Retracted** | Repeated claim in Motion, New York Complaint and Declarations, despite Dec. 20 correction and this notice |

## 4. Individual Representation by Counsel - "Including Employment Counsel"

| | |
|---|---|
| **False Statement** | Plaintiff was represented by counsel, including employment counsel. (Agarwal Decl. ¶ 7); repeated multiple times in Motion |
| **Corrected Record** | Plaintiff was never INDIVIDUALLY represented by counsel, let alone by Employment count |
| **Used to Support** | 925(e) Exception to California Forum Selection and Choice of Law protections. If Plaintiff was *individually* represented by counsel, then the exception might apply. |
| **Contradicted by Evidence** | 1. Exhibit N - Dec 13 Email w/Alan Foster - disclaims employment expertise, declines to help due to conflict of interest (Ex. N.1)<br>2. Exhibit Q - Keech Pietari Email - shows knowledge that Plaintiff had only corporate representation. (Ex. N.2)<br>3. Exhibit G - Further confirmed by KL Gates General Counsel Response. (Ex. G) |
| **Never Retracted** | Repeated claim in Motion and Declarations. |

## 5. Texas Residency Narrative

| | |
|---|---|
| **Unsupported Assertions** | (1) Plaintiff primarily resided in Texas during his employment with Checkmate; (2) moved to avoid taxes; (3) still resides in Texas. |
| **Corrected Record** | (1) Plaintiff worked 71% of his days as a checkmate employee in California and 88% of his days as a voicebite+checkmate employee<br>(2) The provided slack conversation shows otherwise. Defendant's payroll exhibit shows 60% of income taxed as a California resident.<br>(3) Plaintiff lives in Cerritos, California, where he was served in the New York Action |
| **Used to Support** | Jurisdiction in New York; forum challenge; improper "nail and mail" service to Texas address; weakening CA venue claim. |
| **Contradicted by Evidence** | (1) Defendant's own payroll information shows California residency until September 7 (withholdings apparently refunded August 3rd onward). (ECF No. 18-2 at 10, 12).<br>(2) Flight tickets back to California on September 30th. (Ex. O)<br>(3) Declarations of Arjun Vasan, Latha Vasan and Vasan Varadarajan.<br>(4) Medical Documentation for FMLA from California Physician (Ex. P)<br>(6) Google Screenshot of "Arjun Vasan Sugar Land" results (Ex. D)<br>(7) Incorrect Summons with Sugar Land Vasan (ECF No. 18-1 at 6) |

| Never Retracted | Defendant knew that a California provider signed the inpatient treatment medical certification form on November 4th (backdated to October 23rd when treatment began); Plaintiff made multiple complaints about the wrong address on the summons, but Defendant still went ahead and served him with the wrong address on the summons; now they judicially noticed the incorrect address onto the record of this Court |
|---|---|

All Exhibits referenced herein are submitted concurrently with Plaintiff's Opposition to Defendant's Motion to Dismiss or Transfer for Improper Venue.

## Exhibit A - Evidentiary Table

**Plaintiff Makes Reference to the Following Exhibits to his Opposition.**

| Exhibit # | Attached To | Summary |
|---|---|---|
| Exhibit A | Opposition Memorandum | Tables of Exhibits and Evidence |
| Exhibit B | Opposition Memorandum | Table of Witness Locations |
| Exhibit C | Opposition Memorandum | Key Events Timeline |
| Exhibit D | Request for Judicial Notice | Google Search results for "Arjun Vasan" and related queries. |
| Exhibit E | Request for Judicial Notice | SEC Filings Referencing Michael Bell and California Ties |
| Exhibit F | Request for Judicial Notice | Jan 29 Notice of Claim to VoiceBite Shareholders |
| Exhibit G | Request for Judicial Notice | February 22nd Letter to Arjun Vasan from K&L Gates General Counsel re: Ethics Issues |
| Exhibit H | Request for Judicial Notice | Nov 14 Fathom.video AI Summary Email |
| Exhibit I | Declaration of Arjun Vasan | Nov 14 Termination Zoom Call Transcript |
| Exhibit J | Declaration of Arjun Vasan | Nov 14 Termination Screenshots |
| Exhibit K | Declaration of Arjun Vasan | Dec 6 (First) Notice of Claim |
| Exhibit L | Declaration of Arjun Vasan | Emails requesting severance and objecting to the assertion his separation was a resignation. |
| Exhibit M | Declaration of Arjun Vasan | Retaliation for questioning BYOD Policy on Day 2 of Employment |
| Exhibit N | Declaration of Arjun Vasan | Dec 10, 2024: Alan Foster email disclaiming employment law experience and expressing conflict of interest as the corporate counsel for VoiceBite; |
| Exhibit O | Declaration of Arjun Vasan | 1. Flight tickets back to California on Sept 30th 2. Pharmacy receipts at local Walgreens on Artesia Blvd. (Near Cerritos, CA) from then onward. |
| Exhibit P | Declaration of Arjun Vasan | Medical Certification from California Physician for Inpatient Treatment of a Serious Condition |
| Exhibit Q | Declaration of Arjun Vasan | Ryan Keech of KL Gates email threatening to compel disclosure of post termination conversations with Pietari Grohn, on account of his former representation of VoiceBite, not of Plaintiff Individually. |
| | | |
| | | |

## Exhibit A - Evidentiary Table

|  |  |  |
|---|---|---|

**PLAINTIFF REFERENCES THE FOLLOWING SECTIONS OF DEFENDANT'S MOTION.**

| Document Name | Summary of Content | ECF Reference |
|---|---|---|
| **Motion** | Memorandum | 18 |
|  | Statement of Facts - Resignation not Termination |  |
|  | Statement of Facts - Representation by Counsel |  |
|  | Statement of Facts - Transaction Value is "millions of dollars" |  |
|  |  |  |
| **RJN** | Request for Judicial Notice | 18-1 |
| Exhibit A | New York Complaint | 18-1 at 3 |
|  | Summons | 18-1 at 6 |
|  | Complaint | 18-1 at 8 |
| **Brown Declaration** | Brown Declaration | 18-2 |
|  | "Resigning" | 18-2 ¶16 |
| Exhibit A | Slack Conversation re: Texas | 18-2 at 6 |
| Exhibit B | W2 | 18-2 at 10 |
| Exhibit C | Paystubs | 18-2 at 12 |
| Exhibit D | Email re: two weeks paid leave | 18-2 at 21 |
| **Chiu Declaration** | Chiu Declaration | 18-3 |
| **Agarwal Declaration** | Agarwal Declaration | 18-4 |
|  | "Multimillion-dollar acquisition" | At 2 ¶6 |
|  | "Represented by counsel, including employment counsel" | At 3 ¶7 |
|  | "Oversaw .. Mr. Vasan" | At 4 ¶17 |
|  | "Refused to provide" code access | At 4 ¶19 |
|  | Oct 22 Meeting - demotion or termination ultimatum | At 4 ¶22 |
|  | "Alleged Bonuses" | At 5 ¶23 |

### Exhibit A - Evidentiary Table

|  | "Suspend Access" | At 5 ¶24 |
|---|---|---|
|  | "Resigning" | At 5 ¶26 |
| Exhibit A | Merger Agreement | 18-4 at 7 |
|  | "Merger Consideration" defined as "321,199 Purchaser Common Shares" | 18-4 at 12 |
|  | "Purchaser Share Price" shall mean $0.41, subject to adjustment for stock splits and similar events. | 18-4 at 13 |
|  | § 7.4 ("Release") | At 35 |
|  | § 8.1 ("Indemnification") | At 36 |
|  | § 8.8 ("Exclusive Remedy") | At 39 |
|  | § 9.1 ("Holder Representative") | At 40 |
|  | § 9.7 ("Governing Law") | At 42 |
|  | Signature Page | At 47 |
| Exhibit B | Non Competition Agreement | 18-4 at 54 |
|  | ¶11 ("Governing Law") | At 57 |
|  | ¶13 ("Entire Agreement") | At 58 |
| Exhibit C | Bonus Agreement | 18-4 at 62 |
|  | "Employment" Language | At 62 |
| Exhibit D | Offer Letter | 18-4 at 70 |
|  | "Governing Law" | At 73 |
| Exhibit E | Lunchbox Email | 18-4 at 76 |
| Exhibit F | Good Reason Email | 18-4 at 79 |
| **Corporate Disclosure** | Disclosure Statement (Missing Tiger Global) | 18-5 |
| **Proposed Order** | Proposed Order | 18-6 |

<b>Exhibit A - Evidentiary Table</b>

**PLAINTIFF NOTES THE FOLLOWING DISPUTED NARRATIVES WITH CONTRADICTORY EVIDENCE**

### 1.  False Resignation Narrative - Plaintiff was Terminated

| | |
|---|---|
| **False Statement** | Plaintiff voluntarily resigned from Checkmate. |
| **Corrected Record** | Plaintiff was plainly and explicitly terminated by Agarwal, Bell and Brown while on medical leave. |
| **Used to Support** | Denial of Severance; undermining retaliation and wage claims; minimizing California's interest in adjudicating a termination while on medical leave in California. |
| **Contradicted by Evidence** | (Ex. H) Termination Transcript;<br>(Ex. J) Fathom.AI Summary Email;<br>(Ex. L) Emails objecting to "resignation" and demanding severance and his unpaid earned compensation (Nov 14-Dec 31, 2024) |
| **Never Retracted** | (Ex. K) 1st Notice of Claim; (December 6, 2024)<br>*[Add Motion References to Resignation]*<br>(ECF No. 18-2 at 4 ¶16, "Brown Declaration", March 26, 2025)<br>(ECF No. 18-4 at 5 ¶16, "Agarwal Declaration", March 26, 2025) |

### 2.  Omission of Michael Bell - The Key Actor in Plaintiff's Complaint

| | |
|---|---|
| **Misleading Omission** | (Michael Bell - missing almost entirely from motion, at most mentioned as a peripheral figure. Other than Plaintiff (see Exhibit B), Bell is the most commonly referenced witness in the Complaint (ECF No. 10)) |
| **Corrected Record** | Michael Bell—a Manhattan beach resident—is the Central Figure in the Claims at Issue. |
| **Used to Support** | Forum non conveniens argument; claim that the relevant witnesses are outside California; claim that key decisions regarding Plaintiff's claims were made outside California |
| **Contradicted by Evidence** | (Ex. E) SEC Filings Bell is a long time, established California based executive who lives in Manhattan Beach; LinkedIn Profile<br>(Nessler, Lam, Vasan Declarations) - confirm Bell was their supervisor<br>(Complaint 16, 23, 37, 43, 46, 56) Bell is directly implicated, indeed the key decision maker, in most of Plaintiff's claims, ***referenced in 62 paragraphs***. |
| **Never Retracted** | Defendant's Motion almost erases Bell's role in the events at issue |

### 3. "Multimillion Dollar" Merger is Really an Acquihire, with the Promised Cash Never Paid

| | |
|---|---|
| **Misleading Statement** | Checkmate purchased VoiceBite for "millions of dollars". The merger was a "multimillion dollar acquisition". |
| **Corrected Record** | It was a $0 transaction — no one was paid anything other than salary. Checkmate already asserting forfeiture of not just the $131k in Merger Consideration, but $1.5m in earned and unpaid *employment* compensation — a key issue in the dispute. |
| **Used to Support** | Recasts dispute as commercial - used to argue for new york. Undermines wage/employee protections; sophisticated party defense |

4 of 6

**Exhibit A - Evidentiary Table**

| | |
|---|---|
| **Contradicted by Evidence** | 1. Merger Agreement lists 321,199 shares worth $0.41c each as merger consideration. (ECF No. 18-4 at 12-13)<br>2. Bonus Agreement - Bonuses were in consideration of employment, in conjunction with the Offer Letter. (ECF No. 18-4 at 62)<br>3. W-2: around $180k income ($280k/year if not terminated). Paid nothing else other than salary plus back pay; (ECF No. 18-2 at 10)<br>4. Exhibit F - Shareholder Notice of Claim (Jan 29th): (a) admits merger was worth $131k total for all 5 members (b) asserts forfeiture of this equity AND *employment consideration* (retention bonuses) from the entire team. (Exhibit F) |
| **Never Retracted** | Repeated claim in Motion, New York Complaint and Declarations, despite Dec. 20 correction and this notice |

### 4. Individual Representation by Counsel - "Including Employment Counsel"

| | |
|---|---|
| **False Statement** | Plaintiff was represented by counsel, including employment counsel. (Agarwal Decl. ¶ 7); repeated multiple times in Motion |
| **Corrected Record** | Plaintiff was never INDIVIDUALLY represented by counsel, let alone by Employment count |
| **Used to Support** | 925(e) Exception to California Forum Selection and Choice of Law protections. If Plaintiff was *individually* represented by counsel, then the exception might apply. |
| **Contradicted by Evidence** | 1. Exhibit N - Dec 13 Email w/Alan Foster - disclaims employment expertise, declines to help due to conflict of interest (Ex. N.1)<br>2. Exhibit Q - Keech Pietari Email - shows knowledge that Plaintiff had only corporate representation. (Ex. N.2)<br>3. Exhibit G - Further confirmed by KL Gates General Counsel Response. (Ex. G) |
| **Never Retracted** | Repeated claim in Motion and Declarations. |

### 5. Texas Residency Narrative

| | |
|---|---|
| **Unsupported Assertions** | (1) Plaintiff primarily resided in Texas during his employment with Checkmate; (2) moved to avoid taxes; (3) still resides in Texas. |
| **Corrected Record** | (1) Plaintiff worked 71% of his days as a checkmate employee in California and 88% of his days as a voicebite+checkmate employee<br>(2) The provided slack conversation shows otherwise. Defendant's payroll exhibit shows 60% of income taxed as a California resident.<br>(3) Plaintiff lives in Cerritos, California, where he was served in the New York Action |
| **Used to Support** | Jurisdiction in New York; forum challenge; improper "nail and mail" service to Texas address; weakening CA venue claim. |
| **Contradicted by Evidence** | (1) Defendant's own payroll information shows California residency until September 7 (withholdings apparently refunded August 3rd onward). (ECF No. 18-2 at 10, 12).<br>(2) Flight tickets back to California on September 30th. (Ex. O)<br>(3) Declarations of Arjun Vasan, Latha Vasan and Vasan Varadarajan.<br>(4) Medical Documentation for FMLA from California Physician (Ex. P)<br>(6) Google Screenshot of "Arjun Vasan Sugar Land" results (Ex. D)<br>(7) Incorrect Summons with Sugar Land Vasan (ECF No. 18-1 at 6) |

**Exhibit A - Evidentiary Table**

| | |
|---|---|
| **Never Retracted** | Defendant knew that a California provider signed the inpatient treatment medical certification form on November 4th (backdated to October 23rd when treatment began); Plaintiff made multiple complaints about the wrong address on the summons, but Defendant still went ahead and served him with the wrong address on the summons; now they judicially noticed the incorrect address onto the record of this Court |

All Exhibits referenced herein are submitted concurrently with Plaintiff's Opposition to Defendant's Motion to Dismiss or Transfer for Improper Venue.

## Exhibit B - Witnesses

| Name | Role | Location | Compl. ¶s | Priority |
|------|------|----------|-----------|----------|
| **Arjun Vasan** | Plaintiff | Cerritos, CA | 178 | Very High (5) |
| **Michael Bell** | Checkmate Chief of Strategy, lead negotiator for merger, and Plaintiff's supervisor. | Manhattan Beach, CA | 61 | Very High (5) |
| **Vishal Agarwal** | Checkmate CEO. Involved in negotiations, employment and termination | New York, NY | 38 | High (4) |
| **Christopher Lam** | VoiceBite Cofounder, Colleague at Checkmate | Toronto, Canada | 17 | High (4) |
| **Robert Nessler** | VoiceBite Cofounder, Colleague at Checkmate | Cupertino, CA, Los Vegas, NV | 9 | High (4) |
| **Amy Brown** | Checkmate VP of Human Relations. | Kansas | 15 | Medium (3) |
| **Alan Foster** | VoiceBite Corporate Counsel | Santa Clara, CA | 7 | Medium (3) |
| **Ryan Keech** | Checkmate Counsel | Los Angeles, CA | 2 | Medium (3) |
| **Vasan Varadarajan** | Plaintiff's father, advisor. Central to IP allegations in New York complaint. | Cerritos, CA | 5 | Medium (3) |
| **Jeffrey** | Colleague at Checkmate | Albuquerque, NM | 0 | Low (2) |
| **Pranav Sood** | Colleague at Checkmate, VoiceBite | Vancouver, Canada | 0 | Low (2) |
| **Isamu Aoki** | Colleague at Checkmate, VoiceBite Founding Team | San Jose, CA | 0 | Low (2) |
| **Paul Garcia** | Colleague at Checkmate, VoiceBite Founding Team | San Jose, CA | 0 | Low (2) |
| **Latha Vasan** | Plaintiff's Mother | Cerritos, CA | 0 | Low (2) |
| **Christian Dalsanto** | Collaborator at VoiceBite | Palo Alto, CA | 0 | Low (2) |

**Exhibit B - Witnesses**

| Complaint ¶s | Number of Paragraphs in Complaint that reference the Witness. |
|---|---|
| Priority | Importance of Testimony from this Witness |

### Distribution by Jurisdiction



**Exhibit B - Witnesses**

**Distribution By Witness**



## Exhibit C - Key Events Timeline

| Date | Location of Plaintiff | Witnesses | Event Summary (Compl ¶s) |
|------|----------------------|-----------|--------------------------|
| 2023-08 | Cupertino, CA | Vasan, Nessler | VoiceBite founded. (¶ 2) |
| 2023-11 | Cupertino, CA | Vasan, Nessler, Lam | Chris Lam joins as 3rd Co-founder. (¶¶ 33-34) |
| 2024-01 | Cupertino, CA | Vasan, Nessler, Lam, Agarwal, Bell | Merger Negotiations with Checkmate Begin. |
| 2024-02-17 (on or about) | Cupertino, CA, | Vasan, Nessler, Lam, Agarwal, Bell | Exclusive LOI Executed, VoiceBite stops fundraising, devotes efforts to closing merger. (¶ 42-43) |
| 2024-02-20 (on or about) | Cupertino, CA | Vasan, Nessler, Lam, Agarwal, Bell | Mike Bell visits the founders in Cupertino |
| 2024-03-15 (on or about) | Cerritos, CA | Vasan, Nessler, Lam | Plaintiff relocates to family residence in Cerritos, CA. Chris Lam joins him and stays for six weeks through merger close. (¶¶ 16-19) |
| 2024-03-22 (on or about) | Manhattan Beach, CA | Vasan, Lam, Bell | Lam and Vasan visit Bell at his Manhattan Beach home to reach a "handshake deal" |
| 2024-04-03 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell | Intense Zoom Meeting to Finalize Terms, Bell & Agarwal employ coercive tactics. (¶ 16) |
| 2024-04-06 | Cerritos, CA | Vasan, Nessler, Lam, Bell | Bell pressures the founders in a text message to Robert Nessler, urging them to "Fire" Alan Foster (VoiceBite Attorney) (¶ 16) |
| 2024-04-17 to 2024-04-22 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell, Foster, KL Gates, Murtha | Bell and K&L Gates introduce sweeping changes to the transaction documents, alarming Foster. (¶¶ 16-19) |
| 2024-04-25 | Cerritos, CA | Vasan, Nessler, Lam, Bell, Foster | Bell pressures Plaintiff to divulge excerpts from Foster's memo to "understand his concerns". Foster resigns, citing Checkmate's ethical misconduct. (¶¶ 17-19) |
| 2024-04-27 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell, Foster, Grohn | The founders secure last minute replacement counsel (Pietari Grohn). (¶ 18) |
| 2024-04-30 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell | Merger Closes on the deadline imposed by Checkmate (¶ 19) |

### Exhibit C - Key Events Timeline

| | | | |
|---|---|---|---|
| 2024-05-01 | Cerritos, CA | Arjun Vasan, Robert Nessler, Chris Lam, Vishal Agarwal, Mike Bell | Employment commences with Checkmate. (¶¶ 20-23) |
| 2024-05-02 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell | Agarwal threatens to fire Plaintiff for requesting a work laptop and citing California law regarding BYOD policy, establishing a hostile and retaliatory environment. (¶ 24) |
| 2024-05 to 2024-07 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell | Checkmate repeatedly delays promised back payments for work during extended negotiations, citing cash flow issues, despite pressuring the founders to grow the engineering team. (¶ 25-27) |
| 2024-07-23 | Cerritos, CA | Vasan, Nessler, Lam, Agarwal, Bell | Checkmate announces $10m series B internally via Slack. When Plaintiff requested payment pursuant to the Bonus Agreement, Bell and Agarwal retaliated, threaten him with dismissal if he makes further demands. (¶¶ 28-32) |
| 2024-08-03 (on or about) | Midland, TX | Vasan | Plaintiff relocates to stay with brother in Texas. |
| 2024-08-15 (on or about) | Midland, TX | Vasan, Agarwal | Agarwal advises Plaintiff to ensure his tax withholdings are updated prior to the upcoming bonus. |
| 2024-08-19 | Midland, TX | Vasan, Brown | Plaintiff asks Brown how to update his address/withholdings. Brown and HR, on their own initiative back date and refund withholdings to August 3rd. |
| 2024-09-28 | Cerritos, CA | Vasan | Plaintiff returns to Cerritos due to stress and homesickness. |
| 2024-10-22 | Cerritos, CA | Vasan, Agarwal, Bell, Brown | Checkmate issues an ultimatum to Plaintiff to accept demotion or be terminated immediately after Plaintiff suffers a panic attack during a team meeting. (¶ 39) |
| 2024-10-23 | Cerritos, CA, Costa Mesa, CA | Vasan | Plaintiff checks in to treatment in Costa Mesa, CA and later submitting a back dated medical certification (10-23 to 12-06) (¶¶ 40, 41) |
| 2024-11-03 | Costa Mesa, CA | Vasan, Brown, Bell | Brown and Bell pressure Plaintiff to return from leave, cutting off work communications and denying paid leave and conditioning his bonus payment upon his return from leave. (¶¶ 41-45) |

## Exhibit C - Key Events Timeline

| 2024-11-07 | Costa Mesa, CA | Vasan | Plaintiff repeatedly requests his bonus payment, asking Bell and Agarwal to justify withholding. They do not respond. Plaintiff, frustrated and anxious begins looking for alternate work, fearing imminent termination. (¶¶ 46) |
| --- | --- | --- | --- |
| 2024-11-14 | Costa Mesa, CA | Vasan, Bell, Agarwal, Brown | Agarwal, Bell and Brown terminate Plaintiff in an 8AM Zoom call (Exhibit K). At 9:56AM, Plaintiff sends a distressed "good reason resignation" email. (¶¶ 47-49) |
| 2024-11-20 to 2024-11-27 | Costa Mesa, CA | Vasan, Bell, Agarwal, Brown | Plaintiff sends multiple emails requesting his severance and bonus payments. Checkmate does not reply. (¶¶ 49) |
| 2024-12-06 | Cerritos, CA | Vasan, Keech (KL Gates) | Keech sends 1st Notice of Claim, denying severance on account of "resignation" and rejecting Plaintiff's "good reason". Keech begins accusations of IP misuse, which Plaintiff formally contests. (¶¶ 50-51) |
| 2024-12-26 | Cerritos, CA | Vasan | Plaintiff accidentally files his draft complaint, alleging employment claims, but does not pay filing fee. |
| 2025-01-22 | Cerritos, CA | Vasan | Plaintiff voluntarily dismisses and strikes draft complaint once he realizes it was actually filed. |
| 2025-01-22 | Cerritos, CA | Vasan, Keech | Keech sends 2nd Notice of Claim, reiterating IP allegations and overtly alleging Fraud. (¶¶ 51-52) |
| 2025-01-25 | Cerritos, CA | Vasan | Plaintiff files this current action via EDSS, and pays the filing fee (marked 01-28 as filing date) |
| 2025-01-29 | Cerritos, CA | Vasan, Lam, Nessler | Keech sends 3rd Notice of Claim, this time to VoiceBite Shareholders, asserting forfeiture of all merger equity and $1.5m in bonuses for the team. Plaintiff delays service as the shareholders respond and attempt negotiations. (¶¶ 52) |
| 2025-02-18 | Cerritos, CA | Keech, KL Gates, Bell and Agarwal | Checkmate delays replying to the founders counsel, and instead files its retaliatory Action in New York State Supreme Court, against Plaintiff individually. |

Exhibit C - Key Events Timeline

| 2025-03-05 | Japan | Vasan | In Japan on family vacation, Plaintiff serves Checkmate on its Delaware registered agent via personal service, proof filed.. |
| 2025-03-07 | Cerritos, CA | Keech, KL Gates | Checkmate attempts "nail and mail" service to Plaintiff's correct California address (after misidentifying him as another "Arjun Vasan" who lives in Texas). The summons remains uncorrected. |
| 2025-03-17 | Cerritos, CA | Keech, KL Gates, Vasan | Earliest date the "nail and mail" service would be "deemed served", if service was not defective. |

**Exhibit D - Google Results for Arjun Vasan**



**Exhibit D - Google Results for Arjun Vasan**



**Exhibit D - Google Results for Arjun Vasan**



**Exhibit D - Google Results for Arjun Vasan**



**Exhibit E - Bell SEC Filings & LinkedIn Profile**

## A Long Established Resident of the Central District of California

4/2/25, 10:26 PM                          sec.gov/Archives/edgar/data/1710670/000110465920097383/tm2027791d1_partii.htm

**Mike Bell, Chairman**
For the past twenty-five years, Michael Bell has served as CEO/President/COO in early-stage tech startups and public company roles in and around Southern California. Currently, Michael serves as Chief Operating Officer at Ordermark, a leading restaurant technology company and one of LA's fastest growing venture backed companies. Prior to Ordermark, Michael was President at Bridg, a venture-backed software company providing a B2C CRM for some of the nation's leading restaurant brands. Before this, Michael was President of Infrascale, a provider of cloud-based data protection software for enterprise customers and a Leader in Gartner's Magic Quadrant for Disaster Recovery. Michael also served as CEO/President of SOS Online Backup, 3PL Central, and Software.com. Early in his career, Michael co-founded Encore Software and served as its CEO for fourteen years. With an initial capitalization of only $25,000 in 1993, Michael and his team grew Encore to become one of the top-ten largest consumer software publishers in North America and one of the fastest growing – having twice been named to Inc. Magazine's Inc 500 list.

https://www.sec.gov/Archives/edgar/data/1710670/000110465920097383/
tm2027791d1_partii.htm

## A Sophisticated Business Executive - and Manhattan Beach Resident

**DIRECTORS, EXECUTIVE OFFICERS, AND SIGNIFICANT EMPLOYEES**

| Name | Position | Age | Term in Office |
|------|----------|-----|----------------|
| **Executive Officers** | | | |
| Mike Bell | Chief Executive Officer | 56 | Indefinite, appointed August 2020 |
| Ryan Sinnet | Chief Technology Officer | 35 | Indefinite, appointed October 2016 |
| Kevin Morris | Chief Financial Officer | 38 | Indefinite, appointed September 2019 |
| | | | |
| **Directors** | | | |
| Buck Jordan | Chairman | 40 | Indefinite, appointed August 2020 |
| Joseph Essas | Director | 49 | Indefinite, appointed December 2019 |
| Massimo Noja De Marco | Director | 58 | Indefinite, appointed November 2019 |
| Nick Degnan | Director | 38 | Indefinite, appointed September 2019 |
| Thomas Bruderman | Director | 52 | Indefinite, appointed March 2020 |
| | | | |
| **Significant Employees** | | | |
| Rob Anderson | Head of Mechanical Engineering | 27 | Indefinite, appointed September 2016 |

**Mike Bell, Chief Executive Officer**

Mike Bell was appointed CEO of Miso Robotics in August 2020 after serving as the Chairman of the Board of Directors for nearly one year. For the past twenty-five years, Mike has served as CEO/President/COO in early-stage tech startups and public company roles. Most recently, Michael served as Chief Operating Officer at Ordermark, a leading restaurant technology company. Prior to Ordermark, Mike was President at Bridg, a venture-backed software company providing a B2C CRM for some of the nation's leading restaurant brands. He also served as CEO/President of Infrascale, SOS Online Backup, 3PL Central, and Software.com. Early in his career, Mike co-founded Encore Software and served as its CEO for fourteen years. During this time Mike and his team grew Encore to become one of the largest consumer software publishers in North America and one of the fastest-growing – having twice been named to Inc. Magazine's Inc 500 list.

1 of 3

## Exhibit E - Bell SEC Filings & LinkedIn Profile

**SECURITY OWNERSHIP OF MANAGEMENT AND CERTAIN SECURITYHOLDERS**

| Title of Class | Name and address of beneficial owner | Amount and nature of beneficial ownership | Amount and nature of beneficial ownership acquirable | Percent of class | Total voting power per beneficial owner (5) |
|---|---|---|---|---|---|
| **Officers and Directors** | | | | | |
| Common Stock | Ryan Sinnet<br>141 N Parkwood Ave<br>Apt 11,<br>Pasadena, CA 91107 | N/A | 263,131 | 13.32% | N/A |
| Common Stock | Buck Jordan<br>1134 11th Street<br>Suite 101,<br>Santa Monica, CA 90403 | 202,483 | N/A | 11.83% | 41.76% |
| Common Stock | Michael Bell<br>1028 9th Street<br>Manhattan Beach, CA 90266 | 5,208 | 233,219 | 12.26% | 0.12% |
| Common Stock | All directors and officers as a group (1) | 272,691 | 499,350 | 34.91% | 6.14% |

https://www.sec.gov/Archives/edgar/data/1710670/000110465921059344/tm2114854d1_partii.htm

**Exhibit E - Bell SEC Filings & LinkedIn Profile**

## Chief of Strategy at Checkmate



https://www.linkedin.com/in/mikebellsoftwareceo/



January 29, 2025

Ryan Q. Keech
Partner
Ryan.Keech@klgates.com

**VIA ELECTRONIC MAIL ONLY**

T +1 310 552 5070
F +1 310 552 5001

Robert Nessler (as Holder Representative)
1149 Hollyhead Lane
Cupertino, California 95014
robertnessler@gmail.com

**Re:     VoiceBite Corporation/Indemnification Notice of Direct Claim**

Dear Holder Representative:

Reference is made to that certain Agreement and Plan of Merger, by and among Checkmate.com Inc. ("Purchaser"), VoiceBite Merger Sub, Inc., VoiceBite Corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia (each a "Stockholder" and collectively the "Stockholders"), and Robert Nessler as representative of the Pre-Closing Holders (the "Holder Representative"), dated as of April 30, 2024 (the "Merger Agreement"). Capitalized terms not otherwise defined herein have the meaning set forth in the Merger Agreement.

Pursuant to Section 8 of the Merger Agreement and in accordance with Section 8.3(c) of the Merger Agreement, Purchaser and certain indemnified affiliates, as those terms are defined (collectively, "Purchaser Indemnified Parties"), hereby provide to you, in your role as Holder Representative, this notice of Direct Claim and indemnifiable Losses with respect to certain matters under the Merger Agreement.

*        *        *

Following the Closing, Purchaser Indemnified Parties were made aware of serious conduct involving, *inter alia*, breaches of certain representations and warranties made by the Company and its affiliates, which breaches resulted in Losses to Purchaser. Although Purchaser's investigation is ongoing, Purchaser has determined that the Company and/or certain of its affiliates knowingly, willfully and fraudulently breached at least the following representations and warranties made by it in the Merger Agreement, resulting in significant damages and other Losses to Purchaser (collectively, the "Subject Claims"):

- Section 5.7, Title to and Sufficiency of Assets
- Section 5.9, Intellectual Property
- Section 5.19, Disclosure

K&L GATES LLP
10100 SANTA MONICA BOULEVARD  EIGHTH FLOOR  LOS ANGELES  CA 90067
T +1 310 552 5000  F +1 310 552 5001  klgates.com

508938408.2

Collectively and put simply, the Purchaser Indemnified Parties have suffered Losses arising from material misrepresentations and fraud relating to the authorship, licensing and ownership of Company software and other key intellectual property.  The Subject Claims constitute indemnifiable Losses pursuant to Section 8.1(a) of the Merger Agreement, in each case paid, incurred, suffered or sustained by Purchaser and the Surviving Corporation, as Indemnified Parties with respect to the foregoing.

As you know, pursuant to Section 8.1(a) and Section 8.3(c) of the Merger Agreement, the Holder Indemnifying Parties are obligated to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Purchaser Losses arising out of, or relating to certain matters, including, without limitation, any inaccuracies in or breach of the Company's representations and warranties.  As provided in Section 8.5(a) of the Merger Agreement, any limitation on the amount of indemnification payable by any Pre-Closing Holder shall not apply in the event of Fraud by the Company.

While the Purchaser Indemnified Parties' investigation is ongoing, the Purchaser Indemnified Parties state that Purchaser Losses comprising the Subject Claim is an amount in excess of **$5,000,000**.  For purposes of this indemnification claim only, Purchaser Indemnified Parties are making an indemnification claim for Purchaser Losses of **$1,681,815** and expressly state and do not waive non-indemnification claims that include and/or are in excess of these amounts.

Purchaser shall seek recourse for the Indemnifiable Amounts as set forth below:

- Forfeiture of Final Payment Amounts (as defined in the Bonus Agreement): $**200,000**

- Surrender of 321,199 Purchaser Closing Shares: $**131,815**

- Forfeiture of Retention Bonus amounts (as defined in the Bonus Agreement): $**1,350,000**

This Indemnification Claim Notice is a Notice of Claim as set out in Section 8.3(c) of the Merger Agreement.

Nothing herein is intended to be, nor should it be construed as, a waiver or limitation of any of the Purchaser Indemnified Parties' rights, claims or defenses in this matter, all of which are and will remain expressly reserved.

If you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

Ryan Q. Keech

# K&L GATES

February 21, 2025

Charles M. Tea III
charles.tea@klgates.com

T 412 355 6256
F 412 355 6501

**Via Electronic Mail Only**

Arjun Vasan
arjun.vasan@gmail.com

**Re:    Arjun Vasan / K&L Gates and Ryan Keech**

Dear Mr. Vasan:

I am the Deputy General Counsel of K&L Gates and write in response to the email you sent to our Firm's General Counsel, Jeffrey Maletta, dated January 29, 2025.  That email attached a draft complaint you indicated you intend to file with the State Bar of California in which you assert alleged grievances against our Firm and Ryan Keech, a lawyer with our Firm.  We appreciate the opportunity to respond.

Please know that we take very seriously any alleged grievances asserted against our Firm and any of our lawyers, as we are committed to the highest standards of professionalism and ethical behavior.  We have undertaken a thorough review of the allegations contained in your draft complaint and, respectfully, have concluded they are wholly without merit.

For context, you are not a client of K&L Gates.  Rather, you are adverse to our Firm's client, Checkmate.com Inc., in an ongoing dispute arising from representations and agreements made by you in connection with Checkmate's acquisition of your company, VoiceBite Corporation, in May 2024.  In spite of our Firm's repeated urging that you retain counsel to represent you in the ongoing dispute, you have thus far declined to do so, choosing instead to represent yourself *pro se*.

As alleged in the draft complaint, you accuse our Firm of intentional and bad faith conduct in connection with four distinct matters, which you assert violate multiple provisions of the California Rules of Professional Conduct and the ABA Model Rules of Professional Conduct. We address each of those matters below.

**(1)    *Alleged Termination & Advancement of a False Resignation Claim*.**

You assert that on December 6, 2024, K&L Gates sent you a Notice of Claim on behalf of Checkmate falsely stating that you had resigned from your position with Checkmate.  That statement was not false.  Indeed, in the following paragraph of the draft complaint you indicate

that it was your view that you had resigned from the company ("I sent a 'good reason' resignation email") – and moreover the actual email you sent on November 14, 2024, confirms that fact:

> *I hereby resign from checkmate, with good reason, due to the demand made in late October that i accept a demotion, despite exceptional performance.*
>
> *As this demand was not lifted within 30 days, I resign as per our agreement.*

Thus, clearly there is nothing about Checkmate's position – as conveyed by our Firm as counsel on its behalf – regarding your resignation which is false, much less violates any ethics rules.

**(2)    *Alleged Misuse of the "Joint Defenses" Summary of K&L Gates IP Letter*.**

Next you assert that "[d]uring merger negotiations, just prior to close, Checkmate surprised us with new agreements including a 'Trade Secret Acknowledgement' letter drafted by K&L Gates", recite what you claim to be an excerpt of an email addressing the letter from Michael Bell, Checkmate's Chief of Strategy, and allege that "the letter was later weaponized against [you] personally".  First, Mr. Bell does not work for K&L Gates, as you acknowledge, and so we see no basis for how his alleged actions could give rise to an ethics complaint against our Firm. Second, the letter was intended to protect the parties against accusations of improper use of confidential information by memorializing enforceable agreements not to bring confidential information belonging to others onto company property, and there was nothing improper about it.  Third, in connection with the merger negotiations you were adverse to our Firm's client, were (as you admit) taking advice from VoiceBite's counsel, and of course were free to consult with any other counsel of your choosing.  There is nothing about the letter – or related communications between the parties themselves – which gives rise to a violation of any ethics rules by our Firm.

**(3)    *Alleged Threat to Compel Disclosure of Privileged Communications*.**

You also assert that it was improper of Mr. Keech, post-closing, to seek to obtain certain pre-closing communications you and others had with former counsel for VoiceBite, as you claim them to be privileged.  Any pre-closing communications you and others had with counsel for VoiceBite belonged to VoiceBite, which is now owned by our client Checkmate, as is any privilege that previously belonged to VoiceBite.  This is in accord with Section 2.2 of the Agreement and Plan of Merger, to which you are a party ("all of the . . . privileges . . . of each of the Company and Merger Sub will vest in the Surviving Corporation"), as well as governing Delaware law (*see, e.g.*, *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, C.A. No. 7906-CS (Del. Ch. Nov. 15, 2013) ("pre-merger attorney-client communications constitute assets of the target corporation that are transferred to the surviving corporation in a merger").  There is nothing improper about our client seeking access to communications which belong to it and/or to which it is legally entitled.

2

**(4)** *Alleged Misrepresentation of Agreement Excerpts.*

Lastly, you assert that certain agreements have been manipulated and misrepresented by our Firm and Mr. Keech and "do not match the versions [you were] provided just prior to signing by VoiceBite counsel." We have no way of knowing what you were provided or not provided by counsel for VoiceBite prior to closing, or whether or to what extent they match the agreements that form the basis for our client's claims against you. But to be clear, any suggestion by you that our Firm or Mr. Keech intentionally manipulated or misrepresented any documents is totally false and baseless.

*  *  *  *  *  *  *  *  *  *  *  *

Having thoroughly reviewed the matters contained in your draft complaint, we are confident that our Firm and Mr. Keech, in representing a client adverse to you, have acted in a manner consistent with their professional obligations and that your alleged grievances directed at them are without merit. As we see nothing in your draft complaint which could give rise to any possible violation of the applicable ethics rules by our Firm or Mr. Keech, we consider this matter closed.

Very truly yours,

Charles M. Tea III

CMT/jms

February 21,2025

## Exhibit K.1 - Zoom Transcript

**November 14, 2024 at 8AM**

https://fathom.video/share/j-ZStSqCq9Z7mRriEnHs6R7dxy7Aqixp?tab=summary

**Amy**: hi mike

**Mike**: good morning

**Amy**: how are you

**Mike**:how are you?

**Amy**: ah you know, I'm "good", ready to you know complete paperwork

**Mike**: yeah we'll see what today has in store

**Amy**: yeah, very exciting stuff, so

**Mike**: I'm like, my zoom is frozen and my camera is not coming up, so I might quit and try again let me se

**Amy**: ok

**Mike**: ok, I'm going to click back in

**Amy**: ok

**Amy**: hey Vishal

**Vishal**: Hello

**Amy**: Mike's having trouble with his video, so he was going to back out and come back in, so **I'm** not sure. I see he's still here.

**["This Meeting is Being Recorded"]**

**Vishal**: Hello

**Amy**: hey arj

**Vishal**: hey arj. Just waiting for mike, he's, uhm, rejoining

**Amy**: there he is

**Mike**: hello guys, there we go

**Vishal**: good morning arj, how are you feeling

**Mike**: not able to hear you

**Vishal**: ya

**Arj**: can you hear me now?

## Exhibit K.1 - Zoom Transcript

**Vishal**: not very clearly no

**Arj**: hi can you hear me?

**Vishal**: yeah much better

**Vishal**: sounds good, how are you feeling

**Arj**: like a lot better, finally slept for a couple weeks, properly

**Arj**: um, so I um, and now I'm off meds and everything and they've said that um .. they want me to build a work life balance, it's something I've never really had

**Arj**: so like I know it's only five hours a day for now, but we can update that, weekly, as uh .. as the doctor says

**Arj**: I've also been you know, participating in therapy, with um. To learn how to control my emotions better and anger management sort of situations. Which uh. You know, I think, it's always been a problem for me. Um. It usually happens when I don't sleep. And um. I have a tendency to get like very obsessed about .. things ..

**Arj**: so I would get very obsessed with um. But anyhow it doesn't excuse the actions that I did, I'm not trying to make an excuse or a reason.

**Arj**: I'm just saying, I feel better now, and I think that .. you know I've been sorta keeping up, umm with you know with Robert Chris and Jeffrey about what's happening.

**Arj**: and, um I mean I really think there's some knowledge transfer that needs to happen, even if maybe it's not a culture fit. I kind of agree maybe it's not a culture fit between me and checkmate.

**Vishal**: Arj I'll uh just stop you right there uh. ==This call is to let you know that you're being terminated with immediate effect. Right now, right this second.== It has nothing to do with the history, it has nothing to do with anything we have discussed in the past. Or the choice we gave for demotion, and the outburst, it has nothing to do with that. It has purely to do with the fact that you reached out to a competitor, asking to join them, and bring two of the engineers along with you. I have the emails, with me right now.. It is so disappointing arj, I fought for you ..

**Arj**: yeah but you .. you didn't pay me my thing so I thought you guys were trying to screw me over

**Vishal**: sure, so this call is to tell you that because of that action, ==irrespective of anything that has happened in the past, you're being terminated with immediate effect.== And. We can take one of two courses from here. We can either work out a final settlement solution. Or you can get a lawyer involved. either way is fine with us, but I just wanted to let you know that the email you sent out to a competitor, is in my possession. Possession. *both* the emails you sent to them. And that is not acceptable, at all.

## Exhibit K.1 - Zoom Transcript

**Vishal**: we were looking to work out a solution. Until Friday afternoon, I was fighting for you Arj. I really thought we could still make this work. Not anymore. Because that is one thing we can not be OK with.

**Arj**: but I didn't .. I thought you were going to terminate me anyway. This is why I reached out. I didn't .. If you had. Look. I apologize for that. It was a act of .. desperation.

**Vishal**: Arj, not acceptable. Not acceptable. Every single apology you've given. I've had a discussion right, every single time. This is not acceptable. Point blank. This is the end of the call. All of your access will be terminated. All the team members will be informed about this. So you can choose to. We're leaving this up to you now, on whether you want to, you know work out a solution between us, or you want to get lawyers involved.

**Arj**:ok, what is your proposed what is your proposed settlement

**Vishal**: we will review and get back to you on that

**Mike**: that's not what this call is about. Yeah.

**Vishal**: that is not what we're here to talk about, we can review and get back to you. But at this moment we just wanted to make something absolutely clear. You're being completely terminated with no regard to anything else that has happened in the past, and it is only because you have reached out to a competitor, and you have offered to bring and poach two of the engineers from this company, which is a clear violation of the non solicitation. So umm. That's the extent of this call and uh we will be in touch

**Arj**:well I wasn't technically, well, I was on leave right? I wasn't actually in the company.

**Vishal**: Arj, it's not a discussion

**Arj**: I didn't I didn't reach out to him prior to being disconnected from checkmate, which I thought was anticipation of being fired

**Vishal**: Arj like I'm saying you can either get a lawyer to have these discussions. But the decision we are communicating to you is not up for discussion. Um. Mike, Amy anything you want to add please?

**Mike**: no.just if you want to, if you want to negotiate a settlement with us, then reach out directly. uh If you'd rather turn that over to uh a lawyer to represent you that's fine as well. We have one all ready to go. So let us know. ball's in your court.

**Arj**: umm .. well I mean I'm open to discussing it now or in a few minutes

**Mike**: no, that's not the point of this call. So, is that your formal. Are you electing to try to negotiate it directly without a lawyer, is that your option is, your choice?

**Arj**: well I mean it depends on like what what sort of negotiation, but I'll start with that

**Mike**: no no Arj.

**Vishal**: that's fair

**Exhibit K.1 - Zoom Transcript**

**Mike**: if that's the case, we'll let Amy Vishal and I discuss and we'll reach out to you for a meeting and a proposal and we'll see how far it goes. If that doesn't go anywhere we'll just turn it over to the professionals. That's fine. So you want to try to do this ourselves, is that your choice?

**Arj**: uh for now, yes

**Mike**: so alright ok. Ok. Good. We'll get back to you with what our thoughts are and communicate with you via email.

**Vishal**: sounds good, Amy mike can you just stay back for a second please?

[Plaintiff ("Arj") leaves the call]

**Mike**: for sure

**Vishal**: umm, i have the emails
mike: wow, well well handled. He has not got a leg to stand on, yeah, so

**Vishal**: I I was thinking about this last night. I'm like. If there's a 0.001% chance that he did not send that those emails, we would be completely screwed. He's on medical leave, in [this|his] condition, we fired him for something that's not true.

**Vishal**: so, um pulled some favors last night. Um. Today morning we have the emails. I'll forward it to both of you. It's not pretty.

**Mike**: mmhmm yeah

**Amy**: he tried to .. the leave part, you're still employed with the company on leave .. so he's wrong in that thought process.

**Mike**: he's grasping at straws yeah

**Vishal**: mike, umm, we have 20 minutes, do you want to call the voice ai team over. And Amy can be a part of that call too.

**Mike**: yeah yeah. Let me umm.

**Vishal**: it's too early, too short of a notice.

**Mike**: well I don't. that's a question I don't have. Jeff and Robert kind of know they are kind of already on standby. Chris and Mansour are already up. Umm. So let me reach out and find out if they are available and up for a call right now and I'll put it together real quick.

**Vishal**: ok I have a window. Something got cancelled At 12 eastern. So I think I can do a call

**Mike**: Amy can you do 12 eastern Amy

**Amy**: yes I can

## Exhibit K.1 - Zoom Transcript

**Mike**: I can definitely wake everyone up by then.

**Vishal**: ok

**mike**: ok so I'll just schedule that meeting with us three and all the voice people, and I'll just hit em all on text and slack and let them know there's a meeting at 9

**Amy**: you may talk to Robert and Jeffrey and I forgot the third person, separately as well. They obviously were communicating with him, when they should not have been.

**Vishal**: Chris

**Mike**: Yeah i'm, i'm. Pretty sure. The only person I haven't connected with is Pranav. Um. But everybody. So yeah. So I'm in a good place with pretty much everybody. Pranav is the only one. Pretty much everyone else I talk to is pretty much ready. They're like Pranav is so bought in he's committed to the company. Everyone's looking at Arj for who he is. So I think we're in a good place. We'll handle it at noon, eastern, and I'll go ahead and set that up right now.

**Vishal**: Amy you'll handle all the off boarding process?

**Amy**: We'll I'll have to send Mike the off boarding, since he's the manager. I'l send to him right now

**Vishal**: ok. You'll see in the email he reached out twice over two days, so it was not a momentary lapse momentary lapse in judgement

**Mike**: yeah yeah geez ok. Hahaha

**Amy**: thanks

**Vishal**: thanks

**Exhibit I - Fathom.video AI Summary**



**Exhibit I - Fathom.video AI Summary**

- Arjun's status as "on leave" doesn't exempt him from non-solicitation agreement

**Arjun's Response and Attempted Justification**

- Arjun claimed he thought he was going to be terminated anyway, prompting his actions
- Attempted to argue he wasn't technically with the company as he was on leave
- Expressed willingness to negotiate, mentioning he has a lawyer available

**Next Steps and Settlement Options**

- Company offered two paths: work out final settlement or involve lawyers
- Arjun tentatively agreed to try negotiating directly without lawyers
- Mike, Vishal, and Amy to discuss and present a proposal to Arjun

**Post-Call Discussion**

- Confirmed Arjun sent emails on two separate days, not a momentary lapse
- Team expressed confidence in loyalty of other team members, particularly Pernav
- Amy to handle offboarding process, sending documents to Mike

**Planned Follow-up Meeting**

- Scheduled for 12 PM Eastern with voice team members
- Mike to notify Robert, Jeffrey, and others via text and Slack
- Amy included to participate in the discussion

**Next Steps**

- Mike to set up meeting with voice team for 12 PM Eastern
- Amy to send offboarding documents to Mike
- Team to formulate settlement proposal for Arjun
- Monitor and secure company assets/access points following Arjun's termination
- Prepare communication strategy for informing relevant team members about the situation

---

## Action Items

☐ Forward Arjun's emails to competitor to Amy and Mike
Vishal Agarwal

☐ Initiate standard termination procedures for Arjun (access revocation, team notification, etc.)
Amy Brown

**Exhibit I - Fathom.video AI Summary**

4/5/25, 3:44 AM                                     Gmail - Recap of your meeting with ItsaCheckmate

☐ Draft settlement proposal for Arjun. Schedule follow-up meeting to
   discuss
   Mike Bell

☐ Schedule 12PM EST meeting w/ voice team. Notify Robert, Jeffrey,
   Chris, Mayur via text/Slack
   Mike Bell

☐ Prepare/send offboarding docs to Mike for Arjun's termination
   Amy Brown

**View Recording & Summary**

Fathom is the award-winning AI notetaker that takes brilliant meeting notes. Sign up for FREE at fathom.video

⭐⭐⭐⭐⭐          zoom

https://fathom.video/share/j-ZStSqCq9Z7mRriEnHs6R7dxy7Aqixp?tab=summary

**Exhibit K.3 - Termination Screenshots**





## Exhibit K.3 - Termination Screenshots



https://fathom.video/share/j-ZStSqCq9Z7mRriEnHs6R7dxy7Aqixp?tab=summary

**May 1-2nd, 2024 Slack Conversation**
- DM between Plaintiff and Defendant Agarwal and
- Group Conversation between VoiceBite founders, Defendants Bell and Agarwal

arj
 4:52 PM
hey
@vishal
 i understand your policy has been BYOD. but it will be very difficult to recruit engineers with this policy, it's pretty much a standard expectation in silicon valley that you get a top of the line laptop. i'm not going to fight it now, but perhaps lets change this after raising the round.

4:53
i'm already fretting over explaining this to pranav once we are able to onboard him as a full time

vishal
 6:59 PM
Hey Arj, we have recruited over 70 engineers over the last 7 years. It won't be a problem :slightly_smiling_face:
7:00
That is why we don't have to hire from Silicon valley. We can hire from literally anywhere in the world. And it's not a small consideration - it'll be a massive outlay for the company. Remember we have over 300 employees
7:01
If this is a deal breaker for some, what we can do is offer them a one time signing bonus of $1,500 or so but overall, this has not been a problem

arj
 7:37 PM
it's a massive outlay that most of our competitors are willing to make though. i don't think doordash thinks one second about this. they want the best and to provide the best tools for the job.

vishal
 7:38 PM
Not something we are considering right now Arj. We are different than others, we don't have to do what they do and we are still able to hire and retain the best. In the last 6 years, I have not had a problem with it. And like I said, if this is an absolute problem, we can add some initial signing bonus but not in all cases. Let's make sure to keep that as a last resort
7:39
*I'm willing to compete with others on this and I'm confident we will win. If someone does not want to join us for an initial expense of a few thousand dollars, I don't think they are the right fit anyway*

arj
 7:40 PM
**in california it's not even legal though, and it's a security risk. california employers must provide the work equipment for employees.**

vishal
 7:40 PM
*That's not true*

7:40
We have hired tons of people in California

arj
  7:40 PM
yes but this is the law

vishal
  7:41 PM
It's a very serious cost consideration Arj, it can't be taken lightly

arj
  7:47 PM
https://www.employmentlawfirms.com/resources/can-my-employer-require-me-buy-my-own-laptop-work.htm
there are dozens of articles like this. it is the law, whether or not it is costly.

www.employmentlawfirms.comwww.employmentlawfirms.com
Can my employer require me to buy my own laptop for work?
Find out if employers can require employees to provide and work on their own laptops. Learn the meaning of BYOD policies and if they are legal in the workplace.

vishal
  7:47 PM
Got it

arj
  1:39 AM
even beyond this law, the types of people I want to hire are going to immediately be turned off if they knew they would have to use their personal computer for work. they will believe in strict separation between their personal projects and data and work projects and data. i know because I myself feel this way. i'm not comfortable putting monitoring software on my personal computer (neither are sam and paul, while robert and chris have voicebite computers separate from personal, so they don't mind as much). nor would we be comfortable with employer security going through our personal computer and clearing it out if we separate. nor are we ok with the possibility that our personal computers could be subpoenaed if there is a lawsuit or investigation of checkmate. all of these are real, legitimate fears and reasons not to mix work and personal.
it's also cleaner for checkmate to know it fully owns the work computer, and there is no liability, security risk etc.
instead of thinking of this as the employees getting a computer courtesy of checkmate, it would be better to think of it as an investment in checkmate employees, making sure they have the best tools for the job possible. rather than saying "If someone does not want to join us for an initial expense of a few thousand dollars, I don't think they are the right fit anyway", think of the flip side "If you aren't willing to invest a few thousand dollars in someone's productivity, are they a good fit for checkmate?"

vishal
  7:56 AM
Arj - noted on all points. Let's keep in mind that we have been running this way for 6 years with no problems in hiring and retaining employees.  You are coming on too strong on this without a realization about the larger business and cost impact. There is no intent to start providing equipment from our side as of now.
7:57

I'd like to end this conversation here for now. If anything changes in the future, I'll reconsider.

arj
 8:11 AM
So you are ok with us not installing this monitoring software.
8:13
Yes but you also did not hire the types of people i think are right for voicebite. Many great people but i need creative hackers
8:13
The cost impact for voicebite team alone is not that high

vishal
 8:14 AM
Sorry, there are no exceptions. I can't just allow for the AI team not to follow the company process or have equipment just for AI team
8:14
If you think you can't develop a great product with the company policies we have now, you are really restricting your thinking and scope

arj
 8:14 AM
Well then you have to follow california law and get us equipment to install the software on

vishal
 8:15 AM
Arj - I seriously can't continue to have this same conversation. Let's take everyone's opinion on the call we have coming up

arj
 8:15 AM
Bc we arent doing it on our personal computers as i explained above

vishal
 8:15 AM
Alright then you can't work for the company
8:15
We haven't had a problem up until now, so we are good

arj
 8:15 AM
its the law

vishal
 8:16 AM
**Alright, we can't afford to give out equipment so we won't hire people who are stickler for the law**
8:16
Is that clear?

arj
 8:16 AM
Employers have to follow the law

vishal
  8:16 AM
It's about what we can afford to do, and comparing us to DoorDash is ridiculous
8:17
Arj - I'm ending this conversation now

arj
  8:23 AM
Right so we can not install the software and you can provision us computers after the fundraiser

vishal
  10:11 AM
Noted Arjun. At this point you are just being difficult and looking to create problems rather than solutions for a company you just joined. I'm moving this conversation to the common channel so that everyone is aware. And I promise you I won't bother having a difficult conversation with you at whatever point in our journey. That is not the kind of conversation you have with a company you just joined and the tone is absolutely ridiculous

arj
  11:55 AM
why would you make this a group conversation. we could have figured it out. this is not the kind of conversation you should have with a company you just acquired either. you said before you would be empowering us.

[in group thread with my voicebite co-founders, vishal and mike]

@channel I'm moving a 1:1 conversation I am having with Arjun here, and documenting it here for everyone. Arj's point is that we need to provision equipments and computers in order to hire good engineers. And that this is also a California law. We at this point cannot do that because we have over 300 employees and that cash outlay is huge. The tone from
@arj
 is absolutely in the spirit of creating a problem and creating a confrontation, rather than having a mutual conversation and trying to find a solution with a company he just joined. I wanted to make sure everyone is aware and ask if everyone shares Arj's belief. If that continues to be the case, I won't mind having a difficult conversation with the individual at whatever stage of the company to make sure we build a cohesive company for long term benefits.
10:15
If there are any exceptions to be made with regards to installing company software, then it has to be run through Security. They are responsible for SOC2 compliance which is required to win large corporate accounts. If the individual can't comply, then they can't work with us. There is no grey area here.
10:16
Through multiple conversations, I have maintained that we cannot just decide on issuing equipments to a select group. It has to be for the entire company, and is a huge cash outlay which Arj is refusing to acknowledge and understand

arj
  10:16 AM
Yes, so buy us laptops to install the security software on

vishal
  10:17 AM
image.png

image.png

arj
  10:17 AM
Bc its an invasion of privacy
10:17
Otherwise

vishal
  10:17 AM
This is the last discussion, which is telling us what to do instead of having a constructive conversation
10:18
This is not going to be a discussion on this channel. If need be, we'll take a collective call and make a final decision. Rest of the team to chime in please

arj
  10:18 AM
Bc companies have to follow the law there are no exceptions to that either in california, just like you are saying there are no exceptions to the policy
10:19
You can double check the law, at the minimum employer has to reimburse purchase of equipment needed to do the job

Robert Nessler
  10:22 AM
I do not need a new computer and am fine without it. I did find it strange that there was no option to have a CM issued laptop that you return whenever you leave the company, but that isn't a  big deal to me.
Arjun does need more compute power and resources at his disposal but I would agree his way of going about it is not effective or tactful.  I'm not sure what the best solution moving forward is, I think we should meet with Luke and see what resources we have and then go from there.

arj
  10:23 AM
Yes but
@Robert Nessler
 has a voicebite work computer i didnt buy one
10:24
He has a separate personal computer

Chris L
  10:42 AM
I think this has blown up a little bit more than it should, but I can understand both viewpoints. Frankly speaking, I would not feel comfortable using my personal machine for work either (I like to make sure there's a separation), let alone install additional software on it. I'm not an expert on security/compliance implications, but having the physical separation is probably good for everyone. Luckily, I have a laptop from VoiceBite so I can maintain that separation.
On the other hand, I also understand the large commitment for Checkmate this represents. It wouldn't be fair to make exceptions just for the VoiceBite team as it wouldn't be fair to the rest of the employees. We also don't want to start off having the rest of the company look at us and wonder why we got special treatment with laptops, while everyone else gets neglected.

Feelings should be left aside, and we should consider the facts at hand. Does Arj need more compute power - probably, and future ML engineers we bring on may too. Is this a legal issue - in California, it might very well be. Can we afford to procure laptops for everyone - no. Do we want to start making exceptions at this point - probably not. Are there alternative solutions - possibly, and we should focus on brainstorming these.

arj
  10:45 AM
its not about being fair. there's a legitimate business use case for ML engineers to have high end work comptuers

Chris L
  10:45 AM
Arj, just to double check, are you asking for a machine for your own personal use or just for work use?

arj
  10:45 AM
work use only, it's to separate work from personal
10:45
obviously. i need to have my own personal computer for personal reasons.
10:48
and also, i'm ok waiting until fundraising finishes, but in the meanwhile not OK installing monitoring software on my personal computer.

Chris L
  10:56 AM
An idea… rather than calling it an exception for Arjun, can we position this as a business need and have Luke/IT review needs on a case-by-case basis? I'm sure cases like this have come up before and this probably won't be the last. Specialized roles may require specialized tools. For example, designers may need to procure an Adobe Photoshop or Illustrator license. Or a hardware engineer may need a soldering iron and other prototyping equipment to build a new product.
:white_check_mark:
1

vishal
  11:03 AM
Hi
@Chris L

@Robert Nessler
 thank you for engaging in a more civil and professional conversation, that is what I was hoping for. Arj's tone on Day 2 is absolutely the last thing I was expecting, giving me an ultimatum.
I agree, we have a situation and my main problem is the tone and confrontational nature instead of saying we are a team, let's solve this together. I have been going back and forth with Arj since last evening to try and answer his questions but there is nothing that I am saying is helping answer his question. And ultimately we are being given an ultimatum, which is not where we want to be.
When we joined the company, we knew this is a bring your own device company.
We are also talking about two different things. One is compute power for which we can absolutely provide a computer. But if we are simply asking for a company provided laptop on which you can do your basic job, that is not what we will be providing. *For the 7th time, I'm*

*repeating this - it is not funding dependent. Funding will not change this, but Arj keeps coming back to the same point.*
11:04
**I can also promise if this is how it is going to be going ahead, I'd rather cut my losses right now. No employee is indispensable and I can put that in a formal notice. This is not a problem solving approach**

arj
  11:06 AM
we understood bring your own device as relating to mobile phones
11:06
we have never heard of a tech company that does not provide work computers

vishal
  11:08 AM
*The situation is quite clear Arj - you don't want to use your personal computer for work reasons. We don't provide work computers. The only solution is for you to quit. Do you know of any other alternative?*

arj
  11:08 AM
yes you buy me a work computer so we can win voice ordering
11:09
that is the smart solution

vishal
  11:09 AM
Ok. And I'm saying No.
11:09
Anything else?

arj
  11:09 AM
then i'm saying no to installing monitoring software. i am not a quitter though.

vishal
  11:10 AM
**Sure, then we will consult with security and if there is no other alternative, then I am happy to fire you**
11:10
**We will resolve this one way or the other**
11:10
**And I promise you we will win Voice ordering one way or another. That is not dependent on you**

arj
  11:10 AM
I will win voice ordering one way or another
11:11
not dependent on checkmate

Robert Nessler

11:11 AM
Maybe let's calm down a bit, go for a walk and revisit this in a few hours.

vishal
**11:11 AM**
**Super. Next steps:**
**Going to reach out to Security to see what the policy is. If there are no other alternatives,**
**then we go through HR and let you go**

Chris L
11:12 AM
Perhaps I am speaking out of line here - but I think we should all take a breather and a step
back. We've overcome much bigger issues in the past (I'm glad all the negotiation is done)
while on other sides of the table. Now we're on the other side of the table and there's
absolutely no reason we can't figure something out together
:white_check_mark:
1

vishal
11:12 AM
Robert - I've been going back and forth in a loop since last night. I promise I'm calm, I just
don't see an answer
11:12
I'll leave it up to you guys to suggest options, I'm at the end of my rope here

Chris L
11:12 AM
Yah, just talk to Luke. We haven't even gone down that path yet.

vishal
11:12 AM
Chris - you are an equal partner, nothing is out of line.

Chris L
11:12 AM
*Luke / security

vishal
11:13 AM
Sure. Not installing the software is not an option, so I'll wait for Security to let me know
11:13
Again - to be clear, we will provide compute power whether through cloud or a separate
machine
11:13
What we will not be providing is a work laptop

arj
**11:13 AM**
**so you will terminate me for pointing out a violation of the law?**
**11:13**
**i think there are laws against that**

Chris L

11:13 AM
Well there's our solution. Talk to Luke, make a case, and see if we can get you a separate machine with more power.
:white_check_mark:
1

vishal
  11:13 AM
Cause that has bigger implications
11:14
@arj
**sure, if that's the route you want to go I'd rather deal with that headache than the conversation we are having here**

Chris L
  11:23 AM
I've went ahead and sent a DM with Luke/Arj. Let's try exploring this path first

vishal
  **12:32 PM**
**Noted Chris. I'm very clear on the rationale here and the final approval will have to go through me. Reposting this here**
**12:32**
**Again - to be clear, we will provide compute power whether through cloud or a separate machine**
**What we will not be providing is a work laptop**





Sorry, there are no exceptions. I can't just allow for the [Thursday, May 2nd] he company process or have equipment just for AI team

't develop a great product with the company policies we have now, you are really

**arj** 8:14 AM
Well then you have to follow california law and get us equipment to install the software on

**vishal** 8:15 AM
Arj - I seriously can't continue to have this same conversation. Let's take everyone's opinion on the call we have coming up

**arj** 8:15 AM
Bc we arent doing it on our personal computers as i explained above

**vishal** 8:15 AM
Alright then you can't work for the company

We haven't had a problem up until now, so we are good

**arj** 8:15 AM
its the law

**vishal** 8:16 AM
Alright, we can't afford to give out equipment so we won't hire people who are stickler for the law

Is that clear?

**arj** 8:16 AM
Employers have to follow the law

**vishal** 8:16 AM
It's about what we can afford to do, and comparing us to DoorDash is ridiculous

Arj - I'm ending this conversation now

**arj** 8:23 AM



**◼ voicemate** ˅

that is the smart solution                [Today ˅]

**vishal** 11:09 AM
Ok. And I'm saying No.

Anything else?

**arjun** 11:09 AM
then i'm saying no to installing monitoring software. i am not a quitter though.

**vishal** 11:10 AM
Sure, then we will consult with security and if there is no other alternative, then I am happy to fire you

We will resolve this one way or the other

And I promise you we will win Voice ordering one way or another. That is not dependent on you

**arjun** 11:10 AM
I will win voice ordering one way or another

not dependent on checkmate

**Robert Nessler** 11:11 AM
Maybe let's calm down a bit, go for a walk and revisit this in a few hours.

**vishal** 11:11 AM
Super. Next steps:

1. Going to reach out to Security to see what the policy is. If there are no other alternatives, then we

**Chris Lam** 11:12 AM
Perhaps I am speaking out of line here - but I think we should all take a breather and a step back. We've overcome much bigger issues in the past (I'm glad all the negotiation is done) while on other sides of the table. Now we're on the other side of the table and there's absolutely no reason we can't figure something out together

✅ 1



+ Add a bookmark

**Chris Lam** 11:12 AM
Yah, just talk to Luke. We haven't even gone down that path yet.

Today ⌄

**vishal** 11:12 AM
Chris - you are an equal partner, nothing is out of line.

**Chris Lam** 11:12 AM
*Luke / security

**vishal** 11:13 AM
Sure. Not installing the software is not an option, so I'll wait for Security to let me know

Again - to be clear, we will provide compute power whether through cloud or a separate machine

What we will not be providing is a work laptop

**arjun** 11:13 AM
so you will terminate me for pointing out a violation of the law?

11:13   i think there are laws against that

**Chris Lam** 11:13 AM
Well there's our solution. Talk to Luke, make a case, and see if we can get you a separate machine with more power.

✅ 1    😊

**vishal** 11:13 AM
Cause that has bigger implications

@arjun sure, if that's the route you want to go I'd rather deal with that headache than the conversation we are having here

**Chris Lam** 11:23 AM
I've went ahead and sent a DM with Luke/Arj. Let's try exploring this path first

 **Gmail**

Arjun Vasan <arjun.vasan@gmail.com>

## urgent: help needed with checkmate situation

**Alan Foster** <afoster@fosterlawgroup.us>
To: Arjun Vasan <arjun.vasan@gmail.com>

Fri, Dec 13, 2024 at 10:39 AM

Hi Arj,

It would pose a conflict of interest for me to involve myself in this matter, and the subject matter (employment litigation) is outside my personal areas of expertise.

It would be prudent for you to consult with employment litigation attorneys who specialize in representing employees.

The employment litigation space is separate from the corporate and business transactional world I work in, so I do not have a pertinent referral. I suggest you touch base with service providers you trust to see if they can recommend a law firm that represents employees in employment litigation. You could also check with your local county bar association and see if they can suggest some employment litigation candidates for you to meet with.

Good luck.

Regards,

Alan

**Alan Foster**

**Attorney at Law**

**Foster Law Group**

**5201 Great America Parkway, Suite 320**

**Santa Clara, California 95054**

**408.785.8510**

**afoster@fosterlawgroup.us**

**www.fosterlawgroup.us**

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not

the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Thursday, December 12, 2024 7:42 PM
**To:** Alan Foster <afoster@fosterlawgroup.us>
**Subject:** urgent: help needed with checkmate situation

  You don't often get email from arjun.vasan@gmail.com. Learn why this is important

[Quoted text hidden]

4/9/25, 9:14 AM    Gmail - Fwd: You're going to Long Beach on 09/30 (35EXP2)!

Case 2:25-cv-00765-MEMF-JPR    Document 27    Filed 04/09/25    Page 88 of 102    Page ID #:554



Arjun Vasan <arjun.vasan@gmail.com>

---

## Fwd: You're going to Long Beach on 09/30 (35EXP2)!
1 message

**Latha Vasan** <lathavasan1@gmail.com>                          Fri, Sep 27, 2024 at 2:42 PM
To: Arjun Vasan <arjunvasan@gmail.com>

---------- Forwarded message ---------
From: **Southwest Airlines** <southwestairlines@ifly.southwest.com>
Date: Fri, Sep 27, 2024 at 4:34 PM
Subject: You're going to Long Beach on 09/30 (35EXP2)!
To: <lathavasan1@gmail.com>

Here's your itinerary & receipt. See ya soon!
View in web browser | View our mobile site



**Manage Flight | Flight Status | My Account**

 **Travel notice**

**REAL ID Requirement:** Do you have a REAL ID? Beginning May 7, 2025, you will need a state-issued REAL ID compliant license or identification card, or another acceptable form of ID (such as a U.S. Passport), to fly within the United States. Visit www.tsa.gov for a list of acceptable forms of ID and additional information regarding REAL ID requirement.



## Hi Arjun,

We're looking forward to flying together! It can't come soon enough. Below you'll find your itinerary, important travel information, and trip receipt. See you onboard soon!

**SEPTEMBER 30**

# MAF  LGB

Midland/Odessa to Long Beach

---

Confirmation # **35EXP2**                    Confirmation date: 09/27/2024

| PASSENGER | **Arjun Vasan** |
|---|---|
| RAPID REWARDS # | Join or Log in |
| TICKET # | 5262564850739 |
| EST. POINTS EARNED | 1,364 |

---

4/9/25, 9:14 AM    Gmail - Fwd: Ongoing tort litigation 04/09/2025 35EXP2

Rapid Rewards® points are only estimations. Cash + Points bookings will not earn Rapid Rewards points, tier qualifying points for A-List or A-List preferred status or Companion Pass qualifying points.

## Your itinerary

**Flight:** Monday, 09/30/2024    Est. Travel Time: **5h 55m**    Wanna Get Away®

FLIGHT
# 2494

**DEPARTS**
**MAF 06:00**AM
Midland/Odessa

**ARRIVES**
**HOU 07:25**AM
Houston (Hobby)

Stop: Change planes

FLIGHT
# 2233

**DEPARTS**
**HOU 08:25**AM
Houston (Hobby)

**ARRIVES**
**LGB 09:55**AM
Long Beach

## Payment information

| Total cost | | | Payment | |
|---|---|---|---|---|
| **Air - 35EXP2** | | | September 27, 2024 | |
| Base Fare | $ | 227.33 | **Payment Amount** | **$268.98** |
| U.S. Transportation Tax | $ | 17.05 | Visa ending in 8575 | |
| U.S. 9/11 Security Fee | $ | 5.60 | | |
| U.S. Flight Segment Tax | $ | 10.00 | | |
| U.S. Passenger Facility Chg | $ | 9.00 | | |
| **Total** | **$** | **268.98** | | |

**Fare rules:** If you decide to make a change to your current itinerary it may result in a fare increase.

Your ticket number : 5262564850739

## All your perks, all in one place. (Plus a few reminders.)



**Wanna Get Away® fare:** Your two bags fly free®, no change or cancel fees, 6X Rapid Rewards® points, and free same-day standby (taxes and fees may apply but refunds will be provided). Learn more



Make sure you know when to arrive at your airport. Times vary by city.



If your plans change, cancel your reservation at least 10 minutes before the original scheduled departure time of your flight to receive a flight credit. If you don't cancel your reservation in time, your funds will be forfeited.

## Prepare for takeoff

**Exhibit P - Medical Note and Certification**

CHRISTIAN SMALL, MD

760-454-9570
csmall@headlandsat
s.com

215 South Hickory
St.
Suite 114
Escondido, CA
92025

To whom it may concern,

This letter is to confirm that Arjun Vasan has been under my care since 10/23/24 and may return to work without limitations on 12/6/24. If you have any questions or concerns, please feel free to reach out to me.

Christian R. Small, MD

Date  11/05/2024

**Exhibit P - Medical Note and Certification**

Certification of Health Care Provider for
Employee's Serious Health Condition
under the Family and Medical Leave Act

U.S. Department of Labor
Wage and Hour Division

≡**WHD**

WAGE AND HOUR DIVISION

DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR.
RETURN TO THE PATIENT.

OMB Control Number: 1235-0003
Expires: 6/30/2026

The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. 29 U.S.C. §§ 2613, 2614(c)(3); 29 C.F.R. § 825.305. The employer must give the employee at least 15 calendar days to provide the certification. If the employee fails to provide complete and sufficient medical certification, his or her FMLA leave request may be denied. 29 C.F.R. § 825.313. Information about the FMLA may be found on the WHD website at www.dol.gov/agencies/whd/fmla.

**SECTION I - EMPLOYER**

Either the employee or the employer may complete Section I. While use of this form is optional, this form asks the health care provider for the information necessary for a complete and sufficient medical certification, which is set out at 29 C.F.R. § 825.306. **You may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.** Additionally, you **may not** request a certification for FMLA leave to bond with a healthy newborn child or a child placed for adoption or foster care.

Employers must generally maintain records and documents relating to medical information, medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

(1) Employee name:   Arjun _____   _____   Vasan _____
                          First              Middle                Last

(2) Employer name: Checkmate _____   Date: 10/23/2024 _____ (mm/dd/yyyy)
                                                    (List date certification requested)

(3) The medical certification must be returned by   11/07/2024 _____ (mm/dd/yyyy)
       (Must allow at least 15 calendar days from the date requested, unless it is not feasible despite the employee's diligent, good faith efforts.)

(4) Employee's job title: _Vice President AI_____   Job description ☐ is / ☐ is not attached.

    Employee's regular work schedule: _Salary employee_____

    Statement of the employee's essential job functions: _____

_____

(The essential functions of the employee's position are determined with reference to the position the employee held at the time the employee notified the employer of the need for leave or the leave started, whichever is earlier.)

**SECTION II - HEALTH CARE PROVIDER**

Please provide your contact information, complete all relevant parts of this Section, and sign the form. Your patient has requested leave under the FMLA. The FMLA allows an employer to require that the employee submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to the serious health condition of the employee. For FMLA purposes, a "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves **inpatient care or continuing treatment by a health care provider.** For more information about the definitions of a serious health condition under the FMLA, see the chart on page 4.

You also may, but are **not required** to, provide other appropriate medical facts including symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment. Please note that some state or local laws may not allow disclosure of private medical information about the patient's serious health condition, such as providing the diagnosis and/or course of treatment.

Page 1 of 4

Form WH-380-E, Revised June 2020

**Exhibit P - Medical Note and Certification**

Employee Name: _Arjun Vasan_

Health Care Provider's name: (Print) _Dr. Christian Smalls, MD_

Health Care Provider's business address: _215 S. Hickory St. Ste 114 Escondido, Ca. 92025_

Type of practice / Medical specialty: _Psychiatrist_

Telephone: _760-454-7844_    Fax: _____    E-mail: _CSmall @ headlandsats.com_

**PART A: Medical Information**

Limit your response to the medical condition(s) for which the employee is seeking FMLA leave. Your answers should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. **After completing Part A, complete Part B to provide information about the amount of leave needed.** Note: For FMLA purposes, "incapacity" means the inability to work, attend school, or perform regular daily activities due to the condition, treatment of the condition, or recovery from the condition. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b).

(1) State the approximate date the condition started or will start: _10/23/2024_ _____ (mm/dd/yyyy)

(2) Provide your **best estimate** of how long the condition lasted or will last: _12/6/2024_

(3) Check the box(es) for the questions below, as applicable. For all box(es) checked, the amount of leave needed must be provided in Part B.

☒ **Inpatient Care**: The patient (☒ has been / ☐ is expected to be) admitted for an overnight stay in a hospital, hospice, or residential medical care facility on the following date(s): _10/23/24 - 12/6/24_

☐ **Incapacity plus Treatment**: (e.g. outpatient surgery, strep throat)     residential medical care facility

  Due to the condition, the patient (☐ has been / ☐ is expected to be) incapacitated for **more than** three consecutive, full calendar days from: _____ (mm/dd/yyyy) to _____ (mm/dd/yyyy).

  The patient (☐ was / ☐ will be) seen on the following date(s): _____

  The condition (☐ has / ☐ has not) also resulted in a course of continuing treatment under the supervision of a health care provider (e.g. prescription medication (other than over-the-counter) or therapy requiring special equipment).

☐ **Pregnancy**: The condition is pregnancy.    List the expected delivery date: _____ (mm/dd/yyyy).

☐ **Chronic Conditions**: (e.g. asthma, migraine headaches) Due to the condition, it is medically necessary for the patient to have treatment visits at least twice per year.

☐ **Permanent or Long Term Conditions**: (e.g. Alzheimer's, terminal stages of cancer) Due to the condition, incapacity is permanent or long term and requires the continuing supervision of a health care provider (even if active treatment is not being provided).

☐ **Conditions requiring Multiple Treatments**: (e.g. chemotherapy treatments, restorative surgery) Due to the condition, it is medically necessary for the patient to receive multiple treatments.

☐ **None of the above**: If none of the above condition(s) were checked, (i.e., inpatient care, pregnancy) no additional information is needed. Go to page 4 to sign and date the form.

Page 2 of 4                                                    Form WH-380-E, Revised June 2020

**Exhibit P - Medical Note and Certification**

Employee Name: _Arjun Vasan_

(4) If needed, briefly describe other appropriate medical facts related to the condition(s) for which the employee seeks FMLA leave. (e.g., use of nebulizer, dialysis)

_____

_____

**PART B: Amount of Leave Needed**

For the medical condition(s) checked in Part A, complete all that apply. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage.

(5) Due to the condition, the patient ( ☐ had / ☒ will have) **planned medical treatment(s)** (scheduled medical visits) (e.g. psychotherapy, prenatal appointments) on the following date(s): _10/23/24 - 12/6/24_

(6) Due to the condition, the patient ( ☐ was / ☐ will be) **referred to other health care provider(s)** for evaluation or treatment(s).

State the nature of such treatments: (e.g. cardiologist, physical therapy) _____

Provide your **best estimate** of the beginning date _____ (mm/dd/yyyy) and end date _____ (mm/dd/yyyy) for the treatment(s).

Provide your **best estimate** of the duration of the treatment(s), including any period(s) of recovery (e.g. 3 days/week)

_____

(7) Due to the condition, it is medically necessary for the employee to work a **reduced schedule**.

Provide your **best estimate** of the reduced schedule the employee is able to work. From _____ (mm/dd/yyyy) to _____ (mm/dd/yyyy) the employee is able to work: (e.g., 5 hours/day, up to 25 hours a week)

(8) Due to the condition, the patient ( ☐ was / ☐ will be) **incapacitated for a continuous period of time**, including any time for treatment(s) and/or recovery.

Provide your **best estimate** of the beginning date _____ (mm/dd/yyyy) and end date _____ (mm/dd/yyyy) for the period of incapacity.

(9) Due to the condition, it ( ☐ was / ☐ is / ☐ will be) medically necessary for the employee to be absent from work on an intermittent basis (periodically), including for any episodes of incapacity i.e., episodic flare-ups. Provide your **best estimate** of how often (frequency) and how long (duration) the episodes of incapacity will likely last.

Over the next 6 months, episodes of incapacity are estimated to occur _____ times per ( ☐ day ☐ week ☐ month) and are likely to last approximately _____ ( ☐ hours ☐ days) per episode.

Page 3 of 4

Form WH-380-E, Revised June 2020

**Exhibit P - Medical Note and Certification**

Employee Name: _Arjun Vasan_

**PART C: Essential Job Functions**

If provided, the information in Section I question #4 may be used to answer this question. If the employer fails to provide a statement of the employee's essential functions or a job description, answer these questions based upon the employee's own description of the essential job functions. An employee who must be absent from work to receive medical treatment(s), such as scheduled medical visits, for a serious health condition is considered to be **not able** to perform the essential job functions of the position during the absence for treatment(s).

(10) Due to the condition, the employee ( ☐ was not able / ☒ is not able / ☐ will not be able) to perform **one or more** of the essential job function(s). Identify at least one essential job function the employee is not able to perform:

Signature of Health Care Provider _____    Date: _11/05/2024_ _(mm/dd/yyyy)_

| Definitions of a Serious Health Condition (See 29 C.F.R. §§ 825.113-.115) |
| --- |
| **Inpatient Care** |
| • An overnight stay in a hospital, hospice, or residential medical care facility.<br>• Inpatient care includes any period of incapacity or any subsequent treatment in connection with the overnight stay. |
| **Continuing Treatment by a Health Care Provider (any one or more of the following)** |
| **Incapacity Plus Treatment**: A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves either:<br>    o Two or more in-person visits to a health care provider for treatment within 30 days of the first day of incapacity unless extenuating circumstances exist. The first visit must be within seven days of the first day of incapacity; or,<br>    o At least one in-person visit to a health care provider for treatment within seven days of the first day of incapacity, which results in a regimen of continuing treatment under the supervision of the health care provider. For example, the health provider might prescribe a course of prescription medication or therapy requiring special equipment. |
| **Pregnancy**: Any period of incapacity due to pregnancy or for prenatal care. |
| **Chronic Conditions**: Any period of incapacity due to or treatment for a chronic serious health condition, such as diabetes, asthma, migraine headaches. A chronic serious health condition is one which requires visits to a health care provider (or nurse supervised by the provider) at least twice a year and recurs over an extended period of time. A chronic condition may cause episodic rather than a continuing period of incapacity. |
| **Permanent or Long-term Conditions**: A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective, but which requires the continuing supervision of a health care provider, such as Alzheimer's disease or the terminal stages of cancer. |
| **Conditions Requiring Multiple Treatments**: Restorative surgery after an accident or other injury; or, a condition that would likely result in a period of incapacity of more than three consecutive, full calendar days if the patient did not receive the treatment. |

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 15 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

**DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR. RETURN TO THE PATIENT.**

Page 4 of 4                                                    Form WH-380-E, Revised June 2020

 Gmail

Arjun Vasan <arjun.vasan@gmail.com>

## Response
8 messages

**Keech, Ryan Q.** <Ryan.Keech@klgates.com>                                    Fri, Dec 20, 2024 at 9:26 AM
To: Arjun Vasan <arjun.vasan@gmail.com>

Dear Mr. Vasan,


I understand from your attached emails that you have chosen to represent yourself.  I suspect this is in part due to the fact that, as I now understand it, Pietari has a representation of VoiceBite that precludes his consultation with and representation of you.  We fully agree that Pietari's apparent decision to refrain from such communication with and consultation with you is the most prudent course of action.  As Pietari is no doubt aware and has surely told you, any of your communications with him or in his presence regarding this matter are subject to disclosure to the company.  The company will, of course, be following up with Pietari separately to obtain and review any such communications.


As you know, I am an attorney who represents the interests of the company and not your personal interests.  Despite your announced decision to represent yourself, it is advisable for you to immediately retain independent counsel and have that counsel contact me to address these issues.  Assuming you do not do so and your decision is to continue to represent yourself, I will note that I have read your emails and have to say that I'm surprised.  In many ways, your emails directly contradict the company's records regarding your conduct and, to that extent, do not provide any reason for the company to revisit its position.  Of course, other facts may change this analysis: we do have some clarifying questions that I would appreciate you answering.  I can say that if you are able to answer some of the significant questions raised by the emails and records so as to clarify our understanding, it may be that the company will choose to revisit some or all of its position.


For that reason and order to move this matter along expeditiously, I suggest that it would be productive to schedule a call next week with you to address some of these questions, which would be via the videoconference platform of your choice and would be recorded.  Given my own schedule, I would be able to do such a call on either Monday, December 23 or Friday, December 27.  Please let me know what windows work for you and we'll go from there.


Thank you and best regards,


Ryan


This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Ryan.Keech@klgates.com.-5


---------- Forwarded message ----------
From: Arjun Vasan <arjun.vasan@gmail.com>
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Cc: Vishal Agarwal <vishal@itsacheckmate.com>, "rnessler@itsacheckmate.com" <rnessler@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>
Bcc:
Date: Fri, 20 Dec 2024 13:24:46 +0000
Subject: Formal Response to Notice of Direct Claim
Dear Mr. Keech,

See attached my formal response to the Notice of Claim dated December 7th, 2024. This response addresses the allegations comprehensively, highlighting substantive and procedural deficiencies in your client's assertions, including the improper targeting of me, *individually,* and the failure to adhere to the indemnification procedures outlined in the Merger Agreement.

I have included the Holder Representative, Robert Nessler, as a recipient, as required by the Merger Agreement for indemnification matters involving Pre-Closing Holders. I have also included your clients as recipients, as you have not acknowledged my earlier reply.

I am concerned, however, by credible information suggesting that the Holder Representative may be under pressure or threat of termination if they communicate with me or fulfill their contractual duties under the Merger Agreement. Such actions would severely compromise the integrity of the indemnification process and constitute a clear breach of the agreement. I urge your client to confirm that the Holder Representative is free to act independently and without obstruction in fulfilling their role.

Your client's actions to date, including the withholding of earned compensation, are in willful violation of contractual obligations and labor laws. I expect immediate payment of all amounts owed to me under the employment and bonus agreements, as well as adherence to the procedural requirements and pro rata liability provisions set forth in the Merger Agreement.

I await prompt confirmation of compliance with these obligations, and reserve all legal rights inherent in my position to protect my contractual and statutory entitlements, including but not limited to pursuing any necessary remedies to enforce those rights. Please be advised that I will seek interest and maximum damages for what is overdue, due to Checkmate's blatant and ongoing misrepresentation of my termination as a resignation. So, again, I strongly advise that your clients remit payment for all overdue amounts pursuant to my employment offer letter and bonus agreement.

Additionally, I formally demand the following documents:

1. Any and all agreements executed in conjunction with the merger.
2. Any additional documents I signed while an employee.
3. In particular the 'partial bonus acceleration' document I signed on or about October 19th.
4. Written evidence that the structure of Checkmate's widely announced Series B fundraising was in two tranches of $5m, as described by your clients, and therefore did not yet trigger Checkmate's obligation to pay the entire amount up front.
5. An explanation of why Checkmate's claim was not routed through the Holder Representative as per the indemnification process defined in the merger agreement (section 8).

Sincerely,
Arjun Vasan


---------- Forwarded message ----------
From: Arjun Vasan <arjun.vasan@gmail.com>
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>
Cc:
Bcc:
Date: Mon, 16 Dec 2024 00:12:22 +0000
Subject: Re: VoiceBite / Arjun Vasan - Final Notice Before Legal Action
Ryan,

I would like to formally request my personnel file, as well as any documents I signed in relation to my employment at Checkmate, as well as the fully executed set of documents signed in conjunction with the merger. Please request these from your clients and provide them in a timely manner.

Additionally, I must point out that your reference to November 8th as the date of my supposed "resignation", in this context, is a material misstatement of fact that calls into question the credibility of your clients' narrative. Given the context, it strongly suggests an attempt to mislead for financial gain, i.e. commit fraud.

I look forward to your prompt provision of the requested documents and your acknowledgment of these material inaccuracies.

Best regards,
Arjun

On Sat, Dec 14, 2024 at 2:03 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
Ryan,

Due to the difficulty of finding available counsel around the holidays, I will represent myself until further notice, so please direct any correspondence regarding this matter to this email. I have reviewed the letter you sent to Pietari, and I must say I was quite perplexed.

As I thought you must be aware, on **November 14th, 2024**, during an **8 AM Zoom meeting** with the company's CEO, Chief of Strategy, and Head of HR, I was falsely accused of soliciting Checkmate employees to leave for a competitor and **terminated** "effective immediately." Your clients' naked reframing of my departure as a resignation is a transparent effort to avoid their contractual obligations regarding my post-termination compensation and to evade liability for what is clearly a wrongful termination—which occurred while I was on protected medical leave and in an in-patient medical facility.

For clarity, I have attached the relevant email thread below. My "good reason" email was sent **nearly two hours** after the termination meeting. The timeline is indisputable, and any attempts to rebrand my termination as a resignation are both factually incorrect and inconsistent with the company's actions.

Further, it appears that after finding there was no evidence of solicitation, your clients shifted to other accusations in an attempt to avoid their obligations. Regarding the allegations of intellectual property misuse:

    1. I had full rights to use any code brought into Checkmate under the terms of the merger.
    2. "*cyborg*" is a common English word, and its inclusion in a domain name or user account does not infringe on any legal or proprietary rights.
    3. You have provided no evidence of claims by any third party to substantiate these accusations or damages.

The **Bonus Agreement** between myself and Checkmate specifies the limits of what can be held in escrow to account for potential claims:

    - $50,000 in cash for 12 months, and
    - Common stock granted pursuant to the merger for 18 months.

The company is not entitled to withhold any additional amounts beyond these limits, as the right of setoff was explicitly contested and removed during negotiations.

Your reference to **Section 3.3** of the **Checkmate/VoiceBite Merger Agreement** also misinterprets the clause. In case you missed it, in that document's definitions, "Code" refers to the **Internal Revenue Code of 1986**, not a general authority to withhold compensation. This clause is clearly intended to cover government-mandated withholdings and does not authorize unilateral action by the company.

**Demands**
I demand that your clients, by close of business on Friday, December 20th, 2024:

    1. Amend all records to accurately reflect my termination on November 14th, 2024, during the 8 AM Zoom meeting.
    2. Remit payment for all overdue amounts as outlined in my offer letter.
    3. Pay the Initial Bonus Amount, as per the Bonus Agreement, or provide evidence contradicting Checkmate's public announcements of raising a $10M Series B round.

**To Emphasize**

The Company faces significant liability due to its actions regarding my employment:

> 1. Your clients terminated me while I was on ***protected medical leave***, fully aware of my limited access to phone/internet during my ***in-patient care***.
> 2. Your clients falsely accused me, during said meeting, of solicitation of Checkmate employees without investigating, later learning there was no solicitation.
> 3. Your clients are now misrepresenting my termination as a resignation, in **a clear effort to avoid severance obligations.**
> 4. Your clients previously threatened termination over legitimate concerns I raised, including overdue backpay, compliance with California labor laws, and advocating for teammates.
> 5. The company's quarterly leadership slides and public statements reflect the successes of the Voice AI product and team under my leadership.
> 6. All of the above is backed by real, demonstrable, material evidence.

I urge the company to meet its contractual obligations and fulfill the three demands made, by the given date. This will allow us to resolve the immediate matter amicably and discuss reasonable, and additional, terms for a mutual release, should the company desire it. Otherwise, I will engage litigation counsel in the new year.

Best regards,
Arjun

---------- Forwarded message ----------
From: Arjun Vasan <arjun.vasan@gmail.com>
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>
Cc:
Bcc:
Date: Sat, 14 Dec 2024 10:03:09 +0000
Subject: VoiceBite / Arjun Vasan - Final Notice Before Legal Action
Ryan,

Due to the difficulty of finding available counsel around the holidays, I will represent myself until further notice, so please direct any correspondence regarding this matter to this email. I have reviewed the letter you sent to Pietari, and I must say I was quite perplexed.

As I thought you must be aware, on **November 14th, 2024**, during an **8 AM Zoom meeting** with the company's CEO, Chief of Strategy, and Head of HR, I was falsely accused of soliciting Checkmate employees to leave for a competitor and **terminated** "effective immediately." Your clients' naked reframing of my departure as a resignation is a transparent effort to avoid their contractual obligations regarding my post-termination compensation and to evade liability for what is clearly a wrongful termination—which occurred while I was on protected medical leave and in an in-patient medical facility.

For clarity, I have attached the relevant email thread below. My "good reason" email was sent ***nearly two hours*** after the termination meeting. The timeline is indisputable, and any attempts to rebrand my termination as a resignation are both factually incorrect and inconsistent with the company's actions.

Further, it appears that after finding there was no evidence of solicitation, your clients shifted to other accusations in an attempt to avoid their obligations. Regarding the allegations of intellectual property misuse:

> 1. I had full rights to use any code brought into Checkmate under the terms of the merger.
> 2. "***cyborg***" is a common English word, and its inclusion in a domain name or user account does not infringe on any legal or proprietary rights.
> 3. You have provided no evidence of claims by any third party to substantiate these accusations or damages.

The **Bonus Agreement** between myself and Checkmate specifies the limits of what can be held in escrow to account for potential claims:

- $50,000 in cash for 12 months, and
- Common stock granted pursuant to the merger for 18 months.

The company is not entitled to withhold any additional amounts beyond these limits, as the right of setoff was explicitly contested and removed during negotiations.

Your reference to **Section 3.3** of the **Checkmate/VoiceBite Merger Agreement** also misinterprets the clause. In case you missed it, in that document's definitions, "Code" refers to the **Internal Revenue Code of 1986**, not a general authority to withhold compensation. This clause is clearly intended to cover government-mandated withholdings and does not authorize unilateral action by the company.

### Demands
I demand that your clients, by close of business on Friday, December 20th, 2024:

1. Amend all records to accurately reflect my termination on November 14th, 2024, during the 8 AM Zoom meeting.
2. Remit payment for all overdue amounts as outlined in my offer letter.
3. Pay the Initial Bonus Amount, as per the Bonus Agreement, or provide evidence contradicting Checkmate's public announcements of raising a $10M Series B round.

### To Emphasize
The Company faces significant liability due to its actions regarding my employment:

1. Your clients terminated me while I was on **_protected medical leave_**, fully aware of my limited access to phone/internet during my **_in-patient care_**.
2. Your clients falsely accused me, during said meeting, of solicitation of Checkmate employees without investigating, later learning there was no solicitation.
3. Your clients are now misrepresenting my termination as a resignation, in **a clear effort to avoid severance obligations.**
4. Your clients previously threatened termination over legitimate concerns I raised, including overdue backpay, compliance with California labor laws, and advocating for teammates.
5. The company's quarterly leadership slides and public statements reflect the successes of the Voice AI product and team under my leadership.
6. All of the above is backed by real, demonstrable, material evidence.

I urge the company to meet its contractual obligations and fulfill the three demands made, by the given date. This will allow us to resolve the immediate matter amicably and discuss reasonable, and additional, terms for a mutual release, should the company desire it. Otherwise, I will engage litigation counsel in the new year.

Best regards,
Arjun

---

**5 attachments**

- notice-response-final.pdf
  53K
- **Formal Response to Notice of Direct Claim.eml**
  90K
- **Re: VoiceBite / Arjun Vasan - Final Notice Before Legal Action.eml**
  31K
- Gmail - Good reason.pdf
  290K
- **VoiceBite / Arjun Vasan - Final Notice Before Legal Action.eml**
  423K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Fri, Dec 20, 2024 at 9:56 AM

3/29/25, 3:...    Gmail - ...pon

To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Dear Ryan,

"As Pietari is no doubt aware and has surely told you, any of your communications with him or in his
presence regarding this matter are subject to disclosure to the company. The company will, of course, be
following up with Pietari separately to obtain and review any such communications"

**He did not tell me that**, and I believe those communications are subject to implied attorney client
privilege, which is confirmed by your Notice of Claim email stating that you believed he was representing
me, and I believed he was going to represent me. Please refrain from requesting such materials, though
there is nothing to hide.

"In many ways, your emails directly contradict the company's records regarding your conduct and, to that
extent, do not provide any reason for the company to revisit its position."

It looks like I will proceed with legal action, this continued bad faith on the part of the company is frankly
disappointing in the truest sense of the word. I am not interested in answering your questions. Should your
client wish to discuss a settlement with me directly, I am open to that.

My understanding is very clear: prior to any further discussions, or a final settlement w/mutual release, the
post-termination compensation from my offer letter must be paid, including waiting time penalties (30 days
worth of daily wages are around $33,000). I am in the process of filing a wage claim at this very moment.

Please inform your clients to pay the $122,000 that was owed on the first payday after termination, else on
the second if within 5 days of termination. Then we can perhaps discuss a settlement. But this is non-
negotiable, nor do I see any value in discussion otherwise.

- Arjun

[Quoted text hidden]

---

Arjun Vasan <arjun.vasan@gmail.com>                                    Fri, Dec 20, 2024 at 10:05 AM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Ryan,

Further, these were conversations under presumed attorney client privilege, and many within the confines of an in-patient
medical facility where I was being treated for extreme anxiety and panic attacks caused mostly by your client's bad faith
actions. So their confidentiality is doubly protected, if anything.

But I was never informed, **just to be crystal clear**. I just assumed he was busy so he was unable to respond.

- Arjun

[Quoted text hidden]

---

Arjun Vasan <arjun.vasan@gmail.com>                                    Fri, Dec 20, 2024 at 12:36 PM
To: "Keech, Ryan Q." <ryan.keech@klgates.com>, Vishal Agarwal <vishal@itsacheckmate.com>,
"rnessler@itsacheckmate.com" <rnessler@itsacheckmate.com>, Mike Bell <michaelb@itsacheckmate.com>

Ryan,

I never confirmed that Pietari was representing me, so why would you send such a scathing email
full of confidential information without first formally confirming that he was representing me?

Please be advised that this extreme and unethical behavior will be reported to the California bar, as well as offered as
proof of bad faith to the court.

In addition, your clients' trickery during merger negotiations with respect to attorney client privilege will also be reported. If
I recall, k&l gates was also involved, perhaps initiating, in that instance.

Wage complaint has been filed with the labor board, now working on retaliation and other claims. I am securing an attorney now for the express purpose of litigation. Unless your clients satisfy the demands i outlined .. immediate payment of overdue amounts pursuant to employment offer letter, today, and provide written confirmation, i have no inclination to discuss any further, with or without an attorney.

Again, cc'ng your clients and the holder representative for visibility and formally requesting all documents signed by me, or associated with the merger, also my personnel files as an employee and written evidence that Checkmate has not raised a $10m series B as has been reported online beginning October 23rd.

- Arjun

Sent from Gmail Mobile

[Quoted text hidden]

---

**Keech, Ryan Q.** <Ryan.Keech@klgates.com>                    Fri, Dec 20, 2024 at 5:54 PM
To: Arjun Vasan <arjun.vasan@gmail.com>

Mr. Vasan,

Once again, it is in your interest to secure the services of independent counsel and to have that independent counsel contact me immediately to discuss these matters.  If you want the company to revisit its position, I do think that the call I proposed would be helpful to clear up the confusion caused by the disconnect between your emails and the company's records and otherwise to answer some of the company's questions.  Please know that the offer I communicated remains open if you choose to accept it.

[Quoted text hidden]
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                    Fri, Dec 20, 2024 at 6:18 PM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Dear Mr. Keech,

Thank you for your email. I appreciate your offer to revisit the company's position, but I must again decline the proposed call in favor of written communication.

As I have already outlined, the sequence of events on November 14th—including the termination meeting and HR's subsequent actions—is clear and well-documented. I believe it is in everyone's best interest to address these matters through written correspondence to ensure clarity and accuracy.

I look forward to receiving the company's written response and the requested evidence. Additionally, please note a minor correction to my prior demand for preservation of evidence. The updated demand is attached, with the following adjustment:

1.  **Internal Communications**: Emails, Slack messages, text messages, or other communications involving Vishal Agarwal, Michael Bell, Amy Brown, and other relevant parties concerning my employment, performance, or separation. **All** communications during the two months leading up to my separation date**, the separation date itself, and the subsequent month.**

Best regards,
Arjun Vasan

[Quoted text hidden]

---

📄 **updated-preserve-evidence.pdf**
   42K

**Arjun Vasan** <arjun.vasan@gmail.com>                                   Sat, Dec 21, 2024 at 1:21 AM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Mr. Keech,

Further, I ask that you please go through the proper channel prescribed by the merger agreement, *the Holder Representative*, to deal with any and all matters of indemnification related to the VoiceBite Pre Closing Holders. If your clients show an ounce of good faith and pay my clearly owed severance, we can discuss settling the employment claims in conference.

In the meantime, I will proceed as if they do not intend to do so, which given the course of events, and the fact that *they have yet to admit* what will be found in discovery, that they perpetrated a fraudulent misrepresentation of my termination as a resignation in order to save themselves about 1/100th of their recent fundraise and avoid obvious liabilities pursuant to employment law.

- Arjun
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                   Tue, Dec 24, 2024 at 1:13 PM
Draft To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Mr. Keech,

Are your clients going to provide copies of my agreements and personnel file?

- Arjun

Sent from Gmail Mobile

[Quoted text hidden]