1  Arjun Vasan

2  12615 193rd Street

3  Cerritos, CA 90703

4  (562) 900-6541

5  arjun.vasan@gmail.com

6  Plaintiff In Pro Per

7

8                        **UNITED STATES DISTRICT COURT**

9                        **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ARJUN VASAN,                          Case No:  2:25-CV-00765-MEMF-JPR

12          Plaintiff and Counter-Defendant,   Hon. Maame Ewusi-Mensah Frimpong

13                                         **PLAINTIFF'S NOTICE OF MOTION AND**
        v.                                 **MOTION TO DISMISS DEFENDANT'S**
14                                         **COUNTERCLAIMS; MEMORANDUM OF**
                                           **POINTS AND AUTHORITIES IN SUPPORT**
15  CHECKMATE.COM, INC
16  (dba "Checkmate"),                     [*Filed along with Declaration of Arjun Vasan,*
                                           *Request for Judicial Notice* and *[Proposed] Order,]*
17          Defendant and Counterclaimant.
                                           Hearing date: September 18, 2025
18                                         Time: 10 am
19                                         Complaint Filed: January 28, 2025
20

21  **TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

22          PLEASE TAKE NOTICE that on September 18th, 2025, at 10:00 a.m., or as soon thereafter

23  as the matter may be heard in Courtroom 8B of the United States District Court for the Central

24  District of California, located at 350 West 1st Street, Los Angeles, CA 90012, before the Honorable

25  Maame Ewusi-Mensah Frimpong, Plaintiff and Counter-Defendant Arjun Vasan ("AV") will and

26  hereby does move the Court for an order dismissing with prejudice all counterclaims asserted by

27  Checkmate.com, Inc. ("Checkmate") in its Answer to AV's First Amended Complaint (ECF Nos. 10

28  & 72), pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(7), and 19.

                                           i

1   This Amended Motion supercedes ECF No. 75, which AV withdraws. AV respectfully

2   submits that Checkmate is not prejudiced by this amendment, as he has kept opposing counsel and

3   the Court apprised of his delayed discharge from inpatient medical treatment on August 4, 2025. AV

4   further stated in the Joint Rule 26(f) report that this amendment was forthcoming and stipulates to a

5   short extension for opposition briefing, preserving the current hearing date if possible.

6   AV seeks dismissal with prejudice on the grounds that Checkmate's counterclaims are (1)

7   legally insufficient and foreclosed by the law of the case, controlling state and federal authority, and

8   the record before the Court; (2) fail to state a claim upon which relief can be granted under Rule

9   12(b)(6) and Rule 9(b); and/or (3) are subject to dismissal for failure to join necessary and

10  indispensable parties as required by Rule 19 and Rule 12(b)(7). AV further requests that the Court

11  dismiss all such counterclaims with prejudice, or without leave to amend absent a showing by

12  Checkmate of specific facts warranting amendment, and to consider sanctions for frivolous and

13  retaliatory pleading as set forth in the accompanying Memorandum of Points and Authorities.

14  This Motion is based on this Notice, the attached Memorandum of Points and Authorities, the

15  Declaration of Arjun Vasan, the pleadings and records on file in this action, and upon such other

16  written or oral argument as may be presented at or before the hearing on this matter. AV certifies

17  that he met and conferred in good faith with Checkmate regarding the basis for this motion as

18  required by L.R. 7-3. See Declaration of Arjun Vasan ¶¶ 2-5.[1]

19

20                                              **Respectfully Submitted**,

21

22  Dated: **August 15, 2025**                  /s/ *Arjun Vasan*

23      In **Cerritos, CA**
                                                _____

24                                              **Arjun Vasan**

25                                              Plaintiff In Pro Per

26

27  _____

28  [1] On the first page of his Memorandum (numbered 2), Plaintiff includes a manually transcribed quote from the hearing on Defendant's Motion to Dismiss. This will be supplemented by the official hearing transcript as soon as he procures it.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... III

TABLE OF AUTHORITIES ..................................................................................................... V

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 2

   I.     INTRODUCTION .................................................................................................. 2

   II.    FACTUAL BACKGROUND .................................................................................. 3

   III.   RECENT PROCEDURAL HISTORY ................................................................... 4

   IV.   LEGAL STANDARDS .......................................................................................... 5

       A.   *Law of the Case — § 925 Already Controls and California Law Governs* ........................ 5

       B.   *California Law and Public Policy Bars Employment Restrains and Enforces § 925* ........ 5

          1. California's choice-of-law framework protects its fundamental policy. ............................ 6

          2. Non-competes and related restraints are void in employment. ..................................... 6

       C.   *Evidence this Court May Consider for this Motion* ................................................ 7

       D.   *California Contract Guardrails (as applied in § V)* ................................................ 8

       E.   *Rule 12(b)(7) and Rule 19: A Practical Two-Step Approach* .................................... 8

       F.   *Rule 12(b)(6): Failure to State a Claim* .......................................................... 9

       G.   *Rule 9(b): Heightened Standards for Fraud Claims* ............................................. 9

   V.    LEGAL ARGUMENT ........................................................................................... 9

       A.   *The Evidentiary Record Admissible for this Motion is Substantial* ................................. 9

       B.   *Each Contract at issue in the Counterclaims is Invalid, Inapplicable, Voided,*

   *Unenforceable or Favor AV's Position Under Cal. Law and Public Policy* ........................... 10

          1. Merger Agreement (MA) – Does Not Support Personal Liability, Limits Remedies ....... 10

          2. Non-Competition Agreement (NCA) – Unenforceable Under CBPC § 16600 ............... 11

          3. IP Acknowledgment Letter (IPAL) – Fatally Defective and Voidable ........................... 11

          4. IP Assignment Ag. (IPAA) – Unenforceable Employment Condition Under CA Law .... 12

       C.   *Non-Compete Counterclaims Are Barred by Law and the Record* .................................. 13

          1. AV's Two Emails Demonstrate Compliance, Not Breach ......................................... 13

          2. The Terms of the Non-Compete Agreement Foreclose Breach ................................. 14

          3. The Agreement Is Void and Unenforceable ........................................................ 14

          4. No Legitimate Business Interest to Protect ......................................................... 14

          6. Mutual Non-Disparagement—Checkmate's Breach .............................................. 15

          7. Dismissal with Prejudice is Warranted due to the Evidence on Record ....................... 15

          8. The Non-Competition Agreement is Void Under its Own Terms ............................... 15

*D.    Fraud Counterclaims Fail Under Rule 9(b) and Are Evidence of Retaliation*................. *16*

1. Complete Failure to Satisfy Rule 9(b)'s Particularity Requirements ................................ 16

2. Checkmate's Own Allegations Prove the Absence of Fraud ............................................. 17

3. Checkmate Misattributes Team Conduct to Individual Defendant .................................... 18

4. No Material Misrepresentation ........................................................................................... 19

5. No Cognizable Damages ..................................................................................................... 19

6. No Reasonable Reliance ..................................................................................................... 20

7. The Negligent Misrepresentation Claim Fails for the Same Reasons .............................. 20

8. Checkmate's Fraud Allegations are Evidence of its Own Fraudulent Conduct ............... 20

*E.    Breach Counterclaims Are Legally and Contractually Defective* ................................. *21*

*F.    Declaratory Relief Counterclaim Seeks to Endorse Wage Theft* .................................. *21*

*G.    Failure to Allege Satisfaction of Condition Precedent and Join Indispensable Parties* .. *22*

*H.    Dismissal With Prejudice and Sanctions May Be Warranted* ........................................ *24*

VI.    CONCLUSION ....................................................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
    861 F.2d 224, 226–27 (9th Cir. 1988) ..................................................................11

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
    28 Cal. App. 5th 923, 938–41 (2018) .....................................................................6

*Armendariz v. Foundation Health*,
    24 Cal. 4th 83, 114-23 (2000)..................................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662, 678 (2009)........................................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 570 (2007)........................................................................................10

*Brown v. Grimes*,
    192 Cal. App. 4th 265, 277–78 (2011) ...................................................................21

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*,
    547 F.3d 962, 970–71 (9th Cir. 2008) ...................................................................10

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047, 1055 (9th Cir. 2011) .......................................................................7

*Chambers v. NASCO, Inc.*,
    501 U.S. 32, 45–46 (1991)......................................................................................24

*Chavarria v. Ralphs Grocery Co.*,
    733 F.3d 916, 921-28 (9th Cir. 2013) .....................................................................9

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384, 395–97 (1990)..................................................................................24

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*,
    276 F.3d 1150, 1155–56 (9th Cir. 2002) .................................................................9

*DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*,
    28 F.4th 956, 964–69 (9th Cir. 2022); .....................................................................5

*Edwards v. Arthur Andersen LLP*,
    44 Cal. 4th 937, 945–46 (2008) .............................................................................21

*EEOC v. Peabody W. Coal Co.*,
    610 F.3d 1070, 1078 (9th Cir. 2010) .......................................................................9

*Fink v. Gomez*,
  239 F.3d 989, 991–94 (9th Cir. 2001) ............................................................ 24

*Golden v. Cal. Emergency Physicians Med. Grp.*,
  896 F.3d 1018, 1024–27 (9th Cir. 2018) ........................................................ 6

*Goodyear Tire & Rubber Co. v. Haeger*,
  581 U.S. 101, 108–09 (2017) ........................................................................ 24

**Iqbal v. Ashcroft**,
  556 U.S. 662, 678 (2009 ............................................................................... 21

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988, 998–1002 (9th Cir. 2018) ........................................................ 7

*Knievel v. ESPN*,
  393 F.3d 1068, 1076 (9th Cir. 2005) ............................................................. 7

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580, 588 (9th Cir. 2008) ................................................................. 7

*Leadsinger, Inc. v. BMG Music Publ'g*,
  512 F.3d 522, 532 (9th Cir. 2008) ................................................................ 24

*Leeper v. Beltrami*,
  53 Cal. 2d 195, 204–05 (1959 ....................................................................... 8

**MedImmune, Inc. v. Genentech, Inc.**,
  549 U.S. 118, 126–27 (2007) ........................................................................ 22

*Narayan v. EGL, Inc.*
  616 F.3d 895, 899–904 (9th Cir. 2010 .......................................................... 5

*Nedlloyd Lines B.V. v. Superior Court*,
  3 Cal. 4th 459, 465–66 (1992) ...................................................................... 5

*New Hampshire v. Maine*,
  532 U.S. 742, 749 (2001) ............................................................................. 11

*Oasis W. Realty*,
  51 Cal. 4th at 821 ........................................................................................ 21

*Odorizzi v. Bloomfield School District*,
  246 Cal. App. 2d 123, 131-34 (1966 ............................................................. 8

*Phillips v. U.S.*,
  356 F.2d 297, 301 (9th Cir. 1966) ................................................................ 11

*Pineda v. Sun Valley Packing, L.P.*,

2021 WL 3466899, at *5 (C.D. Cal. May 4, 2021) ....................................21

Reiniger v. W.L. Gore & Assocs., Inc.,

2024 WL 353429, at *3 (C.D. Cal. Jan. 30, 2024) ..............................21

*Rich & Whillock, Inc. v. Ashton Dev., Inc,*

157 Cal. App. 3d 1154, 1158–60 (1984) ...........................................8

*Sanchez v. Valencia Holding,*

61 Cal. 4th 899, 910-12 (2015)........................................................9

See *Cadence Design Sys., Inc. v. Pounce Consulting, Inc.,*

2019 WL 1768618, at *2 (N.D. Cal. Apr. 22, 2019)* ........................21

*United States v. State of Wash.,*

759 F.2d 1353, 1357 (9th Cir. 1985) ................................................22

*Verdugo v. Alliantgroup, L.P.,*

237 Cal. App. 4th 141, 154–60 (2015) ...............................................5

Washington Mutual Bank v. Superior Court,

24 Cal. 4th 906, 915–17 (2001) .......................................................5

*Whitewater West Indus. V. Alleshouse*,

981 F.3d 1045, 1056-60 (Fed. Cir. 2020) .........................................14

**STATUTES**

Cal. Civ. Code § 1654 .................................................................13

Cal. Labor Code §§ 2870–2872 ...................................................14

Cal. Civ. Code § 1670.5 ...............................................................8

Cal. Civ. Code § 1691 ..................................................................9

Cal. Labor Code §§ 201, 202, 203, 204, 221, 223...........................12

**RULES**

Fed. R. Civ. P. 19(a)....................................................................11

Fed. R. Evid. 801(d)(2) ...............................................................12

*Fed. R. Evid. 801(d)(2)(C)-(D)*...................................................12

Fed R. Civ. P. 12(b)(7) ...............................................................10

Fed R. Civ. P. 12(b)(6) .................................................................3

**REFERENCED RECORDS (SDNY Case No. 25-cv-03181-JMF)**

| | | |
|---|---|---|
| **Warns Declaration ISO Checkmate Opposition to AV Motion to Dismiss** | SDNY ECF No. 40 | June 16th, 2025 |
| | Exhibit A – 40-1 at 4-49 | Merger Agreement (MA) |
| | Exhibit B – 40-2 at 50-54 | IP Assignment Agreement (IPAA) |
| | Exhibit C – 40-3 at 55-57 | IP Acknowledgement Letter (IPAL) |
| | Exhibit D – 40-4 at 58-65 | Non-Competition Agreement (NCA) |
| **Nessler Declaration ISO AV Motion for Sanctions** | SDNY ECF No. 58-1 | July 25th, 2025 |
| **Vasan Declaration ISO AV Motion to Dismiss** | SDNY ECF No. 35 | June 2nd, 2025 |
| | Exhibit L at 51 | Lunchbox Emails |
| | Exhibit S at 65 | IP Ack. Letter Summary |
| **AV Reply ISO Motion to Dismiss/Stay/Transfer** | SDNY ECF No. 48 | June 23rd, 2025 |
| | Exhibit B at 16 | IP Misattribution Timeline |
| | Exhibit B at 20 | Notice of Direct Claim on Robert Nessler |
| | Exhibit B at 22 | Shareholder Response by Grant Thomas on behalf of Robert Nessler |
| | Exhibit E at 32 | Non-Compete Compilation |
| **Checkmate Memorandum IOT AV Motion to Dismiss** | SDNY ECF No. 41 | June 16th, 2025 |
| **AV Motion for Sanctions** | SDNY ECF No. 58 | July 25th, 2025 |
| **Checkmate Memorandum IOT AV Mot. for Sanctions** | SDNY ECF No. 59 | August 8th, 2025 |

| Declaration | Arjun Vasan (AV) | Authenticates the Following Exhibits |
|---|---|---|
| Exhibit A | Nessler Declaration | Declaration of Robert Nessler as VoiceBite Holder Rep. |
| Exhibit B | Non-Compete | Non-compete Compilation Exhibit |
| Exhibit C | Press Release | VoiceBite Merger Press Rel. Quoting Agarwal |
| Exhibit D | Escrow Email | Screenshot of Escrow Offer from Agarwal |

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

At the hearing on its Motion to Dismiss Plaintiff and Counter-Defendant Arjun Vasan ("AV")'s operative complaint, counsel for Checkmate.com, Inc. ("Checkmate") stated as follows:

> "The declaration Mr. Vasan filed in the New York action, **which was submitted under penalty of perjury**, admits that the primary founders of VoiceBite are **Robert Nessler**, the CEO; **Christopher Lam**, the COO; and **Mr. Vasan**, the CTO. **And this is a direct quote,** Your Honor: 'We jointly negotiated the deal with full transparency and advice of counsel.' Mr. Vasan's admissions that he negotiated deal terms, as set forth in the merger agreement, as well as his title, the fact that he was the founder of VoiceBite ..." –Hearing Transcript (Unofficial. See fn.2)

### – Lead Counsel Gabriel Huey for Checkmate at Oral Argument

Checkmate's own counsel *thus represented to this Court exactly what the record has shown from the start*: that the deal at issue was negotiated by all three founders—on advice of (corporate) counsel—not unilaterally by AV. That binding admission destroys the factual premise of the instant counterclaims, which depend on recasting group actions as individual ones. It also confirms that Mr. Nessler and Mr. Lam — co-founders, co-signatories, and co-negotiators — are **indispensable parties** without whom this case cannot be fairly adjudicated under Rule 19.

AV and his cofounders (together "the founders") built VoiceBite on innovation, *partnership*, and conviction that California's laws protect those who create in good faith. Defendant and Counter-Claimant Checkmate saw opportunity—not for mutual benefit, but in exploitation.

Checkmate's counterclaims ("CCs"), a *verbatim* copy of its now dismissed complaint in the Southern District of New York ("SDNY"), are meritless and contradicted by the record before both this Court and the SDNY, and stand as the latest act in a fraudulent and retaliatory scheme that originated during merger negotiations, continued through AV's employment, and now culminates in this *desperate* effort to abuse judicial process and evade its legal and contractual obligations.[2]

Checkmate's non-compete claims are foreclosed by its own submitted evidence and by California law, which this Court has established governs every aspect of this dispute.[3] Its fraud

---

[2] See AV's Amended Complaint (at ECF No. 10. *AV will supplement with the official transcript as soon as possible.

[3] As established by this court's Order denying Checkmate's Motion to Dismiss or Transfer, Cal. Labor Code § 925 applies to the Merger Agreement, which Checkmate has argued governs the "transaction"—as it does in its counterclaims—and therefore every Delaware choice of law clause is voidable and voided by AV's election (ECF No. 72)

2

theories not only fail to satisfy Rule 9(b)'s heightened pleading standard but are compelling evidence of AV's own claims of fraud and retaliation. Its breach claims rest on invalid or inapplicable agreements, and its request for declaratory relief seeks nothing less than judicial endorsement of wage theft—directly contravening California public policy and statutory protections. In sum, none of the counterclaims rises to the level of a bona fide dispute; each is as revealing as it is unfounded.

In reality, Checkmate structured the agreements at issue—if its present interpretations are credited—to create the illusion of a mutually beneficial transaction, while secretly reserving every advantage for itself and stripping the founders of every promised benefit and protection, including the "millions of dollars" it so loudly touts but never paid. The phantom cash dangled to lure the founders is now cynically invoked to mislead the courts and fabricate damages that do not exist.

But Checkmate's contractual interpretations cannot withstand scrutiny. Its counterclaims fail to comply with a mandatory, *bargained-for* condition precedent: the Merger Agreement ("MA")'s dispute resolution procedure, requiring dismissal under Rule 12(b)(6). Its counterclaims further fail under Rules 12(b)(7) and 19 for failure to join the four members of the VoiceBite founding team whose legal and financial interests are directly at stake, and who have themselves suffered intimidation and retaliation as employees for their support of AV in this dispute. Mr. Nessler's testimony in support of AV's SDNY sanctions motion was not merely under threat of perjury, but under real — and immediately *realized* — threat of adverse employment action. See ECF 75.

*This* Court should not indulge or excuse Checkmate's abuse of process. For these reasons, and those detailed below, AV respectfully requests that this Court dismiss all counterclaims in their entirety, *with prejudice*, and consider if sanctions as are necessary to deter further misconduct, and establish for the record—here in California and as an example to the Nation—that our courts ought to protect founders, workers, and innovators, not to enable their exploitation.

## II.    FACTUAL BACKGROUND

AV incorporates by reference the detailed factual allegations set forth in the operative First Amended Complaint (ECF No. 10) and his judicially noticed[4] Motion to Dismiss, Transfer or Stay in SDNY (SDNY ECF No. 34, Case No. 25-CV-03181-JMF), which together describe the origins,

---

[4] See Order Denying Checkmate's Motion to Dismiss or Transfer (ECF No.72) and granting Judicial Notice of AV's SDNY Motion to Dismiss at Checkmate's request—unopposed and indeed **welcomed** by AV at hearing.

negotiation, and consummation of the VoiceBite–Checkmate merger, the subsequent employment relationship, and the events giving rise to this action.

## III.    RECENT PROCEDURAL HISTORY

1.    **Hearing on Checkmate's Motion (June 24, 2025, CD Cal ECF No. 65):**

The Court conducted a hearing on Checkmate's Motion to Dismiss or Transfer. AV welcomed Checkmate's untimely Request for Judicial Notice, filed the night before (ECF No. 60). During the hearing, Checkmate relied on purported "admissions" "under penalty of perjury" in AV's filings, thereby waiving objections to admissibility and, as AV argued, acknowledging the *truth* of AV's sworn statements and evidentiary submissions in SDNY. See SDNY ECF Nos.34, 35 and 36.

2.    **Checkmate's Opposition Filed in SDNY (June 16, 2025, SDNY ECF Nos. 40, 41):**

Checkmate filed its Opposition (SDNY ECF 41, "SDNY Opp.") to AV's Motion to Dismiss in SDNY, attaching the Warns Declaration (SDNY ECF 40, "Warns Decl.") and the agreements at issue—including two which AV had never seen (and which it has yet to file here), and repeatedly asked for and had never been provided in the months leading up to the SDNY Opp.

3.    **Checkmate Opposes Stay in SDNY (June 20, 2025, SDNY ECF No. 44):**

Checkmate opposes AV's letter-motion to stay by successfully arguing "whatever the California court may eventually determine on that point will not affect this Court's exercise of jurisdiction". AV had argued that continuing briefing on his own filed Motion to Dismiss was wasteful to all.

4.    **AV's Reply ISO Motion to Dismiss in SDNY (June 23, 2025, SDNY ECF No. 48):**

AV filed his reply, addressing all arguments and evidentiary issues raised by Checkmate, and addressing fatal flaws in the two newly disclosed agreements—which Checkmate alleges he breached, and yet expected to respond to without ever having seen.

5.    **C.D. Cal. Order DENYING Checkmate Motion to Dismiss (June 24, 2025, ECF No. 67)**

6.    **Checkmate Voluntarily Dismisses in SDNY (July 10, 2025, SDNY ECF No. 55):**

After nearly 100 pages of briefing from mostly AV, Checkmate voluntarily dismissed its SDNY action without prejudice. It appears C.D. Cal. was perfectly convenient all the while.

7.    **Checkmate Answer Filed in CD Cal (July 10, 2025, SDNY ECF No. 55)**

Checkmate files its Answer, the counterclaims at issue and *forty-six* affirmative defenses

8. **AV's Motion for Sanctions in SDNY (July 14, 2025, SDNY ECF No. 56):**

AV moved for sanctions following Checkmate's voluntary dismissal, supported by the Declaration of Robert Nessler (submitted in his official capacity as Holder Representative of the VoiceBite Pre-Closing Shareholders). See Exhibit A.

9. **AV's Hospitalization and Stipulation (July 10, 2025, CD Cal ECF No. 65):**

Due to an acute medical condition, AV was hospitalized, and the parties stipulated to adjust certain deadlines. AV relayed his appreciation to opposing counsel for this stipulation.

10. **Checkmate's Delay in Pre-Scheduling Meet and Confer (July 2025):**

Checkmate repeatedly delayed responding to AV's request for a pre-scheduling meet and confer, originally made upon filing of the scheduling order on June 26th, 2025. Checkmate counsel waited until a month later, and when AV was still hospitalized, suggested a date of August 14th, 2025—the very last day for the meet and confer to be timely. After some contentious back and forth, a date of August 7th, 2025, was agreed to by the parties for the meet and confer.

## IV.    LEGAL STANDARDS

### A.  Law of the Case — § 925 Already Controls and California Law Governs

This Court has already held that: (1) AV was an employee of Checkmate who primarily lived and worked in California; (2) the agreements at issue were "conditions of employment," as the founders lacked individual choice to sign some (e.g., the bonus agreement or offer letter) but not others; and (3) Checkmate's effort to recast VoiceBite's corporate counsel as AV's individual representative was unpersuasive; and (4) Cal. Lab. Code § 925 applies (citing *DePuy Synthes*).[5] Checkmate's own strategy—arguing that all agreements constituted a single integrated transaction—now binds its counterclaims—a pleading copied substantially verbatim from its SDNY complaint. If every contract was part of one "bargain", each is a "condition of employment," and every founder was compelled to execute all agreements to receive the promised benefits. Checkmate is precluded from relying on Delaware law clauses to undermine the protections of California's public policy.

### B.  California Law and Public Policy Bars Restraints and Enforces § 925

---

[5] See Order Denying Motion to Dismiss (ECF No. 67) at 12-16. **California law governs**.

Where California's statutory and decisional law reflect a strong, long-standing policy favoring employee mobility and rejecting contractual restraints that would deprive California workers of California protections. This Court's broad application of § 925 has sweeping implications to nearly every aspect of dispute—based as it is on a set of documents drafted to rely on Delaware law.

While most argument during briefing on the Motion to Dismiss or Transfer for improper venue was focused on venue, the real implications of the Order with regards to Checkmate's counterclaims lie in Lab. Code § 925's equally powerful voiding of any non-California choice-of-law clauses at AV's election—as he has also unambiguously elected. [6] When a contract purports to apply non-California law, California courts apply Restatement (Second) of Conflict of Laws § 187 under *Nedlloyd* and *Washington Mutual*. A chosen law will not be applied if it would contravene a fundamental California policy and California has a materially greater interest.

Cal. Bus. & Prof. Code § 16600 declares void "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business," subject only to narrow sale-of-business exceptions.[7] In 2008, the Cal. Supreme Court in *Edwards v. Arthur Andersen*[8] held employee non-competes invalid even if "narrowly drawn," rejecting any "rule of reason" in the employment context. California courts have applied *Edwards* to invalidate post-employment restraints beyond classic non-competes, including employee non-solicitation covenants.[9]  California appellate authority likewise recognizes that use of void restraints can support UCL liability.[10] In 2023—24, the Legislature codified Edwards under AB 1076, adding § 1660.1, making it *unlawful* to include a noncompete in an employment contract and requiring individualized notice to current and recent former employees that any such covenants are void; failure to notify is actionable (and subject to

---

[6] *Narayan v. EGL, Inc.* 616 F.3d 895, 899–904 (9th Cir. 2010) applied California wage laws despite a Texas choice-of-law clause, refusing to allow employer-drafted labels to defeat California protections for workers.; see *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 465–66 (1992); *Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906, 915–17 (2001); *DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 964–69 (9th Cir. 2022); *Verdugo v. Alliantgroup, L.P.*, 237 Cal. App. 4th 141, 154–60 (2015) (California won't enforce foreign law that strips its employee protections)

[7] See Cal. Bus. & Prof. Code §§ 16601, 16602, 16602.5

[8] See *Edwards v. Arthur Andersen* 44 Cal. 4th 937, 946–50 (2008)

[9] See *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 938–41 (2018)) and broad "no-rehire" provisions that substantially restrain practice (*Golden v. Cal. Emergency Physicians Med. Grp.*, 896 F.3d 1018, 1024–27 (9th Cir. 2018))

[10] *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575–77 (2009).

1  civil penalties). **SB 699** added **§ 16600.5**, creating a private right of action and specifying that void

2  restraints are unenforceable "regardless of where and when the contract was signed," with fee-

3  shifting for prevailing employees—rendering inclusion or <u>attempted enforcement</u> of non-competes

4  itself unlawful conduct under California law.

5  **C. Evidence this Court May Consider for this Motion[11]**

6  **Rule 12(b)(6)**: While the Court must accept well-pled factual allegations as true, this principle

7  does not apply where allegations are directly contradicted by documents properly before the Court—

8  including those subject to or already judicially noticed. The Ninth Circuit has repeatedly held that

9  the Court need not accept as true allegations contradicting documents that are referenced in the

10  complaint or that are properly subject to judicial notice.[12] On a Rule 12(b)(6) motion, the Court may

11  consider not only the pleading but also documents it attaches, incorporates by reference, or on which

12  it necessarily relies.[13] Further, courts routinely consider documents essential to contract formation,

13  scope, and effect, even at the motion to dismiss stage.

14  **Rule 12(b)(7) and Rule 19**: On a Rule 12(b)(7) motion, courts apply Rule 19's pragmatic,

15  "equity and good conscience" framework. The court may consider evidence outside the pleadings—

16  including declarations from fiduciaries or representatives whose constituents' interests would be

17  affected—to decide whether a person is **required** under Rule 19(a), whether joinder is feasible, and,

18  if not, whether the action should proceed or be dismissed under Rule 19(b).[14]

19

20

21

---

22  [11] Checkmate's approach in this dispute is to object reflexively—even when confronted with its own filings and evidence. AV, by contrast, welcomes the full record, has never objected to any filing or exhibit in this action on technical grounds

23  and—in fact—has repeatedly relied on Checkmate's own filings to undermine its arguments and establish contradictions.
[12] *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

24  1047, 1055 (9th Cir. 2011).

[13] See *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

25  [14] See *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 118–26 (1968) (Rule 19(b) is a pragmatic, equitable

26  inquiry); *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867–71 (2008) (when absent party's claimed interests are substantial and joinder infeasible, dismissal may be required); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558–60 (9th Cir. 1990) (Rule

27  19(a) "required" party analysis focuses on practical impairment of interests and risk of inconsistent obligations); *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779–82 (9th Cir. 2005) (recognizing necessity of representative/sovereign whose interests

28  would be impaired; discussing joinder mechanics); 7 Charles Alan Wright & Arthur R. Miller, **Federal Practice and Procedure** § 1359 (3d ed.) (court may consider affidavits and other extrinsic evidence on Rule 12(b)(7)); *Biagro W. Sales, Inc. v. Helena Chem. Co.*, 160 F. Supp. 2d 1136, 1141 (E.D. Cal. 2001) (considering materials beyond the pleadings on 12(b)(7)).

Joint participants or co-actors are not *automatically* required parties; the touchstone is whether disposition in their absence would, as a practical matter, impair their ability to protect their interests or subject existing parties to multiple or inconsistent obligations.[15]

### D.  California Contract Guardrails (as applied in § V)

Contracts require **free, mutual consent**; apparent assent is voidable for duress, undue influence, mistake, or fraud. **Civ. Code §§ 1567, 1689(b)(1)**. "Economic duress" applies where wrongful pressure leaves no reasonable alternative. *Rich & Whillock*, 157 Cal. App. 3d 1154, 1158–60. **Undue influence** voids agreements procured by unfair persuasion at a moment of vulnerability. *Odorizzi*, 246 Cal. App. 2d 123, 131–34. Unconscionability (procedural + substantive) permits refusal to enforce, limit, or sever terms—but **not** where illegality pervades. See **Civ. Code § 1670.5**; *Armendariz*, 24 Cal. 4th at 114–25; *Sanchez*, 61 Cal. 4th at 910–12. And public-policy illegality (e.g., **§§ 16600, 16600.1, 16600.5**) renders restraints void *ab initio*. **Civ. Code § 1598.** The employee-invention carve-outs (**Lab. Code §§ 2870–2872**) also limit assignment scope and require notice; overbroad reach into independent or post-employment work is unenforceable.[16]

### E.  Rule 12(b)(7) and Rule 19: A Practical Two-Step Approach

A party is "required" if complete relief is otherwise unavailable, or the absentee's interests would be impaired or existing parties risk inconsistent obligations. See **Rule 19(a)**. If joinder isn't feasible, the Court weighs equity-and-good-conscience factors to decide dismissal.[17] See **Rule 19(b)**.[18] Where claims turn on multi-signatory or holder-rep structures, the signatories are typically necessary; some disputes must be dismissed if indispensable parties cannot be joined.[19]

Where, as here, the claims are premised on alleged group actions or collective decisions, and key parties or witnesses are omitted or unable to participate due to intimidation or retaliation, dismissal or other appropriate relief under Rule 12(b)(7) and Rule 19 is especially warranted.

---

[15] *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) (per curiam) (joint tortfeasors are not required parties under Rule 19); *Makah*, 910 F.2d at 558–60 (required-party inquiry turns on practical impairment, not mere participation).
[16] See *Whitewater West Indus. V. Alleshouse*, 981 F.3d 1045, 1056-60 (Fed. Cir. 2020).
[17] *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 547 F.3d 962, 970–71 (9th Cir. 2008).
[18] See *Cachil Dehe*, 547 F.3d 962, 970–71; *Peabody W. Coal*, 610 F.3d 1070, 1078–79; *Dawavendewa*, 276 F.3d 1150, 1156–61.
[19] Fed. R. Civ. P. 19(a); *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010); *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1155–56 (9th Cir. 2002).

### F. Rule 12(b)(6): Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a claim must plead facts that make relief *plausible*; legal conclusions or allegations contradicted by incorporated materials are disregarded.[20]

### G. Rule 9(b): Heightened Standards for Fraud Claims

Claims "grounded in fraud" must plead the **who/what/when/where/how** with particularity or be dismissed/stripped to non-fraud averments. Conclusory assertions are insufficient.[21]

## V.    LEGAL ARGUMENT

### A. The Evidentiary Record Admissible for this Motion is Substantial

Checkmate requested judicial notice of AV's SDNY Motion, and accompanying declarations, argued in open court that their contents were "admissions" "under penalty of perjury" and *true*, AV welcomed this request, and the Court expressly took notice of these filings as *unopposed*.[22] Judicial estoppel, the incorporation-by-reference doctrine, and the party admission rule all preclude selective reliance. The Court may consider these filings and declarations for the purposes of this motion.[23]

Further, AV herewith seeks judicial notice of subsequent SDNY filings from both parties including the Declarations of Thomas Warns and Robert Nessler (SDNY ECFs 40 and 58-1). The sworn Nessler Decl., made in his capacity as Holder Rep.[24], is directly admissible on Rule 12(b)(7) and Rule 19 analysis.[25] The Court may consider his declaration as factual evidence, but also to

---

[20] A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a pleading. To survive such a motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts accept well-pled factual allegations as true, they reject "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

[21] Fed. Rule Civ. Proc 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." See *Vess v. Ciba-Geigy*, 317 F.3d 1097, 1103–08; *Kearns v. Ford Motor*, 567 F.3d 1120, 1124–26; *Swartz v. KPMG LLP*, 476 F.3d 756, 764–66 (9th Cir. 2007). Group pleading is impermissible.

[22] See *Order Denying Motion to Dismiss or Transfer* at 6 ("The Court notes that Vasan does not object to any evidentiary submissions made by Checkmate.")

[23] See *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Khoja v. Orexigen*, 899 F.3d 988, 1002–03 (9th Cir. 2018); Fed. R. Evid. 801(d)(2). In addition, the Court may also treat Checkmate's own statements in court as party admissions.

[24] See Merger Agreement § 9.1 designating Robert Nessler as Holder Rep. Filed by Checkmate in both SDNY and CD Cal.

[25] See *Fed. R. Evid. 801(d)(2)(C)-(D)*; *Phillips v. U.S.*, 356 F.2d 297, 301 (9th Cir. 1966).

resolve issues of indispensable parties and the scope of the "transaction."[26] Checkmate has called Mr. Nessler's declaration "self-serving[27] and uncorroborated" in opposing AV's post-dismissal motion for sanctions in SDNY (ECF 58)—which AV rebuts with record evidence in Exhibit A.

Under *Khoja*, the Court may consider the texts of the documents attached, referenced or necessarily relied on in the pleadings at Rule 12(b)(6).

**B. Each Contract at issue in the Counterclaims is Invalid, Inapplicable, Voided, Unenforceable or Favor AV's Position Under Cal. Law and Public Policy**

As California's integration doctrine and employee-protective statutes control. [28], late "side letters" cannot rewrite an integrated bargain absent clear incorporation, and any employment-adjacent restraint is void unless a narrow statutory exception applies.[29]

The four contracts Checkmate pleads are the Merger Agreement (MA), Non-Compete (NCA), IP Acknowledgment Letter (IPAL), and IP Assignment Agreement (IPAA). Their own SDNY filing (SDNY ECF 40, Warns Decl. Exs. A-D) attaches them—while admitting the IPAL is mis-parted.

1. Merger Agreement (MA) – Does Not Support Personal Liability, Limits Remedies

Forum arguments under MA §9.7 are no longer sustainable under prior rulings.[30] However, equally mandatory are (1) § 9.1, designating a Holder Rep to jointly pursue and defend claims on behalf of the shareholders; (2) §8 defining and *capping*[31] indemnification as the exclusive remedy

---

[26] While the Nessler declaration was submitted in his capacity as Holder Representative, to the extent it describes facts within his personal knowledge as a current Checkmate VP—those statements are independently admissible as party admissions. See *Fed. R. Evid. 801(d)(2)(D)* ("a statement by the party's agent or employee on a matter within the scope of that relationship and while it existed"); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226–27 (9th Cir. 1988).

[27] Mr. Nessler declared, *expressly*, on behalf of all VoiceBite pre-closing equity holders,

[28] Civ. Code § 1625; Code Civ. Proc. § 1856(a), (f); Civ. Code § 1642 (multiple writings read together only if same parties and same subject); see also the incorporation standard summarized in Shaw/Williams/Baker/Wolschlager.

[29] Cal. Civ. Code § 1625; Cal. Code Civ. Proc. § 1856(a), (f); Civ. Code § 1642 (multiple writings read together only if same parties and same subject); see also the incorporation standard summarized in Shaw/Williams/Baker/Wolschlager; see also *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 344 (2004).

[30] By accepting the jurisdiction of this Court and its ruling on § 925, Checkmate is now openly admitting that it has withheld earned compensation from all California-resident VoiceBite pre-closing equity holders—conduct that constitutes wage theft under California law. See **Labor Code §§ 201, 202, 203, 204, 221, 223**. Such conduct cannot be justified by reference to an out-of-state definition of "fraud," nor by any contract provision contrary to California's fundamental public policy.

[31] The indemnification cap in the Merger Agreement contains a fraud exception, which Checkmate has invoked to justify its withholding of earned wages (see ECF No. 23, Ex. N, Notice of Claim). However, the Merger Agreement expressly defines "fraud" as "common law fraud under the laws of the State of Delaware." (Warns Decl. Ex. A § 1.1 [Definitions].) As set forth above, the law of the case requires the application of California law to all substantive issues, and any attempt to import Delaware's definition of fraud is both voidable and has been voided by AV pursuant to Labor Code § 925.

for the related claims at issue; and (3) §9.8, waives jury trials.[32] Notably *it does not incorporate* either the IPAL OR IPAA. [33] The CCs in ¶ 42 assert that these 11th hour add-ons are "valid contracts entered into with consideration" with no further details. <u>They are not</u>, as detailed below.

### 2. Non-Competition Agreement (NCA) – Unenforceable Under CBPC § 16600

The NCA was found by this court to be an express condition of employment subject to § 925. It purports to prohibit competition, solicitation, and disparagement against "the Company"[34] for two years.[35] Checkmate fails even to *allege* the § 16601[36] "sale of business exception" in its counterclaims, but as the Court's ruling also implies, there is a substantial question of whether an acquihire type arrangement is more akin to employment or to a *bona fide sale* of business. The exception to § 16600's general bar was meant to protect *legitimate* business interests. Can a company with no customers, revenue or investors, a few months of code written by 2-3 engineers in a Cupertino garage, have legitimate interests to protect? This is not a case of AV selling "Arjun's Pizza Parlor" and opening up "Arj's Pizza Parlor" next door — what § 16601 was designed to protect — a legitimate and reasonable business interest.[37]

### 3. IP Acknowledgment Letter (IPAL) – Fatally Defective and Voidable

---

[32] AV demanded a jury trial with respect to his employment claims. However, as Checkmate's counterclaims now put the MA and complex IP issues at the center of this litigation, AV believes those claims are best resolved by the Court—not a lay jury—given their technical and legal complexity.

[33] The Merger Agreement is the integrated deal on its subject matter; nothing in it **incorporates** the IPAL or the IPAA by title, exhibit, or schedule. The Assignment Under California law, "in connection with" language is not incorporation by reference, which requires a **clear and unequivocal** identification of the specific document and mutual assent to its terms. *Shaw v. Regents*, 58 Cal.App.4th 44, 54 (1997); *Wolschlager v. Fidelity Nat'l Title*, 111 Cal.App.4th 784, 790–92 (2003).

[34] The NCA expressly defines "Company" as **VoiceBite**, an entity that ceased operations upon merger close. Nevertheless, throughout the agreement, "Company" is used in a manner that appears to refer interchangeably to VoiceBite and Checkmate, creating significant ambiguity about whose interests are being protected and what conduct is prohibited. If "Company" means **VoiceBite**, the provision is meaningless, as a non-operative entity has no interests to protect. If "Company" is intended to mean **Checkmate**, the definition of "business" as the "Company's current business of providing artificial intelligence powered voice systems for phone answering or for restaurant drive through order processing" also nullifies the NCA—as **Checkmate** had no such "current business." This vagueness is fatal to any restrictive covenant under California law, where such ambiguity must be construed strictly against the drafter—**checkmate**!

[35] The non-disparagement provision is **mutual**, also prohibiting executives of the company from disparaging VoiceBite's stockholders—which include Defendant.

[36] California treats employee restraints as per se void and construes the § 16601 sale-of-business exception narrowly; the acquihire posture here underscores the employment character. See *Ixchel Pharma, LLC v. Biogen, Inc.*, *9 Cal. 5th 1130, 1142–49 (2020); Edwards*, 44 Cal. 4th at 946–50; *AMN Healthcare, 28 Cal. App. 5th at 938–41. Cf.* Order at n.22 (defining "acquihire")

[37] What Checkmate claims is that AV has no right to compete, anywhere in the world, in a market he played a significant role in establishing—all while never having paid him a dime other than salary. The record shows that AV's "breach" consisted of seeking employment after his bonus was withheld while he was on medical leave. (ECF Nos. 18-4 at 75).

The IPAL is invalid and unenforceable under California law for multiple, independent reasons. First, its subject is *Christopher Lam*, not AV. By signing, AV merely verified that Mr. Lam acknowledged the referenced clauses, not that *AV* agreed to any obligations to Checkmate. If the Letter binds Lam, they must join Lam. If a typo, they must join Lam to prove mutual intent. Either way, *no Lam*, **no Letter**.[38] This is not a mere *scrivener's error*—it misidentifies **who** is bound—the kind of material defect equity will not "reform" without clear and convincing proof of mutual intent.

Here we have compelling evidence of the hurried and coercive process, where *neither the signatory nor the drafter had the chance to meaningfully review the final terms before execution*.[39]

The MA does not incorporate it — indeed it was introduced only after all *bargained for* terms of the merger had been finalized, *without new consideration*. As a contract of adhesion, that Checkmate admits in ¶ 18, any ambiguity or lack of material terms must be construed strictly against the drafter. See **Cal. Civ. Code § 1654**. The context, execution and shoddy drafting of the IPAL render it not only voidable, but evidence of procedural unfairness in the transaction as a whole.

#### 4. IP Assignment Ag. (IPAA) – Unenforceable Employment Condition Under CA Law

Along with IPAL, the IPAA was imposed at the 11th hour as—as Checkmate admits in CCs ¶ 18—a *requirement* to close the merger and begin employment.[40] The founders did not even realize they were executing a contract with *VoiceBite*—as "part of the transaction" with *Checkmate*. This agreement is unenforceable under California Labor Code §§ 2870-2872. It purports VoiceBite paid $100 to AV, does not allege payment method or show proof, and yet claims "millions" in damages.

**California Labor Code § 2870:** Bars employers from requiring assignment of inventions developed entirely on an employee's own time without employer resources, unless they directly relate to the employer's business or result from work for the employer.[41] AV's pre-VoiceBite code

---

[38] *Reformation corrects a writing to reflect a **mutual** intent; it does not swap obligors after the fact. The Lam/Vasan mismatch—admitted by K&L—defeats any "scrivener's error" theory and, under § 1654, is construed against the drafter.*

[39] Defendant alleges with particularity in the California Action that AV's actions in imposing these agreements constituted fraud and coercion, thereby rendering them voidable.

[40] It is in fact a Stripe Atlas template agreement meant to be signed by **cofounders of a new startup**, who in exchange for IP created **for the startup** prior to incorporation, would receive **founder-level equity** in the new entity. Stripe Atlas is a service that enables easy incorporation of Delaware C Corporations for startup founders. If this same agreement had been executed at the **formation** of VoiceBite, it would not have been a condition of employment—rather it would embody a business partnership between the founders. All pre-VoiceBite code used for VoiceBite was properly licensed by its CIIAA.

[41] **Whitewater West Indus. V. Alleshouse**, 981 F.3d 1045, 1056-60 (Fed. Cir. 2020) (prior-invention assignment restraints unenforceable under §16600 as a strong statement of CA policy);

had no relation to *Checkmate's* business on execution, as Checkmate bought VoiceBite to enter the Voice AI market. See *Id*. ¶ 14. The employer—*Checkmate*—must give written notice of these rights to new hires (Lab. Code **§ 2872**), and no such notice is alleged. Where, as here, IP assignment is required as a **condition of employment**, it is unenforceable to the extent it demands transfer of pre-existing or independently developed IP. A void agreement can't be breached, or the basis for fraud.[42]

**Forbidden Restraints**: The agreement is also forbidden under CBPC §§ 16600, 16600.1 and 16600.5—which bar restraints on trade and efforts to enforce them. "Holdover" or retro-capture terms that sweep pre-company or off-hours work operate as functional noncompetes and are void.

**Standing and Chain-of-Title**: The CCs imply that the agreement was between *Checkmate*, as VoiceBite's successor, and AV, but the counter-signatory is the <u>Mr. Nessler</u> who has declared that all the founders had equal information in disavowing his own employer's narrative. Mr. Nessler signed as VoiceBite's CEO—a position he no longer held on close. As AV and Mr. Nessler had equal information, any fraud claims are precluded by law. See Nessler Decl. ¶¶ 3, 6.

The agreement claims the AV accepted nor does it satisfy § 2870's employer-relatedness test, as none of the code related to *Checkmate*'s business, hence any IP assignment was dead on arrival.

**C.  Non-Compete Counterclaims Are Barred by Law and the Record**

Even if, *arguendo*, the court entertains the notion the § 16601 exception applies, Checkmate has not alleged facts to support a breach claim. Indeed, the two emails filed in its Motion to Dismiss here in this court (ECF 18-4 at 75), foreclose any argument the agreement was breached.

1. AV's Two Emails Demonstrate Compliance, Not Breach

In the first, AV expressly conditions his availability on specific terms of the agreement, showing intent to comply: "I have a short window to decide to leave and *nullify my non-compete*… and I **can** bring over 2 additional 10x engineers ...". (Ex. I, "Lunchbox Emails")

In the second, AV shows *caution* in selecting demo recordings not from Checkmate or VoiceBite, but from 2021-2022, prior to any active obligations to any operating entity: "Ok, I figured it's safer to send some older recordings so there's no potential risk … these are from Cyborg (my earlier company) and from 2021-2022.". *Id*.

---

[42] California bars employers from demanding assignment of prior/independent inventions and requires § 2872 notice; restraints reaching prior inventions are also void under § 16600. Cal. Lab. Code §§ 2870–2872; see also *Whitewater West*.

### 2. The Terms of the Non-Compete Agreement Foreclose Breach

The agreement's operative restriction is defined in its ¶¶ 2 and 3: *during the "Restricted Period" of two years, the Stockholder (i.e. AV), shall not*:

> **Non-Competition** (a) engage or participate in, or acquire any financial or beneficial interest in, any business that competes with the Business in the Restrictive Territory; **¶ 2;**
>
> **Non-Solicitation** (a) solicit or attempt to solicit any of employees of Acquirer or the Company or induce any of employees of Acquirer or the Company to resign from their employment by Acquirer or the Company, as applicable; **¶ 3.**
>
> (**For Both**) (b) induce or assist any other Person to engage in any of the activities described in subparagraph (a) **¶¶ 2, 3**

Critically, AV (1) did not accept a job offer, (2) engage or participate in a competing business, (3) attempt to solicit any Checkmate employees or customers, share confidential information or disparage the company. No facts beyond these emails are alleged, so there is simply no basis for any claim of breach nor any damages to calculate for the alleged breach.[43]

### 3. The Agreement Is Void and Unenforceable

The agreement suffers from serious drafting defects. It defines Checkmate as "Acquirer" and VoiceBite as "Company" at the outset but seems to alternate between using "Company" to refer to VoiceBite and at times seemingly to Checkmate itself—often within the same section or even sentence. This shifting and circular usage renders it impossible to determine which entity's business or interests are being protected, defeating any claim to a clear and enforceable restriction.

Under California law, even valid restrictive covenants are strictly construed, and any ambiguity is resolved against enforcement.[44] The agreement conditions enforceability on employment by "Company." AV was only employed by Checkmate, not "Company". Where, as here, a condition precedent fails, the agreement is unenforceable. Moreover, AV provided no separate consideration in exchange, rendering the agreement void regardless.

### 4. No Legitimate Business Interest to Protect

---

[43] See **Vasan Decl. Exhibit B**: Compilation of Non-Compete Allegations and Source Material

[44] *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946–50 (2008) ("no rule of reason" for employee restraints; employee non-competes void even if narrow); *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142–49 (2020) (clarifies § 16600: per se rule for employee restraints; rule-of-reason analysis limited to certain B2B contexts);

The agreement defines "Business" as "the Company's *current* business of providing artificial intelligence powered voice systems." Neither VoiceBite nor Checkmate had any business operations, customers, or goodwill in the voice AI market at the time of agreement. With no legitimate interest to protect, the agreement fails under any applicable governing law.[45]

### 6. Mutual Non-Disparagement—Checkmate's Breach[46]

From the outset of employment, Checkmate executives singled out and publicly shamed AV for advocating for his legal and contractual rights (see Exhibit M, "BYOD Retaliation"). This conduct escalated when AV demanded timely payment of back pay and earned bonuses[47].

By any reasonable interpretation, these actions constitute a direct breach of the *mutual* non-disparagement provision. Thus, not only is Checkmate unable to articulate a colorable breach by Defendant, but it is also itself in violation of the very agreement it seeks to invoke.

### 7. Dismissal with Prejudice is Warranted due to the Evidence on Record

Checkmate's continued prosecution of this claim, in light of dispositive evidence to the contrary, is improper and should not be tolerated by this Court. Where, as here, amendment would be futile and no colorable claim can be pleaded, dismissal with prejudice is required to preserve judicial resources and protect AV from further abusive litigation.

### 8. The Non-Competition Agreement is Void Under its Own Terms

Under its *bargained for* terms, the Agreement terminates under its own accord if the Stockholder (AV) is terminated without Cause or if he resigned for Good Reason:

> The Restrictive Period shall terminate if Stockholder terminates his employment for Good Reason or the Company terminates Stockholder's employment other than for Cause. ¶ 1

Moreover, "Cause" is to be determined by a specified process: good faith negotiation followed by mediation/arbitration if required:

> Any controversy, dispute or claim regarding whether a termination is for Cause shall first be settled through good faith negotiation. If the dispute

---

[45] Defendant notes this issue is typically Summary Judgment territory and preserves it here.

[46] This Court has recognized AV's allegations include a violation of the NCA's non-disparagement clause. Order at 11.

[47] Checkmate's pattern of conduct included regular threats of termination and public shaming in front of his teammates, including referring to Defendant as "a problem." These actions persisted through his termination and beyond. After Defendant's termination meeting, Checkmate executives Michael Bell and Amy Brown can be heard discussing their ongoing efforts to isolate and disparage Defendant in order to justify the termination to the team.

cannot be settled… the parties agree to attempt in good faith to settle…
by mediation administered by JAMS… ¶ 12

At no time did Checkmate invoke or initiate this process. Instead, having cited the emails as "cause" at time of termination, it subsequently repudiated its own rationale—repeatedly asserting in demand letters and official court filings that Defendant had _resigned_ [48]. See RJN C.

Under these circumstances, Checkmate is **estopped** from asserting any theory of "cause" and the contract's post-termination restrictions—including the non-compete, non-disparagement, non-solicit and forum selection provisions are void and unenforceable as a matter of law.

**D. Fraud Counterclaims Fail Under Rule 9(b) and Are Evidence of Retaliation**

The fraud counts collapse into contract. Checkmate pleads no actionable misrepresentation by AV beyond the _existence of signed reps_ and incomplete disclosures. That is a contract theory, not tort. To state fraud, a plaintiff must plead with particularity the **who, what, when, where,** and **how** of a false statement and facts showing **knowledge of falsity** and **intent**. Absent a concrete, speaker-specific falsehood, Rule 9(b) compels dismissal. And the economic-loss rule bars bootstrapping contract noncompliance into tort absent a recognized, independent fraud—_Robinson Helicopter Co. v. Dana Corp._, 34 Cal. 4th 979, 990–93 (2004). These claims represent a mistaken misunderstanding of what constitutes fraud under the law.

1. Complete Failure to Satisfy Rule 9(b)'s Particularity Requirements

Checkmate's counterclaim falls short of the heightened threshold on multiple fronts:[49]

**No Temporal Specificity**: "Throughout the Transaction" (¶57) is vague and conclusory. _Id_. Without identifying when any specific representation was allegedly made. Rule 9(b) requires "the time" of each statement, not sweeping references to multi-month periods.

**No Geographic Specificity**: Checkmate fails entirely to identify where any alleged oral misrepresentations were made. For written representations, it provides no document dates, meeting locations, or other indicia of place required by Rule 9(b).

---

[48] This tactic was no oversight: by claiming resignation, AV sought to evade its contractual obligation to pay severance totaling over $120,000—only to belatedly claim "for cause" when its ruse was up.

[49] Fraud claims must plead the who/what/when/where/how with **specificity**; conclusory scienter and broad timeframes do not suffice. _Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106–08 (9th Cir. 2003);_ see also _Kearns v. Ford Motor Co., 567 F.3d 1120, 1124–26 (9th Cir. 2009)_. Checkmate's references to "in the months leading up to the transaction" are insufficient and particularly so as these vague periods often contain events of real significance: i.e. merger close and AV's termination.

**No Particularized Scienter**: Checkmate makes only generic, conclusory allegations that "Vasan knew they were false when he was making them" (¶19) without any factual allegations about what Defendant specifically knew, when he knew it, or how it can prove his mental state. Rule 9(b) requires more than threadbare assertions of intent.

**No" assignment-impossibility" Tort**: CCs ¶ 19 is "right" only in one respect: under **Cal. law**, AV could not—as a condition of employment with *Checkmate*—be compelled to assign pre-VoiceBite, off-hours code that neither related to *Checkmate*'s business nor resulted from work for it. See Lab. Code §§ 2870–2872. But a *statutory bar* is not *fraud*. Checkmate pleads no date for the code transfer, repository event or authorship timeline, which independently defeats particularity as to "when" and "how" any statement was false when made. *VoiceBite* transferred its code to *Checkmate*—as Checkmate admits, well after merger close (see Vasan Decl. Ex. D).[50] Under 9(b), Checkmate's failure to allege otherwise with specificity is fatal. At most, this is a chain-of-title issue or a drafting oversight by Checkmate, not a breach by AV or VoiceBite—not fraud.

**Checkmate's Summary Precludes Scienter and Reliance**: Chief of Strategy Bell, as alleged and quoted in AV's operative complaint—and exhibited in his judicially noticed SDNY Motion to Dismiss—expressly (and falsely) described the IPAL as mutually beneficial and as conferring "no new liability" on the founders. Its purpose, Bell claimed, was to mount a *joint defense* against 3rd party claims by a former employer. At no point does Checkmate allege that it informed the founders that it could support *direct* claims, let alone in their *individual* capacity.[51]

These failures require dismissal under Rule 9(b) and are incurable as a matter of law.

2. Checkmate's Own Allegations Prove the Absence of Fraud

---

[50] Checkmate's own pleading makes "delay after delay" central to its fraud theory. CCs ¶21. But its contemporaneous escrow email (Ex. D to the Vasan Decl. filed herewith) shows this "delay" was tied to ongoing bonus-related negotiations—not concealment—and that the code remained in VoiceBite's possession until its post-close transfer. The email chain confirms CEO Agarwal stating, "We are expecting to complete the stock option grants and transfer the first tranche of bonus by first week of September. Post that, the code should be shared/transferred to Checkmate ownership". These emails also assured that "no changes in how the code is managed/operated", that the bonus would be "transferred to an escrow account in the first week of September and earmarked for the Voice AI team" and that the founders retain "full autonomy" even after transfer. Because the counterclaims themselves put the "delay" at issue, and the document is a party admission, it is incorporated by reference and properly considered on this motion. See *Khoja v. Orexigen Therapeutics, Inc.* at 1002-03.

[51] This shows fraud by *Checkmate*, not AV—who raises this allegation here, as it is in his operative complaint (see **Fn 22 at 17** and **Exhibit S**), solely to show what Checkmate said and when (party-opponent statements) and the effect on scienter and reliance at this stage—days before close. See **Fed. R. Evid. 801(d)(2)**; (documents referenced in and central to the pleadings may be considered to prevent cherry-picking). AV does not seek judgment on the merits, which, if necessary, will be presented at summary judgment.

Moreover, Checkmate has pleaded facts that affirmatively negate the essential elements of fraud. The "evidence" Checkmate cites proves transparency and good faith, not deception.

If AV were actually attempting to conceal his father's contributions, he obviously would have removed his father's name from the code—a task requiring a simple search-and-replace. The fact that his father's name remained clearly visible in a few code modules proves the exact opposite: there was no intent to hide anything because there was nothing meaningful to hide.

Checkmate concedes that AV "*discussed with his co-founders the possibility of disclosing to Checkmate the fraudulent representations he made concerning VoiceBite's AI technology*" in ¶35. This allegation is dispositive. Fraudsters do not discuss disclosure with others—they hide their conduct. The fact that AV <u>advocated transparency</u> but ultimately accepted the ***team's consensus*** on what constituted appropriate disclosure, shows good faith and collaboration, not intent to deceive— and highlights the *joint* nature of the negotiations and disclosure decisions.

### 3. Checkmate Misattributes Team Conduct to Individual Defendant

Checkmate's fraud theory treats AV as a sole rogue actor, when in fact VoiceBite had three co-founders with shared responsibilities, who negotiated and acted jointly.

**Wrong Person for Disclosure Duties**: Checkmate provides no allegations about who was responsible for data room management, disclosure updates, or documentation during closing. AV cannot have fraudulent intent for duties that were not his responsibility. If there were any material disclosure deficiencies—which the founders dispute (Nessler Decl. ¶¶ 6, 12-14)—they would represent collective team oversights in a complex transaction, not individual fraud.

**Misattribution of Statements**: The most egregious example appears at CC ¶ 33, where Checkmate attributes to AV statements that were made by *joint* shareholder counsel in response to its own Notice asserted against all VoiceBite founders. Counsel's nuanced legal argument that the ***specific*** code exhibited in its Complaint did not constitute IP per recent Supreme Court precedent was twisted into a personal "admission" that VoiceBite had no value. This demonstrates confusion— or deliberate deception—about *what was said* and *who said what*. See Ex. Y, SDNY Sanctions Mot.

As the Nessler Declaration establishes, the founders negotiated together, decided together, and were fully transparent with each other. There is no dispute here—Checkmate has conceded this point in its own counterclaims, and other filings in SDNY.

### 4. No Material Misrepresentation

Checkmate's fraud claim fails under Rule 12(b)(6) and Rule 9(b) because it does not plead facts showing a material misrepresentation. It alleges, at most, that certain statements about authorship or "originality" of certain functional code modules were inaccurate. But it nowhere alleges, except in wholly conclusory terms, that these statements were material to its decision to enter the transaction or would have altered the value, functionality, or marketability of what was acquired. Rule 9(b) requires particularized factual allegations of materiality; none are provided.

In reality, the "disputed" code consists of functional modules that AV co-wrote with his father over many years, *not* the large language model AI voice ordering that was VoiceBite's core innovation and continues to be used and developed by Checkmate. Checkmate acquired exactly what it bargained for: a fully formed Voice AI team and technological foundation to develop Voice AI products. The existence of the coauthored modules did not reduce VoiceBite's technical capabilities, market value, team expertise or business prospects. Mr. Varadarajan's Declaration, also judicially noticed successfully by Checkmate, expressly refutes the CCs ¶ 28 allegation that he was "another 3rd party with claims to the code". AV, and on information and belief, the other founders immediately notified Checkmate that AV's father was fully aware and approved of the use, beginning in early December 2024, when Checkmate manufactured its allegations. By *re-pleading* this accusation in the face of their own judicially noticed evidence to the contrary, Checkmate and its counsel violated Rule 11(b)(3), in one of the clearest examples of knowing falsity on this docket.

### 5. No Cognizable Damages

Here, Checkmate does not allege with any particularity that it failed to receive the value it bargained for. The allegations are wholly conclusory: Checkmate admits it acquired the full VoiceBite team, technical foundation, and product roadmap, which are currently being used to develop and launch successful voice AI products—including with major customers such as Popeye's. There are no non-conclusory allegations that any alleged omission or misstatement caused loss of value, loss of functionality, or other cognizable harm. On the contrary, Checkmate has received and profited from exactly what it sought to acquire. Furthermore, it's claims of being injured by paying "millions of dollars" is contradicted by its request for Declaratory Relief from its bonus obligations, and its own Notice asserting forfeiture of the only possible "millions" at issue.

Because Checkmate has not pled facts showing any actual injury resulting from the alleged fraud, the claim fails as a matter of law and must be dismissed.

### 6. No Reasonable Reliance

Checkmate cannot claim reasonable reliance while simultaneously claiming it was duped by obvious, easily discoverable information. Checkmate had every opportunity to ask for a code walk-through with technical members of its team. Rather than insist on overbroad IP agreements, unsuitable for a young unfunded startup, it could have required a code review before proceeding.

### 7. The Negligent Misrepresentation Claim Fails for the Same Reasons

Checkmate's negligent misrepresentation claim fails for all the same reasons as the fraud claim, plus the additional unfulfilled requirement that AV owed Checkmate a duty of care. Checkmate has called the merger an "arm's length commercial transaction between sophisticated parties with counsel". In such a transaction, no such special duty exists.

### 8. Checkmate's Fraud Allegations are Evidence of its Own Fraudulent Conduct

The IPAL and IPAA were coerced at the 11th hour, after negotiations had explicitly concluded[52]. Checkmate further delayed production of these documents until it opposed AV's motion to dismiss in SDNY and cannot allege with specificity any actual consideration provided in exchange for the *personal* liability it purports they confer. Checkmate's wholly conclusory assertions of the validity of these agreements cannot survive rule 9(b).

Checkmate's counterclaim relies on vast leaps of logic. The mere presence of a name in a codebase does not justify an inference of infringement or misappropriation.[53] All use of legacy code was expressly authorized. But even assuming infringement—which is denied—this does not, without particularized allegations, support an inference of fraud.[54] *Even* if Checkmate could plead fraud, all code was transferred by VoiceBite to Checkmate[55], not by AV personally.

---

[52] See AV's Am. Cmpl. ¶¶ 114 and here as Vasan Decl. Exhibit E, "IP Letter Summary".

[53] See *Cadence Design Sys., Inc. v. Pounce Consulting, Inc.*, 2019 WL 1768618, at *2 (N.D. Cal. Apr. 22, 2019)* (Similarity in file headers or code structure, without more, does not plausibly allege misappropriation or fraud.).

[54] See (SDNY) Vasan Decl. ¶ 4-5; Varadarajan Decl. ¶ 3; *GEICO v. Dizol*, 133 F.3d 1220, 1222–26 (9th Cir. 1998) (en banc) (Brillhart/Wilton factors govern DJ discretion in Ninth Circuit.)

[55] See Exhibit D, Agarwal Email re Escrow of Bonus Amounts, stating that the codebase itself was to be transferred from **VoiceBite** to **Checkmate** in September 2024—months after the merger closed, and only after bonus funds were either paid

**E.  Breach Counterclaims Are Legally and Contractually Defective**

To state a viable counterclaim for breach of contract, a party must plausibly allege: (1) the existence of a valid and enforceable contract; (2) the party's own substantial performance or excuse for nonperformance; (3) the opposing party's *material* breach; and (4) resulting damages.[56]

Checkmate's breach counterclaims fail under each element. First, as detailed above, the contracts at issue are void or voidable in whole or in part under California public policy and the specific doctrines of duress, unconscionability, and statutory illegality.[57] Second, Checkmate fails to plausibly allege its own substantial performance under the purported agreements—a required element under California law.[58] Third, the counterclaims ignore fundamental defenses such as waiver, estoppel, and prior material breach, all of which bar recovery when the party asserting breach has itself failed to perform.[59] Moreover, any attempt to recover under contract in violation of California wage statutes is independently barred.[60] Because the breach counterclaims are fatally defective both as a matter of law and under the operative contracts, they must be dismissed.[61]

**F.  Declaratory Relief Counterclaim Seeks to Endorse Wage Theft[62]**

---

to the founders or escrowed for withdrawal at their preferred time. This demonstrates Checkmate's own understanding of the founders' wariness of Checkmate's intentions and weariness of its repeated failures to meet its obligations, not AV's "**evasiveness**". In any event, this was not a transfer from AV to Checkmate — or connected with merger close. On an IP level, any personal code would have been by this time *licensed* by the CIIAA of VoiceBite or Checkmate.

[56] See Reiniger v. W.L. Gore & Assocs., Inc., 2024 WL 353429, at *3 (C.D. Cal. Jan. 30, 2024) (applying California law; quoting Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011)); Iqbal v. Ashcroft, 556 U.S. 662, 678 (2009) (plausibility standard applies to pleadings, including counterclaims); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006).

[57] *Edwards v. Arthur Andrsn LLP*, 44 Cal. 4th 937, 945–46 (2008); *Narayan v. EGL, Inc.*, 616 F.3d 895, 899–902 (9th Cir. 2010).

[58] *See Oasis W. Realty, 51 Cal. 4th at 821*; Restatement (Second) of Contracts § 237.

[59] See *Brown v. Grimes*, 192 Cal. App. 4th 265, 277–78 (2011).

[60] See Lab. Code § 1194(a) (employee may recover unpaid wages "notwithstanding any agreement to work for a lesser wage"), Section 16600 et seq. (voiding restrictive covenants), and Lab. Code § 925 (voiding forum selection and choice-of-law clauses that deprive California employees of California protections).

[61] See *Iqbal*, 556 U.S. at 678; *Pineda v. Sun Valley Packing, L.P.*, 2021 WL 3466899, at *5 (C.D. Cal. May 4, 2021) (dismissing contract-based counterclaims incompatible with statutory rights).

[62] Courts should not entertain Checkmate's claims that would contravene controlling statute or policy; the Ninth Circuit applies Brillhart/Wilton discretion. **Gov't Emps. Ins. Co. v. Dizo**l, *133 F.3d 1220, 1222–26 (9th Cir. 1998) (en banc)*.

It is well-settled that a declaratory judgment claim may not be used to evade statutory protections or to obtain a declaration that would contravene fundamental public policy.[63] The Ninth Circuit has repeatedly cautioned that courts should decline to entertain declaratory relief claims that would merely rubber-stamp conduct prohibited by controlling law or public policy.[64]

Here, Checkmate's counterclaim for declaratory judgment effectively seeks an order authorizing its refusal to pay employment compensation earned under California law. Such relief would directly violate the fundamental policies embodied in the California Labor Code, including §§ 201–203 (timely payment), § 204 (regular paydays), and § 1194 (right to recover unpaid wages). Federal courts sitting in California have repeatedly refused to entertain declaratory claims that would enable wage theft or undermine employees' statutory rights.[65] Indeed that this claim was brought *verbatim* to a court that has expressly ruled California law governs shows improper purpose.

Further, the claim mirrors AV's wage and contract claims and would not "serve a useful purpose in clarifying the legal relations at issue." See *Dizol* 133 F.3d 1220, 1225 (9th Cir. 1998) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)). Accordingly, this Court should dismiss the claim for declaratory relief for two reasons: (1) it seeks a judicial endorsement of conduct that would violate core statutory protections and well-established public policy against wage theft and (2) as the same issues will be resolved by the coercive claims, dismissal is appropriate.

### G. Failure to Allege Satisfaction of Condition Precedent and Join Indispensable Parties

The requirement to join all indispensable parties is here reinforced in contractual provisions *bargained for* by the VoiceBite founders and. The MA §§ 8-9 reflects the parties' deliberate choice to structure rights and liabilities *collectively*, anticipating that any dispute or claim would be resolved by the Holder Rep on behalf all pre-closing equity holders, with pro-rata liability. This protection is itself reinforced by the safeguards of Rules 12(b)(7) and 19. Checkmate's attempt to circumvent

---

[63] See **MedImmune, Inc. v. Genentech, Inc.**, 549 U.S. 118, 126–27 (2007) (declaratory relief must present an **actual controversy** and cannot be used as an instrument to undermine substantive law); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (declaratory relief is discretionary and must serve the interests of justice, not frustrate statutory mandates).

[64] **United States v. State of Wash.**, 759 F.2d 1353, 1357 (9th Cir. 1985);

[65] See, e.g., **Pineda v. Sun Valley Packing**, L.P., 2021 WL 3466899, at *4 (C.D. Cal. May 4, 2021) (dismissing declaratory counterclaim that would circumvent statutory wage rights); **O'Brien v. Cam West, Inc.**, 2016 WL 1555659, at *4 (C.D. Cal. Apr. 14, 2016) (no declaratory relief to negate statutory wage protections).

both sets of protections is fundamentally unjust, and precisely the type of litigation these rules were designed to prevent. This unfairness manifests itself in two distinct, yet closely intertwined ways:

**First**, AV cannot possibly receive a fair trial when isolated from Mr. Nessler and Mr. Lam. As affirmed in the Nessler Decl. ¶¶2-3, all key decisions and negotiations were made collectively as equal partners—and in the interest of the five pre-closing equity holders. This collective process was explicitly bargained for as a core protection against the kind of divide-and-conquer tactic at issue in this litigation. The founders were induced to believe that any dispute or attempt to deny the agreed-upon benefits would force Checkmate to act against all of them, not just one, and to risk sacrificing its entire Voice AI product in the process. If there were any real liability arising from the team's good-faith actions—which the founders categorically deny and Checkmate *fails to allege*[66]—liability was always intended to be shared pro rata, as clearly set forth in the Merger Agreement.

**Second**, Mr. Lam, Mr. Nessler, Mr. Aoki, and Mr. Garcia have also been denied their hard-earned bonuses—even as they continue working for the benefit of Checkmate. They subsist in an untenable position: their participation in this litigation, in support of their teammate and their own financial interests, directly risks retaliation under Checkmate's transparent strategy to unwind the very merger it claims was "bargained for." Three of these pre-closing equity holders are lifelong California residents. Yet rather than facing the team collectively with their shared knowledge, strategy and resources, Checkmate isolates and targets AV alone, seeking to deny benefits to all by litigating against one. This attempt to play both sides is not just a violation of the parties' bargain; it is a dangerous and novel legal theory that, if endorsed, would permit any acquiring employer to withhold wages indefinitely from entire *acquihired* teams by litigating against a single member.

These abusive tactics, now also being separately contested through shareholder counsel Mr. Thomas, amount to a transparent attempt to turn a supposedly fair bargain into a theft of a California startup—one founded in a Cupertino garage by its original team, who devoted themselves to building Checkmate's Voice AI product, now live in major national brands like Popeye's Louisiana

---

[66] See Nessler Declaration on Behalf of the VoiceBite Pre-Closing Equity Holders

Kitchen. The continued progress and viability of the VoiceBite project independently refute any claim of fraud or any attempt to circumvent contractual indemnification caps.

### H. Dismissal With Prejudice and Sanctions May Be Warranted

Dismissal with prejudice is not only justified but required in light of the extraordinary record before this Court. Rule 12(b)(6) mandates dismissal where, as here, a party fails to state any plausible claim for relief, and amendment would be futile.[67] Each of Checkmate's counterclaims is not merely defective, but rests on legal theories and factual assertions already rejected by this Court, contradicted by controlling California law, and further refuted by the record, including Checkmate's own admissions, judicially noticed filings in the SDNY action and party witness declarations.

Moreover, sanctions may be warranted under both the Court's inherent authority and 28 U.S.C. § 1927. A federal court may impose sanctions where a party's conduct demonstrates bad faith, abuse of process, or a pattern of frivolous and retaliatory litigation.[68] Here, Checkmate's copy-pasted counterclaims, refusal to join clearly indispensable parties, and pursuit of claims barred by law and precluded by its own evidence all reflect a broader scheme to weaponize process and punish those who insist on their statutory and contractual rights. Courts routinely issue sanctions for such conduct, both to compensate the injured party and to deter further abuse.[69]

## VI. CONCLUSION

The VoiceBite team worked in close collaboration for over six years, across five companies, pioneering practical voice AI for restaurant ordering.[70] Mr. Varadarajan—one of two "third parties"

---

[67] See *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (dismissal with prejudice appropriate where amendment would be futile, or claims are legally deficient).

[68] See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Fink v. Gomez*, 239 F.3d 989, 991–94 (9th Cir. 2001).

[69] See *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–09 (2017) (a sanction must be compensatory rather than punitive when imposed pursuant to civil procedures); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395–97 (1990).

[70] At least three of the space's most prominent competitors were either founded by AV and Mr. Nessler or built from startups acquired from them. Notably, Kea, now with over $45 million in venture funding, and Presto, which pivoted from "tablet on the table" to a public Voice AI leader and went public, both advanced substantially through the acquisition of CyborgOps and the vision of AV, Mr. Nessler, and Mr. Lam (then Presto's Voice PM). AV co-founded Kea as President/CTO with Mr. Nessler as first hire, launching the first widely deployed AI-powered restaurant phone ordering system at hundreds of Domino's locations—outcompeting Domino's own Google partnership—using a human-in-the-loop (HITL) AI system they invented. The two, along with AV's father, Mr. Varadarajan, refined HITL+AI at CyborgOps, collaborating with OpenAI engineers on early integration with its API and pioneering multilingual AI ordering for clients from small Chinese restaurants to Marco's Pizza. Presto acquired CyborgOps, recognizing that its drive-thru ambitions required HITL, and—through collaboration with Mr. Lam—rolled out to major chains including Carl's Jr., Del Taco, and Wienerschnitzel, and paved the way for its public listing.

named in Checkmate's complaint—has expressly refuted any claims to VoiceBite's IP or any liability to Checkmate.[71] Indeed, AV, Mr. Nessler, and Mr. Lam left Presto — the other 3rd party named in the CCs — when new management refused to pursue true automation with emerging Large Language Model (LLM) AI. The founders' vision—LLM-powered voice AI—was the core of what they built at VoiceBite and ultimately "sold" to Checkmate. But the deal was not about a static codebase, but about their vision, roadmap, track record, and the novel AI codebase they were actively developing—as Checkmate CEO Agarwal has publicly acknowledged (Ex. C):[72]

> *In the coming Q3 or Q4 of this year, Agarwal anticipates the addition of an AI-voice drive-thru product. VoiceBite was founded just last year. When asked what attracted Checkmate to go all-in with the startup,* **he said the three co-founders, Robert Nessler, Arjun Vasan and Chris Lam, have extensive experience in developing successful voice AI solutions***. With former roles in companies such as kea and Presto, the trio has helped create products for hundreds of quick-service restaurants.* – Food on Demand Press Release, June 12, 2024,

Checkmate's claims about buying VoiceBite "for the code" are therefore unsustainable. Nevertheless, the founding team—and two consultants, including a star engineer who joined Checkmate along with the founders—substantially developed their LLM based product *after* AV messaged CEO Agarwal over LinkedIn, seeking partnership and customers, not to sell their startup (then just two months old). During merger negotiations—*initiated by Checkmate and resisted strongly by AV*—the team was determined to build technology of real value, a goal openly discussed among themselves and with Agarwal and Bell. The founders regularly demonstrated new features with Checkmate's team during negotiations. VoiceBite's IP *was being created in real time during the four months prior to the merger*, including its integration with the Checkmate platform—work for which the team was not being paid and during which the founders were barred from seeking other sources of income or investment—a situation Checkmate exploited to establish deal leverage.[73]

---

[71] See Varadarajan Decl. from AV's SDNY Motion to Dismiss, judicially noticed at Checkmate's unopposed request

[72] Official merger press release and party admission, posted at Food On Demand—a prominent industry publication—on June 12, 2024: https://foodondemand.com/06122024/checkmate-steps-out-with-a-new-identity-and-expanded-ordering-solutions/. Admissible under Fed. R. Evid. 801(d)(2); see *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). See Vasan Decl. Exhibit C: VoiceBite Merger Press Release

[73] See AV's Amended Complaint ¶¶ 104 to 116

The codebase and product roadmap developed during negotiations serves as the foundation for Checkmate's Voice AI ambitions to this day (Nessler Decl. ¶¶ 12–14, 18).

Checkmate's own legal notices and filings lay bare it's scheme to attribute group conduct to AV as an individual. In his own filings in SDNY, AV clearly identified the source of the allegations in ¶¶ 33-34 of its complaint there—and counterclaims here—a *joint* shareholder letter from "Grant Thomas on Behalf of Robert Nessler—*Holder's Representative for VoiceBite Corporation shareholders*", in response to its own Notice asserting forfeiture of all the team's retention bonuses and merger equity (served only on Mr. Nessler with the salutation "*Dear Holder Representative*"). In response to AV's motion for post-dismissal sanctions, Checkmate finally conceded that AV's identified source was accurate but mislabeled Mr. Thomas "his [AV's] lawyer" and pivoted to accusing AV of misconduct for heated emails he had sent in *response* to such knowing falsehoods (including many presented to this court), demanding they be retracted. *This court has already decided the question of **individual representation***. Mr. Thomas cannot be "AV's lawyer"—whose duties are to *Mr. Nessler*, and through him, *the shareholders*. The Nessler Decl., and the evidence on record before this court and that one, foreclose any argument against proper joinder.

To reduce the founders' efforts—both leading up to the merger and *during employment*—to a dispute over scraps of legacy code, without any plausible theory of damages, is not only baseless—it is an affront to both the team's legacy and the spirit of California innovation and the letter of its public policies. To pretend as if AV built and sold VoiceBite entirely on his own—or as some sort of solo mastermind—is an injustice to his cofounders—one compounded by Checkmate's inexcusable misrepresentations[74]. Through abuse of process [75]— including ongoing witness intimidation and retaliation[76]—and indeed fraud upon two federal courts, Checkmate seeks to turn the parties' "bargain" into a swindle. California public policy demands more. The founders deserve more. AV respectfully requests that the Court grant relief as set forth in the concurrently filed [Proposed] Order, and award such further relief as the Court deems just and proper.

[74] See AV's Post-Dismissal Motion for Sanctions filed in SDNY (submitted for Judicial Notice concurrently with this motion) and his Motion to Strike Affirmative Defenses and Counterclaim Allegations also filed concurrently herewith.

[75] Checkmate's answer includes no less than 46 boilerplate affirmative defenses, including many on their face impossible here, such as statute of limitations defenses. Such pleading is clearly improper under federal precedent: see *Wesch v. Yodlee, Inc. Case No.* 3:20-cv-05991-SK, ECF No. 137 (N.D. Cal. Dec. 6, 2021), striking all 28 such defenses as far too many. Source: https://www.wilmerhale.com/en/insights/client-alerts/20211221-combatting-affirmative-defense-inflation

[76] See AV's Notice of Continuing Witness Interference and Retaliation at ECF 75.

1
2
3
4
5
6
7
8                                              **Respectfully Submitted**,

9

10    Dated: **August 15, 2025**                 */s/ Arjun Vasan*

11            In **Cerritos, CA**            _____

12                                              **Arjun Vasan**

13                                              Plaintiff In Pro Per

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28