1    ARJUN VASAN

2    PLAINTIFF IN PRO PER

3    ARJUN.VASAN@GMAIL.COM

4    (562) 900-6541

5    12615 193RD STREET

6    CERRITOS, CA 90703

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   ARJUN VASAN,                        Case No.:  CV-00765-MEMF-JPR
                                          Hon. Maame Ewusi-Mensah Frimpong
12              Plaintiff and Counter-Defendant,
                                          **OBJECTION TO UNTIMELY OPPOSITION**
13        v.                              **TO MOTION TO DISMISS (Dkt. 79);**
                                          **[PROPOSED] MEMORANDUM IN REPLY**
14

15   CHECKMATE.COM, INC.,                 Complaint Filed: January 28, 2025
                                          Hearing: ~~10:00 a.m. on October 9, 2025~~
16   (dba "Checkmate")                    Courtroom: 8B

17              Defendant and Counterclaimant.

18

19              **OBJECTION TO UNTIMELY OPPOSITION**

20        Plaintiff Arjun Vasan ("AV") objects to the untimely opposition (Dkt. 94) filed by Defendant

21   Checkmate.com, Inc. ("Checkmate") and requests that it be admonished for filing such without

22   leave. See L.R. 7-12, 7-13, Dkt. 89. In the case the Court is inclined to consider the papers, AV

23   lodges herewith his [Proposed] Memorandum in Reply and Declaration authenticating the two IP

24   agreements alleged to be breached in the counterclaims but not attached by Checkmate.

25                                        **Respectfully submitted**,

26   Dated: **September 24, 2025**        /s/ *Arjun Vasan*

27        In: **Cerritos, California**

28                                        **Arjun Vasan**, Plaintiff *In Pro Per*

                                    i

## TABLE OF CONTENTS

**OBJECTION TO UNTIMELY OPPOSITION** ...................................................................... **I**

**TABLE OF CONTENTS** ...................................................................................................**II**

**TABLE OF AUTHORITIES** ..............................................................................................**II**

**INDEX OF REFERENCED EXHIBITS** ............................................................................**VI**

**[PROPOSED] MEMORANDUM IN REPLY** ....................................................................**1**

I.    INTRODUCTION ......................................................................................................1

II.   ARGUMENT ..............................................................................................................2

    *A.*   *The Counterclaims Cannot Survive California Law* ........................................*2*

    *B.*   *The Counterclaims Contradict the Operative Contracts* ................................*3*

    *C.*   *The Breach Counterclaims Fall with the Contracts* .......................................*6*

    *D.*   *The Fraud Claims (IV and V) Fail Further Under Rule 9(b)* ..........................*9*

    *E.*   *The Declaratory Relief Claim (VI) is Duplicative of AV's Breach Claims* .....................*11*

    *F.*   *Checkmate's Contractual Overreach is Unconscionable on the Pleadings* ....................*12*

    *G.*   *Checkmate "Millions of Dollars for Code" Theme Contradicts the Contracts* ..............*13*

    *H.*   *The Counterclaims Rely on Coerced Pre-Suit "Admissions"* ..........................*13*

    *I.*   *Checkmate's Evidentiary Withholding Confirms Bad Faith* ...........................*14*

    *J.*   *The Counterclaims Should be Dismissed with Prejudice* .................................*14*

    *K.*   *Joinder is Required if any IP/Fraud Claims Remain* .....................................*15*

III.  CONCLUSION ..........................................................................................................16

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6**............................................**18**

## TABLE OF AUTHORITIES

CASES

*Aetna Bldg. Maintenance Co. v. West*,
    39 Cal. 2d 198, 204–05 (1952) ........................................................................8

*Alliant Ins. Servs., Inc. v. Gaddy*,
    159 Cal. App. 4th 1292 (2008) ........................................................................4

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal.4th 83, 114 (2000) ..............................................................................11

*Bancroft-Whitney Co. v. Glen,*
    64 Cal. 2d 327, 345–47 (1966) ........................................................................................ 8

*Bancroft-Whitney Co. v. Glen,*
    64 Cal.2d 327, 346 n.10 (1966) ....................................................................................... 8

*Cafasso ex rel. U.S. v. Gen. Dynamics C4 Sys., Inc.,*
    637 F.3d 1047, 1058 (9th Cir. 2011) .............................................................................. 14

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,*
    222 Cal. App. 3d 1371, 1395 (1990) ................................................................................ 9

*Carma Developers (Cal.), Inc. v. Marathon Dev.,*
    2 Cal. 4th 342, 373–74 (1992) ......................................................................................... 9

*Carrico v. City & Cnty. of S.F.,*
    656 F.3d 1002, 1008 (9th Cir. 2011) .............................................................................. 14

*Cortez v. Purolator Air Filtration Prods.* Co.,
    23 Cal. 4th 163, 168–78 (2000) ............................................................................... 11, 15

*Coto Settlement v. Eisenberg,*
    593 F.3d 1031, 1038 (9th Cir. 2010) ................................................................................ 3

*Dawavendewa v. Salt River Project,*
    276 F.3d 1150, 1156 (9th Cir. 2002) .............................................................................. 15

*Edwards v. Arthur Andersen LLP,*
    44 Cal. 4th 937, 945–50 ............................................................................................. 9, 15

*EEOC v. Peabody W. Coal Co.,*
    400 F.3d 774, 779–82 (9th Cir. 2005) ............................................................................ 15

*Esparza v. Sand & Sea, Inc.,*
    2 Cal. App. 5th 781 .......................................................................................................... 5

*Flatley v. Mauro,*
    39 Cal. 4th 299, 330–31 (2006) ...................................................................................... 13

*Gov't Emps. Ins. Co. v. Dizol,*
    133 F.3d 1220, 1223–25 (9th Cir. 1998) ........................................................................ 10

*Guz v. Bechtel Nat'l, Inc.,*
    24 Cal. 4th 317, 349–50 (2000) ........................................................................................ 9

*Hamilton v. State Farm Fire & Cas. Co.,*
    270 F.3d 778, 782–85 (9th Cir. 2001) .............................................................................. 1

*Kearns v. Ford,*

iii

567 F.3d 1120, 1124 (9th Cir. 2009) ...............................................................9

*Khoja v. Orexigen Therapeutics, Inc.*,

   899 F.3d 988, 1002–04 (9th Cir. 2018) ...........................................................3

*Kleveland v. Chicago Title Ins. Co.*,

   141 Cal. App. 4th 761 ......................................................................................5

*Kolani v. Gluska*,

   64 Cal. App. 4th 402, 407–08 (1998) .............................................................9

*Landucci v. State Farm Ins.*,

   65 F. Supp. 3d 694, 716 (N.D. Cal. 2014) ......................................................9

*Leadsinger, Inc. v. BMG Music Publ'g*,

   512 F.3d 522, 532 (9th Cir. 2008) .................................................................14

*Lee v. City of L.A.*,

   250 F.3d 668, 689–90 (9th Cir. 2001) .............................................................3

*Mangindin v. Washington Mut. Bank*,

   637 F. Supp. 2d 700, 707 (N.D. Cal. 2009) ..................................................10

*Mendoza v. Hamzeh*,

   215 Cal. App. 4th 799, 806–08 (2013) .........................................................13

*Mitri v. Arnel Mgmt. Co.*,

   157 Cal. App. 4th 1164 ....................................................................................5

*New Hampshire v. Maine*,

   532 U.S. 742, 749–51 (2001) ...........................................................................1

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,

   442 F.3d 741, 746 n.6 (9th Cir. 2006) .............................................................3

*Rissetto v. Plumbers & Steamfitters Local 343*,

   94 F.3d 597, 600–02 (9th Cir. 1996) ...............................................................1

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,

   806 F.2d 1393, 1401 (9th Cir. 1986) .............................................................14

*Sprewell v. Golden State Warriors*,

   266 F.3d 979, 988 (9th Cir. 2001) ...................................................................3

*Stenehjem v. Sareen*,

   226 Cal. App. 4th 1405, 1420–21 (2014) .....................................................13

*Stokes v. Dole Nut Co.*,

   41 Cal. App. 4th 285, 295–97 (1995) ..............................................................8

*Strategix, Ltd. v. Infocrossing West, Inc.*,

    142 Cal. App. 4th 1068 (2006) ............................................................................4

*Suastez v. Plastic Dress-Up Co.*,

    31 Cal. 3d 774, 781–82 (1982) .........................................................................11

*Valencia Holding Co., LLC*,

    61 Cal.4th 899, 910–11 (2015) .........................................................................11

*Vess v. Ciba-Geigy*,

    317 F.3d 1097, 1106 (9th Cir. 2003) ..................................................................9

*Waller v. Truck Ins. Exch.*,

    11 Cal. 4th 1, 18 (1995) .....................................................................................8

*Wilton v. Seven Falls Co.*,

    515 U.S. 277, 282 (1995).................................................................................10

*Wolschlager v. Fidelity Nat'l Title Ins. Co.*,

    111 Cal. App. 4th 784 .......................................................................................5

*Zucco Partners, LLC v. Digimarc Corp.*,

    552 F.3d 981, 1007–08 (9th Cir. 2009) ............................................................14

## STATUTES

28 U.S.C. § 1927 ................................................................................................13

Cal. Business & Professional Code § 16600 ......................................................3

Cal. Code of Civil Procedure § 1856 (parol evidence) ......................................3

Cal. Civil Code § 1670.5 ...................................................................................3

Cal. Civil Code § 1625 ......................................................................................3

Cal. Evidence Code § 622 ..................................................................................3

Cal. Labor Code §§ 2870–2872 .........................................................................2

## RULES

Fed. Rules of Civil Procedure 11 ......................................................................13

Fed. Rules of Civil Procedure 12(b)(6) ..............................................................1

Fed. Rules of Civil Procedure 12(f) ...................................................................1

Fed. Rules of Civil Procedure 12(g) ...................................................................1

Fed. Rules of Civil Procedure 9(b) ....................................................................2

### INDEX OF REFERENCED EXHIBITS

| Merger Agreement (MA) | Dkt. 94-2; "MA" | CCs ¶¶ 15, 60; Robert Nessler as Holder Representative; "Merger Consideration" is 321,199 shares at $0.41 per share. |
|---|---|---|
| Non-Competition Agreement | Dkt. 94-3; "NCA" | CCs ¶¶ 15, 23, 48-53; Consideration pursuant to OL/MA, no separate consideration. |
| Warns Declaration | Exhibit A-1; | Authenticates IPAA and IPAL |
| Assignment of IP and Other Assets | Exhibit A-2; "IPAA" | CCs ¶¶ 15, 18, 40-45; Breach Alleged in Counterclaims; Consideration is $100.00; |
| IP Acknowledgment Letter | Exhibit A-3; "IPAL" | CCs ¶¶ 15, 18, 39, 41-45; Alleged Breach – No Consideration; |
| Agarwal Declaration | Exhibit C-1; | Authenticates Bonus Agreement, Offer Letter, Lunchbox Emails |
| Bonus Agreement | Exhibit C-2; "BA" | CCs ¶ 71, 73; In Consideration of Employment; $450,000, vested July 30, 2024 - $500,000 total for AV. |
| Offer Letter | Exhibit C-3; "OL" | CCs ¶ 71, 73; Salary/Severance/Benefits. Contingent on Continued Employment. |
| Lunchbox Emails | Exhibit C-4. | CCs ¶¶ 7, 23, 52; |
| Jan 29, 2025, Notice of Direct Claim; Feb 7 Shareholder Response | Exhibit B-2, B-3 | CCs ¶¶ 33-34; Jan 29 Notice served on & addressed to Mr. Nessler as Holder Rep; Feb 7 Response by Grant Thomas on Mr. Nessler's behalf; |
| Dec 6, 2024, and Jan 22, 2025, Notices of Claim | Exhibit D-2, D-4; "Early Notices" | CCs ¶¶ 1, 5-7, 24-32; derive from notices threatening criminal referral at the outset of dispute and replies by AV. |
| Nessler Declaration | Exhibit E; | Confirms Jan 29 Notice/Feb 7 Response; Non-payment of team bonuses; Team dynamics for joinder issues; |

vi

1

**[PROPOSED] MEMORANDUM IN REPLY**

2

**I.    INTRODUCTION**

3    Checkmate's opposition ("Opp.", Dkt. 94), filed 20 days late (without leave), devotes much

4    space to rule violations that do not exist. Its word-count gripe relies on the Aug. 27 revision to the

5    Standing Order—not the operative version when AV filed on Aug. 15 (specifying page limits, with

6    which AV complied). Its Rule 12(g) objection also misfires: AV did not file serial Rule 12(b)(6)

7    motions to the same pleading—the instant motion superseded the earlier one the Court has now

8    mooted, and AV's Rule 12(f) motion targets a different pleading under a separate timeline.[1]

9    **On the merits**, the Opp. fails to meet the core challenges of AV's motion: (1) the contracts

10    at issue are invalid or fail under California law (§§ II.A-B); (2) the counterclaims (CCs) fail to allege

11    facts to support breaches under Rule 12(b)(6) (§ II.C) or fraud under Rule 9(b) (§ II.D); (3) the

12    declaratory relief claim seeks to negate AV's affirmative claims and rights under the Labor Code (§

13    II.E); (4) no damages are plausibly alleged and "millions for code" is contradicted by the pleadings

14    (§ II.G); (5) Checkmate sues AV alone for group conduct—while seeking to forfeit the whole

15    group's wages (§ II.J). The record (§§ II.F, H, I) warrants dismissal with prejudice (§ II.K).

16    Notably, the CCs do not allege product failure or that any code *created at VoiceBite* was

17    misrepresented. Instead, they confine the supposed fraud to *pre-VoiceBite code* purportedly "subject

18    to" third-party claims. The undisputed agreements incorporated by the CCs assign that legacy code

19    for $100 in aggregate, defeating any claim that an astute acquirer plausibly—or reasonably—relied

20    on *that code*, or on AV's nominal warranty of it, to the tune of "*millions of dollars*".

21    California recognizes the same—Labor Code §§ 2870-2872 limits such assignment when a

22    *condition of employment*. The Opp. concedes such condition and relies on a "related to employer's

23    business" exception to argue valid assignment; but the CCs allege the code predated *VoiceBite by

24    years*; and that Checkmate acquired VoiceBite *to enter* its "nascent market". The Opp.'s reliance is

25    thus precluded by the CCs and the statute's plain language requiring relation "*at time of conception*".

26

---

27    [1] In any case, if it reaches this Reply, the Court would have read the Opposition—so Checkmate's procedural arguments
are estopped as it successfully argued for judgment on the merits notwithstanding lateness. Judicial estoppel prevents a
28    litigant from "gaining an advantage by taking one position and then seeking a second advantage by taking an
incompatible position." *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

No "extrinsic facts" are needed to connect these dots. The very approach this Court applied to deny Checkmate's motion to dismiss or transfer under Lab. Code § 925 (Dkt. 67) favor granting AV's motion to dismiss the CCs *with prejudice*—no new facts can cure what California law prohibits. AV's allegedly "AI-generated" "lay opinions" are really just common-sense readings of the pleadings, incorporated materials, binding precedent and the plain language of the law.

For these reasons, AV respectfully asks the Court to admonish the late filing; but consider the papers to dismiss the CCs with prejudice, as amendment cannot cure the defects identified herein.

## II.    ARGUMENT

### A.    The Counterclaims Cannot Survive California Law

The CCs are based on contracts drafted presuming Delaware law would apply. After this Court ruled that Labor Code § 925 applies broadly to any condition of employment (e.g. required to close the merger/*acquihire*) they run against other state protections. Notably, the Opp. declines to offer an alternative choice-of-law analysis. This is dispositive, as California law also includes:

(1) Lab. Code §§ 2870–2872 limits invention-assignment in employment agreements. § 2870 makes unenforceable any requirement that an employee assign an invention they developed entirely on their own time without using the employer's equipment, supplies, facilities, or trade secrets— unless (A) related to the employer's business or actual or demonstrably anticipated R&D (*at time of* *conception of the invention itself*), or (B) results from work performed for the employer. § 2871 lets an employer require disclosure of inventions to determine whether they fall within § 2870; and bars agreements that purport to capture inventions excluded by § 2870. § 2872 requires written notice of rights under § 2870 at the time of signing and to obtain a signed acknowledgment.

(2) Bus. & Prof. Code § 16600 voids post-employment restraints as a default rule. A 'sale-of-business' exception, §16601, offers narrow protection of the goodwill actually sold in the area the business was carried on. §16600.5 (SB 699) makes attempts to enforce void restraints unlawful and gives workers a private right of action (injunction, damages, fees).

(3) Contract integration is defined by Civ. Code §1625: A written contract supersedes prior or contemporaneous negotiations on the same subject; Evid. Code §622: Factual recitals in a written instrument are presumed true (except for consideration); and CCP §1856 (parol evidence): An

integrated writing can't be rewritten by prior/contemporaneous papers; extrinsic evidence may cure

ambiguities, show invalidity (e.g., fraud/mistake), or add consistent terms <u>if not fully integrated</u>.

(4) <u>Civ. Code § 1670.5</u> (unconscionability): A court may refuse to enforce a contract—or any

clause—if it was unconscionable when made. The court can also sever or limit the offending term,

applying the sliding-scale test (procedural + substantive unconscionability).

**B.     The Counterclaims Contradict the Operative Contracts**

Under Rule 12, the Court may consider contracts necessarily relied on; where they contradict

the pleading, the contracts control.[2] Here, the CCs incorporate the (1) <u>Merger Agreement</u> (**MA**), (2)

<u>Non-Competition Agreement</u> (**NCA**), (3) <u>IP Acknowledgment Letter</u> (**IPAL**), (4) <u>Assignment of IP</u>

<u>and Other Assets</u> (**IPAA**), (5) <u>Bonus Agreement</u> (**BA**), and (6) the <u>Offer Letter</u> (**OL**)[3]:

**1. The MA** is not directly alleged to be breached, but its IP reps (§ 5.9) are listed in Claims

IV and V (Fraud, Negl. Misrep.). Checkmate has asserted the MA governs and integrates the others.

On its face, <u>it does not</u> integrate the IPAA and IPAL. See MA § 2 (integrating the NCA, BA and OL

but not the IP papers). MA § 8.5 caps indemnity to the final payment defined in the BA.[4] "[M]erger

consideration" is defined as 321,199 Checkmate shares valued at $0.41 per share, in aggregate for all

five founders: AV, Robert Nessler, Christopher Lam, Isamu Aoki and Paul Garcia.[5] Mr. Nessler is

named as the Holder Representative in MA § 9.1, and his duties described further in § 8.1 and § 8.3.

MA § 8.8 defines these collective indemnities as an exclusive remedy. MA § 8.6 confines reliance to

the representations in § 5, and § 9.5 establishes the MA as the entire and superseding agreement.

**2. The NCA** purports to limit competitive activity, but its vague, circular terms are incurable.

The NCA initially defines "Company" as VoiceBite but seems to switch to using it to *Checkmate*

---

[2] The Court may consider these contracts under incorporation-by-reference (the pleadings necessarily rely on them, and authenticity is not disputed). See, e.g., *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–04 (9th Cir. 2018); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). When incorporated materials contradict conclusory allegations, the documents control. See *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). The Court may also judicially notice Checkmate's prior filing of these contracts to confirm its contents (existence, not truth). See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *Lee v. City of L.A.*, 250 F.3d 668, 689–90 (9th Cir. 2001).

[3] All of these are undisputed, filed and authenticated by Checkmate. See Index of Exhibits (pg. vi).

[4] In AV's case, the final payment amount was $50,000—under the jurisdictional minimum in federal court.

[5] 321,199 shares * $0.41 per share = $131,619. This value is substantiated by the Jan 29 Notice of Direct Claim, which values merger consideration at $131,815 for all five founders (without any calculation), along with $1.55 million in aggregate employment bonuses it deemed forfeited. See Exhibit C-2, 3.

3

and back, often within sentences: "this Agreement is necessary for the protection of the legitimate business interests of *Company* in acquiring the *Company*"; "Stockholder will not directly or indirectly or induce others to disparage *Company* or the *Company* in any manner".

> [the NCA] is made by and between [AV] and Checkmate.com Inc., a Delaware corporation ("Acquirer"). For purposes of this Agreement, "Company" shall be deemed to include Company and its direct and indirect subsidiaries. …
> Acquirer and VoiceBite Corporation, a Delaware corporation (the "Company") are parties to an Agreement and Plan of Merger dated as of the date hereof (the "Merger Agreement"), pursuant to which Acquirer will acquire the Company (the "Merger").

The NCA recites the § 16601 exception without listing any transferred goodwill: no schedule of customers and locations. The claim that "any reasonable person would understand that a signatory is barred from improperly competing with, soliciting the employees of, or disparaging *Checkmate*" (Opp. at 7:12-15) *disproves* enforceability as § 16601 protects only *acquired* goodwill.[6] The NCA claims to protect the "Company's current business [of AI voice ordering]" "anywhere" it has employees, customers or operates (but at least the United States, Canada and European Union). That is facially overbroad—in California, "current business" is a snapshot at signing—existing customers and their expected patronage. The Opp. confirms that the NCA impermissibly attempts to bootstrap Checkmate's customer base onto VoiceBite's product space—this is why the ambiguous definition of "company" matters and why the NCA is not enforceable under California law.

The NCA offers no separate consideration; it recites AV's merger equity as a stockholder and the at-will employment/confidential-information he would receive (the latter is not consideration; it is a restraint). And, if employment by "Company" is consideration—and "Company" is *VoiceBite*—this condition precedent was never met, and the NCA was never valid. Contrary to Opp. at 8:12-14, these are not "fact question[s]"—they are raised by the face of the NCA. Merely reciting "good and valuable consideration" does not make it more than what it was: an unlawful restraint purporting to ban AV's from his chosen industry, world-wide. See Evid. Code §622.

**3. The IPAL** is allegedly signed by AV but "entered into and delivered by *Christopher Lam* in connection with [the merger]"; Checkmate admits Lam was "the addressee" (Opp. at 19:10-13),

---

[6] See *Strategix, Ltd. v. Infocrossing West, Inc.*, 142 Cal. App. 4th 1068 (2006) — reversed an injunction because the non-solicit barred solicitation of the buyer's customers; §16601 "ties the permissible scope to the sold business," i.e., the seller's own customers/employees as of sale. *Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292 (2008) — the rationale for §16601 "does not extend to the buyer's other customers," emphasizing the seller knows its own clients.

but claims "[AV] provides no support for this conclusion, which is an obvious factual attempt to avoid the obligations of an agreement that [AV] reviewed and signed.". This is inapposite: it is clearly *Checkmate* that is making a factual attempt by implying AV *intended* to consent to terms that do not address him. It is clearly *Checkmate* that would require "extrinsic evidence" to reform under CCP §1856. AV makes no factual claim here beyond the face of the document, which does not address him. Checkmate is also attempting to augment its pleading in opposition—the CCs do not address this issue (and neither the CCs or the opposition attach the IPAL or IPAA).

Moreover, the IPAL is not integrated by the MA and is not a valid contract without separate consideration—which it doesn't offer. Checkmate argues that the one-way "connection" (IPAL to MA) bootstraps the MA's consideration—not under California's parol evidence rule, and not when MA § 2 enumerates closing deliverables, but does not reference, attach, schedule or assume the IPAL. The IPAL is thus *outside the transaction*, binds someone else and lacks consideration; any IPAL-based theory fails as a matter of law. Mot. at 12:1-13 & n.38.

Finally, the IPAL *acknowledges* MA § 5.9 and "section 1.4 of the [ECIIAA] that [Mr. Lam] will enter into," and excerpts those clauses; it does not impose any new promise. Under settled California law, acknowledgment is not assent. *Mitri v. Arnel Mgmt. Co.*, 157 Cal. App. 4th 1164; *Esparza v. Sand & Sea, Inc.*, 2 Cal. App. 5th 781; *Kleveland v. Chicago Title Ins. Co.*, 141 Cal. App. 4th 761; cf. *Wolschlager v. Fidelity Nat'l Title Ins. Co.*, 111 Cal. App. 4th 784.

**4. The IPAA** is signed by AV and Mr. Nessler (for VoiceBite) and purports to assign AV's pre-VoiceBite IP not already owned by the company. The MA does not reference the IPAA, and the IPAA does not reference the MA. Checkmate's conclusory "successor" label cannot plausibly allege an assignment or assumption, so it has not plausibly alleged standing to enforce the IPAA, and even if otherwise, *arguendo*, the contract runs up against California Labor Law.

The IPAA recites a nominal $100 paid to AV for pre-VoiceBite code that was purportedly assigned. It does not detail these assets. The CCs admit the "code" it exhibits (config, credentials, utilities) predates even *VoiceBite* by years. It cannot reasonably include code that did not "relate to" *Checkmate* at the *time of conception*—barred in any case by Labor Code §§ 2870-2872.

**5. The BA and OL** are not directly named but Claim VI for Declaratory Relief aims to negate them—while AV's affirmative claims aim to enforce them. These are the only contracts under which AV is owed "further compensation" (that Claim VI seeks to "disentitle"). The BA entitles AV to a retention bonus of $500,000 earned on the "Bonus Date" (July 30, 2024), "in consideration of continued employment" and "in conjunction with" the OL. The OL provides, *inter alia*, guaranteed severance in the case of any termination (cause or no cause).

**In summary**, these constitute the full set of agreements incorporated into the counterclaims, and that the Court can—and should—consider on this Motion. Critically, read together, these papers completely preclude any notion that "millions of dollars" were paid "specifically" for "the code".

### C.    The Breach Counterclaims Fall with the Contracts

**Claim I** bundles the IP papers, and alleges that, "[p]ursuant to" both, [AV] made "express representations and warranties" about the "VoiceBite application code.". CCs ¶ 41. Both IP papers are void or otherwise unenforceable as to AV. The IPAA is unenforceable under Labor Code §§ 2870-2872 and the IPAL addresses a different founder and offers no consideration.

Checkmate concedes § 2870 applies to the IPAA (Opp. at 20), but does not address the lack of a § 2871 exclusion list and § 2872 notice; and (wrongly) claims the § 2870(a)(1) exception:

> Labor Code § 2870 excepts from its coverage any inventions that "[r]elate at the time of conception … to the employer's business." Cal. Labor Code § 2870(a)(1). The "invention" in question—the VoiceBite code—clearly relates to Checkmate's business in the Voice AI sphere.

The CCs disprove any relation *at time of conception*: Checkmate acquired VoiceBite in April 2024 to "be a very early mover" into the "nascent" Voice AI market. CCs ¶¶ 14, 16; its business description lacks any mention of Voice AI. CCs ¶ 13; the code at issue "dated back to as early as 2018" "well before the formation of VoiceBite itself, which was not formed until on or around August 4, 2023.". CCs ¶ 24. No extrinsic facts are needed; § 2870(a)(1) is inapplicable.

This Court has held that AV is entitled to the substantive protections of California law under the plain language of Labor Code § 925. See Dkt. 67. The plain language of § 2870(b) confirms it is such a protection: "To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under

subdivision (a), <u>the provision is against the public policy of this state and is unenforceable</u>." When read together with the CCs, the statute precludes enforceability as to the IPAA.

The IPAL *acknowledges* MA § 5.9(f) and ECIIAA § 1.4, but the CCs don't plead breach of either containing contract. The MA governs and supersedes on VoiceBite-IP subject matter (MA §§ 5.9, 9.5) and the pled theory concerns code delivered "as part of the Transaction.", *before* any operative ECIIAA duty. *Acknowledging* MA § 5.9 cannot transform it to a personal representation, absent explicit language that does so. This contradiction precludes breach of the IPAL—code brought to Checkmate by *VoiceBite* under the MA cannot *also* have been brought by AV *personally*.

In sum, Claim I should be dismissed with prejudice as neither contract is enforceable under California law. Even otherwise, neither is integrated by the MA and therefore are not "part of the Transaction"—undermining any claim to transaction related damages. Even if deemed valid and integrated, MA § 9.5 supersedes side papers on the same subjects (Civ. Code § 1625; CCP § 1856). Finally, the MA's reps were made by *VoiceBite*, not AV—even if breached, <u>which is denied</u>, any breach runs to VoiceBite. Therefore, as pled, Claim I cannot stand.

**Claim II** seeks to enforce the NCA but does not allege that AV <u>diverted a customer or opportunity</u>, <u>misused confidential information</u>, or <u>solicited a Checkmate employee</u>. The opposition attempts to salvage its claim by (newly) alleging the breach as "assisting any other person in an attempt to solicit or induce". As Checkmate admits, the *only* pled facts are the Nov. 7–8, 2024 emails (Ex. C-4), which the Court may consider as Checkmate relies on and filed them—and agrees they are undisputed. Opp. at 6:12-28. Read in full, they show <u>conditional</u>, <u>post-employment planning</u>: On Nov. 7, AV stated that *if his non-compete were nullified*, he could bring two engineers. The Nov. 8 email forwards old audio demo recordings from AV's prior company (2021–2022)—not source code or proprietary VoiceBite/Checkmate materials—and no disclosure of trade secrets or other protected confidences or breach of loyalty is alleged.

Moreover, the CCs: (1) admit Checkmate had no "current business" in Voice AI pre-merger ¶ 13; (2) describe the space of Voice AI for restaurants as "very early stage" and "nascent" ¶ 14; (3) note VoiceBite was started only months before merger ¶ 19, 24; and (4) fail to allege any pre-merger customers for VoiceBite. This is dispositive—even if § 16601 is held to apply, <u>the CCs own facts</u>

preclude any legitimate business interest justifying a global, market wide restraint on trade. No "extrinsic" facts are required—the NCA cannot be enforced for this purpose under California law.

**No breach.** California courts enforce terms the parties chose, not a litigant's post-hoc beliefs. See Cal. Civ. Code §§ 1638–1639 (plain meaning governs), 1644 (ordinary sense of words); *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 18 (1995) (courts may not rewrite contracts). Here, NCA §3 bars "assisting any other person" in an "attempt to solicit or induce" an employee to resign—i.e., aiding another's ongoing attempt to ask or persuade. A conditional, future-tense proposal ("if my non-compete is nullified, I could bring two engineers") is neither assistance nor an attempt to solicit under the clause's plain language. Cf. *Aetna Bldg. Maintenance Co. v. West*, 39 Cal. 2d 198, 204–05 (1952) (to "solicit" is to entreat, request, or ask; mere statements not directed to the employee to induce action are not solicitation). Calling it "a clear attempt to assist" (Opp. at 6) improperly adds terms—"attempting to assist" or "proposing to assist later"—that NCA §3 does not contain.

**No precedent**. Checkmate cites no authority holding that a conditional, exploratory email equals 'assisting an attempt to solicit'; its only citation is *Twombly*, and the rest is contract language and characterization of undisputed emails. Instead, it affords a 500-word footnote attacking citations in AV's already withdrawn and mooted "First Motion to Dismiss". Notably it fails to address settled law in California that preparing to compete is not competing. See *Bancroft-Whitney Co. v. Glen*, 64 Cal.2d 327, 346 n.10 (1966) (Restatement (Second) of Agency §393 cmt. e).

**No damages**. Under Twombly/Iqbal, Checkmate must plausibly allege non-speculative harm caused by a breach; it pleads none. See *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995–97 (9th Cir. 2014); *Wall Street Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008). It identifies no employee who resigned, no customer or deal lost, and no causal chain from AV's two emails to any injury. Boilerplate does not satisfy Rule 9(g). Lost-profit theories must be pleaded with reasonable certainty, not speculation. *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968–69 (2004); *Sargon Enters., Inc. v. USC*, 55 Cal. 4th 747, 773–77 (2012); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 884–88 (2002). A bare, two-email theory with no resulting injury does not state a breach claim.

1    Here, the actual emails kill Claim II at the threshold. <u>California permits employees to prepare</u>

2   <u>to compete</u>—so long as they do not <u>actively compete</u> before departure.[7] The CCs allege no such act;

3   the incorporated emails confirm as much. *Attempting* to enforce a noncompete against a California

4   employee is itself unlawful.[8] Therefore, Claim II is yet another act of willful disregard for California

5   law; the rights of its workers; and the vibrancy of its markets; it should be dismissed with prejudice.

6        **Claim III** fails as the covenant of good faith/fair dealing cannot create or revive duties the

7   contracts don't contain, forbid conduct the contracts permit, or end-run § 16600 by "good faith". See

8   *Edwards v. Arthur Andersen LLP,* 44 Cal. 4th 937, 945–50; *Kolani v. Gluska*, 64 Cal. App. 4th 402,

9   407–08 (1998). The CCs also braid the NCA, IPAA, and IPAL into one count without pinning who

10  owed what to whom or which provision/benefit was frustrated—making it duplicative of the contract

11  claims and deficient under Rules 8 and 10(b). And because (i) the NCA is void and can't be enforced

12  via the covenant, (ii) no implied covenant runs against AV on the IPAL/IPAA (no privity or

13  enforceability), and (iii) the theory adds nothing beyond the contract counts, Claim III should be

14  dismissed with prejudice. (See also *Guz v. Bechtel Nat'l*, 24 Cal.4th 317, 349–50;)

15        **D.    The Fraud Claims (IV and V) Fail Further Under Rule 9(b)**

16        The Opp.'s attempts to defend pleading sufficiency are unpersuasive. It cites *Vitiosus* and

17  *Rana* to justify broad date ranges—but neither had duty-defining temporal boundaries as here (e.g.

18  pre/post-merger, pre/in/post-employment). The CCs conclusory "evasiveness" label is not pled with

19  *any* date—that AV does not recall being asked for a code review is a fact question, but that the CCs

20  do not allege any facts for him to contest is a pleading insufficiency and fair notice question.

21        CCs ¶¶ 4, 6, 35 paraphrase allegations from AV's Complaint ¶ 16 (Dkt. 10 at 5-6; April

22  bullets) to allege concealment by AV; the Court may read them in full, not for truth, but to establish

23  the CCs *misrepresent what AV alleged*—that his repeated attempts to modify the reps/disclosures *on*

24  *paper* were rejected by Checkmate, despite his efforts (and those of VoiceBite's attorney). The Court

25  may disregard the CCs allegations here as contradicted by the text of the referenced document.

26

27  _____

[7] See *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 345–47 (1966) (pre-departure preparations permissible; liability turns on active competitive acts and misuse); *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295–97 (1995) (same);

28  [8] See Bus. & Prof. Code § 16600.5 (prohibiting enforcement or attempted enforcement of non-competes in California).

Opp. at 10 asserts AV represented he and VoiceBite were the "*original* author" and "*exclusive* owner" of the "VoiceBite application code." Neither the bullets in CCs ¶¶ 59, 65, nor the MA and IPAA from which they derive, contain the quoted terms. The CCs thus, at the outset, fail to provide *any* notice—let alone fair notice or 9(b) particularity—of its allegations.

Indeed, "VoiceBite application code" one of several such variants: "VoiceBite software", "VoiceBite's technology", "VoiceBite Proprietary Software"—none match the text of the IPAA or MA. Such deliberate vagueness is one concerning aspect of Checkmate's pleading strategy—another is deliberate misstatement by selective quotation. Both pervade the CCs.

MA § 5 contains <u>*Company*</u> reps, made by *VoiceBite* to Checkmate. But bullets 6, 7 in CCs ¶¶ 59, 65 replace "Company" with "Plaintiff" to conjure *personal* reps from MA § 5.19 ("Disclosure") —disclaiming material omissions across transaction documents. The <u>Company Disclosure Schedules</u> qualify the MA § 5.9 reps (e.g., "§ 5.9(d) … true, correct and complete list of the Company Proprietary Software"). *The CCs don't attach or quote them*. This is dispositive for lack of fair notice or particularity when read with the MA's knowledge definition for Company: "*the actual knowledge of Robert Nessler, Arjun Vasan and Christopher Lam*". MA at 5.

The first bullet in CCs ¶¶ 59, 65 stiches IPAA § 3 with "comprehensive set of components of an AI voice ordering system" (defining "VoiceBite software", a term the IPAA does not contain). It does not specify who defined it and in what context or how it was related to the *pre-VoiceBite code* the IPAA purportedly assigned. These are not real representations of AV or any other founder. The CCs are, in effect, <u>putting words in AV's mouth</u>. See Ex. F (Mapping of CCs allegations to sources).

<u>The CCs rely on pre-suit notices and responses, so the Court may read them</u>. The Feb 7 Response—<u>by counsel for Mr. Nessler (Ex. B-3)</u>—distinguishes VoiceBite IP from functional artifacts (e.g. configs, credentials, utilities—what the CCs exhibit), explaining the latter are not protectable IP. CCs ¶ 33 misstates counsel's distinction and attributes it to AV *personally*, inflating it into an "admission" that *all VoiceBite code lacked IP protection*, and therefore was a "valueless non-asset." The writings don't say that, and they weren't AV's personal statements.

<u>Treating "the code" as a monolith fails 9(b)</u>, the CCs mostly point to non-source artifacts (e.g., deepgram.txt (credentials), env.json (config))—not source code or IP—and to a small 2018

utility showing AV and his father as co-authors (audio.py)—but <u>a co-author is an author</u> with usage rights. They plead no *actual* third-party claim (no C&D, no prior-employer demand) rendering anything "worthless."; their own framing "subject to third party claims" <u>is entirely speculative</u>.

Checkmate's fraud theory targets only *pre-VoiceBite code*—the universe covered by the IPAA—which caps any out-of-pocket loss to the "aggregate" purchase price for those "Assigned Assets" at **$100.00**. (IPAA § 2(a)). The MA transferred the IP *created at VoiceBite* to Checkmate, <u>but the CCs allege no fraud regarding that IP</u>. The refrain that Checkmate paid "millions of dollars" for a "worthless asset" is implausible on the face of the incorporated contracts and fails Rule 8.

Claims IV–V should be dismissed with prejudice—as they depend on the IPAA to no new facts can cure the face of the IPAA even if enforceable, which it is not.

### E.    The Declaratory Relief Claim (VI) is Duplicative of AV's Breach Claims

**Claim VI** seeks a declaration "disentitling" AV from further compensation under the parties' agreements. There are only two contracts under which AV is owed further payment: the BA and OL. Declaratory relief is discretionary and should be dismissed where it duplicates issues that will be resolved by adjudicating the underlying contract claims; it adds no parties, facts, or remedies beyond those disputes.[9] Because the BA/OL rulings will necessarily resolve the same controversy, Count VI is superfluous and should be dismissed with prejudice (or, at minimum, without leave to amend).

Checkmate's claim that it does not ask the court to violate the labor code is disingenuous. It is settled law in California that once wages are earned, they are the property of the employee and cannot be waived or forfeited by private agreement. *Cortez v. Purolator Air Filtration Prods*. Co., 23 Cal. 4th 163, 168–78 (2000) (earned wages are employee's property; courts order restitution); Cal. Lab. Code § 219(a) (no provision of the wage-payment article "can in any way be contravened or set aside by a private agreement"); *Suastez v. Plastic Dress-Up Co*., 31 Cal. 3d 774, 781–82 (1982) (vacation pay vests as earned; forfeiture barred). A declaratory judgment cannot bless what the Labor Code forbids. See § 219(a); *Cortez*, 23 Cal. 4th at 173–78; *Suastez*, 31 Cal. 3d at 781–82.

---

[9] Declaratory relief is discretionary and is properly dismissed where it merely mirrors defenses to existing claims and will be "fully resolved by the determination of the main action.". See **28 U.S.C. § 2201**; *Wilton v. Seven Falls Co*., 515 U.S. 277, 282 (1995); *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223–25 (9th Cir. 1998) (en banc). *Mangindin v. Washington Mut. Bank*, 637 F. Supp. 2d 700, 707 (N.D. Cal. 2009)

Here, the bonus and severance in question are clearly identified as wages payable via Checkmate's payroll system. The BA further recites the bonus as "in consideration of your continued employment" and that AV was "entitled" to it on the Bonus Date (July 30, 2024). Therefore, the retention bonus should have been paid on separation as <u>earned wages</u> under Labor Code § 203. <u>Claim VI seeks to relieve Checkmate of these statutory obligations to AV</u>.

### F.    Checkmate's Contractual Overreach is Unconscionable on the Pleadings

California permits courts to refuse enforcement of unconscionable terms on the face of the papers and minimal, undisputed context. Cal. Civ. Code § 1670.5; see *Armendariz v. Found. Health Psychcare Servs., Inc*., 24 Cal.4th 83, 114 (2000) (sliding scale: both prongs required); *Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899, 910–11 (2015) (oppression/surprise + overly harsh/one-sided terms). Both prongs are satisfied here, independently and cumulatively.

**Procedural Unconscionability** exists when a contract is adhesive or presents with surprise or opacity. These were adhesion papers, imposed as a non-negotiable condition of employment and closing. See CC ¶ 18; NCA recital ("condition of … employment"). The NCA's core defined term ("Company") shifts mid-sentence between VoiceBite and Checkmate, obscuring what business is protected and whom it binds (see § II.B.2). The IPAL is an "acknowledgement" directed to a different founder and merely references external clauses, without any disclosure that it could be weaponized as an independent liability instrument (see § II.B.3). The IPAA provides no § 2872 notice or exclusion schedule, and purports to sweep unspecified, pre-VoiceBite assets for a nominal $100 (see § II.B.4). None of these papers is integrated into the Merger Agreement, which itself enumerates the closing deliverables and consideration and omits the IP papers (see § II.B.1). This opacity and "take-it-or-leave-it" posture is classic procedural unconscionability. See *Sanchez*, 61 Cal.4th at 910–11; *Armendariz*, 24 Cal.4th at 114.

**Substantive Unconscionability** exists when a contract is overly harsh or one sided. Here the IPAA purports a sweeping assignment of pre-VoiceBite assets for a nominal, recited $100—now leveraged into "millions" of alleged exposure. That asymmetry—especially given the absence of statutory notices/exclusions—renders the clause overly harsh. Lab. Code §§ 2870–2872 (see § II.A). The IPAL functions only to amplify personal exposure without reciprocal benefit (see § II.B.3). The

NCA purports a global restraint, untethered to any identified, acquired goodwill—effectively a market-wide ban in a "nascent" field the CCs admit was entered via the merger (see § II.C). The result, if Checkmate's contractual interpretations are credited, is a one-way allocation of rights and risk that prevents lawful work while offering no separate consideration.

### G.    Checkmate "Millions of Dollars for Code" Theme Contradicts the Contracts

Opp. at 10:16–20 asserts Checkmate "paid millions of dollars … specifically for the company's proprietary code" that "ended up being worthless," but the CCs' own narrative targets only pre-VoiceBite legacy material—e.g., code "dating back to 2018," references to "Cyborg," and work done "well before the formation of VoiceBite"—not the substantial code the team built at VoiceBite. While the share, value and importance of the latter is a question of fact, the allegations in the CCs target only purported IP issues inapplicable to code created for VoiceBite after its founding.

> Checkmate's claim for fraud alleges that Checkmate was injured by paying millions of dollars for a company—more specifically, for what Checkmate believed to be the company's proprietary code that ended up being worthless, as neither Plaintiff nor VoiceBite were actually the exclusive owner or rights holder to the code. (Id. at ¶¶ 6, 19, 34, 62.)

The only "dollars" for the "code" are a _nominal $100 recited by the IPAA_ (for transfer of pre-VoiceBite code). The BA and OL specify _employment compensation_—payment for future work, not merger-related transfer of assets. The MA defines only Checkmate _equity_ as "Merger Consideration" (total value circa $132,000 for five founders per its own definitions). The IPAL lacks consideration entirely, and the NCA names employment itself (as well as the merger equity) as consideration—no separate consideration is on offer. On the contracts alone, "millions of dollars for code" is dead on arrival. The Nessler Decl. ¶¶ 5, 9-16 confirms no founder has _received_ their share of even the earned retention bonuses—and that Checkmate is expressly withholding them on account of this dispute.

Checkmate's assertion of "millions for code" is knowingly false and should be stricken or disregarded by the Court. AV reserves all rights under Rule 11 accordingly.

### H.    The Counterclaims Rely on Coerced Pre-Suit "Admissions"

A striking share of allegations in the CCs derive from pre/in-litigation communications. By count, 17 of the 37 factual paragraphs in the CCs (45%) trace back to such materials: CCs ¶¶ 1, 4-7, 17, 28–32 (selective quotes/paraphrases of AV's responses); ¶ 22 (from a Nov. 3–7 email

threatening to *involve counsel* when overdue bonuses were refused during medical leave—hardly "erratic" behavior); ¶¶ 33–34 (a distortion of a joint response by *shareholder counsel*—not AV's statement); ¶ 35 (a recast of AV's complaint text); ¶¶ 36–37 (in-litigation emails). See Dkt. 71, pp. 37–59. AV was often responding under extortionate threats of <u>criminal exposure</u>, <u>career blacklisting</u>, and an <u>injunction barring him from working</u>, *coupled with* <u>demands that he "submit" to a recorded interview</u> and <u>"pay the out-of-pocket costs"</u> of a merger for which he was paid nothing (and <u>while his earned compensation was being unlawfully withheld</u>). See Ex. D. Using such duress to elicit "admissions" is improper. Many of AV's responses are inadmissible under FRE 408(a) and may be disregarded at Rule 12 (or stricken under Rule 12(f)). Counsel's persistence using those coerced responses supports sanctions under Rule 11, 28 U.S.C. § 1927, and the Court's inherent authority.

Separately, statements that constitute criminal extortion fall outside California's litigation privilege as a matter of law. See *Flatley v. Mauro* and progeny.[10] Checkmate has expressed its intent to rely on the privilege in writing. Whether or not its notices were *criminal*, AV's responses are **not** *admissible*, and the Court may weigh if using the former in this way is the very least *sanctionable*.

## I.    Checkmate's Evidentiary Withholding Confirms Bad Faith

Checkmate's "extrinsic evidence" claims are undermined by its withholding of documents its CCs necessarily rely on: (a) it has never attached the IP papers that serve as the foundation for its IP/Fraud claims and (b) as described in § H, the CCs attribute several statements and actions to AV to support claims of scienter and intent—but doesn't attach them or describe the context. Not a single pled statement arises from AV's pre-merger conduct—no scienter or intent can be inferred.

## J.    The Counterclaims Should be Dismissed with Prejudice

Leave may be denied where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); see also *Carrico v. City & Cnty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011) ("properly denied … if amendment would be futile"); *Leadsinger, Inc. v. BMG*

---

[10] See *Flatley v. Mauro*, 39 Cal. 4th 299, 330–31 (2006) (prelitigation demand threatening public criminal accusations unless paid not protected by litigation privilege); *Mendoza v. Hamzeh*, 215 Cal. App. 4th 799, 806–08 (2013) (letter threatening to report to the DA and employer unless paid was extortion and not privileged); *Stenehjem v. Sareen*, 226 Cal. App. 4th 1405, 1420–21 (2014) (threats to report "criminal" conduct to coerce payment fell outside § 47(b)).

*Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (affirming denial of leave based on futility/repeated failure). If the Court finds the IP papers to be incurably defective or unenforceable, as it must, no other facts could possibly save Claims I, IV and V. Claim VI for declaratory relief will be resolved by AV's affirmative statutory and breach claims. Claim II for breach of the non-compete is incurable if the Court finds the two emails do not constitute a breach—AV was terminated a week after these emails (which Checkmate concedes are the extent of its allegations), and under § 16600 (and under its own terms), the agreement is unenforceable post-employment. Claim III is dependent on the NCA, IPAA and IPAL, and cannot be sustained without them.

The Ninth Circuit affirms prejudice where plaintiffs had a chance to amend or where further amendment would be futile. Checkmate has had <u>two prior chances to amend</u>—it amended in SDNY on May 12, 2025, and had another chance after it voluntarily dismissed in that forum and brought the same claims here (verbatim) as its counterclaims. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007–08 (9th Cir. 2009) ("district court's discretion to deny leave to amend is particularly broad" after prior amendment; affirming dismissal with prejudice); *Cafasso ex rel. U.S. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (court may deny leave for futility; discretion particularly broad when plaintiff has previously amended).

The interests of justice would not be served by permitting another bite at the apple, and such pleading would be fundamentally unfair to AV as Checkmate continues to withhold earned wages while pursuing restraints and accusations that contravene California's public policies favoring employee mobility (Bus. & Prof. Code § 16600; *Edwards*), prompt payment of wages (Lab. Code §§ 201–203; *Cortez*), and protection of employee inventions (Lab. Code §§ 2870–2872).

### K. Joinder is Required if any IP/Fraud Claims Remain

Joinder is required on the face of the Merger Agreement and by Checkmate's own actions—not just under Rules 12(b)(7) and 19. Checkmate notably did not plead breach of the MA, which would trigger its Holder-Rep mechanism and pro-rata allocations. Instead, it sued AV alone under ancillary papers (including one addressing a different founder) while seeking damages "arising out of" the transaction governed by the MA. Having chosen that posture, Checkmate cannot blame AV

1  for not "joining indispensable parties": per Rule 13(h), only Checkmate can add parties to its

2  counterclaims, and once a Rule 19(a)(2) showing is made, the Court orders joinder.

3      Per the Ninth Circuit, a party to a contract is necessary, and if not feasible indispensable, to

4  litigation seeking to invalidate, interpret, or alter that contract. *Dawavendewa v. Salt River Project*,

5  276 F.3d 1150, 1156 (9th Cir. 2002); see also *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779–82

6  (9th Cir. 2005) (absent signatory required where relief would affect its contractual rights). Mr.

7  Nessler's declaration as Holder Rep under MA § 9.1 confirms (a) Checkmate attributes group

8  conduct to AV alone, and (b) the other founders' bonuses are being withheld due to this "legal

9  dispute." Checkmate served its Jan. 29 Notice on Mr. Nessler and now prosecutes the dispute by

10  miscasting his Feb. 7 response (through counsel) as AV's personal admission. This is dispositive of

11  indispensability: by asserting that the bonuses are forfeited due to the allegations here, <u>Checkmate

12  has put the absent signatories' rights directly at stake</u>. See Nessler Decl. ¶¶ 5, 9-17; Exhibit B.

13      The issue here isn't whether AV is responsible for *his own actions* (as Checkmate falsely

14  claims), but whether AV can be *individually sued for group actions* and for what it calls "<u>*the*</u>

15  <u>*Company's*</u> proprietary code"—while the whole group's earned wages are withheld. The MA was

16  drafted to guard against this. AV does not "point the proverbial finger at others", he only insists that

17  the parties' bargain be honored (under California law). Temple's "joint tortfeasor" rule is irrelevant

18  where, as here, the governing contract requires collective resolution, and where any ruling might

19  restructure rights of absent parties—which is precisely when Rule 19(a) forbids proceeding.

20  **III.    CONCLUSION**

21      Checkmate fixates on AV's reliance on "extrinsic evidence" and his own complaint. AV

22  concedes on the latter point that he misunderstood "the pleadings" to mean both parties pleadings,

23  and that he took an expansive view of what could be considered on a 12(b)(6) motion. <u>AV corrects

24  that issue here</u>: no extrinsic evidence or reliance on AV's own complaint are required for the Court

25  to grant AV's requested relief. The Index of References and Exhibits (pg. vi), lists each record cited

26  in this reply and specifies its incorporation into the CCs.

27      Under Rules 12(b)(6) and 9(b), dismissal follows from the face of the pleading and contracts

28  it incorporates; and, as needed, the Nov. 7-8 Lunchbox emails and Checkmate's notices. None is

1  disputed, all are necessarily relied on by the CCs, and attached for convenience. The Nessler Decl.

2  and referenced Jan 29 Notice/Feb 7 Response are offered for analysis under Rules 12(b)(7) and 19.

3        Checkmate's reliance on L.R. 7-9 to excuse its missed deadline is unpersuasive. The Court

4  may deem the motion unopposed under L.R. 7-12. That said, as its Opposition actually confirms

5  AV's arguments, AV respectfully requests that the Court consider the motion on the papers (L.R. 7-

6  15), dismiss the CCs with prejudice, and order Checkmate to show cause for violating L.R. 7-12 and

7  admonish its untimely and unauthorized filing under L.R. 7-13.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6

Plaintiff Arjun Vasan certifies that this brief contains 7,000 words, which complies with the 7000-word limit of L.R. 11- 6.1 and the Court's Civil Standing Order dated Aug. 27, 2025.

Respectfully submitted,

Dated: **September 24, 2025**

In: **Cerritos, California**

/s/ *Arjun Vasan*

**Arjun Vasan**, Plaintiff *In Pro Per*