# EXHIBIT C-1

Agarwal Declaration

**Ar jun Vasan v. Checkmate.com, Inc.**

C.D. Cal.. No. 2:25-cv-MEMF-JPR;
ECF No. 18-4

Ryan Q. Keech (SBN 280306)
Ryan.Keech@klgates.com
Gabriel M. Huey (SBN 291608)
Gabriel.Huey@klgates.com
Stacey Chiu (SBN 321345)
stacey.chiu@klgates.com
Rebecca Makitalo (SBN 330258)
rebecca.makitalo@klgates.com
K&L GATES LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

Attorneys for Defendant
CHECKMATE.COM INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARJUN VASAN,<br><br>Plaintiff,<br><br>v.<br><br>CHECKMATE.COM, INC.,<br><br>Defendant. | Case No. 2:25-CV-00765-MEMF-JPR<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DECLARATION OF VISHAL AGARWAL**<br><br>*[Filed concurrently with Motion to Dismiss or Transfer Venue, Declaration of Amy Brown, Declaration of Stacey Chiu, Request for Judicial Notice [Proposed] Order]*<br><br>Hearing Date: May 22, 2025<br>Time: 10 a.m.<br>Courtroom: 8B<br><br>Complaint Filed: January 28, 2025 |

509206346.1

I, Vishal Agarwal, declare

1.    I am a resident of New York, New York, and over the age of eighteen (18) years of age.  I am a founder of and the CEO at Checkmate.com, Inc. ("Checkmate").  I have worked for Checkmate since December 2015.  I have personal knowledge of the facts stated herein and I am otherwise competent to testify.  I submit this declaration in support of Checkmate's Motion to Dismiss or, in the Alternative, Transfer this case.

2.    I am based in New York and conduct my work for Checkmate from there.

3.    Checkmate, a technology company serving the restaurant industry by integrating first-party ordering platforms, third-party services, menu management, accounting reconciliation, and loyalty system, has its principal place of business in New York City, New York.  Checkmate was incorporated in Delaware.

4.    In addition to New York, Checkmate maintains a physical office at 111 East 4th Street, Suite 325, Alton, Illinois.  However, Checkmate operates as a distributed company with most of its workforce operating remotely.  Checkmate does not maintain any physical office in California.

5.    In early 2024, as part of its strategic expansion into the voice AI space, Checkmate pursued the acquisition of VoiceBite, an early-stage startup focused on AI-powered voice ordering.  Arjun Vasan ("Mr. Vasan"), a co-founder of VoiceBite, represented that VoiceBite owned proprietary source code essential to its voice technology platform.  Based on these representations, Checkmate pursued a merger with VoiceBite to accelerate its entry into the AI ordering market.

6.    The merger transaction between Checkmate and VoiceBite closed on April 30, 2024.  The transaction involved the multimillion-dollar acquisition of VoiceBite.  As part of the transaction, Mr. Vasan received equity in Checkmate, along with stock options and additional compensation negotiated as part of a tailored retention package.

509206346.1

- 2 -                    DECLARATION OF VISHAL AGARWAL

7.    Mr. Vasan and his co-founders executed the Merger Agreement and various related documents, including a Retention Bonus Agreement (Schedule 2.3(b)(ix), a Non-Competition Agreement (Schedule 2.3(b)(vi), and an employment offer letter for Mr. Vasan to serve as Vice President of AI Technology, effective May 1, 2024 (Schedule 2.3(b)(viii).   Mr. Vasan was represented by legal counsel, including employment counsel, during the negotiation and execution of the Merger Agreement and related documents.

8.    Attached hereto as **Exhibit A** is a true and correct copy of the Merger Agreement.

9.    Attached hereto as **Exhibit B** is a true and correct copy of the Non-Competition Agreement.

10.    Attached here as **Exhibit C** is a true and correct copy of the Retention Bonus Agreement.

11.    Attached hereto as **Exhibit D** is a true and correct copy of the employment offer letter for Mr. Vasan.

12.    Section 9.7(b) of the Merger Agreement provides that "[a]ny legal action or other Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement will be brought or otherwise commenced exclusively in any state or federal court located in the County of New York, State of New York."

13.    Section 11(b) of the Non-Competition Agreement states that "[a]ny proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal court located in New York County."

14.    Section 9.7(a) of the Merger Agreement states that "This Agreement will be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws)."

509206346.1

DECLARATION OF VISHAL AGARWAL

15.    Section 11(a) of the Non-Competition Agreement states that "[t]his Agreement shall be construed and interpreted and its performance shall be governed by the laws of the state of Delaware without regard to conflicts of law principles of any jurisdiction."

16.    Section 7 of the Retention Bonus Agreement states that "[t]his Bonus Agreement shall be governed in accordance with the laws of Delaware."

17.    I oversaw and worked closely with Mr. Vasan in his role as Vice President of AI Technology.

18.    In the months following the merger, I had several direct communications with Mr. Vasan regarding his conduct and performance. On or around October 14, 2024, he sent a large volume of Slack messages to Checkmate leadership in a single morning. I was involved in evaluating his performance and deciding to issue Mr. Vasan a final warning.

19.    Mr. Vasan also refused to provide Checkmate access to the proprietary code that he had alleged was VoiceBite's core asset.

20.    When Checkmate's technical team was finally able to examine the codebase, it discovered that the material predated VoiceBite's formation and contained references to a prior company founded by Mr. Vasan, CyborgOps, which had been acquired by a third party.  The team also identified code contributions from another third-party whose involvement had not been disclosed. These findings were reviewed by company leadership, including myself.

21.    On or around October 22, 2024, Ms. Brown, Mike Bell, Strategy Chief at Checkmate, and I held a Zoom call with Mr. Vasan to inform him that he was no longer fit to serve in a management role.  However, he was offered the opportunity to remain as an individual contributor.

22.    On or around October 23, 2024, I was notified by Ms. Brown that Mr. Vasan had requested medical leave and was approved to take a personal medical leave that would consist of two weeks of paid time off.

509206346.1

DECLARATION OF VISHAL AGARWAL

# EXHIBIT B

# EXHIBIT C-2

Bonus Agreement

**Arjun Vasan v. Checkmate.com, Inc.**

Case No. 2:25-cv-MEMF-JPR;
ECF No. 18-4 at 61, Exhibit C

Checkmate.com Inc.
April 30, 2024

**BY E-MAIL**

Arjun Vasan

Dear Arjun:

This letter (the "Bonus Agreement") is being delivered to you in connection with the commencement of your employment with Checkmate.com Inc. ("Checkmate") and in conjunction with your execution of an offer letter and Confidential Information and Inventions Agreement with Checkmate.

In consideration of you remaining employed with Checkmate, and to further motivate you to devote the exceptional service and performance necessary to maximize Checkmate's performance and value, Checkmate wishes to provide you with the below bonus opportunity.

1.    Bonus.  On July 30, 2024 (the "Bonus Date"), you will become entitled to receive a cash bonus (less applicable withholdings and deductions) payable as set out below (the "Retention Bonus").

   a.    An amount equal to the Initial Payment Amount (as defined below), subject to reduction or adjustment as set out in this Agreement, shall be paid as set out in Section 3 of this Agreement.

   b.    A maximum of Fifty Thousand Dollars ($50,000) of the Retention Bonus (the "Final Payment Amount"), reduced as provided below, shall be paid as set forth below (the "Final Payment").  The Final Payment Amount may be reduced as set forth below:

      i.    Checkmate may seek recovery of up to your Pro Rata Share of any Purchaser Loss that is recoverable by any Purchaser Indemnified Party pursuant to Article 8 of the Merger Agreement by recovering and offsetting against (and reducing the amount of) the Final Payment Amount (it being understood that such reimbursement shall not reduce such Checkmate Indemnified Party's right to seek recovery as set out in the Merger Agreement of any Purchaser Losses that are not recovered pursuant to this Section 1(b)).  Any recovery of any Purchaser Loss against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

      ii.    Checkmate may seek recovery of any Reduction Amount that was not deducted from the Initial Payment Amount by recovering and offsetting against (and reducing the amount of) the Final Payment Amount.  Any recovery of any Reduction Amount against the Final Payment Amount shall reduce, on a dollar-for-dollar basis, the amount of the Final Payment paid to you hereunder.

      iii.    No later than five (5) business days following the Final Payment Date, Checkmate shall pay an amount in cash to you in the amount of Final Payment Amount reduced as set out in Section 1(b)(i) or (ii) *minus* an amount equal to your Pro Rata Share of any Purchaser Loss for which any Purchaser Indemnified Party may be entitled to indemnification under Section 8 of the Merger Agreement and clause (i) above as result of any pending, but unresolved, claims

for indemnification for which Checkmate has provided notice to the Holder Representative prior to the Final Payment Date in accordance with the Merger Agreement (a "Dispute") (the amount contemplated by clause (C), the "Disputed Cash Amount").

iv.     On the later of the Final Payment Date or five (5) business days following the final resolution of any Dispute, Checkmate shall pay to you an amount in cash equal to (i) any remaining Disputed Cash Amount *minus* (ii) your Pro Rata Share of any Purchaser Indemnified Losses for which any Purchaser Indemnified Party may be entitled to indemnification under Article 8 of the Merger Agreement as result of any unresolved Dispute.

v.      For the avoidance of doubt, in no event shall you be entitled to an amount greater than Fifty Thousand Dollars ($50,000) pursuant to this Section 1(b).

2.      Definitions.

a.      "Expense Reconciliation Agreement" shall mean that certain Expense Reconciliation Agreement dated as of April 30, 2024 by and among Checkmate, VoiceBite Corporation, a Delaware corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia.

b.      "Final Payment Date" shall mean the date that is the later of (a) twelve (12) months after the Closing or (b) the Initial Payment Date.

c.      "Initial Payment Amount" shall mean Four Hundred Fifty Thousand Dollars ($450,000) minus (a) your Pro Rata Share of the amount of Company Transaction Expenses and Indebtedness that are unpaid as of the Closing and minus (b) your pro rata share of Non-Reimbursed Expenses as defined in the Expense Reconciliation Agreement (the amounts in (a) and (b) collectively the "Reduction Amount").

d.      The "Initial Payment Date" shall mean the earlier of (a) the date that is ten (10) business days after completion by Checkmate of a preferred stock financing in which Checkmate sells preferred stock for an aggregate purchase price of not less than $7,500,000 not including conversion of any outstanding notes or SAFEs (a "Qualified Financing") or (b) the date that is ten (10) business days after the one year anniversary of the date of this Bonus Agreement.

e.      "Merger Agreement" shall mean that certain Agreement and Plan of Merger (the "Merger Agreement"), dated April 30, 2024, by and among Checkmate, VoiceBite Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Checkmate, the Company, Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia, and Robert Nessler as the Holder Representative.

3.      Form of Payment.  If Checkmate closes a Qualified Financing (the date of such closing, the "Closing Date") within one year after the date of this Bonus Agreement (the "Anniversary Date"), then any earned Retention Bonus will be payable in cash no later than ten (10) business days after the later of the Bonus Date or the Closing Date. If Checkmate does not close a Qualified Financing by the Anniversary Date, then any earned Retention Bonus will be payable, at your discretion, (a) by conversion of any earned Retention Bonus, without interest, into Checkmate Common Stock at a price per share of $4.67, or (b) in cash, without interest, in fifteen

monthly installments beginning no later than ten (10) business days after your election of payment method is received by Checkmate. If you have not notified Checkmate in writing within 30 days after the Anniversary Date of your choice to have the Retention Bonus convert into Checkmate Common Stock or pay out in fifteen monthly installments, then Checkmate may select the payment method and notify you. As a condition to any earned Retention Bonus converting into Checkmate Common Stock, you and Checkmate will enter into a standard stock purchase agreement. Any payment of Retention Bonus in cash to employees of Checkmate or any of its subsidiaries will be made through Checkmate's or such subsidiary's payroll system on the next regular payroll date after the Payment Date unless such payroll date is within ten (10) business days of the Payment Date, in which case the payment may be made on the second regular payroll date after the Payment Date.

4.     <u>Termination of Employment</u>.  Notwithstanding any other provision of this Bonus Agreement, if you terminate your employment for Good Reason or if the Company terminates your employment for any reason, before the Bonus Date, you will be entitled to receive payment equal to the Initial Payment Amount and Final Payment Amount, each as adjusted or reduced as set out in this Agreement, each paid on the appropriate date set out in Section 1.

If you terminate your employment before the Bonus Date other than for Good Reason, you will not be eligible to receive any Initial Payment Amount or Final Payment.

"<u>Good Reason</u>" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

5.     <u>Dispute Resolution</u>.  Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS.  At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "<u>Mediator Opinion</u>").  The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding.  The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise

admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

6.   <u>Employment Terms</u>.  You and Checkmate acknowledge that neither this Bonus Agreement nor any other oral or written agreement between Checkmate (or any affiliate thereof) and you have established any contract of employment preventing either party from terminating the relationship for any reason.  Nothing in this Bonus Agreement may be construed to create any agreement for any indefinite or specific term of employment and you will at all times be an "at will" employee of Checkmate or an affiliate thereof.

7.   <u>Miscellaneous</u>.  This Bonus Agreement may be modified only by a contract in writing executed by the party to this Bonus Agreement against whom enforcement of the modification is sought. This Bonus Agreement: (i) contains the entire and final agreement of the parties to this Bonus Agreement with respect to the subject matter of this Bonus Agreement, and (ii) supersedes all negotiations, stipulations, understandings, letters, offers, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Bonus Agreement.  If any provision of this Bonus Agreement (including its attachments) is held to be illegal, unenforceable, or invalid by any court of competent jurisdiction, such provision shall be deemed modified to the fullest extent permitted by such court in order to be legal, enforceable, or valid, unless such modification shall be deemed to be inconsistent with the intent of the parties hereto in which case such provision shall be deemed severed from this Bonus Agreement and the remaining provisions and this Bonus Agreement (without the affected provision) shall remain in full force and effect, if and to the extent practicable and equitable.  The failure or delay of either party to enforce at any time any provision of this Bonus Agreement shall not constitute a waiver of such party's right thereafter to enforce each provision of this Bonus Agreement.  You may not voluntarily or by operation of law assign, pledge, delegate or otherwise transfer or encumber all or any part of your rights, duties or other interests in this Bonus Agreement.  Subject to the foregoing, this Bonus Agreement is binding on and inures to the benefit of the successors-in-interest and assigns of each party to this Bonus Agreement (whether by merger, consolidation, or bulk transfer of Checkmate's assets, or otherwise).  Nothing in this Bonus Agreement may be construed to create, or contemplate the creation of, any trust arrangement or security interest.  This Bonus Agreement may be executed simultaneously in two (2) or more counterparts (and by facsimile copy), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bonus Agreement shall be governed in accordance with the laws of Delaware.

8.   <u>Section 409A</u>.  The provisions of this Bonus Agreement have been prepared with the intention to comply in all respects with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), and Treasury Regulations and other official guidance promulgated thereunder, and such provisions shall be construed and interpreted consistent with that intention.  A termination of employment shall not be deemed to have occurred for purposes of any provision of this Bonus Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A of the Code upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A of the Code and, for purposes of any such provision of this Bonus Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." For purposes of Section 409A of the Code, your right to receive any installment payments pursuant to this Bonus Agreement shall be treated as a right to receive a series of separate and distinct payments.  Whenever a payment under this Bonus Agreement specifies a payment period with reference to a number of days (e.g., "payment shall

be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of Checkmate.

9.    <u>Termination</u>.  This This Agreement shall automatically terminate, and be of no further force and effect, upon the termination of the Merger Agreement in accordance with its terms.

***********

Thank you for your cooperation in this transition. The offer set forth in this Bonus Agreement may be revoked by Checkmate at any time prior to acceptance by you upon written notice to you and, if so revoked, cannot be accepted after such revocation. Please contact the undersigned with any questions you may have.

Very truly yours,

Checkmate.com Inc.

DocuSigned by:

*Vishal Agarwal*

E86E90D5BECD434

By: Vishal Agarwal

Its: Chief Executive Officer

ACCEPTED:

_____

Arjun Vasan

Date: _____

Thank you for your cooperation in this transition. The offer set forth in this Bonus Agreement may be revoked by Checkmate at any time prior to acceptance by you upon written notice to you and, if so revoked, cannot be accepted after such revocation. Please contact the undersigned with any questions you may have.

Very truly yours,

Checkmate.com Inc.

_____

By: Vishal Agarwal

Its: Chief Executive Officer

ACCEPTED:

_____
Arjun Vasan

Date: _Apr 30, 2024_

# EXHIBIT C

# EXHIBIT C-3

Offer Letter

**Arjun Vasan v. Checkmate.com, Inc.**

Case No. 2:25-cv-MEMF-JPR;
ECF No. 18-4 at 69, Exhibit D



Checkmate.com Inc.

April 30, 2024

Dear Arjun Vasan,

Offer and Position

We are pleased to extend an offer of employment to you for the position of **VP AI  Technology** at Checkmate.com Inc., a Delaware corporation (the "***Company***"). This offer of employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter.

Duties

In your capacity as VP AI Technology,  you will perform duties and responsibilities that are  commensurate with your position and such other duties as may be assigned to you from  time to time. You will report to Mike Bell.  You agree to devote your full  business time, attention, and best efforts to the performance of your duties and to the  furtherance of the Company's interests.

Location

You will work remotely for the Company, subject to business travel as needed to  properly fulfill your employment duties and responsibilities.

Start Date

Subject to satisfaction of all of the conditions described in this letter, this offer is  based on a mutually acceptable start date of May 1, 2024.

Compensation

Your starting base salary will be $280,000 per year, payable in two (2) week increments, and you will be eligible to receive a target bonus of up to $200,000 based on performance for 2024 and a target bonus of up to 50% of your annual salary based on performance for 2025 going forward, payable in accordance with the Company's standard practices, provided that you will not be eligible for a bonus payments unless you are continuously employed with the Company through the time of payment.  Your compensation is subject to review from time to time, and all payments will be made in accordance with the standard payroll practices of the Company and subject to standard withholdings and deductions.

Stock Options

Subject to approval by the Company's Board of Directors (the "***Board***"), the Company anticipates granting you an option to purchase 100,000 shares of the Company's common stock at the fair market value as

determined by the Board as of the date of grant (the "**Option**").  The anticipated Option will be governed by the terms and conditions of the Company's 2018 Stock Plan (the "**Plan**") and your grant agreement, and will include the following vesting schedule: 1/8th of the total shares will vest on the date that is 6 months after the vesting commencement date, and 1/48th of the total shares will vest at the end of each month thereafter on the same day of the month as the vesting commencement date (or if there is no corresponding day, on the last day of the month), until either the Option is fully vested or your continuous service (as defined in the Plan) terminates, whichever occurs first.

Benefits and Perquisites

You will be eligible to participate in the employee benefit plans and programs available  to the Company's employees, subject to the terms and conditions of such plans and  programs. You will be entitled to paid vacation in accordance with the Company's policies in effect from time to time. You will also be entitled to the fringe benefits and  perquisites that are made available to other similarly situated employees of the Company, each in accordance with and subject to the eligibility and other provisions of  such plans and programs. The Company reserves the right to amend, modify or  terminate any of its benefit plans or programs at any time and for any reason.

Withholding

All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.

Stock Ownership Requirements

Except as may be expressly provided otherwise in this offer letter, as an employee of the Company, you will be required to comply with the Company's  Stock Ownership Requirements applicable to employees and to be adopted in  the future.

At-will Employment

Your employment with the Company will be for no specific period. Rather, your  employment will be at will, meaning that you or the Company may terminate the  employment relationship at any time, with or without cause, and with or without  notice and for any reason or no particular reason. Although your compensation and  benefits may change from time to time, the at-will nature of your employment may only be changed by an express written agreement signed by an authorized officer of the Company.

Contingent Post-Termination Compensation

Notwithstanding any other provision of this offer letter, if the Company terminates your employment or your terminate your employment for Good Reason, in any such case before August 1, 2025  (the "**Applicable Date**"), you will receive as post-termination compensation:

1. A lump sum payment equal to three (3) months base salary, paid on the Company's first regular payroll paydate following the termination, provided that if such paydate is within five (5) days of the termination date, then such amount will be paid on the Company's second regular payroll paydate following the termination (the "**Payment Date**");

2.  A lump sum payment equal to twenty-five percent (25%) of the performance bonus for the then current year, paid on the Payment Date;

3.  any Accrued Compensation (as defined below).

If your employment is terminated by you other than for Good Reason, you will be paid only (i) any earned but unpaid base salary, (ii) other unpaid vested amounts or benefits under the compensation, incentive and benefit plans of the Company in which you participate, and (iii) reimbursement for all reasonable and necessary expenses incurred by you in connection with the performance of your duties on behalf of the Company in accordance with applicable Company policies and guidelines, in each case as of the effective date of such separation from service (the "***Accrued Compensation***").

"***Good Reason***" means: (i) a material reduction in your job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because you will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from any such acquisition; (ii) without your prior written consent, the Company requires you to relocate to a facility or location more than thirty (30) miles away from the location at which you were working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in your then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that none of the foregoing events or conditions will constitute Good Reason unless you provide the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and you resign your employment within 30 days following the expiration of that cure period.

Dispute Resolution

Any controversy, dispute or claim regarding whether a termination is for Good Reason shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Good Reason" as defined in this Agreement (the "Mediator Opinion"). The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding. The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

Section 409A

This offer letter is intended to comply with Section 409A of the Internal Revenue Code ("***Section 409A***") or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this offer letter, payments provided under this offer letter may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this offer letter that may be excluded from Section 409A either as separation pay due to

an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this offer letter shall be treated as a separate payment. Any payments to be made under this offer letter upon the termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this offer letter comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by you on account of non-compliance with Section 409A.

Notwithstanding any other provision of this offer letter, if any payment or benefit provided to you in connection with the termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and you are determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of your termination date (the "***Specified Employee Payment Date***") or, if earlier, on the date of your death. The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which your separation from service occurs shall be paid to you in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

<u>Governing Law</u>

This offer letter shall be governed by the laws of the State of California, without regard to conflict of law principles.

<u>Contingent Offer</u>

This offer is contingent upon:

(a) Verification of your right to work in the United States, as demonstrated by your completion of an I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of your Start Date.

(b) Satisfactory completion of reference checks.

(c) Your execution of the Company's Confidentiality and Intellectual Rights Assignment Agreement.

This offer will be withdrawn if any of the above conditions are not satisfied.

<u>Representations and Obligations</u>

By accepting this offer, you represent that you are able to accept this job and carry out the work that it would involve without breaching any legal restrictions on your activities, such as non-competition, non-solicitation or other work-related restrictions imposed by a current or former employer. You also represent that you will inform the Company about any such restrictions and provide the Company with as much information about them as possible, including any agreements between you and your current or former

# EXHIBIT E

# EXHIBIT C-4

 **Checkmate**

---

**Fwd: Lunchbox - Voice AI**
1 message

---

**Vishal Agarwal** <vishal@itsacheckmate.com>                    Thu, Nov 14, 2024 at 8:24 AM
To: Mike Bell <michaelb@itsacheckmate.com>, Amy Brown <amy.brown@itsacheckmate.com>

FYI

 **Vishal Agarwal**
FOUNDER AND CEO

+1 855.953.4340 | itsacheckmate.com

---

---------- Forwarded message ----------
From: **Nabeel Alamgir** <nabeel@lunchbox.io>
Date: Thu, Nov 14, 2024 at 9:43 AM
Subject: Re: Lunchbox - Voice AI
To: <vishal@itsacheckmate.com>

Here you go.

 **Nabeel Alamgir**
CEO & Co-founder
C: 646.867.5395
O: 1216 Broadway, NY 10001
Website / LinkedIn / Instagram

Sent via Superhuman iOS

On Fri, Nov 8 2024 at 10:40 AM, Arjun Vasan <arjun.vasan@gmail.com> wrote:

Ok, I figured it's safer to send some older recordings that there is no potential risk.

These are from Cyborg (my earlier company) and from 2021-2022, so the voices themselves are not as nice as we can do now. Though it's pre chatGPT, we were amongst the earliest users of LLMs (GPT-3) for this use case while everyone else was still focused on NLP. We worked with OpenAI directly to train the marco's pizza cart prediction model so we could post fully automatically via API.

Since we didn't have API access for HoF and Lee's sandwiches, those orders were partly automated using RPA on their websites, but used humans to verify.

We sold Cyborg to Presto, but did not transfer IP in the transaction, since we switched over to drive thru there and launched del taco, weinerschnitzel and carls jr.

1. House of Fortune (Chinese Vegan)

 hof-a-good-name.wav

hof-howdy-john.mp3

2. Lee's sandwiches (Vietnamese banh me) * (attached below)
lees-that-is-impressive.wav

3. Marco's Pizza (4th or 5th largest pizza chain) * (attached below)

Listen thru to the end, and enjoy!

- Arj


Sent from Gmail Mobile


On Thu, Nov 7, 2024 at 7:33 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:

Hey,

Think we connected a while back about voice ordering, then ended up being acquired by Presto, left started another voice ai company, acquired by checkmate.

Let's connect, I'm thinking of leaving here .. the culture doesn't appeal to me .. I've heard good things about lunchbox over the years.

I know you've started in voice - i noticed you were doing some of zalat pizza's phone ordering with a call center. We're also in zalat, with full voice ai.

(We being checkmate, where i'm not happy atm).

1(562)900-6541

I have a short window to decide to leave and nullify my non compete .. like just 2 weeks. And i can bring over 2 additional 10x engineers i recruited here.

- Arj

Sent from Gmail Mobile

Register Now: Virtual Showcase of Lunchbox Catering & CRM - get an inside look at the back-end features that drive $500+ check averages and an exclusive interview with Paris Baguette.



employer describing such restrictions on your activities. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company. If you have any questions about the ownership of particular documents or other information, you should discuss such questions with your former employer before removing or copying the documents or information.

As a Company employee, you will be expected to abide by Company rules and policies. Normal business hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday. As a full-time exempt salaried employee, you will be expected to work the Company's normal business hours as well as additional hours as required by the nature of your work assignments, and you will not be eligible for overtime compensation.

We are excited at the prospect of you joining our team. If you have any questions about the above details, please call me immediately. If you wish to accept this position, please sign below, and return this letter to me.

I look forward to hearing from you.

Yours sincerely,

Amy Brown **–** Head of Human Resources | US

On behalf of Checkmate.com Inc.

<u>Acceptance of Offer</u>

I have read, understood, and accept all the terms of the offer of employment as set forth in the foregoing letter. I have not relied on any agreements or representations, express  or implied, that are not set forth expressly in the foregoing letter, and this letter  supersedes all prior and contemporaneous understandings, agreements, representations,   and warranties, both written and oral, with respect to the subject matter of this letter.

Signed   *Arjun Vasan*

Date   Apr 30, 2024