ARJUN VASAN

PLAINTIFF IN PRO PER

ARJUN.VASAN@GMAIL.COM

(562) 900-6541

12615 193RD STREET

CERRITOS, CA 90703


UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| ARJUN VASAN,<br><br>    Plaintiff and Counter-Defendant,<br><br>v.<br><br><br>CHECKMATE.COM, INC.,<br>(dba "Checkmate")<br>    Defendant and Counterclaimant. | Case No.:  CV-00765-MEMF-JPR<br> Hon. Maame Ewusi-Mensah Frimpong<br><br>**NOTICE OF ERRATA RE OBJECTION &**<br>**[PROPOSED] REPLY (Dkt. 97)**<br><br>Complaint Filed: January 28, 2025<br>Hearing: ~~10:00 a.m. on October 9, 2025~~<br>Courtroom: 8B |

## <u>NOTICE OF ERRATA</u>

Plaintiff Arjun Vasan ("AV") respectfully files notice that he inadvertently uploaded an

outdated version of his Objection & [Proposed] Reply on September 25, 2025, and forgot to attach

the Exhibit F referenced therein. AV was away from computer after filing and upon review, realized

an earlier version was filed. Herewith, the updated Reply and Exhibit F are attached.

**Respectfully submitted**,

Dated: **September 29, 2025**

In: **Cerritos, California**

/s/ *Arjun Vasan*

**Arjun Vasan**, Plaintiff *In Pro Per*

i

## TABLE OF CONTENTS

**OBJECTION TO UNTIMELY OPPOSITION** ............................................................................. I

**TABLE OF CONTENTS** .................................................................................................... II

**TABLE OF AUTHORITIES** ............................................................................................... II

**INDEX OF REFERENCED EXHIBITS** ............................................................................... VI

**[PROPOSED] MEMORANDUM IN REPLY** .......................................................................... 1

I.     INTRODUCTION ....................................................................................................... 1

II.    ARGUMENT ............................................................................................................. 2

    *A.*    *The Counterclaims Cannot Survive California Law* ...................................... 2

    *B.*    *The Counterclaims Contradict the Operative Contracts* ............................. 3

    *C.*    *The Breach Counterclaims Fall with the Contracts* ..................................... 5

    *D.*    *The Fraud Claims (IV and V) Fail Further Under Rule 9(b)* ....................... 9

    *E.*    *The Declaratory Relief Claim (VI) is Duplicative of AV's Breach Claims* ..................... 11

    *F.*    *Checkmate's Contractual Overreach is Unconscionable on the Pleadings* .................... 12

    *G.*    *Checkmate "Millions of Dollars for Code" Theme Contradicts the Contracts* ............. 13

    *H.*    *The Counterclaims Rely on Coerced Pre-Suit "Admissions"* ................................... 13

    *I.*    *Checkmate's Evidentiary Withholding Confirms Bad Faith* ............................. 14

    *J.*    *The Counterclaims Should be Dismissed with Prejudice* ................................. 14

    *K.*    *Joinder is Required if any IP/Fraud Claims Remain* ...................................... 15

III.    CONCLUSION ......................................................................................................... 16

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6** .......................................... 18

## TABLE OF AUTHORITIES

CASES

*Aetna Bldg. Maintenance Co. v. West*,

    39 Cal. 2d 198, 204–05 (1952) ......................................................................... 8

*Alliant Ins. Servs., Inc. v. Gaddy*,

    159 Cal. App. 4th 1292 (2008) ......................................................................... 4

*Armendariz v. Found. Health Psychcare Servs., Inc.*,

    24 Cal.4th 83, 114 (2000) ............................................................................... 12

*Bancroft-Whitney Co. v. Glen*,

64 Cal. 2d 327, 345–47, 346 n.10 (1966) ........................................................................... 8

*Cafasso ex rel. U.S. v. Gen. Dynamics C4 Sys., Inc.,*

637 F.3d 1047, 1058 (9th Cir. 2011) .......................................................................... 9, 15

*Carrico v. City & Cnty. of S.F.,*

656 F.3d 1002, 1008 (9th Cir. 2011) ............................................................................ 14

*Cortez v. Purolator Air Filtration Prods. Co.,*

23 Cal. 4th 163, 168–78 (2000) ........................................................................... 11, 15

*Coto Settlement v. Eisenberg,*

593 F.3d 1031, 1038 (9th Cir. 2010) .............................................................................. 3

*Dawavendewa v. Salt River Project,*

276 F.3d 1150, 1156 (9th Cir. 2002) ............................................................................ 15

*EEOC v. Peabody W. Coal Co.,*

400 F.3d 774, 779–82 (9th Cir. 2005) .......................................................................... 16

*Esparza v. Sand & Sea, Inc.,*

2 Cal. App. 5th 781 .......................................................................................................... 5

*Flatley v. Mauro,*

39 Cal. 4th 299, 330–31 (2006) ..................................................................................... 14

*Gov't Emps. Ins. Co. v. Dizol,*

133 F.3d 1220, 1223–25 (9th Cir. 1998) ....................................................................... 11

*Kearns v. Ford Motor Co.,*

567 F.3d 1120 (9th Cir. 2009) ......................................................................................... 9

*Khoja v. Orexigen Therapeutics, Inc.,*

899 F.3d 988, 1002–04 (9th Cir. 2018) ........................................................................... 3

*Kleveland v. Chicago Title Ins. Co.,*

141 Cal. App. 4th 761 ...................................................................................................... 5

*Kowalski v. Tesmer,*

543 U.S. 125, 129–30 (2004) ........................................................................................... 6

*Leadsinger, Inc. v. BMG Music Publ'g,*

512 F.3d 522, 532 (9th Cir. 2008) ................................................................................. 14

*Lee v. City of L.A.,*

250 F.3d 668, 689–90 (9th Cir. 2001) ............................................................................. 3

*M&T Bank v. SFR Invs. Pool 1, LLC,*

964 F.3d 854, 861–62 (9th Cir. 2020) ............................................................................. 6

Mangindin v. Washington Mut. Bank,

    637 F. Supp. 2d 700, 707 (N.D. Cal. 2009) ........................................................... 11

Mendoza v. Hamzeh,

    215 Cal. App. 4th 799, 806–08 (2013) ................................................................. 14

Mitri v. Arnel Mgmt. Co.,

    157 Cal. App. 4th 1164 ........................................................................................... 5

Reyn's Pasta Bella, LLC v. Visa USA, Inc.,

    442 F.3d 741, 746 n.6 (9th Cir. 2006) ................................................................... 3

Schreiber Distrib. Co. v. Serv-Well Furniture Co.,

    806 F.2d 1393, 1401 (9th Cir. 1986) .................................................................... 14

Semegen v. Weidner,

    780 F.2d 727, 731 (9th Cir.1985) .......................................................................... 9

Sprewell v. Golden State Warriors,

    266 F.3d 979, 988 (9th Cir. 2001) ......................................................................... 3

Stenehjem v. Sareen,

    226 Cal. App. 4th 1405, 1420–21 (2014) ............................................................ 14

Stokes v. Dole Nut Co.,

    41 Cal. App. 4th 285, 295–97 (1995) .................................................................... 8

Strategix, Ltd. v. Infocrossing West, Inc.,

    142 Cal. App. 4th 1068 (2006) .............................................................................. 4

Suastez v. Plastic Dress-Up Co.,

    31 Cal. 3d 774, 781–82 (1982) ............................................................................ 11

Valencia Holding Co., LLC,

    61 Cal.4th 899, 910–11 (2015) ............................................................................ 12

Waller v. Truck Ins. Exch.,

    11 Cal. 4th 1, 18 (1995) ......................................................................................... 8

Warth v. Seldin,

    422 U.S. 490, 499 (1975) ....................................................................................... 6

Wilton v. Seven Falls Co.,

    515 U.S. 277, 282 (1995) ..................................................................................... 11

Wolschlager v. Fidelity Nat'l Title Ins. Co.,

    111 Cal. App. 4th 784 ........................................................................................... 5

Zucco Partners, LLC v. Digimarc Corp.,

552 F.3d 981, 1007–08 (9th Cir. 2009) ................................................................. 15

STATUTES

28 U.S.C. § 1927 ....................................................................................................... 13

Cal. Business & Professional Code § 16600 ............................................................ 3

Cal. Code of Civil Procedure § 1856 (parol evidence) ........................................... 3

Cal. Civil Code § 1670.5 .......................................................................................... 3

Cal. Civil Code § 1625 .............................................................................................. 3

Cal. Evidence Code § 622 ......................................................................................... 3

Cal. Labor Code §§ 2870–2872 ................................................................................ 2

RULES

Fed. Rules of Civil Procedure 11 ............................................................................. 13

Fed. Rules of Civil Procedure 12(b)(6) ................................................................... 1

Fed. Rules of Civil Procedure 12(f) ......................................................................... 1

Fed. Rules of Civil Procedure 12(g) ........................................................................ 1

Fed. Rules of Civil Procedure 9(b) .......................................................................... 2

### INDEX OF REFERENCED EXHIBITS

| | | |
|---|---|---|
| Merger Agreement (MA) | Dkt. 94-2; "MA" | CCs ¶¶ 15, 60; Robert Nessler as Holder Representative; "Merger Consideration" is 321,199 shares at $0.41 per share. |
| Non-Competition Agreement | Dkt. 94-3; "NCA" | CCs ¶¶ 15, 23, 48-53; Consideration pursuant to OL/MA, no separate consideration. |
| Warns Declaration | Exhibit A-1; | Authenticates IPAA and IPAL |
| Assignment of IP and Other Assets | Exhibit A-2; "IPAA" | CCs ¶¶ 15, 18, 40-45; Breach Alleged in Counterclaims; Consideration is $100.00; |
| IP Acknowledgment Letter | Exhibit A-3; "IPAL" | CCs ¶¶ 15, 18, 39, 41-45; Alleged Breach – No Consideration; |
| Agarwal Declaration | Exhibit C-1; | Authenticates Bonus Agreement, Offer Letter, Lunchbox Emails |
| Bonus Agreement | Exhibit C-2; "BA" | CCs ¶ 71, 73; In Consideration of Employment; $450,000, vested July 30, 2024 - $500,000 total for AV. |
| Offer Letter | Exhibit C-3; "OL" | CCs ¶ 71, 73; Salary/Severance/Benefits. Contingent on Continued Employment. |
| Lunchbox Emails | Exhibit C-4. | CCs ¶ 7, 23, 52; |
| Jan 29, 2025, Notice of Direct Claim; Feb 7 Shareholder Response | Exhibit B-2, B-3 | CCs ¶¶ 33-34; Jan 29 Notice served on & addressed to Mr. Nessler as Holder Rep; Feb 7 Response by Grant Thomas on Mr. Nessler's behalf; |
| Dec 6, 2024, and Jan 22, 2025, Notices of Claim | Exhibit D-2, D-4, D-5; "Early Notices" and AV responses | CCs ¶¶ 1, 5-7, 24-32; derive from notices threatening criminal referral at the outset and selective quotes of replies by AV. |
| Nessler Declaration | Exhibit E; | Confirms Jan 29 Notice/Feb 7 Response; Non-payment of team bonuses; Team dynamics for joinder issues; |
| Allegation-Source Map | Exhibit F; | CCs paragraphs mapped to sources. |

# [PROPOSED] MEMORANDUM IN REPLY

## I.    INTRODUCTION

Checkmate's opposition ("Opp.", Dkt. 94), filed 20 days late (without leave), devotes much space to rule violations that do not exist. Its word-count gripe relies on the Aug. 27 revision to the Standing Order—not the operative version when AV filed on Aug. 15 (specifying page limits, with which AV complied). Its Rule 12(g) objection misfires as AV did not file serial Rule 12(b)(6) motions to the same pleading—the instant motion superseded the earlier one the Court now mooted, and AV's Rule 12(f) motion targets a different pleading under a separate timeline.[1]

**On the merits**, the Opp. fails to meet the core challenges of AV's motion: (1) the contracts at issue are invalid or fail under California law (§§ II.A-B); (2) the counterclaims (CCs) fail to allege facts to support breaches under Rule 12(b)(6) (§ II.C) or fraud under Rule 9(b) (§ II.D); (3) the declaratory relief claim seeks to negate AV's affirmative claims and rights under the Labor Code (§ II.E); (4) no damages are plausibly alleged and "millions for code" is contradicted by the pleadings (§ II.G); (5) Checkmate sues AV alone for group conduct—while seeking to forfeit the whole group's wages (§ II.J). The record (§§ II.F, H, I) warrants dismissal with prejudice (§ II.K).

Notably, the CCs do not allege product failure or that any code *created at VoiceBite* was misrepresented. Instead, they confine the supposed fraud to *pre-VoiceBite code* purportedly "subject to" third-party claims. The undisputed agreements incorporated by the CCs purportedly assigns that legacy code for $100 in aggregate. No diligent acquirer could plausibly—or *reasonably*—have relied on *that code*, or on AV's nominal warranty of it, to the tune of "*millions of dollars*".

California recognizes the same—Labor Code §§ 2870-2872 limits such assignment when a *condition of employment*. The Opp. concedes such condition and relies on a "related to employer's business" exception to argue valid assignment; but the CCs allege the code predated *VoiceBite by years*; and that Checkmate acquired VoiceBite *to enter* its "nascent market". The Opp.'s reliance is thus precluded by the CCs and the statute's plain language requiring relation "*at time of conception*".

---

[1] If it reaches this Reply, the Court would have read the Opposition—so Checkmate's procedural arguments are estopped as it successfully argued for judgment on the merits notwithstanding lateness. Judicial estoppel prevents a litigant from "gaining an advantage by taking one position and then seeking a second advantage by taking an incompatible position." *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

No "extrinsic facts" are needed to connect these dots. The very approach this Court applied to deny Checkmate's motion to dismiss or transfer under Lab. Code § 925 (Dkt. 67) favor granting AV's motion to dismiss the CCs *with prejudice*—no new facts can cure what California prohibits. AV's allegedly "AI-generated" "lay opinions" are really just common-sense readings of the pleadings, incorporated materials, binding precedent and the plain language of the law.

For these reasons, AV respectfully asks the Court to admonish the late filing; but consider the papers to dismiss the CCs with prejudice, as amendment cannot cure the defects identified herein.

## II.    ARGUMENT

### A.    The Counterclaims Cannot Survive California Law

The CCs are based on contracts drafted presuming Delaware law would apply. After this Court ruled that Labor Code § 925 applies broadly to any condition of employment (e.g. required to close the merger/*acquihire*) they run against other state protections. Notably, the Opp. declines to offer an alternative choice-of-law analysis. This is dispositive, as California law also includes:

(1) Labor Code § 2870 renders unenforceable assignment of inventions developed entirely on an employee's own time without using the employer's equipment, supplies, facilities, or trade secrets—unless (A) related to its business or actual or demonstrably anticipated R&D (*at time of conception of the invention itself*), or (B) results from work performed for it. § 2871 lets employers require disclosure of inventions to determine if § 2870 applies; and bars agreements that purport to capture such inventions. § 2872 requires written notice and signed acknowledgment of these rights.

(2) Bus. & Prof. Code § 16600 voids post-employment restraints as a default rule. A 'sale-of-business' exception, §16601, offers narrow protection of the goodwill actually sold in the area the business was carried on. §16600.5 (SB 699) makes attempts to enforce void restraints unlawful and gives workers a private right of action (injunction, damages, fees).

(3) Contract integration is defined by Civ. Code §1625: A written contract supersedes prior or contemporaneous negotiations on the same subject; Evid. Code §622: Factual recitals in a written instrument are presumed true (except for consideration); and CCP §1856 (parol evidence): An integrated writing can't be rewritten by prior/contemporaneous papers; extrinsic evidence may cure ambiguities, show invalidity (e.g., fraud/mistake), or add consistent terms if not fully integrated.

(4) <u>Civ. Code § 1670.5</u> (unconscionability): A court may refuse to enforce a contract—or any clause—if it was unconscionable when made. The court can also sever or limit the offending term, applying the sliding-scale test (procedural + substantive unconscionability).

### B.    The Counterclaims Contradict the Operative Contracts

Under Rule 12, the Court may consider contracts necessarily relied on; where they contradict the pleading, the contracts control.[2] Here, the CCs incorporate the (1) <u>Merger Agreement</u> (**MA**), (2) <u>Non-Competition Agreement</u> (**NCA**), (3) <u>IP Acknowledgment Letter</u> (**IPAL**), (4) <u>Assignment of IP and Other Assets</u> (**IPAA**), (5) <u>Bonus Agreement</u> (**BA**), and (6) the <u>Offer Letter</u> (**OL**)[3]:

**1. The MA** (Dkt. 94-2) is not directly alleged to be breached, but its reps (§§ 5.9, 5.19) are listed in Claims IV and V (Fraud, Negl. Misrep.). Checkmate asserts it governs and integrates the others, but <u>it does not</u> integrate the IPAA and IPAL. See MA § 2 (integrating the NCA, BA and OL but not the IP papers). MA § 8.5 caps indemnity to the final payment defined in the BA.[4] "[M]erger consideration" is defined as 321,199 Checkmate shares valued $0.41 per share, in aggregate for all five founders: AV, Robert Nessler, Christopher Lam, Isamu Aoki and Paul Garcia.[5] Mr. Nessler is named as the Holder Representative in MA § 9.1, and his duties described further in § 8.1 and § 8.3. MA § 8.8 defines these collective indemnities as an exclusive remedy. MA § 8.6 confines reliance to the representations in § 5, and § 9.5 establishes the MA as the entire and superseding agreement.

**2. The NCA** (Dkt. 94-3) defines Checkmate as "Acquirer"; "Company" starts as VoiceBite (*Id.* at 2) but seems to transform to *Checkmate*, often mid-sentence: "this Agreement is necessary for the protection of <u>the legitimate business interests of *Company* in acquiring the *Company*</u>" (*Id.* at 4); "Stockholder will not … <u>disparage *Company* or the *Company*</u> in any manner" (*Id.*).

---

[2] The Court may consider these contracts under incorporation-by-reference (the pleadings necessarily rely on them, and authenticity is not disputed). See, e.g., *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–04 (9th Cir. 2018); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). When incorporated materials contradict conclusory allegations, the documents control. See *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). The Court may also judicially notice Checkmate's prior filing of these contracts to confirm its contents (existence, not truth). See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *Lee v. City of L.A.*, 250 F.3d 668, 689–90 (9th Cir. 2001).

[3] All of these are undisputed, filed and authenticated by Checkmate. See Index of Exhibits (pg. vi).

[4] In AV's case, the final payment amount was $50,000—under the jurisdictional minimum in federal court.

[5] 321,199 shares * $0.41 per share = $131,619.59. This value is substantiated by the Jan 29 Notice of Direct Claim, which values merger consideration at $131,815 for all five founders (without any calculation), along with $1.55 million in aggregate employment bonuses it deemed forfeited. See Exhibit C-2, 3.

The NCA recites the § 16601 exception <u>without listing any transferred goodwill</u>: no schedule of customers and locations. That "any reasonable person would understand that a signatory is barred from improperly competing with, soliciting the employees of, or disparaging *Checkmate*" (Opp. at 7:12-15) *disproves* enforceability as § 16601 protects only *acquired* goodwill.[6] The NCA claims to protect the "<u>Company</u>'s current business [of AI voice ordering]" "anywhere" it has employees, customers or operates (but <u>at least</u> the United States, Canada and European Union). That is facially overbroad—in California, "current business" is a snapshot at signing—<u>existing customers and their expected patronage</u>. The Opp. confirms Checkmate impermissibly attempts to bootstrap its customer base onto VoiceBite's product space—this is why the ambiguous definition of "Company" matters and why the NCA is not enforceable under California law.

The NCA recites as consideration the merger equity, at-will employment and confidential-information AV would receive (the last is a restraint not consideration). If employment by *Company* is consideration—and "Company" is *VoiceBite*—<u>this condition precedent was never met</u>, and the NCA was never in force. Contrary to Opp. at 8:12-14, these are not "fact question[s]"—they are raised by the face of the NCA. Merely reciting "good and valuable consideration" does not make it more than what it was: an unlawful restraint purporting to ban AV from his chosen industry, world-wide. See Evid. Code §622; Bus. & Prof. Code. § 16600.

**3. The IPAL** (Ex. A-3) allegedly bears AV's signature but was "entered into and delivered by *Christopher Lam* … in connection with [the merger]," and Checkmate concedes Lam is "the addressee" (Opp. 19:10–13). Its response—that AV "provides no support" and "makes a factual attempt"—is inapposite: the document's text controls at Rule 12, and redefining the bound party would require unpled reformation supported by extrinsic evidence (barred at this stage by CCP § 1856). AV asserts no fact beyond the IPAL's face. Checkmate also may not amend via opposition: the CCs never address this defect and neither the CCs nor the Opposition attach the IP papers.

---

[6] See *Strategix, Ltd. v. Infocrossing West, Inc*., 142 Cal. App. 4th 1068 (2006) — reversed an injunction because the non-solicit barred solicitation of the <u>buyer</u>'s customers; §16601 "ties the permissible scope to the sold business," i.e., the seller's own customers/employees as of sale. *Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292 (2008) — the rationale for §16601 "<u>does not extend to the buyer's other customers</u>," emphasizing the seller knows its own clients.

Moreover, the IPAL is not integrated by the MA and is not a valid contract without separate consideration—which it doesn't offer. Checkmate argues that the one-way "connection" (IPAL to MA) bootstraps the MA's consideration—not under California's parol evidence rule, and not when MA § 2 enumerates closing deliverables, but does not reference, attach, schedule or assume the IPAL. The IPAL is thus *outside the transaction*, binds someone else and lacks consideration; any IPAL-based theory fails as a matter of law. Mot. at 12:1-13 & n.38.

Finally, the IPAL *acknowledges* MA § 5.9 and "section 1.4 of the [ECIIAA] that [Mr. Lam] will enter into," and excerpts those clauses; it does not impose any new promise. Under settled California law, acknowledgment is not assent. *Mitri v. Arnel Mgmt. Co.*, 157 Cal. App. 4th 1164; *Esparza v. Sand & Sea, Inc.*, 2 Cal. App. 5th 781; *Kleveland v. Chicago Title Ins. Co.*, 141 Cal. App. 4th 761; cf. *Wolschlager v. Fidelity Nat'l Title Ins. Co.*, 111 Cal. App. 4th 784.

**4. The IPAA** (Ex. A-2) is signed by AV and Mr. Nessler (for VoiceBite) and purports to assign "technology and [IP]" AV "has developed" "*on behalf of*" VoiceBite and "tangible personal property" used for it, for an "aggregate purchase price" of $100. It promises reimbursement for "out of pocket" costs in AV's acquisition and maintenance of these "assigned assets"—which it defines but does not *detail*. The IPAA does not reference the MA, and the MA does not reference the IPAA. The IPAA is the source of bullets 1-2 in the CCs fraud claims (IV and V)—but it does not contain the alleged phrase "comprehensive set of components of an AI voice ordering system".

**5. The BA and OL** (Ex. C-2, C-3) are not directly named but Claim VI for Declaratory Relief aims to negate them—while AV's affirmative claims aim to enforce them. These are the only contracts under which AV is owed "further compensation" (that Claim VI seeks to "disentitle"). The BA entitles AV to a retention bonus of $500,000 earned on the "Bonus Date" (July 30, 2024), "in consideration of continued employment" and "in conjunction with" the OL. The OL provides, *inter alia*, guaranteed severance in the case of any termination (cause or no cause).

**In summary**, these constitute the full set of agreements incorporated into the counterclaims, and that the Court can—and should—consider on this Motion. Critically, read together, these papers completely preclude any notion that "millions of dollars" were paid "specifically" for "the code".

**C.    The Breach Counterclaims Fall with the Contracts**

**Claim I** bundles the IP papers, and alleges that, "[p]ursuant to" both, [AV] made "express representations and warranties" about the "VoiceBite application code.". CCs ¶ 41. Both IP papers are void or otherwise unenforceable as to AV. The IPAA is unenforceable under Labor Code §§ 2870-2872 and the IPAL addresses a different founder and offers no consideration.

Checkmate's conclusory "successor" label contradicts its framing of the IPAA as "part of the Transaction". If a successor, the IPAA *preceded* the merger, and any out-of-pocket loss is capped at its recited "aggregate purchase price" of $100.00 (IPAA § 2(a)).[7]

CCs ¶¶ 24-29 exhibit non-source artifacts (e.g., deepgram.txt (credentials), env.json (config), deployment.txt (documentation))—<u>not source code or IP</u>—and a small 2018 utility showing AV and his father as *co-authors* (audio.py)—but <u>a co-author is an author</u> with usage rights. The CCs allege these artifacts predate VoiceBite by years and was developed on behalf of other entities. Such assets could not have been assigned by the IPAA's own terms (§ II.B.4). The CCs allege no *actual* third-party claim (no prior-employer demand or C&D)—rendering "subject to third party claims" <u>entirely speculative</u>. A party must exert its own rights, not those of absent parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). The CCs have not plausibly alleged standing to enforce its claims—which further run afoul of Labor Code § 2870.

Checkmate concedes § 2870 applies to the IPAA (Opp. at 20), but does not address the lack of a § 2871 exclusion list and § 2872 notice; and (wrongly) claims the § 2870(a)(1) exception:

> Labor Code § 2870 excepts from its coverage any inventions that "[r]elate at the time of conception … to the employer's business." Cal. Labor Code § 2870(a)(1). The "invention" in question—the VoiceBite code—clearly relates to Checkmate's business in the Voice AI sphere.

The <u>CCs disprove any relation *at time of conception*</u>: Checkmate acquired VoiceBite in April 2024 to "be a very early mover" into the "nascent" Voice AI market. CCs ¶¶ 14, 16; its business description lacks any mention of Voice AI. CCs ¶ 13; the code at issue "dated back to as early as 2018" "<u>well before the formation of VoiceBite itself</u>, which was not formed until on or around August 4, 2023.". CCs ¶ 24. No extrinsic facts are needed; § 2870(a)(1) is inapplicable.

---

[7] A successor "stands in the shoes" of its predecessor—no greater rights, and subject to all defenses. See *M&T Bank v. SFR Invs. Pool 1, LLC*, 964 F.3d 854, 861–62 (9th Cir. 2020); Restatement (Second) of Contracts § 336.

This Court has held that AV is entitled to the substantive protections of California law under the <u>plain language of Labor Code § 925</u>. See Dkt. 67. The <u>plain language of § 2870(b)</u> confirms such a protection: "To the extent a provision [purports an assignment that violates] (a), <u>the provision is against the public policy of this state and is unenforceable</u>." When read together with the CCs, the statute precludes enforceability as to the IPAA.

The IPAL *acknowledges* MA § 5.9(f) and ECIIAA § 1.4, but the CCs don't plead breach of either containing contract. The MA governs and supersedes on VoiceBite-IP subject matter (MA §§ 5.9, 9.5) and the pled theory concerns code delivered "as part of the Transaction,", *before* any operative ECIIAA duty. *Acknowledging* MA § 5.9 cannot transform it to a personal representation, absent explicit language that does so. This contradiction precludes breach of the IPAL—code brought to Checkmate by *VoiceBite* under the MA cannot *also* have been brought by AV *personally*.

Finally, even if *arguendo* enforceable, the IP papers do no work. <u>If integrated</u>, MA § 9.5 supersedes on the same subjects (Civ. Code § 1625; CCP § 1856), and any breach channels through MA § 8 under § 8.8. <u>If not integrated</u>, they cannot support *transaction-related damages*. In any case, <u>the CCs do not plead breach of the MA</u>. Claim I must be dismissed with prejudice as, if permitted, enforcing the IP papers would render as dead-letter both California law and the governing MA.

**<u>Claim II</u>** seeks to enforce the NCA but does not allege that AV <u>diverted a customer or opportunity</u>, <u>misused confidential information</u>, or <u>solicited a Checkmate employee</u>. The opposition attempts to salvage its claim by (newly) alleging the breach as "assisting any other person in an attempt to solicit or induce". As Checkmate admits, the *only* pled facts are the Nov. 7–8, 2024 emails (Ex. C-4), which it relies on and agrees are undisputed—the Court may consider them. Opp. at 6:12-28. Read in full, they show <u>conditional</u>, <u>post-employment planning</u>: AV stated that *if his non-compete were nullified*, he <u>*could*</u> bring two engineers. See Mot. at 13:19-26.

Moreover, the CCs: (1) admit Checkmate had no "current business" in Voice AI pre-merger ¶ 13; (2) describe the space of Voice AI for restaurants as "very early stage" and "nascent" ¶ 14; (3) note VoiceBite was started only months before merger ¶ 19, 24; and (4) fail to allege any pre-merger customers for VoiceBite. This is dispositive—even if § 16601 is held to apply, <u>the CCs own facts</u>

1    preclude any legitimate business interest justifying a global, market wide restraint on trade. No

2    "extrinsic" facts are required—the NCA cannot be enforced for this purpose under California law.

3    **No breach.** California courts enforce terms the parties chose, not a litigant's post-hoc beliefs.

4    See Cal. Civ. Code §§ 1638–1639 (plain meaning governs), 1644 (ordinary sense of words); *Waller*

5    *v. Truck Ins. Exch.*, 11 Cal. 4th 1, 18 (1995) (courts may not rewrite contracts). Here, NCA §3 bars

6    "assisting any other person" in an "attempt to solicit or induce" an employee to resign—i.e., aiding

7    another's ongoing attempt to ask or persuade. A conditional, future-tense proposal ("if my non-

8    compete is nullified, I could bring two engineers") is neither assistance nor an attempt to solicit

9    under the clause's plain language. Cf. *Aetna Bldg. Maintenance Co. v. West*, 39 Cal. 2d 198, 204–05

10   (1952) (to "solicit" is to entreat, request, or ask; mere statements not directed to the employee to

11   induce action are not solicitation). Calling it "a clear attempt to assist" (Opp. at 6) improperly adds

12   terms—"attempting to assist" or "proposing to assist later"—that NCA §3 does not contain.

13   **No precedent**. Checkmate cites no authority holding that a conditional, exploratory email

14   equals 'assisting an attempt to solicit'; its only citation is *Twombly*, and the rest is contract language

15   and characterization of undisputed emails. Instead, it affords a 500-word footnote attacking citations

16   in AV's already withdrawn and mooted "First Motion to Dismiss". Notably it fails to address settled

17   law in California that preparing to compete is not competing. See *Bancroft-Whitney Co. v. Glen*, 64

18   Cal.2d 327, 346 n.10 (1966) (Restatement (Second) of Agency §393 cmt. e).

19   **No damages**. Under *Twombly/Iqbal*, Checkmate must plausibly allege non-speculative harm

20   caused by a breach; it pleads none. See *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

21   990, 995–97 (9th Cir. 2014); *Wall Street Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171,

22   1178 (2008). It identifies no employee who resigned, no customer or deal lost, and no causal chain

23   from AV's two emails to any injury. Boilerplate does not satisfy Rule 9(g). Lost-profit theories must

24   be pleaded with reasonable certainty, not speculation. *Lewis Jorge Constr. Mgmt., Inc. v. Pomona*

25   *Unified Sch. Dist.*, 34 Cal. 4th 960, 968–69 (2004); *Sargon Enters., Inc. v. USC*, 55 Cal. 4th 747,

26   773–77 (2012); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 884–88 (2002). A bare, two-email

27   theory with no resulting injury does not state a breach claim.

28

Here, the actual emails kill Claim II at the threshold. <u>California permits employees to prepare to compete</u>—so long as they do not <u>actively compete</u> before departure.[8] The CCs allege no such act; the incorporated emails confirm as much. *Attempting* to enforce a noncompete against a California employee is itself unlawful.[9] Therefore, Claim II is yet another act of willful disregard for California law; the rights of its workers; and the vibrancy of its markets; it should be dismissed with prejudice.

**Claim III** fails as the covenant of good faith/fair dealing cannot create or revive duties the contracts don't contain, forbid conduct the contracts permit, or end-run § 16600 by "good faith". See *Edwards v. Arthur Andersen LLP,* 44 Cal. 4th 937, 945–50; *Kolani v. Gluska*, 64 Cal. App. 4th 402, 407–08 (1998). The CCs braids the NCA, IPAA, and IPAL into one count—making it duplicative of the contract claims and deficient under Rules 8 and 10(b). And because (i) the NCA is void and can't be enforced via the covenant, (ii) no implied covenant runs against AV on the IPAL/IPAA (no privity or enforceability), and (iii) the theory adds nothing beyond the contract counts, Claim III should be dismissed with prejudice. (See also *Guz v. Bechtel Nat'l*, 24 Cal.4th 317, 349–50;)

### D.    The Fraud Claims (IV and V) Fail Further Under Rule 9(b)

The Opp.'s attempts to defend pleading sufficiency are unpersuasive. It cites *Vitiosus* and *Rana* to justify broad date ranges—but neither had *duty-defining* temporal boundaries as here (e.g. pre/post-merger, pre/in/post-employment). The CCs conclusory "evasiveness" label is not pled with *any* date—that AV does not recall being asked for a code review is a fact question, but that the CCs do not allege any facts for him to contest is a pleading insufficiency and fair notice question.[10]

<u>CCs ¶¶ 4, 6, 35</u> paraphrase allegations from AV's Complaint ¶ 16 (Dkt. 10 at 5-6) to allege concealment; the Court may read them in full, not for truth, but to establish the CCs *misrepresent*

---

[8] See *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 345–47 (1966) (pre-departure preparations permissible; liability turns on active competitive acts and misuse); *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295–97 (1995) (same);

[9] See Bus. & Prof. Code § 16600.5 (prohibiting enforcement or attempted enforcement of non-competes in California).

[10] Rule 9(b) exists to give notice, protect reputation, and avoid costly fishing expeditions. *Kearns v. Ford Motor Co*., 567 F.3d 1120 (9th Cir. 2009) (dismissal for failure to specify *when* plaintiff was exposed to misrepresentations); *Cafasso v. Gen. Dynamics C4 Systems, Inc*., 637 F.3d 1047 (9th Cir. 2011);. *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985) (9(b) serves to limit ability to impose "enormous social and economic" costs). Here, AV suffers each such prejudice;

1    *AV's allegations*—that his repeated attempts to update the reps/disclosures were rejected—by

2    Checkmate.[11] The Court may disregard these allegations as contradicted by the referenced text.

3        CCs ¶¶ 59, 65 assert AV represented he and VoiceBite were the "*original* author" and

4    "*exclusive* owner" of the "VoiceBite application code." Neither the listed bullets, nor the MA and

5    IPAA from which they derive, contain the quoted terms. Indeed, "VoiceBite application code" is one

6    of several such variants: "VoiceBite software", "VoiceBite's technology", "VoiceBite Proprietary

7    Software"—none match the text of the IPAA or MA. The CCs thus, at the outset, fail to provide *any*

8    notice—let alone fair notice or 9(b) particularity—of its allegations. Such deliberate vagueness is

9    one concerning aspect of Checkmate's pleading strategy—another is deliberate misstatement by

10    selective quotation. Both defects pervade the bulleted "misrepresentations" in CCs ¶¶ 59, 65.

11        Bullets 1, 2 derive from the IPAA. The first stiches IPAA § 3 with "comprehensive set of

12    components of an AI voice ordering system" (defining "VoiceBite software", a term the IPAA does

13    not contain). It does not specify what constitutes this "comprehensive set"; who defined it; when and

14    in what context or how it was related to the *pre-VoiceBite code* the IPAA purportedly assigned.

15    These are not real representations of AV or any other founder. The CCs are, in effect, putting words

16    in AV's mouth. See Ex. F (Mapping of CCs allegations to sources).

17        Bullets 6, 7 replace "Company" with "Plaintiff" to conjure *personal* reps from MA § 5.19

18    ("Disclosure") —disclaiming material omissions across transaction documents. MA § 5 contains

19    *Company* reps, made by *VoiceBite* to Checkmate. The Company Disclosure Schedules qualify the §

20    5.9 reps (e.g., "§ 5.9(d) … true, correct and complete list of the Company Proprietary Software").

21    *The CCs don't attach or quote the disclosures*. This is dispositive for lack of fair notice or

22    particularity when read with the MA's knowledge definition for Company: "*the actual knowledge of

23    Robert Nessler, Arjun Vasan and Christopher Lam*". MA at 5. Without the schedules, who drafted

24    them, who uploaded them and *when*—how can AV possibly contest alleged *omissions*?

25        The CCs rely on pre-suit notices and responses, so the Court may read them. Ex. C, D. The

26    Feb 7 Response—by counsel for Mr. Nessler (Ex. B-3)—distinguishes VoiceBite IP from artifacts

27

28    _____

[11] Moreover, there was nothing to conceal *at that stage*, as the alleged "representations" (all contract clauses) were being negotiated—and had just been presented to the founders.

exhibited by the CCs, explaining the latter are not protectable IP. CCs ¶ 33 misstates the distinction and attributes it to AV *personally*, as an "admission" that *all VoiceBite code lacked IP protection*, and was a "valueless non-asset." The writings don't say that, and <u>they weren't AV's own statements</u>.

<u>Treating "the code" as a monolith fails 9(b)</u>. Checkmate's fraud theory—*by its very nature*—targets only *pre-VoiceBite code* transferred by the IPAA for $100. Any IP <u>*owned by VoiceBite*</u> was transferred by the MA, <u>but the CCs allege no fraud regarding that IP</u>. Checkmate's damages theory of "millions of dollars" for a "worthless asset" is implausible on the pleadings when the contracts it incorporates show an employment-based acquihire—not an IP based asset purchase. See § II.G.

**Claims IV and V** should be dismissed with prejudice as failing 9(b) on every metric: who, what, where, when and how; and as entirely dependent on the IPAA—no new facts can cure the face of that document even if enforceable, which it is not under § 2870—regardless of successor status.

### E.    The Declaratory Relief Claim (VI) is Duplicative of AV's Breach Claims

<u>Claim VI</u> seeks a declaration "disentitling" AV from further compensation under the parties' agreements. There are only two contracts under which AV is owed further payment: the BA and OL. Because rulings on AV's breach claims will necessarily resolve the same controversy, Count VI is superfluous and should be dismissed with prejudice[12] (or, at minimum, without leave to amend).

Checkmate's claim that it does not ask the court to violate the labor code is disingenuous—Claim VI also seeks relief from "*relevant law*". Moreover, it is settled in California that once wages are earned, <u>they are the property of the employee</u> and cannot be waived or forfeited by private agreement. *Cortez v. Purolator Air Filtration Prods*. Co., 23 Cal. 4th 163, 168–78 (2000) (earned wages are employee's property; courts order restitution); Cal. Lab. Code § 219(a) (no provision of the wage-payment article "can in any way be contravened or set aside by a private agreement"); *Suastez v. Plastic Dress-Up Co*., 31 Cal. 3d 774, 781–82 (1982) (vacation pay vests as earned; forfeiture barred). Declaratory judgment cannot bless what the Labor Code forbids. See § 219(a); *Cortez*, 23 Cal. 4th at 173–78; *Suastez*, 31 Cal. 3d at 781–82.

---

[12] Declaratory relief is discretionary and is properly dismissed where it merely mirrors defenses to existing claims and will be "fully resolved by the determination of the main action.". See **28 U.S.C. § 2201**; *Wilton v. Seven Falls Co*., 515 U.S. 277, 282 (1995); *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223–25 (9th Cir. 1998) (en banc). *Mangindin v. Washington Mut. Bank*, 637 F. Supp. 2d 700, 707 (N.D. Cal. 2009)

1    Here, the bonus and severance in question are clearly identified as wages payable via

2    Checkmate's payroll system. The BA further recites the bonus as "in consideration of your

3    continued employment" and that AV was "entitled" to it on the Bonus Date (July 30, 2024).

4    Therefore, the retention bonus should have been paid on separation as <u>earned wages</u> under Labor

5    Code § 203. <u>Claim VI seeks to relieve Checkmate of these statutory obligations to AV.</u>

6    **F.    Checkmate's Contractual Overreach is Unconscionable on the Pleadings**

7    California permits courts to refuse enforcement of unconscionable terms on the face of the

8    papers and minimal, undisputed context. Cal. Civ. Code § 1670.5; see *Armendariz v. Found. Health*

9    *Psychcare Servs., Inc*., 24 Cal.4th 83, 114 (2000) (sliding scale: both prongs required); *Sanchez v.*

10   *Valencia Holding Co., LLC*, 61 Cal.4th 899, 910–11 (2015) (oppression/surprise + overly harsh/one-

11   sided terms). Both prongs are satisfied here, independently and cumulatively.

12   <u>**Procedural Unconscionability**</u> exists when a contract is adhesive or presents with surprise

13   or opacity. These were adhesion papers, imposed as a non-negotiable condition of employment and

14   closing. See CC ¶ 18; NCA recital ("condition of … employment"). The NCA's core defined term

15   ("Company") shifts mid-sentence between VoiceBite and Checkmate, obscuring what business is

16   protected and what it prohibits (see § II.B.2). The IPAL is addressed to another founder and merely

17   "acknowledges" external clauses, without disclosing that it could be weaponized as an independent

18   liability instrument (see § II.B.3). The IPAA provides no § 2872 notice or § 2871 exclusion list, and

19   purports to sweep unspecified, pre-VoiceBite assets for a nominal $100 (see § II.B.4). The IP papers

20   are not integrated into the MA, which enumerates other closing deliverables and omits them (see §

21   II.B.1). This opacity and "take-it-or-leave-it" posture is classic procedural unconscionability.

22   <u>**Substantive Unconscionability**</u> exists when a contract is overly harsh or one sided. Here the

23   IPAA purports a sweeping assignment of pre-VoiceBite assets for a nominal, recited $100—now

24   leveraged into "millions" of alleged exposure. That asymmetry—especially given the absence of

25   statutory notices/exclusions—renders the clause overly harsh. Lab. Code §§ 2870–2872 (see § II.A).

26   The IPAL functions only to amplify personal exposure without reciprocal benefit (see § II.B.3). The

27   NCA purports a global restraint, untethered to any identified, acquired goodwill—effectively a

28   market-wide ban in a "nascent" field the CCs admit was entered via the merger (see § II.C). The

result, if Checkmate's contractual interpretations are credited, is a one-way allocation of rights and risk that prevents lawful work while offering no separate consideration.

### G.    Checkmate "Millions of Dollars for Code" Theme Contradicts the Contracts

Opp. at 10:16–20 asserts Checkmate "paid millions of dollars … specifically for the company's proprietary code" that "ended up being worthless," but the CCs' own narrative targets only pre-VoiceBite legacy material—e.g., code "dating back to 2018," references to "Cyborg," and work done "well before the formation of VoiceBite"—not the substantial code the team built at VoiceBite. While the share, value and importance of the latter is a question of fact, the allegations in the CCs target only purports IP issues inapplicable to code created for VoiceBite after its founding.

> Checkmate's claim for fraud alleges that Checkmate was injured by paying millions of dollars for a company—more specifically, for what Checkmate believed to be the company's proprietary code that ended up being worthless, as neither Plaintiff nor VoiceBite were actually the exclusive owner or rights holder to the code. (Id. at ¶¶ 6, 19, 34, 62.)

The only "dollars" for the "code" are a _nominal $100 recited by the IPAA_ (for transfer of pre-VoiceBite code). The BA and OL specify _employment compensation_—payment for future work, not merger-related transfer of assets. The MA defines only Checkmate _equity_ as "Merger Consideration" (total value circa $132,620 for five founders per its own definitions). The IPAL lacks consideration entirely, and the NCA names employment itself (as well as the merger equity) as consideration—no separate consideration is on offer. On the contracts alone, "millions of dollars for code" is dead on arrival. The Nessler Decl. ¶¶ 5, 9-16 confirms no founder has _received_ their share of even the earned retention bonuses—and that Checkmate is expressly withholding them on account of this dispute.

Checkmate's assertion of "millions for code" is knowingly false and should be stricken or disregarded by the Court. AV reserves all rights under Rule 11 accordingly.

### H.    The Counterclaims were Manufactured by Coercing Pre-Suit "Admissions"

On Nov. 20-27, 2024, AV sought his unpaid compensation after his Nov. 14 termination. Ex. D-1. On Dec. 6, 2024, Checkmate's _first_ "notice of claim" alleged "criminal misconduct" and, _inter alia_, demanded AV "immediately reimburse" the "out-of-pocket costs" of the merger. CCs ¶ 30, 31. Ex. D-2. A second such "notice" on Jan. 22, 2025, threatened to "litigate" "criminal liability" and obtain injunctions barring work; and demanded AV "submit" to an interview or provide unspecified

evidence. CCs ¶ 32. Ex. D-4, 5. Both "notices" misstated the IPAL—claiming AV promised not to bring 3rd party IP "onto [VoiceBite]'s premises" (the actual document—which it withheld then and has not attached here, reads *Checkmate*). A Jan. 29 notice served on Mr. Nessler asserted forfeiture of the team's bonuses and "over $5 million dollars" in unspecified damages. The Feb. 7 reply by *counsel for Mr. Nessler* was distorted into AV's personal "admission". CCs ¶¶ 33, 34. Exs. C, E. Using such tactics to elicit "admissions" for a complaint is improper; the court may disregard such allegations or consider them with full context. See Exhibit F.

AV's purportedly "bizarre and implausible" "excuses" (CCs ¶ 31) responded to the Dec. 6 notice (*Id*. ¶ 30) and the "no matter what" quote (*Id*. ¶¶ 1, 5, 32, 60), and "admission" in CCs ¶ 28 regarding his father's co-authorship responded to the Jan. 22 notice (*Id*. ¶ 32). These "notices" were sent shortly after AV offered to settle for what he was owed (Ex. D-1)—notwithstanding unlawful termination on medical leave (which the 1st notice falsely asserted as a "resignation"). Any use of such to establish liability (e.g. fraud elements of scienter and intent) is barred by FRE 408.

Separately, statements that constitute criminal extortion fall outside California's litigation privilege as a matter of law. See *Flatley v. Mauro* and progeny.[13] Checkmate has expressed its intent to rely on the privilege in writing. Whether or not its notices were *criminal*, AV's responses are **not admissible**, and the Court may weigh if using the former in this way is the very least *sanctionable*.

### I. Checkmate's Evidentiary Withholding Confirms Bad Faith

Checkmate's "extrinsic evidence" claims are undermined by its withholding of documents its CCs necessarily rely on: (a) it has never attached the IP papers that serve as the foundation for its IP/Fraud claims and (b) as described in § H, the CCs attribute several statements and actions to AV to support claims of scienter and intent—but doesn't attach them or describe the context. Not a single pled statement arises from AV's pre-merger conduct—no scienter or intent can be inferred.

### J. The Counterclaims Should be Dismissed with Prejudice

---

[13] See *Flatley v. Mauro*, 39 Cal. 4th 299, 330–31 (2006) (prelitigation demand threatening public criminal accusations unless paid not protected by litigation privilege); *Mendoza v. Hamzeh*, 215 Cal. App. 4th 799, 806–08 (2013) (letter threatening to report to the DA and employer unless paid was extortion and not privileged); *Stenehjem v. Sareen*, 226 Cal. App. 4th 1405, 1420–21 (2014) (threats to report "criminal" conduct to coerce payment fell outside § 47(b)).

Leave may be denied where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); see also *Carrico v. City & Cnty. of S.F.*, 656 F.3d 1002, 1008 (9th Cir. 2011) ("properly denied … if amendment would be futile"); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (affirming denial of leave based on futility/repeated failure). If the Court finds the IP papers to be incurably defective or unenforceable, as it must, no other facts could possibly save Claims I, IV and V. Claim VI for declaratory relief will be resolved by AV's affirmative statutory and breach claims. Claim II for breach of the non-compete is incurable if the Court finds the two emails do not constitute a breach—AV was terminated a week after these emails (which Checkmate concedes are the extent of its allegations), and under § 16600 (and under its own terms), the agreement is unenforceable post-employment. Claim III is dependent on the NCA, IPAA and IPAL, and cannot be sustained without them.

Moreover, Checkmate has had <u>two prior chances to amend</u>—it amended in SDNY on May 12, 2025, and had another chance after it voluntarily dismissed that action and brought the same claims here (verbatim) as counterclaims. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007–08 (9th Cir. 2009) ("discretion to deny leave to amend is particularly broad" after prior amendment; affirming dismissal with prejudice); *Cafasso* at 1058 (9th Cir. 2011) (same).

The interests of justice would not be served by permitting another bite at the apple, and such pleading would be fundamentally unfair to AV as Checkmate continues to withhold earned wages while pursuing restraints and accusations that contravene California's public policies favoring employee mobility (Bus. & Prof. Code § 16600; *Edwards*), prompt payment of wages (Lab. Code §§ 201–203; *Cortez*), and protection of employee inventions (Lab. Code §§ 2870–2872).

### K.    Joinder is Required if any IP/Fraud Claims Remain

Joinder is required on the face of the Merger Agreement and by Checkmate's own actions—not just under Rules 12(b)(7) and 19. Checkmate notably did not plead breach of the MA, which would trigger its Holder-Rep mechanism and pro-rata allocations. Instead, it sued AV alone under ancillary papers (including one addressing a different founder) while seeking damages "arising out of" the transaction governed by the MA. Having chosen that posture, Checkmate cannot blame AV

1  for not "joining indispensable parties": per Rule 13(h), only Checkmate can add parties to its

2  counterclaims, and once a Rule 19(a)(2) showing is made, the Court orders joinder.

3       Per the Ninth Circuit, a party to a contract is necessary, and if not feasible indispensable, to

4  litigation seeking to invalidate, interpret, or alter that contract. *Dawavendewa v. Salt River Project*,

5  276 F.3d 1150, 1156 (9th Cir. 2002); see also *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779–82

6  (9th Cir. 2005) (absent signatory required where relief would affect its contractual rights). Mr.

7  Nessler's declaration as Holder Rep under MA § 9.1 confirms (a) Checkmate attributes group

8  conduct to AV alone, and (b) the other founders' bonuses are being withheld due to this "legal

9  dispute." Checkmate served its Jan. 29 Notice on Mr. Nessler and now prosecutes the dispute by

10  miscasting his Feb. 7 response (through counsel) as AV's personal admission. This is dispositive of

11  indispensability: by asserting that the bonuses are forfeited due to the allegations here, <u>Checkmate</u>

12  <u>has put the absent signatories' rights directly at stake</u>. See Nessler Decl. ¶¶ 5, 9-17; Exhibit B.

13       The issue here isn't whether AV is responsible for *his own actions* (as Checkmate falsely

14  claims), but whether AV can be *individually sued for group actions* and for what it calls "*<u>the</u>*

15  *<u>Company's</u>* proprietary code"—while the whole group's earned wages are withheld. The MA was

16  drafted to guard against this. AV does not "point the proverbial finger at others", he only insists that

17  the parties' bargain be honored (under California law). Temple's "joint tortfeasor" rule is irrelevant

18  where, as here, the governing contract requires collective resolution, and where any ruling might

19  restructure rights of absent parties—which is precisely when Rule 19(a) forbids proceeding.

20  **III.    CONCLUSION**

21       Checkmate fixates on AV's reliance on "extrinsic evidence" and his own complaint. AV

22  concedes on the latter point that he misunderstood "the pleadings" to mean both parties pleadings,

23  and that he took an expansive view of what could be considered on a 12(b)(6) motion. <u>AV corrects</u>

24  <u>that issue here</u>: no extrinsic evidence or reliance on AV's own complaint are required for the Court

25  to grant AV's requested relief. The Index of References and Exhibits (pg. vi), lists each record cited

26  in this reply and specifies its incorporation into the CCs.

27       Under Rules 12(b)(6) and 9(b), dismissal follows from the face of the pleading and contracts

28  it incorporates; and, as needed, the Nov. 7-8 Lunchbox emails and Checkmate's notices. None is

disputed, all are necessarily relied on by the CCs, and attached for convenience. The Nessler Decl. and referenced Jan 29 Notice/Feb 7 Response are offered for analysis under Rules 12(b)(7) and 19.

Checkmate's reliance on L.R. 7-9 to excuse its missed deadline is unpersuasive. The Court may deem the motion unopposed under L.R. 7-12. That said, as its Opposition actually confirms AV's arguments, AV respectfully requests that the Court consider the motion on the papers (L.R. 7-15), order Checkmate to show cause for violating L.R. 7-12, admonish its untimely and unauthorized filing under L.R. 7-13 and—for the reasons herein—dismiss the CCs with prejudice.

Dated: **September 25, 2025**

In: **Cerritos, California**

**Respectfully submitted**,

/s/ *Arjun Vasan*

**Arjun Vasan**, Plaintiff *In Pro Per*

17

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6</u>

Plaintiff Arjun Vasan certifies that this brief contains 7,000 words, which complies with the 7000-word limit of L.R. 11- 6.1 and the Court's Civil Standing Order dated Aug. 27, 2025.

**Respectfully submitted**,

Dated: **September 25, 2025**

/s/ *Arjun Vasan*

In: **Cerritos, California**

**Arjun Vasan**, Plaintiff *In Pro Per*