1   Arjun Vasan
2   arjun.vasan@gmail.com
3   12615 193rd Street
4   Cerritos, CA 90703
5   562-900-6541
6   Plaintiff in Pro Per
7
8
9                **UNITED STATES DISTRICT COURT**
10               **CENTRAL DISTRICT OF CALIFORNIA**
11
12  **Arjun Vasan**,                          Case No.:  2:25−cv−00765−MEMF−ASx
                                              Hon. Maame Ewusi-Mensah Frimpong
13          Plaintiff and Counter-Defendant
14                                            **PLAINTIFF'S NOTICE OF MOTION AND**
15          vs.                               **MOTION FOR SANCTIONS UNDER FED.**
                                              **R. CIV. P. 11, 28 U.S.C. § 1927 AND THE**
16                                            **COURT'S INHERENT POWERS;**
    **Checkmate.com, Inc.**,                 **MEMORANDUM OF POINTS AND**
17                                            **AUTHORITIES**
    (dba "Checkmate"),
18                                            Complaint Filed: January 28, 2025
            Defendant and Counterclaimant    Hearing Date: January 8, 2026
19                                            Hearing Time: 10:00 A.M.
20                                            Courtroom: 8B
21
22
23  TO THE HONORABLE COURT, ALL PARTIES AND COUNSEL OF RECORD:
24          PLEASE TAKE NOTICE that on January 8, 2026 at 10:00 A.M. or as soon thereafter as
25  the matter may be heard in Courtroom 8B of the above-entitled Court, located at 350 West First
26  Street, Los Angeles, CA 90012, Plaintiff Arjun Vasan ("AV") will and hereby does move the
27  Court for sanctions against Defendant Checkmate.com, Inc. ("Checkmate") and its counsel under
28  Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent authority.

The motion is grounded on: Checkmate (1) leveraging coercive demand letters to harass and provoke "admissions" (Rule 11(b)(1)); (2) supporting merits elements with settlement-context communications as barred by Rule 408 (Rule 11(b)(2)); (3) filing Counterclaims (CCs) that lack evidentiary support and contradict incorporated documents (Rule 11(b)(3)); (4) unreasonable and vexatious multiplication of proceedings by counsel (28 U.S.C. § 1927); and (5) bad-faith litigation tactics warranting sanctions under the Court's inherent powers.

AV respectfully requests the Court: (i) strike allegations that rely on settlement dialog; or misstate contracts or party-opponent statements; (ii) require any amended pleading, if permitted, to remove Rule 408-barred matter and to quote verbatim and attach source documents with pinpoint citations; (iii) impose a deterrent monetary penalty payable to the Clerk and award non-attorney, out-of-pocket costs tied to the violations; (iv) issue a written admonition; (v) preclude re-assertion of the stricken allegations; and (vi) grant such further relief under § 1927 and its inherent power as the Court deems just and proper, consistent with Rule 11(c)(5).

Rule 11(c)(2) Certification. On October 21, 2025, AV served on Checkmate's counsel the motion and supporting papers pursuant to Fed. R. Civ. P. 11(c)(2). More than 21 days elapsed, and the challenged allegations were not withdrawn or corrected. Appendix A ("Safe Harbor"). Minor changes have since been made. The Ninth Circuit does not require a filed Rule 11 motion to be a verbatim copy of the served version; safe harbor is satisfied where, as here, the grounds and relief requested remain substantially the same and no prejudice results. Vasan Decl. ¶¶ 2-3.

Local Rule 7-3 Statement. After serving the safe-harbor notice, AV sent multiple emails and sought to confer on this motion. Counsel did not respond, or propose any alternative dates, so a C.D. Cal. L.R. 7-3 conference did not occur. See Appendix A; Vasan Decl. ¶¶ 2-3.

This motion is based upon this Notice; the accompanying Memorandum; the Declarations and Exhibits (including Ex. F itemizing the challenged allegations); the pleadings and records on file; and such further evidence and argument as may be presented at the hearing.

**Dated**: November 17, 2025

*/s/ Arjun Vasan*

In **Cerritos, California**

**Arjun Vasan,** Plaintiff In Pro Per

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**TABLE OF CONTENTS**................................................................................................**III**

**TABLE OF AUTHORITIES** ........................................................................................**IV**

**INDEX OF REFERENCED EXHIBITS**.................................................................. **VII**

**MEMORANDUM OF POINTS AND AUTHORITIES** ........................................... **1**

   I.    INTRODUCTION ................................................................................................... 1

   II.    BACKGROUND ..................................................................................................... 1

   III.   STANDARDS........................................................................................................... 3

   IV.   ARGUMENT ........................................................................................................... 6

      *A.    Checkmate's "Notices" Constitute Extortion as a Matter of Law; Evidence of Improper Purpose under 11(b)(1) and Vexatious Multiplication under § 1927* ...................................... 6*

      *B.    Withholding and Misstatement of Contracts Confirms Bad Faith*.................................... 8*

      *C.    Use of Settlement Dialog to Prove Merits Violates 11(b)(2) and FRE 408* ...................... 10*

      *D.    Misleading Quotation and Paraphrasing Violate 11(b)(3) and FRE 106* ........................ 12*

   V.    THIS MOTION IS NOT PREMATURE, DUPLICATIVE OR IMPROPER ....................... 16

   VI.   CONCLUSION ...................................................................................................... 17

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6** ....................................... **19**

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Hudson v. Moore Business Forms, Inc.*,

4

    836 F.2d 1156 (9th Cir. 1988) ............................................................... 4

5

*Aveta Inc. v. Bengoa*,

6

    C.A. No. 3598-VCL (Del. Ch. Aug. 13, 2010) ............................................ 15

7

*Beech Aircraft Corp. v. Rainey*,

8

    488 U.S. 153, 171–72 (1988) .......................................................... 5, 15

9

*Blixseth v. Yellowstone Mountain Club, LLC*,

10

    796 F.3d 1004, 1007–08 (9th Cir. 2015) ................................................. 3

11

*Caputo v. Tungsten Heavy Powder, Inc.*,

12

    96 F.4th 1111, 1153–55 (9th Cir. 2024) ................................................. 3

13

*Cassino v. Reichhold Chems., Inc.*,

14

    817 F.2d 1338, 1342 (9th Cir. 1987) ..................................................... 5

15

*Chambers v. NASCO, Inc.*,

16

    501 U.S. 32, 45–46 (1991) ............................................................... 4

17

*Christian v. Mattel, Inc.*,

18

    286 F.3d 1118, 1127–30 (9th Cir. 2002) ............................................. 4, 12

19

*Cooter & Gell v. Hartmarx Corp.*,

20

    496 U.S. 384, 393 (1990) ............................................................... 3

21

*Diaz v. Prof'l Cmty. Mgmt., Inc.*,

22

    16 Cal. App. 5th 1190, 1216–18 (2017) ................................................. 4

23

*Falcon Brands, Inc. v. Mousavi & Lee, LLP*,

24

    74 Cal. App. 5th 506, 520–21 (2022) ................................................... 7

25

*Fink v. Gomez*,

26

    239 F.3d 989, 992–94 (9th Cir. 2001) ................................................... 4

27

*Flatley v. Mauro*,

28

39 Cal. 4th 299, 326 (2006) ........................................................................................ 4, 6

*Fortis Advisors LLC v. Allergan W.C. Holding Inc.,*

   C.A. No. 2019-0159-MTZ, at 7 (Del. Ch. May 14, 2020)......................................... 15

*Goodyear Tire & Rubber Co. v. Haeger,*

   581 U.S. 101, 108–13 (2017)......................................................................................... 4

*In re Keegan Mgmt. Co. Sec. Litig.,*

   78 F.3d 431, 436 (9th Cir. 1996) ................................................................................... 3

*Malin v. Singer,*

   217 Cal. App. 4th 1283 (2013) ...................................................................................... 7

*Mendoza v. Hamzeh,*

   215 Cal. App. 4th 799, 806 (2013) ........................................................................... 5, 6

*New Alaska Dev. Corp. v. Guetschow,*

   869 F.2d 1298, 1306 (9th Cir. 1989) ............................................................................. 3

*Old Chief v. United States,*

   519 U.S. 172, 180–82 (1997)......................................................................................... 5

*People v. Arias,*

   13 Cal. 4th 92, 156 (1996) ........................................................................................... 15

*People v. Asta,*

   251 Cal. App. 2d 64, 87 (1967) ................................................................................. 5, 6

*People v. Combs,*

   34 Cal. 4th 821, 842–43 (2004) .................................................................................. 14

*People v. Pride,*

   3 Cal. 4th 195, 235 (1992) ........................................................................................... 15

*People v. Riel,*

   22 Cal. 4th 1153, 1189–90 (2000) .............................................................................. 14

*People v. Sanders,*

   188 Cal. 744, 749–50 (1922) ........................................................................................ 7

*People v. Umana,*

138 Cal. App. 4th 625, 640–41 (2006) ....................................................... 8

*Rhoades v. Avon Prods., Inc.*,

   504 F.3d 1151, 1161–62 (9th Cir. 2007) ............................................. 5, 14

*Roadway Express, Inc. v. Piper*,

   447 U.S. 752, 764 (1980)........................................................................ 4

*Sea–Land Serv., Inc. v. Lozen Int'l, LLC*,

   285 F.3d 808, 821 (9th Cir. 2002) ....................................................... 14

*Stenehjem v. Sareen*,

   226 Cal. App. 4th 1405, 1423 (2014) ................................................. 5, 6

*Townsend v. Holman Consulting Corp.*,

   929 F.2d 1358, 1362 (9th Cir. 1990) (en banc) ................................. 3, 12

*Transbay Auto Serv., Inc. v. Chevron U.S.A. Inc.*,

   807 F.3d 1113, 1120–22 (9th Cir. 2015) ............................................. 14

*United States v. Safavian*,

   435 F. Supp. 2d 36, 43–44 (D.D.C. 2006) .......................................... 14

*United States v. Vallejos*,

   742 F.3d 902, 905 (9th Cir. 2014) (cleaned up)................................... 15

*Weil v. Citizens Telecom Servs. Co., LLC*,

   922 F.3d 993, 999–1000 (9th Cir. 2019) ............................................. 14

1

## INDEX OF REFERENCED EXHIBITS

| Merger Agreement (MA) | Dkt. 94-2; "MA" | CCs ¶¶ 15, 60; |
|---|---|---|
| Warns Declaration | Exhibit A-1; | Authenticates IPAA and IPAL |
| Assignment of IP/Assets .. | Exhibit A-2; "IPAA" | CCs ¶¶ 15, 18, 40-45; |
| IP Acknowledgment Letter | Exhibit A-3; "IPAL" | CCs ¶¶ 15, 18, 39, 41-45; |
| Agarwal Declaration | Exhibit C-1; | Authenticates BA and OL |
| Bonus Agreement | Exhibit C-2; "BA" | CCs ¶ 71, 73; |
| Offer Letter | Exhibit C-3; "OL" | CCs ¶ 71, 73; |
| Lunchbox Emails | Exhibit C-4. | CCs ¶¶ 7, 23, 52; |
| Jan 29, 2025, Notice; Feb 7 Shareholder Response | Exhibit B-2, B-3 | CCs ¶¶ 33-34; Jan 29 Notice; Feb 7 Response by Grant Thomas |
| Nov 20, 2024, to Jan 29, 2025, settlement outreach and notices of claim. | Exhibit D-1 to D-5; | CCs ¶¶ 1, 5-7, 24-32; threats of criminal referral, demands for money payment and early settlement dialog |
| Nessler Declaration | Exhibit E; | Confirms Jan 29 Notice/Feb 7 Response; Non-payment of bonuses; |
| Allegation-Source Map | Exhibit F; | CCs paragraphs mapped to sources. |
| Nov 14. Zoom Transcript, Screenshots and Summary | Exhibit K-1 to K-3; | Termination Meeting Transcript, Fathom screenshots and AI summary |
| Ethics Complaint | Exhibit G-1 to G-3 | Ethics allegations served on KL Gates and General Counsel response |

**Note**: for the convenience of the Court and other readers, the hyperlinks in this brief link (as possible) directly to the page and section of the referenced documents. The vast majority of evidence has been filed previously in this action and authenticity has not been disputed.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This motion concerns litigation conduct that no reasonable attorney could view as proper. Defendant Checkmate.com, Inc. ("Checkmate"), through counsel, embarked on a pre-litigation campaign of coercive "notices", threatening *criminal* referral while demanding Plaintiff Arjun Vasan ("AV") "immediately reimburse [it]" and answer for "misrepresentations" spliced from contracts it refused to disclose—all while withholding his earned wages. AV's responses in the "open to resolution *if*" context it purported, are now repurposed as its counterclaims ("CCs").

The Court may weigh if the "notices" constitute extortion as a matter of law (Pen. Code §§ 518, 519, 523) to discern improper purpose (Rule 11(b)(1)). The use of settlement dialog to support merits elements is an untenable legal theory (Rules 408, 11(b)(2)). Misstating withheld party-opponent statements and contract clauses; and fabricating "millions of dollars" in damages advances allegations without actual or potential evidentiary basis. (Rules 11(b)(3), 106).

The result is a pleading built on threats, omissions, and distortions, not evidence. These tactics undermine the integrity of these proceedings and exemplify conduct that Rule 11, § 1927, and the Court's inherent powers are designed to deter. As AV proceeds *pro se*, fee-shifting fails to achieve deterrence; appropriate sanctions may include dismissal with prejudice, striking of offending allegations, a corrective admonition and penalty payable to the Clerk to reinforce the duty of candor, and to compensate the Court for the burden imposed by the misconduct at issue.

## II.    BACKGROUND

On **May 1, 2024**, AV starts employment at Checkmate, with compensation guarantees negotiated as part of its "acquihire" of VoiceBite—a pre-revenue Voice AI startup he cofounded with Robert Nessler and Christopher Lam. The parties executed: a Merger Agreement (**MA,** Dkt. 94-2), Offer Letter (**OL,** Ex. C-3), Bonus Agreement (**BA,** Ex. C-2), IP Acknowledgement (**IPAL**, allegedly between AV and Checkmate, but addresses Mr. Lam, Ex. A-2), Assignment of IP and Other Assets (**IPAA**, between VoiceBite and AV, Ex. A-1), Non-Competition Agreement (**NCA,** Dkt. 94-3). AV disputes the validity and/or enforceability of the NCA, IPAA and IPAL in his Motion to Dismiss CCs ("MTD": Dkt. 81; 97-2, 4; 98 (reply)).

1

On **Nov. 14, 2024**, AV was terminated during medical leave and told settlement terms would be sent shortly. Ex. K. On **Nov. 20**, AV requested unpaid severance and bonuses. Ex. D-1.

On **Dec. 6, 2024**, Checkmate escalates with a "Notice of Claim" purportedly under MA indemnity provisions—alleging "criminal misconduct" and demanding that AV "immediately reimburse" its "out of pocket costs". On Dec. 20, AV responds, requesting signed contracts and personnel files, citing California law. Exs. D-2, D-3.

On **Jan. 22, 2025**, Checkmate's 2nd Notice, threatens to "litigate" "criminal liability" and enjoin lawful work unless AV provides a "detailed explanation" and includes "supporting evidence", in which case it was "open to resolution". Ex. D-4. AV responds. Ex. D-5.

On **Jan. 28, 2025**, AV files this action, later amended Feb. 21, 2025. See Dkt. 10.

On **Jan. 29, 2025**, AV sends an ethics complaint to K&L Gates regarding the "notices". Ex. G. The same day, a third Notice was served on Robert Nessler, Holder Representative under MA § 9.1—claiming "over $5 million" in unsubstantiated damages, accounting for $1.68 million by forfeiture of the founders' bonuses and merger equity. See Exs. B-2, E.

On **Feb. 7, 2025**, Mr. Nessler responds to the Notice, via counsel Grant Thomas; distinguishing the functional code snippets in the notices from VoiceBite IP. See Ex. B-3, E.

On **Feb. 14, 2025**, Checkmate sues AV personally in New York State Supreme Court, a substantially verbatim precursor to its counterclaims here. This is later removed to the Southern District of New York (SDNY) by AV on April 12 (Case No. 1:25-cv-03181-JMF).

On **Feb. 20, 2025**, K&L Gates General Counsel ("GC") Charles Tea responds evasively to AV's ethics allegations. Ex. G at 14-16. Tea conceals the state lawsuit, and despite AV raising the misrepresented contracts does not produce them for review.

On **May 12, 2025**, Checkmate amends its complaint in response to AV's motion to quash (post-removal). The allegations at issue remained verbatim. See SDNY ECF No. 21.

On **July 10, 2025**, after full briefing on AV's motion to dismiss in SDNY, Checkmate voluntarily dismisses and brings its counterclaims in this instant action. See Dkt. 71.

On **July 25, 2025**, AV files for post-dismissal sanctions in SDNY, contesting the notion that "millions of dollars" were "paid for code" that he confessed was not IP and so a "valueless

MOTION FOR SANCTIONS

non-asset", as lacking evidentiary basis, contradicting the record and filed for improper purpose. Mr. Nessler integrates the record evidence in a supporting declaration. SDNY ECF No. 58.

On **Aug. 8, 2025**, Checkmate opposes the sanctions motion—declining to address either issue—instead cross-moving for sanctions citing heated litigation emails. SDNY ECF No. 59.

On **Aug. 15, 2025**, AV moves to dismiss (MTD) in CD Cal. See Dkts. 81, 97, 98.

On **Sep. 1, 2025**, AV files a reply/opposition to Checkmate's opposition/cross-motion, corroborating the Nessler Declaration with on-record evidence. See SDNY ECF No. 66.

On **Sep. 8, 2025**, Checkmate's SDNY reply again declines to address the merits of AV's arguments or the Nessler Declaration. See SDNY ECF No. 67.

On **Sep. 18, 2025**, Checkmate files an unauthorized and untimely opposition (Opp.) to the MTD —20 days late per the Court's standing order—still withholding the IP papers. The Opp. again repeats the issues AV raised in the sanctions motion. See Dkt. 95.

On **Sep. 24, 2025**, AV's Reply attaches the withheld contracts, and organizes evidence incorporated by the CCs. See Dkts. 97-1; 97-2; 97-3; 97-4; 97-5; 97-6, 98, 98-1.

On **Oct. 21, 2025**, AV serves a safe-harbor letter attaching this motion.

## III.    STANDARDS

### A.  Rule 11, 28 U.S.C. § 1927 and the Court's Inherent Power

**Standards**. Rule 11 requires counsel to certify, after reasonable inquiry, that filings are factually grounded, legally tenable, and not interposed for an improper purpose. Fed. R. Civ. P. 11(b)(1)–(3); *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 393 (1990). The test is objective reasonableness—what a reasonable attorney of ordinary competence would conclude. *Townsend v. Holman Consulting Corp*., 929 F.2d 1358, 1362 (9th Cir. 1991) (en banc). 28 U.S.C. § 1927 permits sanctions when an attorney unreasonably and vexatiously multiplies proceedings, which in the Ninth Circuit requires subjective bad faith. *Caputo v. Tungsten Heavy Powder, Inc*., 96 F.4th 1111, 1153–55 (9th Cir. 2024); *Blixseth v. Yellowstone Mountain Club, LLC*, 796 F.3d 1004, 1007–08 (9th Cir. 2015); *In re Keegan Mgmt. Co. Sec. Litig*., 78 F.3d 431, 436 (9th Cir. 1996); *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989). Separately, courts may sanction bad faith conduct under their inherent power. *Chambers v. NASCO, Inc*.,

501 U.S. 32, 45–46 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). Bad faith encompasses a broad range of willful improper conduct; recklessness plus an improper purpose suffices. *Fink v. Gomez*, 239 F.3d 989, 992–94 (9th Cir. 2001). In *Hudson v. Moore Business Forms, Inc*., the Ninth Circuit affirmed Rule 11 sanctions for inflating damages to pressure an ex-employee without "any reasonable factual or legal basis", noting the counterclaims seemed "frivolous and brought to harass", 836 F.2d 1156 (9th Cir. 1988). ***That is this case***.

**Remedies and calibration**. Rule 11(c)(4) authorizes non-monetary directives and a penalty paid to the court, tailored to deterrence. *Cooter & Gell*, 496 U.S. at 393–98; Fed. R. Civ. P. 11 advisory committee's note (1993). Inherent-power sanctions include striking allegations, evidentiary/issue preclusion, fee awards, and referral for discipline; compensatory fee awards must be limited by causation—i.e., to fees incurred because of the misconduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–13 (2017); *Roadway Express*, 447 U.S. at 764–67; *Chambers*, 501 U.S. at 45–46. Courts may also deploy targeted rule-based tools—and impose non-fee remedies when fee-shifting would under-deter (e.g., pro se cases). *Christian v. Mattel, Inc*., 286 F.3d 1118, 1127–30 (9th Cir. 2002). See also *Diaz v. Prof'l Cmty. Mgmt., Inc*., 16 Cal. App. 5th 1190, 1216–18 (2017) (penalties to deter sharp practice).

**Application**. Given the *pro se* posture (softening the bite of fee-shifting), appropriate sanctions include: (1) penalties to the Clerk under Rule 11(c)(4), and (2) non-monetary sanctions that neutralize the tactical advantage and deter recurrence—e.g., striking allegations premised on settlement talk, evidentiary preclusion (Rules 408/403/37(c)(1)), a Rule 106 completeness condition for future use of party statements, corrective orders, and, if warranted, a certification condition before re-asserting the same allegations. This supports Rule 11's deterrent aims and preserves the "just, speedy, and inexpensive" resolution of the case.

**B. The Extortion Exception to Litigation Privilege**

California's litigation privilege, though broad, does not shield communications that constitute extortion as a matter of law. *Flatley v. Mauro*, 39 Cal. 4th 299, 326 (2006). A threat is extortionate when used to wrongfully obtain concessions through fear, such as a threat to accuse the individual of a crime. Cal. Penal Code §§ 518, 519, 523; *Mendoza v. Hamzeh*, 215 Cal. App.

4th 799, 806 (2013) (extortion where a letter threatened to report alleged crimes unless payment was made). The demand need not be explicit; the threat may be implied—the coercive nature is judged by the circumstances. *Id*. See also *Stenehjem v. Sareen*, 226 Cal. App. 4th 1405, 1423 (2014) (wrongful threat when attorney demanded a large sum of money unrelated to actual damages, coupled with a threat to file a criminal complaint). "[T]he more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim." *People v. Asta*, 251 Cal. App. 2d 64, 82-83 (1967).

### C. Federal Rules of Evidence 106, 403, 408

**Rule 106 (Rule of Completeness)**. When a party introduces part of a statement, the court may require admission at the same time of any other part—or any other related statement—and that fairness ought to be considered. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988) (describing the common-law rule of completeness, partially codified in FRE 106, and holding it error to bar contextual portions needed to avoid misleading the factfinder)

**Rule 403 (balancing)**. Even relevant evidence may be excluded if its probative value is substantially outweighed by dangers of unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or needless cumulation. See Fed. R. Evid. 403 & ACN ("Unfair prejudice" is an undue tendency to suggest decision on an improper basis, commonly (though not necessarily) an emotional one); see also *Old Chief v. United States*, 519 U.S. 172, 180–82 (1997) (courts should consider whether less prejudicial substitutes are available);

**Rule 408 (compromise offers and negotiations)** bars evidence of (1) offers/acceptances of consideration and (2) conduct or statements made in compromise negotiations used to prove or disprove the validity or amount of a disputed claim or impeach by inconsistent statement or contradiction. Fed. R. Evid. 408(a)–(b) & ACN. Ninth Circuit emphasizes context: when there is a disputed claim; courts have discretion to decide if communications were part of settlement negotiations and, even if admissible for another purpose, to exclude under 403. See *Cassino v. Reichhold Chems., Inc*., 817 F.2d 1338, 1342 (9th Cir. 1987); *Rhoades v. Avon Prods., Inc*., 504 F.3d 1151, 1161–62 (9th Cir. 2007); Fed. R. Evid. 408.

*Application*: These rules authorize the Court to (i) require full context for statements under 106, (ii) exclude mischaracterized snippets if probative value is outweighed by prejudice or risk of misleading the factfinder under 403, and (iii) bars settlement communications from use to prove liability or amount under 408, while allowing limited, non-merits uses only with appropriate 403/105 safeguards.

## IV.    ARGUMENT

### A.    Checkmate's "Notices" Constitute Extortion as a Matter of Law; Evidence of Improper Purpose under 11(b)(1) and Vexatious Multiplication under § 1927

Rule 11 warrants sanctions when a filing is presented "for an improper purpose," including to harass or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1). Here, Checkmate's "notice of claim" campaign crossed the line into extortion as a matter of law, confirming improper purpose and warranting deterrent sanctions under Rule 11 and § 1927.

In *Flatley v. Mauro*, the Cal. Supreme Court held that a lawyer's demand—threatening criminal accusations and publicity unless a payment was made—was "extortion as a matter of law" and unprotected. The Court emphasized that coupling a wrongful threat (e.g., to accuse of crime; disgrace or "secrets" Penal Code §§ 518–519) with a demand for money or concessions that makes the demand illegal; dressing in legalese does not sanitize it.

In *Mendoza v. Hamzeh*, a letter threatening to report the recipient to prosecutors, tax authorities and customers unless he paid "damages exceeding $75,000" was extortion as a matter of law. The truth or falsity of the accusations—and whether money was actually owed—was irrelevant once a criminal-report threat was paired with a money demand.

Likewise, in *Stenehjem v. Sareen*, a threat to file a qui tam/criminal-tinged action unless the victim settled qualified as extortion, falling outside anti-SLAPP and the privilege. California decisions clarify that the threat need not be specific; vagueness can magnify fear and satisfies the statute. See, e.g., *People v. Sanders*/*Asta*/*Bolanos* (quoted with approval in *Flatley*): vague, general criminal accusations can support extortion when paired with a demand.

Checkmate's "Notices" Cross the Line. (Dkt. 97-5)

The Dec. 6 letter (*Id*. at 4) announces Checkmate "has no intention to make any more payments" and demands "immediate reimbursement for all … out-of-pocket expenses associated with the Merger," i.e., a money payment, while reciting accusations of "criminal misconduct". The Jan. 22 letter (*Id*. at 14) threatened to "*explore and potentially litigate … criminal liability*," demanded AV "submit to an interview" or provide a detailed written response with evidence by a fixed deadline, and stated the client is "open to resolution" but will otherwise "pursue legal action." This is classic conditional leverage—pay/perform or face criminal-framed litigation.

Here, the threat is directly linked to the demand; the law "does not contemplate the use of criminal process as a means of collecting a debt." See *Flatley*, 39 Cal. 4th at 326; *Falcon Brands, Inc. v. Mousavi & Lee, LLP*, 74 Cal. App. 5th 506, 520–21 (2022). Penal Code § 523 confirms letters used to obtain concessions (inc. "admissions") are extortion when a threat is wrongful.

Relation to the CCs Does Not Save Checkmate.

Checkmate may cite *Malin v. Singer*, 217 Cal. App. 4th 1283 (2013) to justify its threats as related to the CCs and therefore permissible. But *Malin* distinguished criminal referral from exposure that might result from filing a civil suit. Checkmate may also rely on language from the 2nd notice to deny direct threats: "your conduct renders you liable for claims … our client intends to pursue against you [fraud/breach citations]" and "*exposes* you to claims of [IP and trade secret theft citations]". These contradict: IP claims can only be asserted by owners, while the fraud and breach claims allege that AV "did not and could not" have assigned ownership. Any relation is thus precluded by the claims Checkmate had standing for (and later made). Moreover, it directly threatened, *on its accord*, to "litigate claims of fraud, including both civil and criminal liability." (Dkt. 97-5 at 16). Ambiguity does not save it—Courts recognize that vagueness *magnifies* fear— "the more vague and general … the better it would subserve the [purpose of] magnifying the fears of his victim." *People v. Sanders*, 188 Cal. 744, 749–50 (1922).

Conditionality Makes it Extortion—and it was Successful.

Under PC §§ 518, 519, 523, extortion is indicated if a party conditions "resolution" while brandishing criminal exposure. Here, Checkmate purports "open[ness] to resolution" *if* AV "immediately reimburses" and submits to an interview/provides evidence, else it will "litigate"

MOTION FOR SANCTIONS

"criminal liability". California condemns this quid-pro-quo: *Flatley* (criminal accusations unless paid), *Mendoza* (reporting to authorities unless paid), *Stenehjem* (no talismanic words required; context controls)—conditionality makes the letters extortion as a matter of law.

While not required under *Flatley*, here the record shows *successful* extortion. Checkmate coerced responses it later termed "admissions" in the CCs. California's extortion law reaches "other consideration" and "signatures" that create liability. See Pen. Code § 518(a); § 522 (extortion of signature to create a debt, demand, charge, or right of action); § 523 (extortion by letter); *People v. Umana*, 138 Cal. App. 4th 625, 640–41 (2006). Here, Checkmate obtained precisely that "consideration": coerced writings they converted into a right of action.

Aggravated Extortion – Wages as Hostage

California law requires final wage payment at termination (Lab. Code § 201), forbids conditioning such wages on concessions (§ 206.5), and penalizes willful nonpayment (§ 203). Wage theft above statutory thresholds may constitute grand theft (Pen. Code § 487m). Here, Checkmate expressly threatened criminal referral for tactical advantage in a civil dispute ***and*** threatened to commit a potential felony against AV—reinforcing the extortionate nature of its conduct. See Pen. Code §§ 518, 523.

**B.    Withholding and Misstatement of Contracts Confirms Bad Faith**

The notices purported several "misrepresentations" by AV, derived from contract clauses –substantially those listed in CCs ¶¶ 59, 65. AV requested the executed versions of the contracts, which he did not possess. Checkmate refused to provide them—or respond to requests citing Cal. Labor code § 432 (right to copies of signed instruments) and § 1198.5 (right to inspect personnel records). Meanwhile, MA § 8.3(c) required a response to a "Notice of Claim" within 30 days. Deprived of the operative contracts, AV responded in good faith to "representations" *he never actually made*. See Exs. D-1, D-2, C-2.

By withholding the IPAA, Checkmate concealed that it constrained representation and assignment (for $100, not millions) to IP created "*on behalf of*" VoiceBite ("assigned assets"). AV could not study the text, which (as purported to assign pre-existing IP) is plainly not valid under Cal. Lab. Code § 2870. See Dkt. 98 at 12. It also inserts language in the first bullet (from

8

IPAA § 3) that alters the meaning entirely. '.. "owner, inventor and/or author" of certain assigned intellectual property related to VoiceBite software (namely, a "comprehensive set of components of an AI voice ordering system" (see Company Disclosure Schedule, Section 5.9))'. This "set" is not defined in the notices (the CCs neglect to reference the schedules entirely). Dkt 97-2 at 6. Checkmate was putting words into AV's mouth and demanding he answer for them.

By withholding the IPAL, Checkmate concealed that it addressed another founder, Mr. Lam—and only "acknowledged" MA § 5.9(f) and a clause from a future employment agreement with *Checkmate*, not "[VoiceBite]". AV asserted (in reply to the notices and an ethics complaint to K&L Gates) that VoiceBite counsel redlined and swapped "*have entered into with VoiceBite*" for "*will enter into with Checkmate*", citing a version shared prior to signing. AV noted that if it did read "[VoiceBite]", it would have altered the parties' bargain. The GC's response refused to retract the misstatement, or provide the contract, stating: See Ex. G-2; Ex. G-3.

> you assert that certain agreements … "do not match the versions [you were] provided just prior to signing by VoiceBite counsel." ==We have no way of knowing== … to what extent they match the agreements that form the basis for our client's claims … any suggestion … that our Firm or Mr. Keech intentionally manipulated or misrepresented any documents is totally false and baseless.

By withholding the MA, AV was prevented from confirming, *inter alia*, that five bullets tagged to MA §§ 5.9, 5.19 were (1) made by *VoiceBite* to Checkmate; (2) qualified by the (yet withheld) disclosure schedule and the "knowledge of [Nessler], [AV] and [Lam]". Indeed, two MA § 5.19 bullets simply swap in "Plaintiff" where the actual language reads "Company" (e.g. VoiceBite) or "this agreement". See Ex. F. AV also could not study the contract architecture and notice the IP papers were not incorporated—a fact which provides substantial defenses.

When read together, the contracts undermine Checkmate's theory of damages.

Checkmate variously alleges "millions of dollars" were (1) payable to AV individually; (2) paid specifically for "the code"; and, most egregiously, (3) ***actually paid***. The CCs are careful to hedge this language, never directly alleging *completed* payment ("Vasan sought to convince Checkmate to pay millions of dollars..", CCs ¶ 2; "… worth the potential for millions of dollars and an executive role..", CCs ¶ 17; "..to induce Checkmate into paying Vasan millions of

MOTION FOR SANCTIONS

dollars.", CCs ¶ 59). Later filings, still relied on in this action, exhibit no such caution—even misrepresenting what was actually alleged. After being challenged on the "millions" in AV's MTD, Checkmate's Opposition distilled its entire fraud theory as follows: (Dkt. 94 at 16:16-19).

> .. claim for fraud alleges that ==Checkmate was injured by paying millions of dollars== for a company—more specifically, for what Checkmate believed to be ==the company's proprietary code== that ==ended up being worthless==, as neither Plaintiff nor VoiceBite were actually the exclusive owner or rights holder to the code ...

It has never explained how it counts the "millions", to whom it was "paid" and for what reason. The contracts *it has filed* show that, at most, **it paid $100** for "the code" it disputes. Dkt. 98 at 19. Mr. Nessler confirms that even the caveated language in the CCs has no basis in fact: (1) $1.5 million in retention bonuses were for future employment, not "code"; (2) were to be split by the team, not for AV personally; (3) ***have never been paid***. See Dkt. 97-6 ¶¶ 2–3, 5–6, 9, 18.

> Checkmate is following the employer playbook condemned in *Hudson v. Moore*.

Its initial disclosures (Dkt. 113-5 at 10) list no numbers (vs "millions of dollars" in the CCs and briefing), let alone a computation. On challenge, it declared only that it would do so "in good faith" when such could be made. See Dkt. 114. It seeks declaratory relief for unpaid wages it withholds, and *from relevant law*, CCs ¶ 73; and its repeated demand for "the full costs of this action" (e.g. attorney fees) is a taunt: *not only will we not pay what we owe you, but we will take what you have. Id*. This is condemned by *Hudson*: "if the cost of litigation was the only basis … the proper cause of action" would be malicious prosecution. AV respectfully asks the Court to consider if such requests should be countenanced in *California*, especially when four California based VoiceBite founders are yet denied their earned retention bonuses. Nessler Decl. ¶¶ 2, 9.

**C.    Use of Settlement Dialog to Prove Merits Violates 11(b)(2) and FRE 408**

Settlement talks initiated during AV's Nov. 14, 2025, firing, with CEO Agarwal stating: "you're being terminated … we can either work out a final settlement solution. Or you can get a lawyer involved." and Strategy Chief Bell: "if you want to negotiate a settlement with us, then reach out directly." Ex. K. AV did so on Nov. 20: proposing "to resolve this matter amicably and expeditiously", itemizing "settlement terms" in line with his contracts and noting he "remain[ed]

1    open to resolving this matter in good faith" and wished to "move forward" "without escalation".

2    On Dec. 6, Checkmate's first "notice of claim" rejected his offer, declared "no intention to make

3    any more payments … *at this time*" and introduced the fraud allegations at issue. AV replied on

4    Dec. 15-24 by email, and Dec. 20 by letter—disputing the allegations, requesting his contracts,

5    personnel files and damages calculations; and again, itemizing offers. On Dec. 20–21, counsel

6    requested AV sit for an interview and answer "clarifying questions," stating the client "may …

7    revisit some or all of its position" based on AV's answers—all compromise markers.

8           The Jan. 22 "Second and Final Notice" reiterated "no further payments … at this time,"

9    threatened to "fully explore and potentially litigate … fraud, including both civil and criminal

10   liability," and conditioned its "open[ness] to resolution" on AV "submitting to an interview" or,

11   by fixed deadline, delivering a "detailed and accurate written response .. supported by evidence."

12   AV's explanations, offers and demands—were clearly attempts at resolving the dispute. Both

13   parties threatened legal action and offered conditions upon which it could be avoided. Ex. D-4.

14          A third notice on Jan. 29 (to Mr. Nessler under MA § 9.1) asserted "over $5 million" in

15   damages—accounting for $1.68 million by forfeiture of the team's bonuses and merger equity.

16   The Feb. 7 response by Grant Thomas, counsel for Mr. Nessler, distinguished VoiceBite IP from

17   functional artifacts exhibited in the CCs: "[Checkmate has not] established a claim exceeding the

18   amount of $25,000 pursuant to Section 8.1, much less for the losses exceeding $5,000,000 as

19   claimed … VoiceBite invites [Checkmate] to submit another letter substantiating its claims."

20          Pre-suit negotiations ended with Checkmate's Feb. 14 New York filing, later removed by

21   AV and now dismissed and re-pled as the CCs here, effectively verbatim. See Dkt. 71.

22          Under FRE 408(a), once compromise negotiations are established, statements during that

23   negotiation—even if the specific message lacks a formal "offer"—are inadmissible to prove

24   liability or the amount of a disputed claim (or for impeachment). The Nov. 20 → Feb. 14 period

25   bears every marker of compromise dialogue. Recasting snippets as "admissions" to support

26   merits elements is exactly what Rule 408(a) forbids. *Rhoades v. Avon Prods., Inc.*

27          A pleading theory that depends on Rule 408-barred material to establish merits elements

28   is not "warranted by existing law." Fed. R. Civ. P. 11(b)(2); *Christian v. Mattel, Inc.*, 286 F.3d

1118, 1127 (9th Cir. 2002); *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (*en banc*). No competent attorney could treat negotiation rhetoric (e.g., "no matter what" price-floor language) or settlement give-and-take as predicates for liability or damages. Even if an "other purpose" were later asserted, admissibility would be resolved by Rule 403 and motions *in limine*, not by embedding negotiation excerpts into a pleading. See *Rhoades*.

### D.  Misleading Quotation and Paraphrasing Violate 11(b)(3) and FRE 106

A striking portion of the CCs derive directly from these notices and responses—without them, the CCs fail to allege key fraud elements. The CCs out-of-context use of these statements implicates Rule 11(b)(3) as setting forth factual allegation without reasonable inquiry—or in this case, <u>despite such inquiry</u>—into whether evidentiary basis existed or would exist after discovery.

1.  **Dec. 6 Notice** → "<u>Bizarre and Implausible Excuses</u>" (CCs ¶¶ 30-31, Dkt. 27 at 97)

The CCs exhibit a few screenshots of the word "cyborg" in domain names and credential files. AV's response stated these were non-code personal property that pre-dated "CyborgOps, Inc.", named *because* of his fondness for the word. There is nothing "bizarre and implausible" about this statement. It is a simple fact that incidental use of a word to name a company does not bar using the same word *for other purposes*—or confer (without trademark) exclusive rights to that company. Here, the allegation is filed without any source document (Rule 106) and despite a clear and expressed settlement context (Rule 408).

2.  **Jan. 22 Notice** (Dkt. 97-5 at 13) → "<u>No matter what</u>" and co-authorship "admission"

CCs ¶¶ 1, 5, 32, 60 fixate on the phrase "no matter what" in AV's response, alleging he was expressing fraudulent intent, e.g. he would be paid even if he had committed fraud. The actual email (Ex. D-5) refers to a joint negotiation position, and rebuts Checkmate's claim that it would have "otherwise paid less" for VoiceBite, as follows:

> *We* would not have sold to your client at any price point lower than the closing terms (and without explicit "no matter what" guarantees which your client is overtly violating): … This was the bare minimum: any theoretical damages you are claiming are illusory.

Checkmate's misleading use of the phrase entirely leaves out that it was already *quoted* by AV—in reference to negotiation of bonus and severance guarantees. As Mr. Nessler declared,

MOTION FOR SANCTIONS

'"no matter what" refers to a negotiating position shared by the three primary founders (myself, Arjun Vasan, and Christopher Lam) during joint negotiations.' Nessler Decl. ¶ 2. AV's email also explicitly makes a settlement offer "I suggest your client brings this to a close, amicably, by … fulfilling all obligations …including severance ($122k), retention bonus ($500k) and performance bonus ($200k) … this is my final offer".

CCs ¶ 29 purports AV "admitted" "another third party … had developed the property that [AV] falsely claimed to own" is lifted from the same email and misstates what AV actually wrote. In context, AV said that his father—the other co-author of the legacy code he himself co-authored—approved of his use and asserted no claim to that code. That is not an admission: a co-author is an author, and consent from his sole co-author confirms AV's rights, not their absence. In any event, the executed IPAA forecloses Checkmate's gloss: the "assigned assets" are limited to work *on behalf of* VoiceBite. And, even construed under a broad reading of the plain language (*arguendo* ignoring Lab. Code § 2870) the representation is that the assignor is "owner, author and/*or* inventor" (which AV clearly was) and to the best of their knowledge, could assign title— which AV satisfied, given his father's express approval. AV never "admitted" otherwise. Using a settlement email with a candid good-faith explanation into a merits "admission" violates FRE 408(a) and lacks evidentiary support after reasonable inquiry under Rule 11(b)(3); no reasonable attorney could rely on such to plead falsity, intent or scienter. The Court may strike CCs ¶¶ 28, 29 and direct a corrective pleading removing such 408-barred material.

   3. **Jan. 29 Notice** → "not, in fact, intellectual property" (CCs ¶¶ 33-34, Dkt. 71 at 8)

   **CCs ¶¶ 33-34** attribute to AV statements that could not possibly derive from statements he made, as AV did not communicate with Checkmate or its counsel in February 2025:

> **CCs ¶ 33.** In February 2025, Plaintiff's excuses shifted yet again. This time, he claimed that the software, the code – the heart of VoiceBite – was not, in fact, intellectual property – emphasizing the stark and troubling reality that Checkmate had been duped … into acquiring a valueless non-asset.

> **CCs ¶ 34.** Of course, Checkmate would not have agreed to acquire VoiceBite if its core technology was not, in fact "intellectual property." Plaintiff's misrepresentations regarding the originality and ownership

of the code were ==knowing falsehoods that he told== with full awareness
of their materiality to Checkmate's decision …

After several filings in both this court and SDNY, Checkmate finally conceded that <u>AV's</u>
<u>identified source was *correct*</u>, but only *compounded* its misattribution by instead calling Mr.
Thomas "*his [AV's] lawyer*" — yet another *knowingly false statement*:

> "[a]t no time" was his approval given for unspecified "statements to
> be attributed solely to him" ==by his lawyer and that he cannot be bound==
> ==by statements made by his lawyer== (*id.*); (<u>SDNY ECF No. 59 at 6</u>)

AV does not disavow the actual response.[1] What he objects to is distorting that response
and misattributing that distortion to himself *personally*. AV has no formal engagement with Mr.
Thomas — who is not "*his lawyer*". Mr. Thomas is *Mr. Nessler's attorney*, in his Holder Rep.
capacity[2]. The sequence is telling: (1) Checkmate's Jan 29 Notice was addressed to and served
only on Mr. Nessler; salutation "<u>*Dear Holder Representative*</u>,"; (2) Mr. Thomas's Feb 7 response
is addressed "<u>*From Grant Thomas: on Behalf of Robert Nessler, Holder Representative for the*</u>
<u>*VoiceBite Corporation Shareholders*</u>"; and (3) Checkmate's NY State complaint was filed with
these allegations on Feb 14, mere days later—underscoring time-of-filing knowledge. Moreover,
now *ten months later*, the allegations persist *verbatim* as <u>CCs ¶¶33-34</u>.

---

[1] **Fed. R. Evid. 801(d)(2)(B)** demands a clear manifestation that *this* party adopted the statement's truth. Contrast <u>*United States v. Safavian*</u>, 435 F. Supp. 2d 36, 43–44 (D.D.C. 2006) (email forwards with affirmative endorsement treated as adoptive admissions). Here, AV's brief, process-oriented sign-off on an explicitly **joint** Holder-Rep letter is not a personal adoption. In any case, Checkmate was not privy to the sign-off at time of filing.

[2] Checkmate cannot claim the right to sue AV individually and also bind AV to the words of *Mr. Nessler's* counsel, writing on behalf of the shareholders. See <u>Fed. R. Evid. 801</u>(d)(2)(B)–(D) (adoptive admission requires a party's own manifestation; authorized-speaker and agency prongs require actual authorization/agency and within-scope conduct); AV signed off on Mr. Thomas's Feb. 7 response as the shareholders' response under MA § 9.1, not as his personal statement. An opposing-party statement under <u>FRE 801(d)(2)</u> must be the **party's own**, clearly adopted (not merely received or generally approved), or made by an authorized agent on a matter within the scope of that relationship. <u>*Transbay Auto Serv., Inc. v. Chevron U.S.A. Inc.*</u>, 807 F.3d 1113, 1120–22 (9th Cir. 2015) ("possession-plus"/clear incorporation required for adoption); <u>*Sea–Land Serv., Inc. v. Lozen Int'l, LLC*</u>, 285 F.3d 808, 821 (9th Cir. 2002) (adoption only where contents are expressly incorporated); <u>*Weil v. Citizens Telecom Servs. Co., LLC*</u>, 922 F.3d 993, 999–1000 (9th Cir. 2019) (801(d)(2)(D) demands proof of agency and within-scope subject matter); <u>*People v. Combs*</u>, 34 Cal. 4th 821, 842–43 (2004); <u>*People v. Riel*</u>, 22 Cal. 4th 1153, 1189–90 (2000) (adoptive admission requires knowledge and words/conduct manifesting belief in truth; selective extraction does not suffice); Cal. Evid. Code §§ 1221–1222. In all events, the exchange occurred during compromise negotiations and is inadmissible to prove liability, scienter, or amount; or to impeach credibility. <u>FRE 408(a)(2)</u>; *Rhoades v. Avon Prods., Inc.*.

MOTION FOR SANCTIONS

The Court may draw a strong inference that this exchange was not just misrepresented but *engineered*. Aware of Mr. Nessler's duty to retain counsel on behalf of the shareholders, Checkmate created a situation where a response was inevitable.

The actual text of the Feb 7 Response (Ex. B-3) refers to *the specific code* exhibited in Checkmate's pleading, distinguishing it from VoiceBite's Intellectual Property, and never names AV as the source, or that he was even involved in the response:

> VoiceBite owned all intellectual property identified in the VoiceBite Merger Agreement. VoiceBite's intellectual property was and is free of licenses, including at the time of transfer. VoiceBite is the author of all intellectual property … transferred …
>
> After discussions with VoiceBite personnel, the code at issue was not owned, licensed, or transferred to any third party. Further, this code … is not capable of being "intellectual property" ... The code at issue is merely scènes à faire or API integrations not subject to copyright or intellectual property protection. As the code … is merely elements dictated by functionality, and therefore cannot be subject to protection and thus are not subject to claims for …
>
> (Grant Thomas, Feb 7 Response, Vasan Decl. ¶ 6, Ex. B-3)[3]

Checkmate asks the courts to believe its claims respond to AV's *individual* acts and have *nothing to do with* the Holder Rep[4]., or the other shareholders—whose bonuses, *incidentally*, are also being withheld on account of a "legal dispute" (i.e. this dispute). This is unpersuasive.

> Whether Plaintiff sent a pre-suit letter to the Holder Representative, on behalf of all shareholders, is entirely irrelevant to, and has no

---

[3] **Fed. R. Evid. 106** (amended Dec. 1, 2023). The Advisory Committee explains that the rule of completeness, grounded in fairness, "cannot fulfill its function if the party that creates a misimpression about the meaning of a proffered statement can then object on hearsay grounds and exclude a statement that would correct the misimpression." Advisory Comm. Note (2023). See also *Beech Aircraft Corp. v. Rainey*, recognizing that the common-law completeness doctrine—partially codified in Rule 106—was "designed to prevent exactly the type of prejudice" caused when fragments are taken out of context, quoting Wigmore's formulation that the remainder may be introduced "to secure … a complete understanding of the total tenor and effect of the utterance." 488 U.S. 153, 171–72 (1988). The Ninth Circuit applies the same principle: if the omitted portion would correct a misleading impression created by taking something out of context, Rule 106 requires completion; conversely, when the redaction is not misleading, Rule 106 does not compel admission of more. *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (cleaned up). California's analogue—Evid. Code § 356—serves the identical purpose: "to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression." *People v. Arias*, 13 Cal. 4th 92, 156 (1996) (quoting *People v. Pride*, 3 Cal. 4th 195, 235 (1992)).

[4] See *Fortis Advisors LLC v. Allergan W.C. Holding Inc.*, C.A. No. 2019-0159-MTZ, at 7 (Del. Ch. May 14, 2020) (contractual shareholder representative is the **real party in interest**; the rep litigates in the stockholders' stead and cannot compel individuals to act); see also *Aveta Inc. v. Bengoa*, C.A. No. 3598-VCL (Del. Ch. Aug. 13, 2010) (recognizing the shareholder representative's separate authority under the MA).

MOTION FOR SANCTIONS

bearing on, whether Plaintiff can pursue claims in this litigation against only the Defendant individually. Clearly, Plaintiff can. … The Amended Complaint seeks to hold Defendant accountable for his, and only his, actions leading up to, during, and after the Transaction. (SDNY ECF No. 41 at 31)

Clearly, the CCs seek to hold AV accountable for more than *just* his own actions. Here, *the Notice was bait*—aimed to provoke a *group* response, strip out a useful snippet and recast as AV's own words. This is advocacy without candor, and this Court should not humor or excuse it.

## V.    THIS MOTION IS NOT PREMATURE, DUPLICATIVE OR IMPROPER

Opposing counsel may argue that this motion is duplicative of the pending Rule 12(b)(6-7) motion, but Rule 11 has a different purpose—***deterrence***—and must be brought separately. Under Rule 11 the Court may consider declarations and extrinsic evidence—unavailable under Rule 12. Here, the critical evidence is the testimony of Mr. Nessler, Holder Rep. under the very MA touted by Checkmate as governing the parties' bargain. MA § 9.1. Mr. Nessler integrates the record and corroborates the facts and arguments made herein. His statements have never been addressed, let alone rebutted. Moreover, this motion addresses litigation conduct, not pleading sufficiency. It bears on the fair adjudication of this dispute and remains collateral to the merits.

Counsel may also argue these are "evidence quarrels" for a later stage, but the sanctions regimes address how counsel pleads and litigates *now*. Rule 11 is judged at filing and exists to deter pleadings that are factually unsupported, legally untenable, or filed for improper purpose. See *Cooter & Gell*; *Townsend v. Holman*; *Christian v. Mattel*. "[M]illions" rhetoric and fee-leverage tactics are not harmless. See *Hudson v. Moore*. The improper use of out-of-context settlement snippets and altered contract clauses to fabricate misrepresentations has a real effect *now*. It aims to boost Checkmate beyond the 12(b)(6) stage and to discovery, where it seeks to overwhelm and impede a *pro se* party's pursuit of earned and unpaid wages.

Checkmate's discovery posture is why this motion is proper and necessary for a fair, just and speedy resolution of this matter. It should not require *discovery* to show (*inter alia*) it ***paid millions of dollars for the code***—if it actually did so, competent evidence would be available, *now*. Its failure to produce any evidence, or even a theory of such evidence, is dispositive. The counterclaims were brought to frustrate AV's employment claims—not to recover any actual

1   damages it sustained. The Court has the tools to prevent this case from being derailed—and

2   through this Motion, the opportunity. Whether under Rule 11, § 1927 or its inherent power, the

3   Court can and should remedy the issues identified herein and deter such future misconduct.

4   **VI.    CONCLUSION**

5          Checkmate alleges it was "duped" by AV into "paying millions of dollars" "specifically

6   for the code," which turned out to be "a valueless non-asset," and he "admitted" as much. Dkt.

7   94 at 16:16-20. AV's Reply (Dkt. 98) picks apart the pleadings and the documents they invoke;

8   and under California law. But pleading issues are only a symptom, the misconduct is ongoing—

9   and seeks to divert attention from Checkmate's clear misconduct with a fishing expedition into

10  years of code. The Court may and should act now to protect AV, his teammates and its integrity.

11         Checkmate's coercive "notices" rewrote contracts into promises never made, withheld

12  the agreements that would expose the rewrite, and coupled demands for payment and coerced

13  interrogation with threats of criminal exposure; while withholding his earned and unpaid wages.

14  When AV's settlement-context responses didn't supply everything needed, a 3rd "notice" to Mr.

15  Nessler elicited a counsel response it would distort and recast as AV's personally. This is how its

16  New York complaint was made. The very same allegations are now before this forum.

17         Without this strategy, Checkmate would have no defense for its conduct as an employer

18  or acquirer. Mr. Nessler's declaration connects the dots: the CCs are not just unsupported—but

19  *manufactured*. They were intended as, and are, leverage to evade paying AV, and four others.

20  This is improper purpose, not "zealous advocacy". Checkmate's coercive pattern is now mirrored

21  in its discovery dispute with AV's father. But this logic has a fatal flaw—its success relies on the

22  victim being intimidated. Instead, AV filed this action, and now, this motion.

23         Checkmate's sharp practice and lack of candor are foundational to this dispute. Conduct

24  so ingrained is unlikely to self-correct without intervention. Indeed, counsel refused to meet and

25  confer on the grounds for this motion despite safe harbor service 25 days ago. No changes have

26  been made to the claims manufactured by the conduct described herein—initially filed in New

27  York state court, later advocated in SDNY, only to be dismissed and now brought here to harass

28  AV and interfere with his discovery efforts—which it is has successfully done.

For these reasons, AV respectfully requests the Court grant this motion to issue sanctions as set forth in the [Proposed] Order filed herewith, not just to punish Checkmate and its counsel, but to deter such future malefactors and protect the integrity of these proceedings.

Dated: **November 17, 2025**

In: **Cerritos, California**

**Respectfully submitted**,

/s/ *Arjun Vasan*

**Arjun Vasan**,

Plaintiff *In Pro Per*

MOTION FOR SANCTIONS

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6

Plaintiff Arjun Vasan certifies that this brief contains 6,999 words, which complies with the 7000-word limit of L.R. 11-6.1 and the Court's Civil Standing Order dated Aug. 27, 2025.

Dated: **November 17, 2025**

In: **Cerritos, California**

**Respectfully submitted**,

/s/ *Arjun Vasan*

**Arjun Vasan**,

Plaintiff *In Pro Per*