Arjun Vasan

arjun.vasan@gmail.com

12615 193rd Street

Cerritos, CA 90703

562-900-6541

Plaintiff in Pro Per

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Arjun Vasan**, <br><br> Plaintiff and Counter-Defendant <br><br><br> vs. <br><br><br> **Checkmate.com, Inc.**, <br> (dba "Checkmate"), <br><br> Defendant and Counterclaimant | Case No.:  2:25−cv−00765−MEMF−ASx <br> Hon. Maame Ewusi-Mensah Frimpong <br><br> **DECLARATION OF ARJUN VASAN IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS UNDER FED. R. CIV. P. 11, 28 U.S.C. § 1927 AND THE COURT'S INHERENT POWERS** <br><br> Complaint Filed: January 28, 2025 <br> Hearing Date: January 8, 2026 <br> Hearing Time: 10:00 A.M. <br> Courtroom: 8B |

I, ARJUN VASAN, declare:

1.  I am the Plaintiff in this action. I submit this declaration in support of my Motion for Sanctions under Rule 11, 28 U.S.C. § 1927 and the Court's Inherent Powers. I have personal knowledge of the facts herein and could and would testify competently thereto.

2.  On October 22, 2025, I served a safe harbor notice, attaching my motion, on Checkmate counsel Ryan Q. Keech, Rebecca Makitalo, Stacey Chiu and Jacob Winningham. Minor changes have been made; but the grounds and relief sought are substantively the same.

3.  I followed up on Oct. 26 and again on Oct. 29, seeking to confer on the motion. Counsel never responded, and as of this filing, the contested allegations have not been withdrawn or modified. Appendix A contains true and correct copies of the safe harbor notice sent via email and the attached motion. The full email thread is included.

4.  I have spent the past several years building and leading voice AI technology startups. But instead of pursuing that work, I have now spent the better part of a year contesting claims that are contradicted by the claimant's own documents and, in my view, lack any factual basis. These claims have occupied two federal courts (and one state court), resulting not just in personal harm, but a diversion of judicial resources; and further risk a chilling effect on founders and employees who push back on misconduct or insist that contractual and statutory rights are honored. I respectfully submit meaningful, deterrent sanctions are necessary to signal that this is not an acceptable approach to litigation.

5.  These claims have turned what would have been a hard-fought wage and breach action, but one that could have been contested on a part-time basis, into a full-time endeavor.

6.  I would have litigated on a part-time basis and pursued employment or a new venture if not for these fraud claims, which accuse me of running a "scam" for "millions of dollars in ill-gotten gains," and "duping" Checkmate into acquiring a "valueless non-asset."

7.  These inflammatory allegations are easily found by anyone who searches my name and would require an explanation to prospective employer or investors. As a result, I have reasonably chosen not to risk new opportunities while these claims remain pending.

8.  Checkmate's litigation strategy has delayed adjudication of my affirmative claims by, conservatively, at least six months—and risk further such delay.

9.  Prior to this litigation, I earned $24,000/month in salary at Checkmate, not counting the substantial unpaid bonuses that form the core of my wage claims. If fully paid, my 2024 income would have topped $700k—in line with the years prior to Checkmate.

10. As a *pro se* party, I understand I am not entitled to compensation for time spent due to sanctionable misconduct. I submit these figures to emphasize that the matters addressed in my motion have had a substantial material cost in lost income and opportunities.

MOTION FOR SANCTIONS

11. While I have not kept detailed time-records during litigation, I conservatively estimate that I have spent upwards of 250 hours split across the New York action and this one, dealing only with the counterclaims (previously New York complaint).

12. Checkmate counsel has previously provided rates of $800-1000/hour in requesting fees and recently estimated $15,000 in bringing a counterclaim-related discovery motion.

13. Using a conservative figure of $500/hour for Los Angeles based representation, and counting estimated time spent in the C.D. Cal. action (conservatively at 100 hours over my Motion to Dismiss, this Motion for Sanctions and counterclaim-related discovery), a fair estimate for costs—if I were represented—would be $50,000. Payable to the Clerk, this number would achieve a reasonable deterrent effect without being overly punitive.

14. *I declare under the penalty of perjury of the Laws of the United States of America that the foregoing statements are true and correct.*

**Executed on**: November 17, 2025                    /s/ *Arjun Vasan*_____

In **Cerritos, California**                              **Arjun Vasan,** Plaintiff In Pro Per

# APPENDIX A

Safe Harbor Notice;
Memorandum;
Meet and Confer Attempt;
and Contested Allegations

 Gmail

Arjun Vasan <arjun.vasan@gmail.com>

---

## Arjun Vasan v. Checkmate.com, Inc. - 2:25-cv-00765-MEMF-ASx - Rule 11 Safe Harbor Notice

3 messages

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                        Wed, Oct 22, 2025 at 12:41 AM
To: "Keech, Ryan Q." <ryan.keech@klgates.com>, "Chiu, Stacey G." <Stacey.Chiu@klgates.com>, "Makitalo, Rebecca I." <Rebecca.Makitalo@klgates.com>, "Winningham, Jacob R." <Jacob.Winningham@klgates.com>

Counsel,

Pursuant to Fed. R. Civ. P. 11(c)(2), I am serving (not filing) the attached Plaintiff's Motion for Sanctions (with exhibits) directed to counterclaim contentions that (i) misuse settlement communications to prove liability/amount (FRE 408, 11(b)(2)), (ii) mischaracterize the Feb. 7 Holder-Rep response letter and miscast it as my personal "admission" (FRE 801(d)(2) failure), (iii) misquote/withhold contractual language in violation of Rule 11(b)(3)'s reasonable-inquiry requirement; (iv) crossed the *Flatley* line with extortionate demand letters leveraged to procure "admissions" (Rule 11(b)(1), Penal Code §§ 518–519).

If, by 5:00PM, Wednesday, November 12, 2025, Checkmate withdraws its counterclaims or amends to remove the allegations in Exhibit F, I will not file the motion.

Best regards,
Arjun Vasan
562-900-6541 | arjun.vasan@gmail.com

---

**9 attachments**

📄 **Notice and Motion for Sanctions.pdf**
657K

📄 **Exhibit E - Nessler Declaration.pdf**
684K

📄 **Exhibit A - Warns Declaration, IPAA, IPAL.pdf**
793K

📄 **Exhibit C - Agarwal Decl., Bonus Agreement, Offer Letter, Lunchbox Emails.pdf**
5552K

📄 **Exhibit B - Jan 29 Notice, Feb 7 Response (FINAL).pdf**
2218K

📄 **Exhibit D - Settlement Outreach, Notices of Claim, Document Requests.pdf**
4139K

📄 **Exhibit F - Allegation to Source Map Flat.pdf**
722K

📄 **Exhibit G - Ethics Complaint and Charles Tea Formal Response (FINAL) copy.pdf**
3124K

📄 **Exhibit K - Zoom Transcript copy.pdf**
6194K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                        Sun, Oct 26, 2025 at 7:40 AM
To: "Keech, Ryan Q." <ryan.keech@klgates.com>, "Chiu, Stacey G." <Stacey.Chiu@klgates.com>, "Makitalo, Rebecca I." <Rebecca.Makitalo@klgates.com>, "Winningham, Jacob R." <Jacob.Winningham@klgates.com>

Counsel,

Please see the attached corrected Exhibit F. This is a **courtesy update only**; it does not modify or supersede the Rule 11

motion I previously served, and it does not alter the November 12, 2025, 5:00 p.m. PT expiration of the safe-harbor period.

For the avoidance of doubt, the Ninth Circuit does not require the filed Rule 11 motion to be word-for-word identical to the served version; safe harbor is satisfied so long as the grounds and relief remain substantially the same and no prejudice results. The corrected Exhibit F simply clarifies the same paragraph mapping; it does not add grounds or change the requested relief. Withdrawing the listed allegations (whether as mapped in the earlier Exhibit F or this corrected one) would, as a practical matter, withdraw most of the counterclaims.

As before, I will not file if, by 5:00 p.m. PT on November 12, 2025, Checkmate:

1. Withdraws the counterclaims; or
2. Withdraws/Disavows CC ¶¶ 1, 4, 5, 6, 28, 29, 30, 31, 32, 33, 34, 35, 60 and the bullet-point "representations" in ¶¶ 59 and 65 (as itemized in Ex. F), or stipulates to strike them.

Please confirm by filing either (a) a short Notice of Disavowal, or (b) a stipulation to strike. Either approach cures Rule 11 without a Rule 15 amendment.

Best regards,
Arjun Vasan
[Quoted text hidden]

---

📄 **Exhibit F - Allegation to Source Map.pdf**
143K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Wed, Oct 29, 2025 at 10:11 PM
To: "Keech, Ryan Q." <ryan.keech@klgates.com>, "Chiu, Stacey G." <Stacey.Chiu@klgates.com>, "Makitalo, Rebecca I."
<Rebecca.Makitalo@klgates.com>, "Winningham, Jacob R." <Jacob.Winningham@klgates.com>

Counsel,

Please confirm one of the following times next week to meet and confer on this motion: Tuesday at 10AM, Wednesday at 11AM or Friday at 10AM. If none work, please provide an alternate time that works for Checkmate. If no confirmation or alternative provided, I will attach this email thread as my L.R. 7-3 certification for the motion.

Best regards,
Arjun Vasan
[Quoted text hidden]

Arjun Vasan

arjun.vasan@gmail.com

12615 193rd Street

Cerritos, CA 90703

562-900-6541

Plaintiff in Pro Per

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Arjun Vasan**, <br><br> Plaintiff and Counter-Defendant <br><br><br> vs. <br><br><br> **Checkmate.com, Inc.**, <br> (dba "Checkmate"), <br><br> Defendant and Counterclaimant | Case No.:  2:25−cv−00765−MEMF−JPR <br> Hon. Maame Ewusi-Mensah Frimpong <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS UNDER FED. CIV. P. 11, 28 U.S.C. § 1927 AND THE COURT'S INHERENT POWERS; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Complaint Filed: January 28, 2025 <br> Hearing Date: ---- <br> Hearing Time: ---- <br> Courtroom: 8B |

TO THE HONORABLE COURT, ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on [hearing date] at [time] or as soon thereafter as the matter may be heard in Courtroom 8B of the above-entitled Court, located at 350 West First Street, Los Angeles, CA 90012, Plaintiff Arjun Vasan ("AV") will and hereby does move the

Court for sanctions against Defendant Checkmate.com, Inc. ("Checkmate") and its counsel under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent authority.

<u>The motion is based on:</u> Checkmate (1) filing Counterclaims (CCs) that lack evidentiary support and contradict incorporated documents (Rule 11(b)(3)); (2) leveraging coercive demand letters to harass and provoke "admissions" (Rule 11(b)(1)); (3) supporting merits elements with settlement-context communications as barred by Rule 408 (Rule 11(b)(2)); (4) unreasonable and vexatious multiplication of proceedings by counsel (28 U.S.C. § 1927); and (4) bad-faith litigation tactics warranting inherent-power sanctions.

<u>AV respectfully requests that the Court</u>: (i) dismiss the Counterclaims with prejudice, or, at minimum, strike all allegations that rely on settlement communications or misstate contracts or party-opponent statements; (ii) if leave to amend is permitted, require any amended pleading to remove all Rule 408-barred matter and to quote the contracts verbatim with pinpoint citations, attaching the complete agreements and source documents for any purported party-opponent statements; (iii) impose a monetary penalty payable to the Clerk sufficient to deter repetition and award AV his non-attorney, out-of-pocket costs causally tied to the violations; (iv) issue a written corrective admonition; (v) for a defined period, require that any future complaint or counterclaim on the same nucleus of facts append the Court's admonition and include a Rule 11(b) certification (or, in the alternative, preclude re-assertion of the stricken allegations absent leave of Court upon a detailed proffer); and (vi) grant such further relief under § 1927 and the inherent power as the Court deems just and proper, consistent with Rule 11(c)(5).

<u>Why this Motion is proper, necessary and not "duplicative briefing".</u>

Rule 11 serves a different function than Rule 12: ***deterrence***, not merits adjudication. It must be brought by a separate, safe-harbored motion, so some factual background will naturally overlap with the pending Rule 12(b)(6) briefing; but the record and relief are distinct. A 12(b)(6) motion confines the Court to the pleadings, incorporated materials, and judicially noticeable facts; a Rule 11 motion is a collateral proceeding in which the Court may consider declarations and exhibits and weigh questions of fact to assess the reasonableness of inquiry and tenability of legal contentions. This motion is also not a summary-judgment proxy: Rule 56 tests triable facts,

whereas here, AV targets litigation conduct—extortionate demand letters, settlement snippets used in violation of FRE 208 and misattribution/misquotations—issues collateral to the merits. The Rule 12 motion seeks dismissal; this motion seeks deterrent/punitive sanctions for bad faith and violations of Rule 11(b) under Rule 11(c), 28 U.S.C. § 1927 and the Court's inherent power.

If the Court resolves the pending Motion to Dismiss before this motion is filed (due to Rule 11's 21-day safe-harbor), AV requests that the Court (a) exercise its inherent power and/or § 1927 authority to issue appropriate sanctions on the existing record; and (b) alternatively, issue an Order to Show Cause under Rule 11(c)(3) to address the misconduct identified herein. The Supreme Court and Ninth Circuit recognize ancillary jurisdiction to adjudicate sanctions even after merits disposition. See, e.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395–98 (1990) (Rule 11), *Willy v. Coastal Corp.*, 503 U.S. 131, 137–39 (1992) (Rule 11/inherent power), *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991) (inherent power).

If the Court rules on the MTD after this motion is filed but before it is heard, AV requests that the Court retain and exercise jurisdiction to decide this motion (or convert it to an OSC under Rule 11(c)(3)) and/or impose § 1927/inherent-power sanctions as warranted by the record. See *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–10 (2017) (scope of inherent-power sanctions); *Fink v. Gomez*, 239 F.3d 989, 992–94 (9th Cir. 2001) (bad faith or reckless conduct with improper purpose supports inherent-power sanctions). Upon finding bad faith, the Court may convert any dismissal to with prejudice as a sanction. See *Anheuser–Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)

Rule 11(c)(2) Certification. On October 21, 2025, AV served on Checkmate's counsel a copy of this motion and all supporting papers pursuant to Fed. R. Civ. P. 11(c)(2). More than 21 days have elapsed, and the challenged allegations were not withdrawn or corrected.

Local Rule 7-3 Statement. This motion is made following the conference of the parties pursuant to C.D. Cal. L.R. 7-3, which took place on [meet-and-confer date].

This motion is based upon this Notice; the accompanying Memorandum; the Declarations and Exhibits (including Ex. F itemizing the challenged allegations); the pleadings and records on file; and such further evidence and argument as may be presented at the hearing.

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................IV

TABLE OF AUTHORITIES ..........................................................................IV

MEMORANDUM OF POINTS AND AUTHORITIES.................................... 1

I.    INTRODUCTION ..................................................................................... 1

II.   BACKGROUND ....................................................................................... 1

III.  STANDARDS............................................................................................ 3

IV.   ARGUMENT ............................................................................................ 6

    A.    *Checkmate's "Notices" Are Extortion as a Matter of Law—and Evidence of Improper Purpose under 11(b)(1) and Vexatious Multiplication under § 1927....................................... 6*

    B.    *Withholding and Misstatement of Contracts Confirms Bad Faith................................... 8*

    C.    *Use of Settlement Correspondence Violates 11(b)(2) and FRE 408 ............................ 10*

    D.    *Selective Quotation and Paraphrasing Violate 11(b)(3) and FRE 106........................ 11*

    E.    *The Court Should Impose Punitive and Deterrent Sanctions ......................................... 15*

V.    CONCLUSION........................................................................................ 17

## TABLE OF AUTHORITIES

**CASES**

*Aveta Inc. v. Bengoa,*

    C.A. No. 3598-VCL (Del. Ch. Aug. 13, 2010)................................................. 14

*Beech Aircraft Corp. v. Rainey,*

    488 U.S. 153, 171–72 (1988)............................................................. 4, 14

*Cassino v. Reichhold Chems., Inc.,*

    817 F.2d 1338, 1342 (9th Cir. 1987) ..................................................... 5

*Chambers v. NASCO, Inc.,*

    501 U.S. 32, 45–46 (1991)................................................................ 4, 15

*Christian v. Mattel, Inc.*,

   286 F.3d 1118, 1127 (9th Cir. 2002) .................................................................. 10, 15

*Cooter & Gell v. Hartmarx Corp.*,

   496 U.S. 384, 393 (1990) ............................................................................................ 3, 15

*Diaz v. Prof'l Cmty. Mgmt., Inc.*,

   16 Cal. App. 5th 1190, 1216–18 (2017) ................................................................ 16

*Fink v. Gomez*,

   239 F.3d 989, 992-94 (9th Cir. 2001) ..................................................................... 4, 15

*Flatley v. Mauro*,

   39 Cal. 4th 299, 326 (2006) ....................................................................................... 4, 6

*Fortis Advisors LLC v. Allergan W.C. Holding Inc.*,

   C.A. No. 2019-0159-MTZ, at 7 (Del. Ch. May 14, 2020) ................................ 14

*Goodyear Tire & Rubber Co. v. Haeger*,

   581 U.S. 101, 108–13 (2017) ........................................................................................ 15

*In re Keegan Mgmt. Co., Sec. Litig.*,

   78 F.3d 431, 436 (9th Cir. 1996) .............................................................................. 4, 15

*Malin v. Singer*,

   217 Cal. App. 4th 1283 (2013) ..................................................................................... 7

*Mendoza v. Hamzeh*,

   215 Cal. App. 4th 799, 806 (2013) .......................................................................... 4, 6

*New Alaska Dev. Corp. v. Guetschow*,

   869 F.2d 1298, 1306 (9th Cir. 1989) ........................................................................ 15

*New W. Film Prods., Inc. v. Gaiman*,

   963 F.3d 918, 933 (9th Cir. 2020) ............................................................................... 4

*Old Chief v. United States*,

   519 U.S. 172, 180–82 (1997) ......................................................................................... 5

*People v. Arias*,

   13 Cal. 4th 92, 156 (1996) ........................................................................................... 14

*People v. Asta*,

   251 Cal. App. 2d 64, 87 (1967) ........................................................................... 4, 6

*People v. Combs*,

   34 Cal. 4th 821, 842–43 (2004) ........................................................................... 13

*People v. Pride*,

   3 Cal. 4th 195, 235 (1992) ........................................................................... 14

*People v. Riel*,

   22 Cal. 4th 1153, 1189–90 (2000) ........................................................................... 13

*People v. Sanders*,

   188 Cal. 744, 749–50 (1922) ........................................................................... 7

*Rhoades v. Avon Prods., Inc.*,

   504 F.3d 1151, 1161–62 (9th Cir. 2007) ........................................................... 5, 10, 13

*Roadway Exp., Inc. v. Piper*,

   447 U.S. 752, 764 (1980)........................................................................... 4, 15

*Sea–Land Serv., Inc. v. Lozen Int'l, LLC*,

   285 F.3d 808, 821 (9th Cir. 2002) ........................................................................... 13

*Stenehjem v. Sareen*,

   226 Cal. App. 4th 1405, 1423 (2014) ........................................................................... 4, 6

*Townsend v. Holman Consulting Corp.*,

   929 F.2d 1358, 1362 (9th Cir. 1990) (en banc) ........................................................... 3, 10

*Transbay Auto Serv., Inc. v. Chevron U.S.A. Inc.*,

   807 F.3d 1113, 1120–22 (9th Cir. 2015) ........................................................................... 13

*United States v. Safavian*,

   435 F. Supp. 2d 36, 43–44 (D.D.C. 2006) ........................................................................... 13

*United States v. Vallejos*,

   742 F.3d 902, 905 (9th Cir. 2014) (cleaned up)........................................................................... 14

*Weil v. Citizens Telecom Servs. Co., LLC*,

   922 F.3d 993, 999–1000 (9th Cir. 2019) ........................................................................... 13

vi

## INDEX OF REFERENCED EXHIBITS

| | | |
|---|---|---|
| Merger Agreement (MA) | Dkt. 94-2; "MA" | CCs ¶¶ 15, 60; |
| Warns Declaration | Exhibit A-1; | Authenticates IPAA and IPAL |
| Assignment of IP/Assets .. | Exhibit A-2; "IPAA" | CCs ¶¶ 15, 18, 40-45; |
| IP Acknowledgment Letter | Exhibit A-3; "IPAL" | CCs ¶¶ 15, 18, 39, 41-45; |
| Agarwal Declaration | Exhibit C-1; | Auths Bonus Agmt., Offer Letter |
| Bonus Agreement | Exhibit C-2; "BA" | CCs ¶ 71, 73; |
| Offer Letter | Exhibit C-3; "OL" | CCs ¶ 71, 73; |
| Lunchbox Emails | Exhibit C-4. | CCs ¶¶ 7, 23, 52; |
| Jan 29, 2025, Notice; Feb 7 Shareholder Response | Exhibit B-2, B-3 | CCs ¶¶ 33-34; Jan 29 Notice; Feb 7 Response by Grant Thomas |
| Dec 6, 2024, and Jan 22, 2025, Notices of Claim | Exhibit D-1 to D-5; | CCs ¶¶ 1, 5-7, 24-32; threats of criminal referral and responses re settlement |
| Nessler Declaration | Exhibit E; | Confirms Jan 29 Notice/Feb 7 Response; Non-payment of bonuses; |
| Allegation-Source Map | Exhibit F; | CCs paragraphs mapped to sources. |
| Zoom Transcript, Screenshots and Summary | Exhibit K-1 to K-3; | Termination Meeting Transcript, Fathom screenshots and AI summary |
| Ethics Complaint | Exhibit G-1 to G-3 | Ethics allegations served on KL Gates and General Counsel response |

MOTION FOR SANCTIONS

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

This motion concerns a pattern of litigation conduct that no reasonable attorney could view as proper. Defendant Checkmate.com, Inc. ("Checkmate") and its counsel advanced factual allegations contradicted by the contracts they withheld, misused settlement correspondence as "admissions," and built their counterclaims (CCs) on demand letters that California classifies as extortion as a matter of law. Together, these acts reveal violations of Rules 11(b)(1) (improper purpose), 11(b)(2) (legally untenable theory), and 11(b)(3) (lacking evidentiary support), as well as 28 U.S.C. § 1927 and warrant using the Court's inherent power to sanction misconduct.

Checkmate's campaign began not in court but in a series of coercive "Notices of Claim" that threatened criminal referral and injunctive action unless Plaintiff Arjun Vasan ("AV") paid purported merger expenses and submitted to interrogation—while concurrently withholding his signed contracts and unpaid wages. These notices misrepresent withheld agreements, mislead by selective quotation and use wrongful threats to force AV to address representations he never made. Having coerced "responses" under false pretenses, Checkmate repurposed clear settlement correspondence in violation of Rule 408 as admissions of fraud, intent, and scienter.

The result is a pleading built on threats, omissions, and distortions, not evidence. Such tactics undermine the integrity of these proceedings and exemplify conduct that Rule 11, § 1927, and the Court's inherent powers are designed to deter. As AV proceeds *pro se*, fee-shifting fails to achieve deterrence; the appropriate sanction is dismissal of the CCs with prejudice, striking of offending allegations, a corrective admonition and penalty payable to the Clerk to reinforce the duty of candor, and to compensate the Court for the burden imposed by the misconduct at issue.

### II.  BACKGROUND

On **May 1, 2024**, AV begins employment at Checkmate, with guaranteed bonuses and severance negotiated as part of its "acquihire" of VoiceBite—a pre-revenue Voice AI startup cofounded with Robert Nessler and Christopher Lam. The parties executed the Merger Agreement (**MA**, Dkt. 94-1), Offer Letter (**OL**, Ex. C-3), Bonus Agreement (**BA**, Ex. C-2), Non-Competition Agreement (**NCA**, Dkt. 94-2), IP Acknowledgement (**IPAL**, allegedly between AV

and Checkmate, but addresses Mr. Lam, Ex. A-2), Assignment of IP and Other Assets (**IPAA**, allegedly between VoiceBite and AV, Ex. A-1). AV disputes the validity and/or enforceability of the NCA, IPAA and IPAL in his Motion to Dismiss CCs (MTD, Dkt. 81, 97-2, 97-4, 98 (reply)).

On **Nov. 14, 2024**, AV was terminated during medical leave and subsequently requested payment of earned and unpaid compensation, which he termed expressly as a settlement offer—language used by Checkmate during his termination in claiming it would propose an offer shortly after the meeting. See Ex. K (zoom transcript). As Checkmate did not do so, AV himself took the initiative with an offer along the lines of his contracts on Nov. 20. AV had no obligation to sign a release or "settle" to receive already vested bonuses and guaranteed severance. See Ex. D-1.

On **Dec. 6, 2024**, Checkmate responded, escalating with a "Notice of Claim" purportedly under the indemnity provisions of the Merger Agreement—alleging "criminal misconduct" and demanding AV "immediately reimburse" the "out of pocket costs" of the Merger. Checkmate expressly details AV's settlement offer before rejecting it. On Dec. 20, AV formally responds and requests his signed contracts and personnel file citing California law. Exs. D-2, D-3.

On **Jan. 22, 2025**, Checkmate sent a second Notice, threatening to "litigate" "criminal liability" and to seek to enjoin lawful work unless AV responded with a "detailed explanation" and include "supporting evidence", in which case it was "open to resolution". See Ex. D-4.

On **Jan. 28, 2025**, AV files the instant action, later amended Feb. 21, 2025. See Dkt. 10.

On **Jan. 29, 2025**, AV sent an ethics complaint to K&L Gates LLP, noting the coercive nature of the "notices". The same day, Checkmate sent a third Notice, this time served on Robert Nessler, as the designated Holder Representative pursuant to MA § 9.1. The Notice claimed an unsubstantiated "over $5 million" in damages, with $1.68 million accounted for by forfeiture of the founders' earned retention bonuses and merger equity. See Exs. B-2, B-3, E.

On **Feb. 7, 2025**, Mr. Nessler responds to the Notice (for the team), via counsel Grant Thomas; distinguishing functional artifacts exhibited in the notices/CCs from VoiceBite's IP.

On **Feb. 14, 2025**, Checkmate files a complaint in New York State Supreme Court, which is substantially a verbatim precursor to its operative counterclaims. This is later removed to the Southern District of New York (SDNY) by AV on April 12 (Case No. 1:25-cv-03181-JMF).

2

On **May 12, 2025**, Checkmate amends its SDNY complaint in response to AV's motion to quash. The allegations at issue remained verbatim. See SDNY ECF No. 21.

On **July 10, 2025**, after full briefing on AV's motion to dismiss in SDNY, Checkmate voluntarily dismisses brings its claims as counterclaims in this instant action. See Dkt. 71.

On **July 25, 2025**, AV files for post-dismissal sanctions in SDNY, challenging the notion that Checkmate "paid millions of dollars for code that AV confessed was a valueless non-asset" as lacking any evidentiary basis, contradicted by the record and filed for an improper purpose. Mr. Nessler integrates the record evidence in a supporting declaration. SDNY ECF No. 58.

On **Aug. 8, 2025**, Checkmate opposes the sanctions motion—declining to address either issue—instead cross-moving for sanctions citing heated litigation emails.[1] SDNY ECF No. 59.

On **Aug. 15, 2025**, AV moves to dismiss the CCs (MTD) in CD Cal. See Dkt. 81, 97, 98.

On **Sep. 1, 2025**, AV files a reply/opposition to Checkmate's opposition/cross-motion, corroborating the Nessler Declaration with on-record evidence. See SDNY ECF No. 66.

On **Sep. 8, 2025**, Checkmate's SDNY reply again declines to address the merits of AV's arguments or the Nessler Declaration. See SDNY ECF No. 67.

On **Sep. 18, 2025**, Checkmate files an unauthorized and untimely opposition to the MTD —20 days after the deadline per the Court's standing order. See Dkt. 95.

On **Sep. 24, 2025**, AV's Reply ISO his MTD attaches the contracts Checkmate withheld, and organizes evidence referenced by the CCs. See Dkt. 97 (reply)/98 (errata).

## III.    STANDARDS

### A.  Rule 11, 28 U.S.C. § 1927 and the Court's Inherent Power

---

[1] In its response to AV's post-dismissal sanctions motion in SDNY, Checkmate declined to address the merits of AV's motion (and attached Nessler Declaration), and instead cross-moved for sanctions for heated emails to counsel. AV anticipates Checkmate may do the same here—and suggests the Court disregard any such misdirection. While AV regrets the tone of certain emails, they were informal, private communications, not filings with the Court within the scope of Rule 11. More importantly, they were a direct, frustrated response to the very misconduct alleged in this motion—manufacturing of claims via extortionate tactics and misuse of settlement communications. Checkmate's cross-motion argued that the emails showed improper purpose in bringing that sanctions motion and therefore sanctionable. But here (and there), a proper purpose is clear: without these actions, Checkmate clearly fails to state fraud/breach claims that, until resolved, impede AV's personal and professional life. Moreover, the CCs represent an ongoing attempt to frustrate AV's pursuit of his affirmative wage claims—which are prioritized under California public policy.

MOTION FOR SANCTIONS

**Fed. R. Civ. P. Rule 11** imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and determined that court-filings are factually grounded (11(b)(3)), legally tenable (11(b)(2)) and not interposed for an improper purpose (11(b)(1)). See *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). The standard is <u>objective reasonableness</u>: whether a "reasonable attorney of ordinary competence" would have concluded that the pleading was well-founded. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc).

**28 U.S.C. § 1927** authorizes a court to sanction an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." Sanctions under § 1927 require a finding of subjective bad faith. *New W. Film Prods., Inc. v. Gaiman*, 963 F.3d 918, 933 (9th Cir. 2020). Bad faith is present when an attorney "knowingly or recklessly raises a frivolous argument." *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996).

**Finally, a court has the inherent power** to "protect[] the due and orderly administration of justice and in maintaining the authority and dignity of the court." and sanction a party or attorney who has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). A specific finding of bad faith, which includes "a broad range of willful improper conduct," is required. *Fink v. Gomez*, 239 F.3d 989, 992-94 (9th Cir. 2001).

## B.  Exceptions to Litigation Privilege

California's litigation privilege, though broad, does not shield communications that constitute extortion as a matter of law. *Flatley v. Mauro*, 39 Cal. 4th 299, 326 (2006). A threat is extortionate when it is used to wrongfully obtain concessions through fear, such as a threat to accuse the individual of a crime. See Cal. Penal Code §§ 518, 519; *Mendoza v. Hamzeh*, 215 Cal. App. 4th 799, 806 (2013) (extortion where a letter threatened to report alleged crimes unless payment was made). The demand need not be explicit; the threat may be implied, and its coercive nature is judged by the circumstances. *Id*. See also *Stenehjem v. Sareen*, 226 Cal. App. 4th 1405, 1423 (2014) (wrongful threat where an attorney demanded a large sum of money unrelated to any actual damages, coupled with a threat to file a criminal complaint). "[T]he more

vague and general the terms of the accusation the better it would sub-serve the purpose of the accuser in magnifying the fears of his victim." *People v. Asta*, 251 Cal. App. 2d 64, 87 (1967).

### C. Federal Rules of Evidence 106, 403, 408

**Rule 106 (Rule of Completeness)**. When a party introduces part of a statement, the court may require admission at the same time of any other part—or any other related statement—and that fairness ought to be considered. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72 (1988) (describing the common-law rule of completeness, partially codified in FRE 106, and holding it error to bar contextual portions needed to avoid misleading the factfinder)

**Rule 403 (balancing)**. Even relevant evidence may be excluded if its probative value is substantially outweighed by dangers of unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or needless cumulation. "Unfair prejudice" means an undue tendency to prompt decision on an improper basis, commonly an emotional one; courts should consider whether less prejudicial substitutes are available. *Old Chief v. United States*, 519 U.S. 172, 180–82 (1997); Fed. R. Evid. 403 & ACN.

**Rule 408 (compromise offers and negotiations)** bars evidence of (1) offers/acceptances of consideration and (2) conduct or statements made in compromise negotiations used to prove or disprove the validity or amount of a disputed claim or impeach by inconsistent statement or contradiction. The Rule permits other purposes (e.g., bias, negating undue delay, obstruction), subject to Rule 403. Documents otherwise discoverable are not immunized merely for being exchanged in negotiations. Fed. R. Evid. 408(a)–(b) & ACN. Ninth Circuit emphasizes context: the Rule applies when there is a disputed claim; courts have discretion to decide if particular communications were part of settlement negotiations and, even if admissible for another purpose, to exclude under 403. See *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987); *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161–62 (9th Cir. 2007); Fed. R. Evid. 408.

*Application*: In combination, these rules authorize the Court to (i) require the full, contextual statements under 106, (ii) exclude mischaracterizing snippets where probative value is substantially outweighed by prejudice or risk of misleading the factfinder under 403, and (iii) bar

use of settlement communications to prove liability/amount under 408, while allowing limited, non-merits uses only with appropriate 403/105 safeguards.

## IV.    ARGUMENT

### A.    Checkmate's "Notices" Are Extortion as a Matter of Law—and Evidence of Improper Purpose under 11(b)(1) and Vexatious Multiplication under § 1927

Rule 11 sanctions are warranted when a filing is presented "for an improper purpose," including to harass or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1). Here, Checkmate's "notice of claim" campaign crossed the line into extortion as a matter of law, confirming improper purpose and warranting deterrent sanctions under Rule 11 and § 1927.

In *Flatley v. Mauro*, the Supreme Court held that a lawyer's demand—threatening criminal accusations and publicity unless a payment was made—was "extortion as a matter of law" and unprotected. The Court emphasized that the coupling of a wrongful threat (e.g., to accuse of crime; disgrace or "secrets" Penal Code §§ 518–519) with a demand for money or concessions that makes the demand illegal; dressing in legalese does not sanitize it.

In *Mendoza v. Hamzeh*, a letter threatening to report the recipient to prosecutors, tax authorities, and customers unless he paid "damages exceeding $75,000" was extortion as a matter of law. The truth or falsity of the accusations—and whether money was actually owed—was irrelevant once the letter paired a criminal-report threat with a monetary demand.  In *Stenehjem v. Sareen*, a threat to file a qui tam/criminal-tinged action unless a settlement was reached likewise qualified as extortion, again falling outside anti-SLAPP and the privilege. California decisions also make clear the threat need not be specific; vagueness can magnify fear and satisfies the statute. See, e.g., *People v. Sanders/Asta/Bolanos* (quoted with approval in *Flatley*): vague, general criminal accusations can support extortion when paired with a demand.

Checkmate's "Notices" Clearly Cross the Line.

The Dec. 6 letter announces Checkmate "has no intention to make any more payments" and demands "immediate reimbursement for all … out-of-pocket expenses associated with the Merger," i.e., a money payment, while reciting accusations of "criminal misconduct". The Jan. 22 letter escalated further with threats to "*explore and potentially litigate … criminal liability*,"

demands that AV "submit to an interview" or provide a detailed written response with evidence by a fixed deadline, and states the client is "open to resolution" but will otherwise "pursue legal action." This is classic conditional leverage—pay/perform or face criminal-framed litigation.

Under *Flatley*/*Mendoza*/*Stenehjem*, those features—criminal-referral threats + demands for money and compelled "cooperation" under a deadline—fit the extortion pattern as a matter of law: "the threat is directly linked to the demand," and the law "does not contemplate the use of criminal process as a means of collecting a debt." Penal Code § 523 confirms that threatening letters used to obtain money or other benefits (including coerced "admissions") are criminal when the threat is wrongful, regardless of whether payment is made.

Relation to the CCs Does Not Save Checkmate.

Checkmate may cite *Malin v. Singer*, 217 Cal. App. 4th 1283 (2013) to justify its threats as related to the CCs and therefore permissible. But *Malin* expressly distinguished threats of criminal referral from exposure that might result from filing a civil suit. Checkmate may then rely on language from the 2nd notice to "plausibly deny" it was making a direct threat: "your conduct renders you liable for claims … our client intends to pursue against you [fraud/breach citations]" and "*exposes* you to claims of [IP and trade secret theft citations]". These contradict: IP claims can only be asserted by owners, while the fraud/breach claims allege that AV "did not and could not" have assigned ownership. This precludes any relation of the threats at issue to any claims Checkmate had standing to make. Moreover, Checkmate also directly threatened, *on its own accord*, to "fully explore and potentially litigate claims of fraud, including both civil and criminal liability." (Ex. D-4 at 3 (pp. 71–72 of 92)). The intent was intimidation. California does not provide a "relation to claims" safe harbor; what matters is means and purpose. Coupling threats of criminal-exposure with demands for money or compelled cooperation crosses the *Flatley* line into extortion as a matter of law; and courts have long recognized that vagueness magnifies fear, not legitimacy—"the more vague and general the terms … the better it would subserve the purpose of the accuser in magnifying the fears of his victim." *People v. Sanders*, 188 Cal. 744, 749–50 (1922). Here, the Notice's ambiguity is the feature, not a defense—its design was to instill undue fear in a *pro se* party, not to advance a civil claim.

7

Conditionality Makes it Extortion.

Under PC §§518, 519, 523, extortion is indicated if a party conditions "resolution" while brandishing criminal exposure. That is the case here: "open to resolution" if AV pays 'immediate reimbursement' and submits to an interview/provides evidence, else it will "litigate" "criminal liability". California courts condemn this quid-pro-quo: *Flatley* (criminal accusations unless paid), *Mendoza* (report to authorities unless paid), *Stenehjem* (no talismanic words required; context controls). The conditionality is what makes the letters extortionate as a matter of law.

Aggravated Extortion – Wages as Hostage

The coercion here is not merely rhetorical; it is aggravated by weaponizing earned wages. California law requires final wages be paid immediately at termination (Lab. Code § 201), forbids conditioning any part of those wages on a release or concession (§ 206.5), and imposes waiting-time penalties for willful nonpayment (§ 203). Moreover, intentional wage theft above statutory thresholds may be prosecuted as grand theft under Pen. Code § 487m. In effect, not only did it wrongfully threaten criminal referral for advantage in a civil dispute, but Checkmate also expressly threatened to commit a felony against AV—reinforcing the extortionate nature of its conduct: *confess or we won't pay what you're already earned*. See Pen. Code §§ 518, 523.

**B.    Withholding and Misstatement of Contracts Confirms Bad Faith**

The notices listed several purported "misrepresentations" by AV, all contractual clauses and substantially those listed in the CCs. AV repeatedly requested the executed versions of these agreements, which he did not possess. Checkmate refused to provide them—or respond to these requests which cited Cal. Labor code § 432 (right to copies of signed instruments) and § 1198.5 (right to inspect and copy personnel records). Meanwhile, **MA § 8** required a response to any "Notice of Claim" within one month; deprived of the operative contracts, AV nevertheless responded in good faith to "representations" he never actually made. See Exs. D-1, D-2, C-2.

By withholding the IPAA, Checkmate concealed that it constrained AV's representations and assignment to technology created "*on behalf of*" VoiceBite. AV was further prevented from studying the agreement, which (as purported to assign pre-existing IP not created *on behalf of* VoiceBite) is plainly not valid under Cal. Lab. Code § 2870. See Reply ISO Motion to Dismiss

8

Counterclaims. Checkmate further inserted language into the first bullet (derived from IPAA § 3), completely altering its meaning. Whereas the actual clause is limited to the "assigned assets" (pre-existing code created *on behalf of* VoiceBite), the notices (and the CCs) fabricate an entirely new rep by stitching in a context-free fragment from (by recollection), <u>the disclosure schedules that it has (ironically) never disclosed</u>: "a comprehensive set of components …". The CCs (or notices) do not specify what constitutes or qualifies this "comprehensive set". In effect, Checkmate was putting words into AV's mouth and demanding he answer for them.

      <u>By withholding the IPAL</u>, AV was prevented from seeing that it addressed an entirely different founder, Christopher Lam—and that it merely "acknowledged" clauses in the MA and in a future Confidential Information Agreement with *Checkmate* … not "[VoiceBite]". This is dispositive—VoiceBite was months old, pre-revenue, pre-funding. The founders were working with personal accounts and equipment—used for prior ventures. AV repeatedly asserted (in replies to the notices and an ethics complaint sent to K&L Gates General Counsel ("GC")) that counsel for VoiceBite redlined and swapped out "*have entered into with VoiceBite*" for "*will enter into with Checkmate*" and cited the version shared the day prior to signing. AV noted that if the clause did read "VoiceBite", Checkmate would have fraudulently altered the parties' bargain. The GC's formal response refused to retract the misstatement, or to provide the agreement, stating "<span style="color:red">Lastly, you assert that certain agreements … "do not match the versions [you were] provided just prior to signing by VoiceBite counsel." We have no way of knowing … to what extent they match the agreements that form the basis for our client's claims against you. But to be clear, any suggestion by you that our Firm or Mr. Keech intentionally manipulated or misrepresented any documents is totally false and baseless.</span>" Exs. G-1, 2, 3.

      <u>By withholding the MA</u>, AV was prevented from confirming, *inter alia*, that five bullets tagged to MA § 5.9 were (1) made by *VoiceBite* to Checkmate; (2) qualified by the disclosure schedule (yet withheld) and by the "knowledge of [Nessler], [AV] and [Lam]". Indeed, two of the "representations" in the CCs blatantly swap in "Plaintiff" where the actual language reads "Company" (e.g. VoiceBite). AV was also prevented from studying the contract architecture and noting that the IP papers were not incorporated—a fact that provides AV substantial defenses.

MOTION FOR SANCTIONS

## C.     Use of Settlement Correspondence Violates 11(b)(2) and FRE 408

The pre-suit correspondence was settlement negotiation start to finish. The parties engaged in a continuous negotiation from Nov. 20 → Feb. 14. The Dec. 6, "Notice" explicitly referenced and rejected AV's Nov. 20 offer, declared "no intention to make any more payments … at this time," and demanded "immediate reimbursement" of alleged merger "out-of-pocket expenses." AV responded on Dec. 15 and Dec. 20-24 by email, and Dec. 20 by formal letter—identifying contract requirements, disputing the allegations, insisting on production of the executed agreements, personnel file and damages calculations—several times detailing explicit and itemized settlement offers. On December 20–21, Checkmate's counsel asked AV to sit for a recorded interview and answer "clarifying questions," stating the company "may … revisit some or all of its position" depending on AV's answers—another hallmark of compromise talks pairing conditional reconsideration with an information demand. AV declined the interview and proposed to continue in writing. (Dec. 20–21 email thread.)

The Jan. 22 "Second and Final Notice" maintained that Checkmate would make "no further payments … at this time," threatened to "fully explore and potentially litigate … fraud, including both civil and criminal liability," and conditioned its "open[ness] to resolution" on AV "submitting to an interview" or, by a fixed deadline, delivering a "detailed and accurate written response … supported by evidence." AV answered with technical and contractual explanations, settlement offers and production demands—all clearly in the context of resolving the dispute. Both parties threatened legal action and offered conditions upon which it could be avoided.

A third notice on Jan. 29 (to the Holder Rep. under MA § 9.1) asserted "over $5 million" in damages—about $1.68 million accounted for by forfeiture of founders' bonuses and merger equity. The Feb. 7 response by Grant Thomas, counsel for Mr. Nessler, distinguished VoiceBite IP from the functional artifacts exhibited in the CCs—stating "[Checkmate has not] established a claim exceeding the amount of $25,000 pursuant to Section 8.1, much less for the losses exceeding $5,000,000 as claimed … VoiceBite invites [Checkmate] to submit another letter substantiating its claims." Pre-suit negotiations came to an end on Feb. 14, when Checkmate filed a complaint in New York, which it later dismissed and re-pled verbatim as its CCs here.

Under FRE 408(a), once a compromise negotiation is established, statements made during that negotiation—even if any specific message lacks a formal "offer"—are inadmissible to prove liability, scienter, reliance, or the amount of a disputed claim (or for impeachment). The Nov. 20 → Feb. 14 period bears every marker of compromise dialogue: payment demands and refusals, conditional "open to resolution" alternating with litigation threats, and discussion of modes of dialog (recorded interview vs written responses). Mining snippets from this dialogue to recast as "admissions" and support merits elements is exactly what Rule 408(a) forbids. *Rhoades v. Avon Prods., Inc.* (settlement dialog cannot be used for merits proof).

A pleading theory that depends on Rule 408-barred material to establish merits elements is not "warranted by existing law." Fed. R. Civ. P. 11(b)(2); *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002); *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc). No reasonable attorney could treat negotiation rhetoric (e.g., "no matter what" price-floor language) or settlement give-and-take as predicates for liability or damages. Even if an "other purpose" were later asserted, admissibility would be resolved by Rule 403 and motion in limine, not by embedding negotiation excerpts into a pleading. See *Rhoades.*

### D.     Selective Quotation and Paraphrasing Violate 11(b)(3) and FRE 106

A striking and critical portion of Checkmate's counterclaims derive directly from these notices and responses—indeed without them, the CCs fail to allege key fraud elements. Beyond admissibility, the CCs out-of-context use of these statements implicates Rule 11(b)(3) as setting forth allegations without any reasonable inquiry—or in this case, despite a reasonable inquiry—indicating that an evidentiary basis existed or would exist after discovery.

### 1.  **Dec. 6 Notice** → "Bizarre and Implausible Excuses" (CCs ¶¶ 30-31)

The CCs exhibit a few screenshots referring to the use of the word "cyborg", in domain names and credential files. AV's formal response to the notice stated that these were non-code personal property that in fact pre-dated "CyborgOps, Inc.", which was named *because* of AV's fondness for the word "cyborg". There is nothing "bizarre and implausible" about this statement. It is a plain and simple fact that incidental use of a word to name a company does not preclude use of that same word *for other purposes*—and does not confer (without explicit trademark) any

11

exclusive rights to such use by that company. Checkmate's failure here is not just its subjective and pejorative characterizations, but its filing of such without attaching any source document (Rule 106) and despite a clear and expressed settlement context (Rule 408).

2. **Jan. 22 Notice** → "No matter what" and co-authorship "admission"

**CCs ¶¶ 1, 5, 32, 60** make much ado of the phrase "no matter what" in a pre-suit email, implying AV was expressing fraudulent intent, i.e. he would be paid no matter what even if he had committed fraud. The actual email (Ex. D-5) refers to a joint negotiation position, and rebuts Checkmate's claim that it would have "otherwise paid less" for VoiceBite, as follows:

> **We** would not have sold to your client at any price point lower than the closing terms (and without explicit <mark>"no matter what"</mark> guarantees which your client is overtly violating): … This was the bare minimum: any theoretical damages you are claiming are illusory.

Checkmate's misleading use of the phrase entirely leaves out that it was already *quoted* by AV—in reference to negotiation of bonus and severance guarantees. As Mr. Nessler has declared, "The phrase "no matter what" refers to a negotiating position shared by the three primary founders (myself, Arjun Vasan, and Christopher Lam) during joint negotiations". Nessler Decl. ¶ 2. AV's email also explicitly makes a settlement offer "I suggest your client brings this to a close, amicably, by considering my separation as a termination without cause, and fulfilling all obligations pursuant to such a designation--including severance ($122k), retention bonus ($500k) and performance bonus ($200k) … this is my final offer".

**CCs ¶ 29** purports AV "admitted" "another third party … had developed the property that [AV] falsely claimed to own" is lifted from the same email and misstates what AV actually wrote. In context, AV said that his father—the other co-author of legacy code that AV himself co-authored—approved of AV's use and asserted no claim to that code. That is the opposite of an admission: a co-author is an author, and consent from the other co-author confirms AV's rights, not their absence. In any event, the executed IPAA forecloses Checkmate's gloss: the "assigned assets" are limited to those created *on behalf of* VoiceBite. Moreover, even construed under Checkmate's misreading of the plain language (and *arguendo* ignoring Lab. Code § 2870) the representation is that the assignor is the "owner, author and/*or* inventor" (which AV clearly

was as a co-author) and <u>to the best of Assignor's knowledge,</u> had the ability to assign exclusive title—which AV satisfied, <u>given his father's express approval</u>. AV never "admitted" otherwise. Using a settlement email to convert a candid good-faith explanation into a merits "admission" violates FRE 408(a) and lacks evidentiary support after reasonable inquiry under Rule 11(b)(3); no reasonable attorney could rely on such to plead falsity, intent or scienter. The Court may strike <u>CCs ¶¶ 28, 29</u> and direct a corrective pleading removing such 408-barred material.

      3. **Jan. 29 Notice** → "<u>not, in fact, intellectual property</u>" (CCs ¶¶ 33-34)

**<u>CCs ¶¶ 33-34</u>** attribute to AV statements that could not possibly derive from statements he made, as AV did not communicate with Checkmate or its counsel in February 2025:

> **CCs ¶ 33.** In February 2025, Plaintiff's excuses shifted yet again. This time, he claimed that the software, the code – the heart of VoiceBite – was not, in fact, intellectual property – emphasizing the stark and troubling reality that Checkmate had been duped … into acquiring a valueless non-asset.

> **CCs ¶ 34.** Of course, Checkmate would not have agreed to acquire VoiceBite if its core technology was not, in fact "intellectual property." Plaintiff's misrepresentations regarding the originality and ownership of the code were knowing falsehoods that he told with full awareness of their materiality to Checkmate's decision …

After several filings by AV in both this court and SDNY, Checkmate's finally conceded that <u>his identified source was *correct*</u>, but only *compounded* its misattribution by instead calling Mr. Thomas "*his [AV's] lawyer*" — yet another *knowingly false statement*:

> "[a]t no time" was his approval given for unspecified "statements to be attributed solely to him" by his lawyer and that he cannot be bound by statements made by his lawyer (*id.*); (SDNY ECF <u>No. 59 at 6</u>)

AV does not disavow the actual response.[2] What he objects to is distorting that response and misattributing that distortion to himself *personally*. AV has no formal engagement with Mr. Thomas — who is not "*his lawyer*". Mr. Thomas is *Mr. Nessler's attorney*, in his Holder Rep.

---

[2] **Fed. R. Evid. 801(d)(2)(B)** demands a clear manifestation that *this* party adopted the statement's truth. Contrast *United States v. Safavian*, 435 F. Supp. 2d 36, 43–44 (D.D.C. 2006) (email forwards with affirmative endorsement treated as adoptive admissions). Here, AV's brief, process-oriented sign-off on an explicitly **joint** Holder-Rep letter is not a personal adoption. In any case, Checkmate was not privy to the sign-off at time of filing.

capacity[3]. The sequence is telling: (1) Checkmate's Jan 29 Notice was addressed to and served only on Mr. Nessler; salutation "*Dear Holder Representative*,"; (2) Mr. Thomas's Feb 7 response is addressed "*From Grant Thomas: on Behalf of Robert Nessler, Holder Representative for the VoiceBite Corporation Shareholders*"; and (3) Checkmate's NY State complaint was filed with these allegations on Feb 14, mere days later—underscoring time-of-filing knowledge.

The Court may draw a strong inference that this exchange was not just misrepresented but *engineered*. Aware of Mr. Nessler's duty to retain counsel on behalf of the shareholders[4], Checkmate created a situation where a response was inevitable.

The actual text of the Feb 7 Response (Ex. B-3) refers to *the specific code* exhibited in Checkmate's complaint, distinguishing it from VoiceBite's Intellectual Property, and never names AV as the source, or that he was even involved in the response:

> VoiceBite owned all intellectual property identified in the VoiceBite Merger Agreement. VoiceBite's intellectual property was and is free of licenses, including at the time of transfer. VoiceBite is the author of all intellectual property … transferred …
>
> After discussions with VoiceBite personnel, the code at issue was not owned, licensed, or transferred to any third party. Further, this code … is not capable of being "intellectual property" … The code at issue is merely scènes à faire or API integrations not subject to copyright or intellectual property protection. As the code … is merely elements dictated by functionality, and therefore cannot be subject to protection and thus are not subject to claims for …

---

[3] Checkmate cannot claim the right to sue AV individually and also bind AV to the words of *Mr. Nessler's* counsel, writing on behalf of the shareholders. See Fed. R. Evid. 801(d)(2)(B)–(D) (adoptive admission requires a party's own manifestation; authorized-speaker and agency prongs require actual authorization/agency and within-scope conduct); AV approved Mr. Thomas's Feb. 7 response as the shareholders' statement under MA § 9.1, not as his personal statement. An opposing-party statement under FRE 801(d)(2) must be the **party's own**, clearly adopted (not merely received or generally approved), or made by an authorized agent on a matter within the scope of that relationship. *Transbay Auto Serv., Inc. v. Chevron U.S.A. Inc.*, 807 F.3d 1113, 1120–22 (9th Cir. 2015) ("possession-plus"/clear incorporation required for adoption); *Sea–Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (adoption only where contents are expressly incorporated); *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 999–1000 (9th Cir. 2019) (801(d)(2)(D) demands proof of agency and within-scope subject matter); *People v. Combs*, 34 Cal. 4th 821, 842–43 (2004); *People v. Riel*, 22 Cal. 4th 1153, 1189–90 (2000) (adoptive admission requires knowledge and words/conduct manifesting belief in truth; selective extraction does not suffice); Cal. Evid. Code §§ 1221–1222. In all events, the exchange occurred during compromise negotiations and is inadmissible to prove liability, scienter, or amount. FRE 408(a); *Rhoades v. Avon Prods., Inc.*.

[4] See *Fortis Advisors LLC v. Allergan W.C. Holding Inc.*, C.A. No. 2019-0159-MTZ, at 7 (Del. Ch. May 14, 2020) (contractual appointment of a shareholder representative makes that representative the **real party in interest**; the rep litigates in the stockholders' stead and cannot compel individuals to act); see also *Areta Inc. v. Bengoa*, C.A. No. 3598-VCL (Del. Ch. Aug. 13, 2010) (recognizing the shareholder representative's separate authority under the merger agreement).

MOTION FOR SANCTIONS

<u>(Grant Thomas, Feb 7 Response, Vasan Decl. ¶ 6, Ex. B-3)</u>[5]

Checkmate asks the court to believe its claims respond to AV's *individual* acts, and have

*nothing to do with* the Holder Rep., or the other shareholders—whose bonuses, *incidentally*, are

also being withheld on account of a "legal dispute" (i.e. this dispute). This is unpersuasive.

> Whether Plaintiff sent a pre-suit letter to the Holder Representative, on behalf of all shareholders, ==is entirely irrelevant to==, and has no bearing on, whether Plaintiff can pursue claims in this litigation against only the Defendant individually. Clearly, Plaintiff can. … ==The Amended Complaint seeks to hold Defendant accountable for his, and only his, actions leading up to, during, and after the Transaction.==
> (SDNY ECF No. 41 at 26)

Clearly, the CCs seek to hold AV accountable for more than *just* his own actions. Here, *the*

*Notice was bait*—aimed to provoke a *group* response, strip out a useful snippet and recast as AV's

own words. This is advocacy without candor, and this Court should not humor or excuse it.

### E.    The Court Should Impose Punitive and Deterrent Sanctions

Fed. R. Civ. P. 11(c)(4) authorizes non-monetary directives and "a penalty paid to the

court" calibrated for deterrence. See *Cooter & Gell at* 393–98 (1990) (deterrence focus; broad

discretion); Fed. R. Civ. P. 11 advisory note (1993) (sanctions should be effective to deter).

Here, as AV is *pro se*, limiting sanctions to unavailable fee-shifting creates a moral hazard

inviting further gamesmanship. The Court may weigh the equities to tailor remedies accordingly.

Independent of Rule 11, the Court may sanction bad-faith litigation conduct under its

inherent power, including by imposing fines, striking allegations, issue/evidentiary preclusion,

and referral for professional discipline. *Chambers v. NASCO, Inc.*; *Fink v. Gomez* at 991–94 (9th

Cir. 2001) (bad faith includes a broad range of willful improper conduct; recklessness plus an

---

[5] **Fed. R. Evid. 106** (as amended Dec. 1, 2023). The Advisory Committee explains that the rule of completeness, grounded in fairness, "cannot fulfill its function if the party that creates a misimpression about the meaning of a proffered statement can then object on hearsay grounds and exclude a statement that would correct the misimpression." Advisory Comm. Note (2023). See also *Beech Aircraft Corp. v. Rainey*, recognizing that the common-law completeness doctrine—partially codified in Rule 106—was "designed to prevent exactly the type of prejudice" caused when fragments are taken out of context, quoting Wigmore's formulation that the remainder may be introduced "to secure … a complete understanding of the total tenor and effect of the utterance." 488 U.S. 153, 171–72 (1988). The Ninth Circuit applies the same principle: if the omitted portion would correct a misleading impression created by taking something out of context, Rule 106 requires completion; conversely, when the redaction is not misleading, Rule 106 does not compel admission of more. *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (cleaned up). California's analogue—Evid. Code § 356—serves the identical purpose: "to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression." *People v. Arias*, 13 Cal. 4th 92, 156 (1996) (quoting *People v. Pride*, 3 Cal. 4th 195, 235 (1992)).

improper purpose suffices). Courts may consider the pattern and purpose of the conduct and tailor remedies to prevent recurrence. See also *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–13 (2017) (causation limits for compensatory fee awards; punitive fines to the court fall within sanctioning powers); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–67 (1980).

Sanctions are likewise available against counsel under 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying proceedings, which in the Ninth Circuit requires subjective bad faith—i.e., knowingly or recklessly advancing frivolous positions. *In re Keegan Mgmt. Co. Sec. Litig.*, 78 F.3d 431, 436–39 (9th Cir. 1996); *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989). Where fee-shifting offers little deterrent because the opponent is *pro se*, the Court may pair § 1927 findings with inherent-power or Rule 11 remedies (e.g., fines to the Clerk; preclusion; corrective orders) for deterrent effect. See *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127–30 (9th Cir. 2002) (non-fee sanctions for legally untenable contentions).

Courts routinely deploy non-fee sanctions to curb sharp practice—including penalties to the Clerk and bar referrals—precisely to deter future abuse regardless of the opponent's fee posture. See, e.g., *Diaz v. Prof'l Cmty. Mgmt., Inc.*, 16 Cal. App. 5th 1190, 1216–18 (2017) (sanctions, payment to the Clerk, and referrals where the litigation strategy was "borne of sharp practices"). And case-management and discovery rules supply additional, targeted tools: Rule 16(f) (violations of scheduling/management orders), Rule 26(g) (improper certifications), and Rule 37(b)/(c) (preclusion and other sanctions for discovery abuses), all of which permit non-fee remedies that directly neutralize the tactical advantage improperly gained.

Applied here, a deterrent package properly focuses on (1) punitive monetary penalties payable to the Court (Rule 11(c)(4); inherent power), and (2) punitive non-monetary sanctions that function as fee-equivalents by removing the fruits of misconduct and constraining future abuse—e.g., striking allegations predicated on settlement snippets, evidentiary preclusion (Rules 408/403/37(c)(1)), a completeness requirement for any future use of party statements (Rule 106), corrective orders, and, if warranted on the record, a narrow certification or pre-filing condition to prevent relitigating the same nucleus of facts. These measures accord with Rule 11's deterrent

1  aim and the Court's duty to preserve the "just, speedy, and inexpensive" determination of

2  actions, while avoiding the moral hazard that would otherwise exist in a pro se posture.

3  **V.    CONCLUSION**

4      Checkmate's fraud story runs like this: AV "duped" it into "paying him" "millions of

5  dollars" "specifically for the code," which was "a valueless non-asset," and he "admitted" as

6  much. As shown in AV's Reply (Dkt. 98), that tale fails on the pleadings and the documents they

7  invoke; and under California law. This motion addresses how the tale was authored.

8      Checkmate's extortion tinged "notices" rewrote contract language into promises AV

9  never made, withheld the very agreements that would expose the rewrite, and coupled demands

10  for "immediate reimbursement" and coerced "submi[ssion] to an interview" with the drumbeat of

11  "criminal" exposure—while threatening to and withholding earned and unpaid wages. When

12  AV's settlement-context responses didn't give them all it needed, it sent a third "notice" to the

13  Holder Rep Mr. Nessler, eliciting a lawyer's advocacy letter it would soon mischaracterize.

14      AV's "no matter what" shorthand for *guaranteed retention bonuses* became fraudulent

15  intent. Permission to use code co-authored by his father became an "admission" that AV lacked

16  rights to do so. Counsel's distinction between VoiceBite IP and functional code snippets

17  morphed—seven days later—into "Vasan admitted" … VoiceBite was a "valueless non-asset."

18  None of this was presented with the documents or context that would reveal the switch; all of it

19  came from settlement responses that no reasonable attorney would treat as merits evidence. The

20  misstated contract clauses from the notices, became bulleted "misrepresentations" in the CCs.

21      Without this strategy, and the allegations that derive from it, Checkmate would not have a

22  defense for its indefensible conduct as an employer. Mr. Nessler's declaration connects the dots:

23  this lawsuit is not just unsupported—but *manufactured*. It was intended to be, and is, leverage to

24  evade paying AV, and four others. *Improper purpose* is not zealous advocacy. Checkmate's lack

25  of candor and gamesmanship did not start with its denied Motion to Dismiss in this venue, but is

26  foundational to this dispute. Conduct so ingrained is unlikely to self-correct without intervention

27  from the Court. For these reasons, AV respectfully requests the Court grant the motion and

28  impose punitive, deterrent sanctions as is set forth in the [Proposed] Order filed herewith.

Respectfully Submitted,

**Dated**: _____

/s/ *Arjun Vasan*

In **Cerritos, California**

_____

*By:*    **Arjun Vasan**
Plaintiff In Pro Per

MOTION FOR SANCTIONS

## **<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6</u>**

Plaintiff Arjun Vasan certifies that this brief contains 6,992 words, which complies with the 7000-word limit of L.R. 11- 6.1 and the Court's Civil Standing Order dated Aug. 27, 2025.

**Respectfully submitted**,

Dated: **October 20, 2025**

In: **Cerritos, California**

/s/ ***Arjun Vasan***

**Arjun Vasan**, Plaintiff *In Pro Per*

| CCs ¶ | | Source | |
|---|---|---|---|
| 4, 6, 35 | 4. [AV] debated with his co-founders whether to disclose his concealment in fear he would be discovered and exposed by Checkmate…<br><br>6. [AV] has recently admitted that he intentionally concealed his misrepresentations concerning VoiceBite's technology to Checkmate in part because he allegedly feared an adverse response from Checkmate …<br><br>35. Then again in February 2025, Plaintiff brazenly made the excuse that he actually discussed with his co-founders the possibility of disclosing to Checkmate the fraudulent representations … | Cmpl. ¶ 16;<br>(misrepresents source text) | 16. … Defendant utilized the one-sided exclusivity to pressure them to accept terms that undermined their interests (¶ 112):<br>• April 2, 2024: The founders agree on a plan to disclose personal legacy code —some of it co-authored by Plaintiff's father ("VV"), who had given his full consent to its use for VoiceBite. …<br>• April 3, 2024: During a meeting …<br>- Post-meeting, the founders debate disclosing the legacy code, citing Bell's hostility to changes and Agarwal's reassurances ….<br>….. (See Dkt. 10 at ¶ 16 for full context) |
| 30, 31 | 30. Checkmate confronted Plaintiff with its findings. On December 6, 2024, Checkmate, through counsel, sent a letter to Plaintiff's legal counsel, detailing…<br>31. Plaintiff's excuses became increasingly bizarre and implausible. He falsely characterized the numerous "Cyborg" references embedded in the VoiceBite application code. | Dec 6 "notice of claim" and AV's response Exhibit D-1, 2;<br>(inadmissible under FRE 408/coerced) | The first notice lists the same reps/warranties as in CCs ¶¶ 59, 65; alleges "serious civil or even criminal misconduct"; claims to "disentitle" AV from the compensation he "claims to be owed"; demands AV immediately pay for its out of pocket merger costs; rejects AV's settlement outreach; misstates the IPAL (replacing "Checkmate" with "VoiceBite"), while refusing to provide the document for AV to review. |
| 1, 5, 32 60 | 1. "No matter what." These three words, written by Plaintiff …") in January 2025 …<br>5. …Plaintiff's "no matter what" expectations …<br>32. In January 2025, …. sought to negotiate payment … to himself "no matter what" while all the while hiding the true state … | Jan 22 "notice of claim"; AV's responses; Exhibit D-4;<br>(inadmissible under FRE 408/coerced) | The second notice repeats the list of reps; threatens to "litigate" "both civil and criminal liability"; claims Checkmate will seek injunctive relief to enforce the non-compete; demands submission to an interview or detailed written response, "supported by evidence"; |

|  |  |  |  |
|---|---|---|---|
|  | 60. ... Plaintiff, who admits in writing that he intended at the time that he would be paid "no matter what," knew of their falsity ... |  | client will not make payments—but is open to resolving the matter.<br><br>(See Ex. E (Nessler Declaration ¶ 2-3)) re "No Matter What" phrase—used by all founders to refer to retention bonuses being negotiated) |
| 28, 29 | 28. ... on or around January 23, 2025, Plaintiff admitted in writing that Varadarajan ...– had developed the property ...<br>29. The truth was thus becoming clear: Arjun Vasan did not have the rights he claimed to have. ...  VoiceBite ... could not assign: ... | *Id*. (inadmissible under FRE 408/coerced) |  |
| 33, 34 | 33. In February 2025, Plaintiff's excuses shifted yet again. This time, he claimed that the software, the code – the heart of VoiceBite – was not, in fact, intellectual property –emphasizing the stark and troubling reality that Checkmate had been duped by Plaintiff into acquiring a valueless non-asset.<br>34. Of course, Checkmate would not have agreed to acquire VoiceBite if its core technology was not, in fact "intellectual property." Plaintiff's misrepresentations regarding the originality and ownership of the code were knowing falsehoods that he told with full awareness of their materiality to Checkmate's decision to acquire VoiceBite. | *Jan 29 "notice of direct claim"; served on Robert Nessler as Holder Rep under MA § 9.1; Exhibit B-1--3; (inadmissible under FRE 408), derives from Feb 7 response by Grant Thomas, Counsel for Mr. Nessler,* **misattributed to AV** | See Exhibit B.<br>VoiceBite owned all intellectual property identified in the VoiceBite Merger Agreement. VoiceBite's intellectual property was and is free of licenses, including at the time of transfer. VoiceBite is the author of all intellectual property VoiceBite transferred to Checkmate. Therefore, VoiceBite has not made any misrepresentations about ownership of intellectual property, including specifically no misrepresentations for which Purchaser Identified Parties seek indemnification, although none are specifically identified in the January 29, 2025 letter.<br>VoiceBite has been made aware that Purchaser Indemnified Parties have concerns about ownership of intellectual property based on newly discovered "comments" found in source code. After |

| | | | |
|---|---|---|---|
| | | | discussions with VoiceBite personnel, the code at issue was not owned, licensed, or transferred to any third party. Further, this code, to the extent that it is the source of Purchaser Indemnified Parties' claims to which purchaser Indemnified Parties' are seeking indemnification is not capable of being "intellectual property" within the meaning of the VoiceBite merger agreement. ==The code at issue is merely scènes à faire or API integrations not subject to copyright or intellectual property protection. As the code is functional in nature, the code itself is merely elements dictated by functionality, and therefore cannot be subject to protection and thus are not subject to claims for indemnification based violations of Sections 5.7, 5.9, and 5.19.== |
| 59, 65; Bullet 1 | Plaintiff was "owner, inventor and/or author" of certain assigned intellectual property related to VoiceBite software (namely, a "comprehensive set of components of an AI voice ordering system") and that such intellectual property was not subject to "any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party" or "any claim of any prior employer or third party client" of Plaintiff; | IPAA § 3 | 3. Assignor Representations and Warranties. The Assignor represents and warrants to the Company that, to the best of Assignor's knowledge, (a) the Assignor is the owner, inventor and/or author of, and can grant exclusive right, title and interest in and to, each of the Assigned Assets transferred by the Assignor hereunder; (b) none of the Assigned Assets are subject to any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party, or any other rights that might interfere with the Company's use, or exercise of ownership |

Exhibit F – Allegation – Source Map

| | | | of, any of the Assigned Assets; (c) the Assigned Assets are free of any claim of any prior employer or third party client of the Assignor or any school, university or other institution the Assignor attended; and (d) the Assignor is not aware of any claims by any third party to any rights of any kind in or to any of the Assigned Assets. The Assignor agrees to immediately notify the Company upon becoming aware of any such claims. *Note – "comprehensive set of components of an AI voice ordering system" is not defined here, but in Exhibit D-2,4, (notices of claim), it is asserted this comes from the Company Disclosure Schedule – which remains undisclosed and was not attached. Nowhere is the comprehensive set detailed. |
|---|---|---|---|
| Id. Bullet 2 | Plaintiff had provided to VoiceBite "all worldwide patents, patent applications, patent rights, copyrights, copyright registrations, moral rights, trade names, trademarks, service marks, domain names and registrations and/or applications for all of the foregoing, trade secrets, know-how, mask work rights, rights in trade dress and packaging, goodwill and all other intellectual property rights and proprietary rights relating in any way to the Technology, any Derivative or any Embodiment, whether arising under the laws of the United States of America or the laws of any other state, country or jurisdiction" related to VoiceBite's technology; | IPAA § 1(e) | (e) "Intellectual Property Rights" means, collectively, all worldwide patents, patent applications, patent rights, copyrights, copyright registrations, moral rights, trade names, trademarks, service marks, domain names and registrations and/or applications for all of the foregoing, trade secrets, know-how, mask work rights, rights in trade dress and packaging, goodwill and all other intellectual property rights and proprietary rights relating in any way to the Technology, any Derivative or any Embodiment, whether arising under the laws of the United States of |

**Exhibit F – Allegation – Source Map**

| | | | America or the laws of any other state, country or jurisdiction. |
|---|---|---|---|
| Id. Bullet 3 | That VoiceBite owned or had valid and enforceable right to use, all intellectual property used or proposed to be used in connection with its business; | MA § 5.9(c) | Qualified by Company Disclosure Schedule |
| Id. Bullet 4 | That neither VoiceBite "nor any of its current or proposed products or services have infringed upon, misappropriated or are currently infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person;" | MA § 5.9(f) | Qualified by Company Disclosure Schedule |
| Id. Bullet 5 | That "no source code for any VoiceBite Proprietary Software has been delivered, licensed, or made available" to any person "who is not an employee" of VoiceBite; | MA § 5.9(h) | Qualified by Company Disclosure Schedule |
| Id. Bullet 6 | That Plaintiff had not "omitted to state a material fact necessary in order to make the statements and information contained herein or therein, not misleading;" and | MA § 5.19 | Neither this Agreement nor any agreement, attachment, schedule, exhibit, certificate or other statement delivered pursuant to this Agreement or in connection with the transactions contemplated hereby omits to state a material fact necessary in order to make the statements and information contained herein or therein, not misleading |
| Id. Bullet 7 | That Plaintiff "is not aware of any information necessary to enable a prospective purchaser of VoiceBite" to "make an informed decision with respect to the purchase of such Company Shares or business that has not been expressly disclosed herein." | Id. | The Company is not aware of any information necessary to enable a prospective purchaser of the Company Shares or the business of the Company and its Subsidiaries to make an informed decision with respect to the purchase of such Company Shares or business that has not been expressly disclosed herein. |