ARJUN VASAN

PLAINTIFF IN PRO PER

ARJUN.VASAN@GMAIL.COM

(562) 900-6541

12615 193RD STREET

CERRITOS, CA 90703

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARJUN VASAN,<br><br>Plaintiff and Counter-Defendant,<br><br>v.<br><br>CHECKMATE.COM, INC.,<br>(dba "Checkmate")<br><br>Defendant and Counterclaimant. | Case No.: CV-00765-MEMF-ASx<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR SANCTIONS UNDER FED. R. CIV. P 11, 28 U.S.C. § 1927 AND THE COURT'S INHERENT POWERS**<br><br>Complaint Filed: January 28, 2025 |

**TABLE OF CONTENTS**

**MEMORANDUM IN REPLY** ................................................................................................................. 3

   I.    INTRODUCTION ............................................................................................................................ 3

   II.   AV'S REQUESTED RULE 11 INQUIRY IS RIPE AND PROPER ................................................... 4

   III.  CHECKMATE DOES NOT CONTEST THE CORE RECORD SHOWING ................................... 6

       A.    Mr. Nessler's Declaration and Contracts Filed and Authenticated by Checkmate Undermine the "Millions of Dollars for Code" Narrative.................................................................................................. 6

       B.    Checkmate Misstated Contracts Terms to Falsely Argue Misrepresentation ............................... 7

       C.    Checkmate Concedes the Accuracy of AV's Nov. 14 Meeting Transcript ..................................... 8

1

Case 2:25-cv-00765-MEMF-AS   Document 133   Filed 12/08/25   Page 2 of 19   Page ID #:3861

| | | |
|---|---|---|
| IV. | CHECKMATE USES MATERIAL IN WAYS BARRED BY RULES 408 AND 106 .................................... 8 | |
| | D. MA § 8.3(c) Defines "Notice of Claim" and Obligates the Parties to Dispute Liability and Amount ........... 9 | |
| | E. The Actual Chronology Shows a Live Dispute Over Liability and Amount .................................... 9 | |
| | F. Key "Admissions" Cherry-Picked from Material Barred by Rules 408 and 106 ........................................ 11 | |
| V. | THREATENING TO "LITIGATE … CRIMINAL LIABILITY" TO INSTILL FEAR AND LEVERAGE IS NOT A LEGITIMATE USE OF LITIGATION PRIVILEGE ...................................................................................... 12 | |
| | G. Flatley, Mendoza, Stenehjem, and Asta—not Malin—match Checkmate's conduct ................................... 12 | |
| | H. Malin Confirms that "Criminal" Threats are Improper when used for Leverage ..................................... 13 | |
| | I. Monex v. Gilliam is Inapposite—it Supports AV's Motion ................................................................ 14 | |
| | J. Wage Withholding Aggravates Extortion and Violates California Public Policy ..................................... 14 | |
| VI. | THE CROSS-MOTION FAILS BOTH PROCEDURALLY AND SUBSTANTIVELY ................................ 15 | |
| | K. Checkmate Ignored AV's Attempts to Confer on His Motion ......................................................... 15 | |
| | L. Checkmate Never Conferred About its Own Cross-Motion ............................................................ 15 | |
| | M. The Cross-Motion also Fails on the Merits ............................................................................. 16 | |
| VII. | CONCLUSION ............................................................................................................................. 18 | |

**TABLE OF AUTHORITIES**

*Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1 (1981)------------------------------------------ 14

*Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987) ------------------------------ 11

*Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir. 2002)------------------------------------------ 16

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396–97 (1990) ------------------------------------------5

*Fink v. Gomez*, 239 F.3d 989, 992–94 (9th Cir. 2001) ---------------------------------------------------- 17

*Libarian v. State Bar*, 38 Cal. 2d 328 (1952) ----------------------------------------------------------- 13

*Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148 (C.D. Cal. 2010) -------------------------------- 14

*Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157–62 (9th Cir. 2007) -------------------------------- 11

<2>2</2>

**MEMORANDUM IN REPLY**

I.   **INTRODUCTION**

<u>Checkmate's Opposition is a study in evasion.</u> It ignores the Declaration of MA § 9.1 Holder Rep. Robert Nessler, does not address the record, and relies on invective rather than evidence.

<u>On the facts</u>, it fails to confront Mr. Nessler's sworn testimony and the contracts *it filed* that show (1) "millions of dollars for code" rhetoric has no basis in the deal structure; (2) the $1.5 million in promised employment bonuses *remains unpaid*; and (3) that CCs ¶ 33's "not, in fact, intellectual property" was lifted from *Mr. Nessler's counsel's* response to its own Feb. 7, 2025 Notice; pled without caveat as "Vasan admitted" and misrepresented to argue that *all* VoiceBite code was not IP and thus "a valueless non-asset". *Id*. ¶¶ 2–3, 9, 18; AV Decl. Exs. B-2, B-3, E. It also fails to dispute the motion's contention that the CCs demonstrably misstated contract clauses.

<u>On the law</u>, it fails to distinguish *Flatley v. Mauro*, *Mendoza v. Hamzeh*, *Stenehjem v. Sareen* or *People v. Asta*—leading cases that condemn threatening "criminal" referral as leverage for money or concessions. It leans on *Malin v. Singer* and litigation privilege but does not engage *Malin*'s own acknowledgement that extortion laws properly forbid threats of criminal referral as "unrelated to seeking monetary redress," and not privileged. And *Monex v. Gilliam* is plainly inapposite.

<u>On Rule 408</u>, it purports "no disputed claim existed and no valuable consideration" existed when it sent "Notices of Claim"—but the MA *defines* such notices as assertions of indemnity claims, requires the Indemnifying Party to "dispute" "the right to indemnification" or "the amount thereof" within 30 days, and directs resolution "by mutual agreement, litigation or otherwise." MA § 8.3(c); AV Decl. Ex. A-1. The Notices invoked that clause; and AV and Mr. Nessler's counsel disputed any liability and amount in response. AV Decl. Exs. D-2, B-3; Nessler Decl. ¶¶ 2–3, 9, 18.

Rather than address these points, the Opp. devotes pages to AV's frustrated emails from over five months ago, and alleged use of AI. See Opp. 1–7, 14–17. But it never explained the evidentiary basis it had to claim "millions of dollars" were "**paid**" "for code" AV "admitted" was "not, in fact, intellectual property". It never denies using settlement talk as merits evidence, or threats to "litigate" "criminal liability" to extract "admissions". While purporting its claims are "legitimate", it affords

few words—if any—to defend this supposed legitimacy. Moreover, its claim of "vexatious" filings is better explained as the ordinary learning curve of a <u>first time</u> *pro se* litigant.

Finally, this Court already issued an Order to Show Cause directed at Checkmate, based on its failure to timely confer under Local Rule 7-3. See Dkt. 45. Despite this clear warning, Checkmate ignored AV's request to meet about this motion and added its own cross motion without any effort to confer at all. By failing to confront the substance of this Motion—and by disregarding L. R. 7-3 and this Court's Standing Order, it concedes it engaged in sanctionable conduct. Accordingly, <u>the Court should grant AV's Motion and strike or summarily deny the cross-motion</u>.

## II.   AV'S REQUESTED RULE 11 INQUIRY IS RIPE AND PROPER

The Opp. suggests (1) because its CCs are still "pending," a Rule 11 motion is improper; (2) a Rule 11 motion that asks the Court to look at evidence is an impermissible attempt to "litigate the merits"; (3) Rule 11 is not in play pre-discovery; (4) and AV filing a sanctions motion in a different court precludes him from addressing abuses in this one. <u>None of that is correct</u>.

**First**, Checkmate implies sanctions must await a Rule 12(b)(6) decision or final judgment. Opp. 13. But in 1993, Rule 11 was amended to add a safe-harbor and encourage prompt service and resolution of sanctions issues, while the offending paper is still on file. The Advisory Committee explained: "…the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely…a party cannot delay [its motion] until conclusion of the case (or judicial rejection of the offending contention)." 1993 Rule 11 advisory note.

**Second**, Checkmate insists that AV is asking the Court to "determine the merits" in violation of Rule 11's limit. Opp. at 13:26, relying on one phrase: "the CCs fail to allege key fraud elements.", which only confirms AV's argument that it *persistently* omits key context. The full paragraph reads:

> A striking portion of the CCs derive directly from these notices and responses—**without them**, the CCs fail to allege key fraud elements. The CCs out-of-context use of these statements implicates Rule 11(b)(3) as setting forth factual allegation without reasonable inquiry—or in this case, <u>despite such inquiry</u>—into whether evidentiary basis existed or would exist after discovery. (Dkt. 121 at 19:7-10, emphasis added)

By contrast, the Opp. titles a section "Checkmate Discovers Plaintiff's Fraud and Promptly Files Suit", purporting its conclusions *as true* to expressly argue merits. The Supreme Court explains

4

1 | that a Rule 11 motion addresses collateral issues—"whether the attorney has abused the judicial
2 | process"—not the *ultimate* merits of underlying claims. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S.
3 | 384, 396–97 (1990). Rule 11 may require courts "to consider issues of law and fact" related to the
4 | merits, to decide if certifications were reasonable. *Id*. at 399–400. If courts were barred otherwise as
5 | such an inquiry may *affect* an eventual merits ruling, Rule 11 would be toothless.

**Third**, Checkmate implies sanctions are premature as discovery is not completed. Opp. 13. But Rule 11(b)(3) requires that factual allegations "have evidentiary support" or be likely to after "reasonable…investigation or discovery". Fed. R. Civ. P. 11(b)(3). Here, Checkmate was aware the allegations at issue did ***not*** have support—e.g. that it did ***not*** pay "millions of dollars" "for the code", that AV did ***not***—in fact —make the "not, in fact, intellectual property" statement in CCs ¶¶ 33; that a striking portion of the CCs derives from Rule 408-barred material. None of this is likely to be supported by discovery—as all of it is *contradicted* by undisputed evidence on the docket already.

**Fourth**, the Opp. argues the motion asks the Court to "fully analyze the merits" of the CCs to find it "so outside the bounds of reason" and "therefore sanctionable". But Rule 11 allows targeting of *specific* "claims, defenses, …" and "factual contentions". Fed. R. Civ. P. (c)(4). See *Hudson v. Moore Bus. Forms, Inc*., 836 F.2d 1156, 1159–63 (9th Cir. 1988) (affirming sanctions for grossly inflated damages but reversing sanctions for an underlying counterclaim as not fully frivolous). Such a targeted inquiry is precisely what AV seeks here—and is plainly contemplated by Rule 11. The Court is not required to adjudicate IP ownership issues to find "millions for code" unsupportable.

**Finally**, the Opp. argues that since the *allegations* it makes are the same as in SDNY, it must have acted in good faith—an absurd non-sequitur to an argument that the CCs were *re-filed verbatim* despite sworn testimony and documentary evidence refuting those allegations. The New York action was filed with the same improper purpose as the CCs—to frustrate AV's pursuit of his employment claims. By filing this motion, AV gave Checkmate *yet another chance* to provide contrary evidence or testimony; and it yet again declined. The only reasonable inference is that evidence to the contrary *does not exist*, and its allegations were made without evidentiary basis at time of filing or *reasonable* belief that such would be procured through discovery. In any case, AV's motion, and Mr. Nessler's sworn declaration, remain substantive, corroborated and now—*unrebutted*.

III. **CHECKMATE DOES NOT CONTEST THE CORE RECORD SHOWING**

    A. **Mr. Nessler's Declaration and Contracts Filed and Authenticated by Checkmate Undermine the "Millions of Dollars for Code" Narrative**

The Motion placed significant weight on the declaration of Robert Nessler, the Holder Rep. named in MA § 9.1 to act for the VoiceBite stockholders—including AV—on post-closing disputes. See MA § 9.1; Nessler Decl. ¶¶ 1–2. Mr. Nessler testified that: (a) $1.5 million in bonuses (the only "millions" in the deal) were compensation for continued employment, not purchase price "for the code," and were to be shared among the founders and team; (b) those bonuses have never been paid to AV or any other founder; (c) Checkmate asserts they are forfeited along with merger equity; and (d) the "not, in fact, intellectual property" phrase comes from counsel's February 7, 2025 response to Checkmate's third Notice, written on his behalf "for the VoiceBite shareholders," not from any statement AV made personally. Nessler Decl. ¶¶ 2–3, 5–6, 9, 18; Vasan Decl. Exs. B-2, B-3, E.

Those points align with the contracts Checkmate filed in this case and in the SDNY action, including the MA, the RBA, the EOL, the IP Assignment (IPAA), and the IP Acknowledgment (IPAL). See Vasan Decl. Exs. A-1 to A-3. The IPAA recites $100 in aggregate consideration for AV's IP. IPAA § 2. There is no contract, payment record, or damages computation that shows Checkmate ever agreed to pay, or did pay, "millions of dollars" for code. Id. Exs. A-1 to A-3.

Checkmate's CCs and briefing nonetheless assert that it "was injured by paying millions of dollars for a company—more specifically, for what Checkmate believed to be the company's proprietary code that ended up being worthless," and that "Vasan made these misrepresentations to induce Checkmate into paying Vasan millions of dollars." Dkt. 94 at 16:16–19 (citing CCs ¶ 59). The CCs ¶¶ 33–34 allege that "Vasan admitted" the code was "not, in fact, intellectual property" and thus "a valueless non-asset." But unless "millions of dollars paid to AV for the code" meant "$1.5 million was *promised* to five founders for *future work* but withheld after earning"; and "[AV] admitted the code was not IP and therefore was valueless" meant "The Holder Rep's counsel argued *specific code* at issue in the Notices and CCs was functional and not protectable, and none of VoiceBite's IP infringed on anyone"; Checkmate's *foundational* theory lacks an evidentiary basis that no discovery can reasonably conjure. The actual record before the Court shows three things:

1. The CCs ¶ 33 "admission" did not come from AV at all. It comes from Grant Thomas's Feb. 7 letter, sent "on behalf of Robert Nessler" "for the VoiceBite shareholders," responding to the third Notice of Claim under MA § 8.3(c). Vasan Decl. Exs. B-2, B-3, E; Nessler Decl. ¶¶ 2–3, 9, 18.

2. Even at face value, the phrase addresses specific code at issue in the Notices and CCs—not what Checkmate calls "the heart of VoiceBite". Thomas's legal argument explains that functional, non-protectable elements do not become "IP" simply by inclusion in a codebase. Nessler Decl. ¶¶ 6–9, 14–18. This applies to *any* codebase that contains such elements, e.g. **all of them**.

3. No document ties "millions of dollars" to code consideration. The MA, RBA, OL, BA, and IPAA together show a small, fixed IP payment and separate, un-paid employment bonuses for future work. Vasan Decl. Exs. A-1 to A-3; Nessler Decl. ¶¶ 2–3, 5–6, 9, 18.

Checkmate knows exactly where the "not, in fact, intellectual property" phrase came. It was a settlement response, written by someone else's lawyer, to its own Notice. Yet it continues to plead that phrase as AV's personal "admission," and to build its "millions of dollars for worthless code" narrative on that misattribution. The Opposition offers no explanation or justification for this choice.

Rule 11(b)(3) required Checkmate to have a factual basis both for its "millions of dollars paid to Vasan for code" rhetoric and for attributing the "not, in fact, intellectual property" language to AV himself. Fed. R. Civ. P. 11(b)(3). It had none when it filed in New York; it had none when it re-filed the CCs here; and, after Nessler's sworn testimony and the contracts are in the record, it still has none. The Opp. offers no competing declaration or other evidence to rebut the motion. Silence in the face of that showing is a concession. See *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (failure to respond in opposition "constitutes waiver or abandonment"); *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005). Rule 11 does not permit counsel to inflate damages and misattribute a third party's settlement phrase to an opponent, then continue to advocate those contentions after the true record has been put before the Court. That is precisely what Rule 11(b)(3) is meant to deter.

**B.     Checkmate Misstated Contracts Terms to Falsely Argue Misrepresentation**

The Opp. finally admits what Checkmate attempted to obscure in the CCs and later briefing: the purported "misrepresentations" listed in CCs ¶¶ 59, 65 derive from clauses in the MA and what it

calls "related transaction documents". The Court may compare the actual terms in those agreements with the listed "misrepresentations" and find, as AV laid out, that key terms are plainly misstated in the CCs. See Ex. F. In particular, it inserts language into IPAA § 3 to alter its meaning and attempt to weld it to the MA—which was between entirely different parties.

The first two Notices contain the same list, with at least one other misstatement. The IPAL bullet purports an obligation not to bring third party IP onto "[VoiceBite]"'s premises, but the actual text refers to Checkmate (and is addressed to Christopher Lam, not AV). This expands obligations far beyond the MA, which is qualified by a disclosure schedule, to instead (as alleged) every line of code used for VoiceBite. While AV disputes this interpretation—he did not have the contracts when forced to respond to threats of "criminal liability". <u>AV was addressing statements he never made</u>. Accordingly, separate from Rule 408, no scienter or falsity can be inferred from his pre-suit emails.

### C. Checkmate Concedes the Accuracy of AV's Nov. 14 Meeting Transcript

AV submitted a transcript of the 8am Nov. 14, 2024, Zoom meeting in which Checkmate terminated his employment. Vasan Decl. Ex. K. In that meeting, Checkmate (a) "terminated" AV with "immediate effect" "right now, right this second" for allegedly violating a non-solicitation clause; (b) presented him with a choice to "work out a final settlement solution" "with us" or "get a lawyer involved"; and (c) discussed post-termination plans, and a meeting with AV's team at 9am, to inform them of his termination. <u>Mr. Nessler corroborates all these details</u>.

<u>The Opp. at 15:25-26 quotes and relies on that transcript</u>, therefore conceding its accuracy. The transcript shows both parties viewed the situation as a dispute requiring "settlement" on Nov. 14. One does not propose a "final settlement solution" or suggest counsel unless there are disputed claims and amounts to be resolved. The assertion that "no disputed claim existed" when it sent *contractual* Notices cannot be squared with its own words on Nov. 14 and with the MA itself.

### IV. CHECKMATE USES MATERIAL IN WAYS BARRED BY RULES 408 AND 106

Checkmate tells the Court that "[AV]'s communications with Checkmate following the end of his employment … including notices to [AV] and the shareholders' counsel, occurred before any disputed claim existed and no valuable consideration was involved." Opp. 10:26–11:2. Checkmate is hoping the Court doesn't actually review the source material—which it should know is a false hope.

**D.     MA § 8.3(c) Defines "Notice of Claim" and Obligates the Parties to Dispute Liability and Amount**

MA § 8.3(c) governs "Direct Claims" between the parties and states as follows, defining a "Notice of Claim" mechanism that only applies when a party "claims a right to payment":

> If an Indemnified Party claims a right to payment pursuant hereto [it] will send written notice of such claim to the Indemnifying Party (a "**Notice of Claim**"). … In the event the Indemnifying Party does not notify the Indemnified Party within thirty (30) days following its receipt of such Notice of Claim that [it] disputes the Indemnified Party's right to indemnification under this Section 8 or the amount thereof, the Indemnified Party will be conclusively entitled to the amount set forth in such Notice of Claim. **In the event the Indemnifying Party has timely disputed the Indemnified Party's right to indemnification under this Section 8 or the amount thereof, the Indemnified Party and the Indemnifying Party will, as promptly as reasonably practicable, establish the merits and amount of such Direct Claim (by mutual agreement, litigation or otherwise).**

Merger Agreement § 8.3(c) (Vasan Decl. Ex. A-1) (emphasis added).

The MA thus presupposes what Rule 408 describes: a claim "disputed as to validity or amount," and then negotiations to resolve "the merits and amount" with agreement or litigation.

**E.     The Actual Chronology Shows a Live Dispute Over Liability and Amount**

**Nov. 14, 2024.** On the termination Zoom, Checkmate's executives told AV he could either "work out a final settlement solution" or "get a lawyer involved" and proposed that, if he wanted to "negotiate a settlement," he should reach out. Vasan Decl. Ex. K. One does not suggest a "final settlement solution" unless there is at least one claim and at least one disputed amount.

**Nov. 20, 2024.** AV followed that invitation and sent an email with "settlement terms" to "resolve this matter amicably and expeditiously," itemizing liability and the amounts he believed were owed: unpaid bonuses, severance and related contract-based compensation. *Id*. Ex. D-1.

**Dec. 6, 2024.** Checkmate responded under MA § 8.3(c) with a formal "Notice of Claim". *Id*. Exs. D-2, D-3. The "Notice" falsely asserted AV resigned and "disentitled" him from "any further payments"—and *listed out AV's settlement itemization* before rejecting it. It raised its own claims of fraud and "criminal misconduct,", using MA language to demand AV "immediately reimburse" its "out-of-pocket expenses." In other words, Checkmate rejected AV's offer and made its own claims.

9

**Dec. 20, 2024.** AV responds, rejecting the fraud accusations, requesting his personnel file and contracts, and reiterating his claims for unpaid wages and bonuses. *Id*. Ex. D-2. He disputed "the right to indemnification" (e.g. liability) and "amounts" in the Notice of Claim under § 8.3(c).

**Jan. 22, 2025**. Checkmate escalated with a "Second and Final Notice," again invoking the MA. *Id*. Ex. D-4. The letter escalated with threats to "fully explore and potentially litigate … fraud, including both civil and criminal liability"; and conditioned "open[ness] to resolution" on AV sitting for an interview or to replying with detailed written response "supported by evidence" by a deadline.

AV's response refutes the claims and makes a "final" settlement offer. The "No matter what" phrase and "admission" of his father's co-authorship derive from this email. Ex. D-5.

**Jan. 29, 2025**. Checkmate then sent a third Notice of Claim to Mr. Nessler as Holder Rep., again under § 8.3(c), now quantifying its supposed "Direct Claim" at "over $5 million," (without substantiation) and asserting forfeiture of over $1.5 million in team retention bonuses. *Id*. Ex. B-2.

**Feb. 7, 2025**. Through counsel Grant Thomas, Nessler responded for the VoiceBite founders, disputing Checkmate's claims and "over $5 million" figure, explaining that it had not supported even $25,000 in qualifying losses, and inviting it to provide real, documented numbers. *Id*. Ex. B-3; Nessler Decl. ¶¶ 2–3, 9, 18. This was, again, a formal dispute of both liability and amount.

**Feb. 14, 2025**. Checkmate then filed its New York action based on the same allegations in the Notices of Claim. These allegations are now asserted in its CCs here.

Starting Nov. 14, 2024, there was nothing "pre-dispute" about the relationship. Checkmate's executives proposed a "final settlement solution." On Nov. 20, AV responded with a settlement offer spelling out liability and amounts. Checkmate served its "Notices" on Dec. 6, and then Jan. 22 and Jan. 29, 2025, citing MA § 8.3(c); rejecting AV's claims (and amounts) and asserted its own. AV and Nessler disputed those claims in writing, within the 30-day window the contract prescribes. Liability and "valuable consideration" were discussed throughout. It was a settlement negotiation.

There is no *genuine* dispute that "valuable consideration was involved." Both sides were bargaining over money (wages, bonuses, alleged merger "losses") and non-monetary concessions (interviews, written "explanations," and releases)—these are the forms of consideration that Rule 408 contemplates. The "no disputed claim" line should be rejected out of hand.

By the plain language of MA § 8.3(c) and the actual sequence of communications, there was a "claim … disputed as to validity or amount" within the meaning of Rule 408 well before counsel ever drafted its pleading and filed suit in New York.

### F. Key "Admissions" Cherry-Picked from Material Barred by Rules 408 and 106

Federal Rule of Evidence 408 provides that evidence of "furnishing, promising, or offering" consideration in compromising a claim, and "conduct or a statement made during compromise negotiations about the claim," is "not admissible on behalf of any party either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a)(1)–(2). The chronology shows one single sequence from Nov. 14, 2024, to Feb. 7, 2025: liability was disputed; valuable consideration was discussed repeatedly; and the parties attempted "final settlement" by mutual agreement to avoid litigation. That is the core of Rule 408's domain. See *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157–62 (9th Cir. 2007); *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987).

Checkmate insists it does not use AV's emails "to prove or disprove the validity or amount" of its claims, but only to "illustrate Plaintiff's fraudulent scheme." Opp. 11:2–9. While it is unclear what "illustrate" would mean otherwise, the CCs plainly use them in support of fraud elements:

* Allege "admissions" about ownership and originality of the code;

* Plead scienter and fraudulent intent (e.g., the "no matter what" snippet); and

* Support the contention that Checkmate paid "millions of dollars" for "worthless" code.

This is exactly what Rule 408 forbids. An "illustrate" label does not change the function.

On top of Rule 408 is Rule 106's completeness principle. Fed. R. Evid. 106. Checkmate's approach—pulling short phrases like "no matter what", "not, in fact, intellectual property" or his father's permission to co-authored code out of context and labeling them admissions—is exactly the cherry-picking barred by Rule 106. AV notes that in a recent case, this Court found Rule 408 issues premature at the pleading stage. But here, AV is alleging compound misconduct of which knowing violations of Rule 408 is a *component*. When a party makes extortionate threats while purporting it is "open to resolution", in letters that misstate contract terms and misrepresent facts, while it withholds earned wages of an employee it *just* fired during medical leave, and then uses his replies to draft a

pleading that would otherwise be insufficiently alleged—that is more than an admissibility dispute; it is a pleading not "warranted by existing law"; and thus in violation of Rule 11(b)(2). Exs. D-5, B-3

## V. LITIGATION PRIVILEGE DOES NOT PROTECT THREATS TO "LITIGATE … CRIMINAL LIABILITY" INTENDED TO INSTILL FEAR AND LEVERAGE

### G. *Flatley*, *Mendoza*, *Stenehjem*, and *Asta*—not *Malin*—match Checkmate's conduct

As discussed in the Motion, *Flatley v. Mauro*, *Mendoza v. Hamzeh*, and *Stenehjem v. Sareen*, are more applicable than *Malin*. The Dec. 6 Notice accuses AV of "criminal misconduct," declares "no intention to make any more payments at this time," and demands "immediate reimbursement" of supposed "out-of-pocket expenses associated with the Merger." Vasan Decl. Exs. D-2, D-3. Its Jan. 22 "Second and Final Notice" escalates: it reiterates no "further payments" "at this time"; threatens a non-compete injunction and to "fully explore and potentially litigate … fraud, including both civil and criminal liability" unless AV promptly submits to interrogation or provides detailed written "explanations" backed by evidence—in which case it remained "open to resolution". *Id.* Ex. D-4. Both "Notices" explicitly use withheld wages as additional money leverage. Mot. 6-8.

The *Malin* letter did not include the *word* "criminal"; it suggested that filing a civil complaint might lead to exposure—concluding "My client will file the Complaint against you and your other joint conspirators unless this matter is resolved to my client's satisfaction…" That is not a threat to "litigate" "criminal liability". Not even close. Unlike in *Malin*, and like the Notices, the letters in *Flatley*, *Mendoza* and *Stenehjem* plainly threaten criminal referral for advantage in a civil dispute.

The statutes do not require a perpetrator to name a specific authority or dollar amount. Penal Code § 518 defines extortion as the "obtaining of property or other consideration … induced by a wrongful use of force or fear…", further specified in § 519 which lists:

(a) To do an unlawful injury to the person or property of the individual threatened …

(b) To accuse the individual threatened [or their relatives] … of any crime.

(c) To expose, or to impute to him or them any deformity, disgrace or crime.

(d) To expose any secret affecting him or them.

Through the Notices, Checkmate violated each category. It threatened unlawful withholding of earned wages under California law. It threatened first to impute "criminal misconduct" and then to

"litigate" "criminal liability". The first notice insisted "third parties may be notified" and the second threatened injunctions to blacklist AV from a market he helped create, citing a non-compete which is plainly unenforceable under California law post-employment and under its own terms.

Moreover, the *Malin* Court found claims of false statements in that letter were unsupported. Here, AV demonstrated that the Notices misstated contract terms by simply comparing the contracts on record with the alleged "misrepresentations"; and falsely stated that he resigned a day before he was explicitly terminated. AV gave notice of these issues to K&L Gates General Counsel Charles Tea, with evidence. Not only did Checkmate refuse to correct or retract them, it proceeded to file its New York complaint with contract citations simply removed to imply these were extrinsic "oral and written misrepresentations." It amended in SDNY without correcting these statements and declined to do so when filing its CCs here and later advocating them. The Opp. finally concedes the alleged misrepresentations are contract clauses, e.g. "fraudulent misrepresentations in the Merger Agreement and related transactional documents." Opp. at 18:24. The Court may read the papers and see that the contracts were definitively misstated. The Opp. does not address and thus concedes this.

    **H.**    ***Malin* Confirms that "Criminal" Threats are Improper when used for Leverage**

Opp. at 17–18 leans on *Malin* to argue its letters as protected pre-litigation communications. But *Malin* explains "no one disputes that it would be constitutional for extortion laws to prohibit a person from threatening to file criminal complaints or assist with criminal prosecutions," citing *Libarian v. State Bar*, 38 Cal. 2d 328 (1952), disciplining counsel for using such threats for leverage in a civil dispute. 217 Cal. App. 4th at 1305. The court reasons such threats are unrelated "to seeking monetary redress for an injury because criminal prosecutions are not concerned with compensating injured individuals, who may serve as 'a witness for the state' but 'will leave the courtroom empty-handed.'" *Id*. (quoting *W. Page Keeton et al. on the Law of Torts* § 2, at 7 (5th ed. 1984)).

Checkmate had no legitimate need to use the word "criminal" in an MA § 8.3(c) Notice, nor does it have standing to "litigate" it. Private parties cannot "litigate criminal liability"; only the State can. By threatening to "litigate" what it cannot legally prosecute, counsel was plainly threatening a referral to prosecutors to instill fear and create leverage: to pressure AV to "immediately reimburse" it; accept its unlawful withholding of his wages "at this time"; and extract statements it could plead

as "admissions". This is precisely what the extortion statutes and cases like *Flatley*, *Mendoza* and *Stenehjem* condemn. *Malin* does not bless this; it flags it as the proper target of extortion statutes.

### I. *Monex v. Gilliam* is Inapposite—It Supports AV's Motion

Checkmate bizarrely cites *Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148 (C.D. Cal. 2010), to argue its threats were protected by litigation privilege. But *Monex* expressly found a civil cause of action for extortion under Penal Code §§ 519 and 523, holding such threats "independently wrongful", noting the phrase "the criminal activities perpetrated daily by Monex" as an example of extortionate framing. *Id*. at 1156–57. It *rejected* a defendant's attempt to invoke the privilege for two reasons. **First**, it found it "inapplicable because the evidence establishes that he was not making a settlement demand related to litigation that was contemplated in good faith and was under serious consideration." Here, the Opp. explicitly *denies* a settlement context or (absurdly) that any dispute was "existent"—admitting in effect to bad faith. Opp. at 10, 11. **Second**, it held that threats that are extortion as a matter of law—like those in *Flatley*—are not protected by § 47(b), and the privilege "would [be] inapplicable … even if there were a legitimate settlement demand." *Id*. at 1167–68 n.7. Checkmate's "Notices" therefore fail on both counts and are not protected by the privilege.

### J. Wage Withholding Aggravates Extortion and Violates California Public Policy

The extortion problem is amplified by Checkmate's unlawful withholding of earned wages.

California requires prompt payment of all wages due at termination. Cal. Lab. Code § 201. It forbids requiring an employee to sign a release as a condition of receiving wages that are concededly due. *Id*. § 206.5. Wages are exempt from pre-judgment attachment, and employers may not do via self-help what no other creditor could do by attachment. In *Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1 (1981), the employer applied the employee's entire final paycheck to a debt she owed on a promissory note, effectively issuing a "zero" paycheck. The Court of Appeal found this violated California's wage-exemption policy and that an employer "is not entitled to a setoff of debts owing it by an employee against any wages due that employee." *Id*. at 6–7. While the court declined waiting time penalties as the law was then unsettled, it condemns self-help as impermissible. *Id*. at 7–9.

Here, Checkmate declared "no intention to make any more payments at this time", alongside "criminal misconduct" and "criminal liability." AV Decl. Exs. D-2 to D-4; Nessler Decl. ¶¶ 2–3, 5–

6, 9. Holding statutory rights hostage to extract concessions is exactly the sort of "self-help" *Barnhill* forbids. Combined with the "criminal" language, and ongoing failure to specify any actual damages, it reinforces Checkmate's intention to use duress and coercion to force concessions, not to vindicate contract rights in good faith. That supports sanctions under Rule 11(b)(1) for improper purpose and under § 1927 / inherent power for bad-faith litigation.

## VI.    THE CROSS-MOTION FAILS BOTH PROCEDURALLY AND SUBSTANTIVELY

### K.    Checkmate Ignored AV's Attempts to Confer on His Motion

Local Rule 7-3 requires a meaningful conference about "the substance of the contemplated motion and any potential resolution" at least seven days before filing. C.D. Cal. L.R. 7-3. AV plainly complied. After serving Rule 11(c)(2) safe-harbor notice on Oct. 21, 2025, he emailed counsel and proposed specific times to confer. AV Decl. ¶¶ 2–3 & App. A. Counsel did not respond to accept any proposed times or offer alternatives. No conference took place, as AV disclosed in the Motion.

The Opp. does not deny this. Instead, it quotes a sentence from AV's safe-harbor email—"If, by 5:00 PM, Wednesday, November 12, 2025, Checkmate withdraws its counterclaims or amends to remove the allegations in Exhibit F, I will not file the motion"—calling this an "attempt to coerce it into abandoning" its "legitimate claims." Opp. at 7, 16; Makitalo Decl. ¶¶ 30–31 & Ex. O. But that sentence tracks Rule 11(c)(2), which requires serving a sanctions motion and then **not filing it** if the challenged paper is withdrawn or corrected within 21 days. Fed. R. Civ. P. 11(c)(2).

<u>Following the Rule is not "coercion." It is compliance.</u>

This episode fits a pattern. When it moved to dismiss or transfer this case (Dkt. 18), the Court issued an Order to Show Cause to Checkmate for failing to comply with L. R. 7-3, relying on AV's declaration that it had not timely conferred. Dkt. 45 (OSC re L.R. 7-3). Counsel's response to that warning was not to improve its meet-and-confer practice, but to ignore AV's request entirely when sanctions were aimed at it. If counsel answered AV's email or proposed alternate times, both parties' issues could have been discussed in a single conference: AV's motion, and its cross-motion. It chose silence instead. That choice supports an inference that it did not want to face substantive questions about its conduct outside the adversarial posture of a filed motion.

### L.    Checkmate Never Conferred About its Own Cross-Motion

The Opposition ends with a request for sanctions against AV. Opp. 14–17. That request is itself a motion for purposes of Local Rule 7-3. Yet Checkmate nowhere claims that it contacted AV to discuss the contemplated cross-motion, its bases, or any possible resolution. It did not piggyback on AV's meet-and-confer request. It did not send its own. It simply filed.

Courts in this District routinely deny or strike motions for failure to comply with L. R. 7-3. See *ABS Ent., Inc. v. CBS Corp.*, No. CV 15-6257 PA (AGRx), 2015 WL 9474346, at *1 (C.D. Cal. Nov. 25, 2015); *Mardiros v. City of Hope*, No. 2:19-cv-02196-MCS-MAA, 2021 WL 13582694, at *1 (C.D. Cal. Jan. 22, 2021). This Court's Standing Order warns that motions may be "stricken or denied" for L.R. 7-3 violations. Here Checkmate had notice, via the Oct. 23 safe harbor, for weeks prior to its decision to cross-move. There is simply no excuse for its failure even *attempt* to confer.

Accordingly, the Court should strike or summarily deny Checkmate's cross-motion for repeat failure to comply with the Local Rules and the Court's Civil Standing Order.

### M.     The Cross-Motion also Fails on the Merits

Even setting L. R. 7-3 aside, the cross-motion does not come close to justifying sanctions.

**First**, Rule 11 applies to "a pleading, written motion, or other paper" presented to the Court. Fed. R. Civ. P. 11(b). The CM focuses primarily on AV's off-docket emails, and alleged use of AI. Those emails, while regrettable, are not court filings. Rule 11 does not reach them. See Opp. at 2–7, 14–17; Makitalo Decl. Exs. A–O; *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir. 2002).

**Second**, these emails are a small cluster from five to six months ago, sent in the aftermath of extortionate demand letters, withheld wages, accusations of "criminal misconduct," and relentless, false, *ad hominem* attacks in court filings *and* private communications. They were a reaction to that conduct. Any suggestion of an ongoing "campaign" is belied by its own exhibits: it does not point to recent communications in the same tone because there are none. Starved of any recent material, the Opp. even attempts to transform an ordinary safe harbor notice into evidence of "vexatiousness".

**Third**, sanctions under § 1927 or inherent power require at least reckless conduct combined with improper purpose. *Fink v. Gomez*, 239 F.3d 989, 992–94 (9th Cir. 2001). AV's Motion is based on Checkmate's own words, the parties' agreements, Rules 408 and 106, and binding extortion and wage caselaw. It addresses litigation misconduct: extortionate letters, misuse of settlement dialog,

misattribution of statements, and unsupported damages rhetoric. Even if the Court denies sanctions, *the Motion is plainly not frivolous*. It reflects the concerns Rule 11(b)(1)–(3) was designed to police.

**Fourth**, Checkmate leans on a label of "vexatiousness" that is untethered to any standard or the cases it cites. In *Perrin*, Judge Frimpong issued sanctions for causing a mistrial with improper use of settlement dialog despite repeat warnings. In *Havensight*, "although the judge had previously requested that [it] refrain from filing further recusal motions, [it] decided to Just Do It." In *Lahiri*, the 9th Circuit affirmed § 1927 sanctions on a copyright attorney for a five-year pursuit of a frivolous claim + repeated misrepresentations + an attempt to force the judge's recusal by hiring the judge's former firm. There is no such conduct here, or any explicit warning. This is AV's very first lawsuit.

**Fifth**, the Opp. opens by attacking AV's purported reliance on generative AI and footnotes its own briefs that alleged citation errors in *withdrawn* filings. Opp. 1–2, 4–6, 15 n.2. But the motion cites **36 cases**, with detailed analysis of several—and the Opp. finds exactly *zero issues* with any of them. Moreover, counsel cited *Monex v. Gilliam* to support its assertion of litigation privilege, but as noted, *Monex* explicitly rejects the privilege for extortionate letters strikingly similar to its Notices. This alone proves that possessing a law license does not prevent the citation of inapposite case law.

As AV's capability to find and argue the law matures, counsel has pivoted to alleging that AI is unduly influencing his litigation strategy. E.g. what to file and when. That is a non-sequitur—AV would have to make these decisions with or without AI, and as with caselaw, technology is just a tool; AI doesn't (yet at least) have motivations and intentions. Counsel clearly also misunderstands Rule 11 by repeatedly attacking withdrawn filings for these issues. Rule 11 deals with live papers.

Rule 11 scrutinizes challenged filings and the evidentiary support for allegations. It does not turn on whether a party uses a word-processor, a research database, or any other technology. To the extent AV made any citation errors earlier, those can and were corrected in the ordinary course; they do not transform his current, evidence-based motion into a sanctionable abuse. It is worth noting that Checkmate also made these allegations during briefing on its motion to dismiss or transfer—and this Court disregarded them and ruled for AV on every substantive point, preferring his plain language reading of statutory law and, expressly, his *choice of caselaw*. Dkt. 67.

**Finally**, the Opp. does not identify any statement in AV's Motion, pleadings, or other filings that is factually false or legally unwarranted. It simply insists that its own claims are "legitimate" and that AV's attempt to hold it to Rule 11 standards is itself sanctionable. It reiterates *ad hominem* attacks on a *pro se* party—demanding that he retain counsel to "advise [him] of this reality" (that there is no basis for sanctions here). But every argument in the motion is supported by documentary evidence and sworn testimony from the MA § 9.1 Holder Rep. By failing to address the evidence, or rebut any arguments, Checkmate concedes the motion is *substantive*—and it now stands *unrebutted*.

## VII.  CONCLUSION

Checkmate's Opposition is long on invective and short on answers. It does not dispute or even acknowledge Mr. Nessler's testimony. It does not explain how "millions of dollars" were ever paid "for the code." It does not reconcile its "Notices of Claim" campaign with MA § 8.3(c), Rules 408 and 106 or the governing extortion caselaw. It does not justify its misattribution of "not, in fact, intellectual property" to AV—or its clear misrepresentation of counsel's argument in CCs ¶¶ 33-34. It does not correct its cherry-picked use of "no matter what." It does not deny that it failed to confer about this Motion (or its cross-motion). By disregarding the issues, while attacking AV's motives and tone, Checkmate has conceded that it cannot show its CCs were warranted by existing law, supported by a reasonable inquiry or filed for a proper purpose. Fed. R. Civ. P. 11(b)(1)–(3).

Checkmate's reference to its "legitimate claims" and "thorough investigation" as a basis to deny relief is unavailing. AV does not seek a ruling on the merits of its conclusions *here*, but surely, the "legitimacy" of its claims would not justify the conduct at issue in this collateral inquiry. And litigation privilege is, at most, a shield to tort liability—not a blanket protection from sanctions.

The Court should not condone this pattern of extortion, wage leverage, settlement misuse, factual distortion, and disregard for its procedures. AV respectfully requests that the Court grant his Motion under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power; impose sanctions as outlined in his [Proposed] Order; and strike or summarily deny the cross-motion for failure to comply with Local Rule 7-3 and for lack of substantive merit.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6

Plaintiff Arjun Vasan certifies that this brief contains 6,730 words, which complies with the 7000-word limit of L.R. 11-6.1 and the Court's Civil Standing Order dated Aug. 27, 2025.

Dated: **December 8, 2025**

In: **Cerritos, California**

**Respectfully submitted**,

/s/ *Arjun Vasan*

**Arjun Vasan**,

Plaintiff *In Pro Per*